IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC COUNTY ENVIRONMENTAL COALITION, et. al., <br>     Plaintiffs <br><br> v. <br><br> MILLCREEK TOWNSHIP SEWER AUTHORITY, et. al., <br>     Defendants | ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 05-59 ERIE <br> ) ELECTRONICALLY FILED <br> ) <br> ) <br> ) |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs, Erie County Environmental Coalition, PennEnvironment, and the Gaia Defense League (hereinafter collectively known as "Plaintiffs") submit the following as their Brief in Support of Motion for Summary Judgment. This case arises out of violations of the Clean Water Act ("the Act" or "CWA") by Millcreek Township Sewer Authority and Millcreek Township (hereinafter collectively known as "Millcreek" or "Defendants") for illegally discharging raw and/or untreated sewage into Walnut Creek without a permit. Each reported discharge by Defendants is a violation of the Act. There are no disputed issues of material fact regarding Defendants' violations of the CWA, therefore, summary judgment should be granted for the Plaintiffs along with the declaratory and injunctive relief sought.

**Legal Background**

Congress enacted the Act in 1972 to "restore and maintain the chemical, physical and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). The Act establishes a goal of attaining "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(1) and (2).

1

To accomplish this end, the CWA prohibits "the discharge of any pollutant by any person" unless done in compliance with some provision of the Act. 33 U.S.C. § 1311(a). The term "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The term pollutant includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water." 33 U.S.C. §1362(6). Section 402 of the Act establishes the National Pollution Discharge Elimination System (NPDES), a program that allows permitted discharges. 33 U.S.C. § 1342.

Under the CWA, any citizen may commence a civil action "against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation . . . ." 33 U.S.C. § 1365(a). The term "citizen" is defined in the Act as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The Act defines "person" as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5). The term "effluent standard or limitation" includes an "unlawful act under subsection (a) of section 1311 . . . ." 33 U.S.C. § 1365(a). Included as an unlawful act under section 1311 is "the discharge of any pollutant by any person," except in compliance with a NPDES permit. 33 U.S.C. § 1311(a); <u>Reynolds v. Rick's Mushroom Serv.</u>, 246 F. Supp. 2d. 449, 453-54 (E.D. Pa. 2003). Plaintiffs Erie County Environmental Coalition, PennEnvironment, Inc., and The Gaia Defense League, are all corporations or associations, within the meaning of "person" and "citizen" as defined by the Act.

**Factual Background**

Defendant Millcreek Township Sewer Authority owns the sewage conveyance system and Defendant Millcreek Township manages and operates that same sewage conveyance system. (Comp. at 3-4, ¶ 16; Ans. at 4, ¶ 16.)  During or immediately following heavy rain events and other heavy run-off events, overflow from the Defendant's sewer system has been discharged into Walnut Creek. (Comp. at 3, ¶ 12; Ans. at 3, ¶ 12.)  The Kearsarge Pumping Station has a bypass that discharges directly into Walnut Creek. (Comp. at 4, ¶ 21; Ans. at 4, ¶ 21.)  Millcreek has not been issued a NPDES permit pursuant to the CWA. (Comp. at 3, ¶ 12; Ans. at 3, ¶ 12.) Therefore, numerous discharges occurred without a NPDES permit. (Comp. at 5-7, ¶ 34; Ans. at 6, ¶ 34.)

In the 1980s, Millcreek, with approval, increased the pumping capacity of the Kearsarge Pump Station. On December 7, 1988, Millcreek illegally constructed a bypass line at the Kearsarge Pump Station, which allows the discharge of pollutants directly into Walnut Creek. Millcreek did not alert the Commonwealth of this addition until June 24, 1991. In 1992, following discharges of raw and/or inadequately treated sewage into Walnut Creek, Millcreek Township and Millcreek Township Sewer Authority entered into a Consent Order and Agreement with the Commonwealth of Pennsylvania Department of Environmental Protection ("PADEP"), in accordance with the CWA and Pennsylvania Clean Streams Law. (Comp. at 5, ¶ 27; Ans. at 5, ¶ 27). This Consent Order and Agreement required the removal of the Kearsarge bypass and Millcreek failed to comply. In 2003, a second consent order was entered into by Millcreek and the PADEP, pursuant to Pennsylvania's Clean Streams Law, 35 Pa. Stat. Ann. § 691.1 et. seq. (Comp. at 5, ¶ 28; Ans. at 5, ¶ 28).  Despite these two consent orders, Millcreek continues to discharge and violate the CWA on a constant and/or intermittent basis.

**Standard of Review**

Summary judgment should be granted if there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of a material fact exists only when "a reasonable jury could return a verdict for the non-moving party." Raymond Proffitt Found. v. United States EPA, 930 F. Supp. 1088, 1096 (E.D. Pa. 1996) (quoting, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). This standard also applies in Clean Water Act cases, holding that if no genuine issue of material fact exists, granting summary judgment in favor of the moving party is appropriate. S. Fla. Water Management Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 111 (2004). Summary judgment is properly awarded to a plaintiff who presents adequate evidence that a defendant violated the Clean Water Act by "discharg[ing] a pollutant into navigable waters from a point source without a NPDES permit, and finding no disputed issues of material fact . . . ." Reynolds, 246 F. Supp. 2d. at 458; United States v. Municipality of Penn Hills, 6 F. Supp. 2d. 432 (W.D. Pa. 1998).

**Argument**

**I.    Defendants are in violation of the Clean Water Act for illegally discharging sewage into Walnut Creek.**

Millcreek admits to discharging sewage from pumping stations through bypasses into Walnut Creek. Discharges of pollutants are illegal unless the discharger has a Federal or State issued permit allowing for such discharges. Therefore, Millcreek is discharging illegally into Walnut Creek violating the CWA.

Millcreek's system is an old sewer system that combines both sewage and stormwater in the same pipes. Such a combined system causes an overload to the pipes during wet weather events that cause the facility to discharge through outlets known as Combined Sewer Overflows

4

("CSO"). Pursuant to the Clean Water Act, it is unlawful for a person to discharge *pollutants* from a *point source* into *navigable waters* without a NPDES permit. 33 U.S.C. § 1311(a) (emphasis added). Defendants have undisputedly discharged sewage into Walnut Creek. It is also undisputed that Millcreek does not currently possess, nor have they at any time possessed, a NPDES permit for any of the relevant discharge points.

The CWA definition of *pollutant* includes both sewage and municipal waste. 33 U.S.C. §1362(6). Therefore, Millcreek's discharges into Walnut Creek are pollutants as defined by the Act. The Millcreek pumping stations are point sources, as defined in section 502(14) of the Act, "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. §1362(14). The Kearsarge Pumping Station, the 51st and Zimmerly Pumping Station, the Larchmont and Beaver Pumping Station, and the Church and Patton Pumping Station ("Millcreek pumping stations") each have points that empty discharge into Walnut Creek. These points of discharge are discernible and in most cases convey combined sewage and stormwater through a pipe directly to Walnut Creek. Walnut Creek is a navigable water, or "water[] of the United States," as defined in section 502(7) of the Clean Water Act, 33 U.S.C. §1362(7). Therefore, Millcreek has discharged and continues to discharge pollutants from point source into a water of the United States.

Millcreek has several CSOs that discharge raw and/or inadequately treated sewage into the Creek on wet weather occasions. This is done even though Millcreek has the capacity to discharge this sewage into the Erie Wastewater System for a fee. When there is an excess amount of sewage mixed with stormwater, it is cheaper for Millcreek to discharge the extra

waste into Walnut Creek than to pay Erie to treat it. Prior to filing the sixty-day notice letter, there were twenty-nine individual occasions since August 2000 when Millcreek had pumped raw and/or inadequately treated sewage into Walnut Creek.  On six occasions where Millcreek was actually able to report the approximate amount of discharge, the discharges amounted to 9,581,280 gallons of sewage in to the Creek. On the remaining thirteen occasions, Millcreek was unable to give an accurate amount of gallon discharge; the longest of these discharges lasted for 13 hours. These discharges made without a permit are illegal and the locations and dates of each are as follows:

a. **Kearsarge Pumping Station**

| WHEN | Hours of discharge | Amount of discharge | Exhibits |
|---|---|---|---|
| September 17, 2004 | 13 hours | 1,914,000 gallons | Ex. 1 |
| September 9, 2004 | 22 hours | 5,044,000 gallons | Ex.1 |
| September 10, 2004 | 10 minutes | 156,000 gallons | Ex.1 |
| August 1, 2004 | 2.5 hours | unknown gallons | Ex.2 |
| July 31, 2004 | 13 hours | 150,000-1,800,000 gallons | Ex.2 |
| July 16, 2004 | 7 minutes | 10,500 gallons | Ex.2 |
| May 21, 2004 | 1 hour 25 minutes | 75,000 gallons | Ex.3 |
| March 20, 2004 | 3 hours 26 minutes | 231,000 gallons | Ex.4 |
| November 28, 2003 | 7 minutes | 14,000 gallons | Ex. 5 |
| September 29, 2003 | 6 hours 55 minutes | 1,019,780 gallons | Ex. 6 |
| May 12, 2002 | 5 hours | unknown gallons | Ex. 7 |
| April 14, 2002 | 3 hours 30 minutes | unknown gallons | Ex. 8 |
| February 1, 2002 | 12 hours | 108,000 gallons | Ex. 9 |
| August 16, 2001 | 39 minutes | 10,000 gallons | Ex.10 |
| November 7, 2000 | unknown time span | "minor discharge" | Ex. 11 |
| December 14, 1999 | 7 hours | 300,000-1,000,000 gallons | Ex. 12 |

b. **51st, 52nd, and Zimmerly Street Pumping Stations**

| September 9, 2004 | 15 hours | 378,000 gallons | Ex. 1 |
|---|---|---|---|
| July 31, 2004 | 2 hours 10 minutes | 58,500 gallons | Ex. 2 |
| September 29, 2003 | unknown time span | 108,000 gallons | Ex. 6 |
| April 14, 2002 | 1 hour | "did not exceed 24,999gallons" | Ex. 8 |
| February 1, 2002 | 6 hours | unknown gallons | Ex. 9 |
| May 12, 2002 | 4 hours | unknown gallons | Ex. 7 |

6

| August, 2000 | 3 hours 30 minutes | 25,000-74,999 gallons | Ex. 13 |

c. **Larchmont and Beaver Street Pumping Stations**

| September 9, 2004 | 1.5 hours | 306,000 gallons | Ex. 1 |
| April 14, 2002 | 1 hour | "did not exceed 24,999 gallons" | Ex. 8 |
| February 1, 2002 | 6 hours | "intermittent ~ 40,000 gallons" | Ex. 9 |

d. **Church and Patton and Pershing Street Pumping Stations**

| September 9, 2004 | 15 hours | 129,000 gallons | Ex. 1 |
| July 31, 2004 | 2 hours 10 minutes | 19,500 gallons | Ex. 2 |
| April 14, 2002 | 2 hours | "did not exceed 24,999 gallons" | Ex. 8 |

Discharges continue to occur without a permit. Since the sixty day notice letter was served, there have been at least 5 additional discharges from Millcreek amounting to over 3.5 million gallons of pollution entering into Walnut Creek. These additional discharges were unpermitted and unregulated.

NPDES permits are important to control and reduce pollutant discharges and to protect water quality. Furthermore, the NPDES permitting is necessary and important in achieving water quality standards in our nation's waters. Miccosukee, 541 U.S. at 108; see 33 U.S.C. § 1311(b)(1)(C). "[O]ne of the Act's primary goals was to impose NPDES permitting requirements on municipal wastewater treatment plants." Miccosukee, 541 U.S. at 105; see 33 U.S.C. § 1311(b)(1)(B).

II. **Defendants are in violation of the Clean Water Act for failure to adhere to the CSO Control Policy**

Municipal wastewater systems with CSOs are required in their NPDES permit provisions to adhere to the Combined Sewer Overflow Control Policy ("CSO Policy"). 33 U.S.C. § 1342(q). The Act requires that "[e]ach permit, order, or decree issued . . . for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator . . . ." Id.

The CSO Policy establishes a consistent and national approach for regulating discharges from CSO into waterbodies through the NPDES permit program. Exhibit 14, CSO Control Policy, 59 Fed. Reg. 18,688, 18,689 (1994). Under the CSO Policy, permittees with CSOs should demonstrate implementation of EPA's nine minimum controls ("NMC") as well as development and implementation of a long term control plan ("LTCP"), both outlined in the CSO Policy. Id. at 18,691. The NMC are required to be implemented until the CSOs are completely eliminated. This will help to ensure both protection of water quality and public health. The NMC required include: proper operation and regular maintenance programs for the sewer system and the CSO outfalls; maximization of flow to the treatment facility, control of solid and floatable materials in CSOs; pollution prevention programs to reduce containments in CSOs; public notification to ensure that the public receives adequate notification of CSO occurrences and impacts; and monitoring to effectively characterize CSO impacts and the efficacy of controls. Id.

The sewage conveyance system owned and operated by the Millcreek is a municipal wastewater system that has combined sewer overflows. Therefore, Millcreek is required by law to follow the CSO Policy and its failure to do so is in violation of the CWA.

### III.     Plaintiffs have standing to file suit under the CWA

To the extent that the Court did not address this issue in its February 1, 2006 Order granting Motion for Protective Order [Doc. No. 20], Plaintiffs offer the following in support of standing. An organization has standing to bring suit on behalf of its members "(a) when its members would otherwise have standing to sue in their own right; (b) the interests at stake are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

requires the participation of individual members in the suits." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

Prongs (b) and (c) of organizational standing are met by Plaintiffs and require little discussion. Plaintiffs' objective of protecting the water quality of Walnut Creek, is germane to the purpose of maintaining and improving the quality of the natural environment of each organization. Participation by the individual members of the groups is not required.

Although warranting more discussion, prong (a), i.e., that at least one individual member would otherwise have standing to sue, is also easily met. An individual has standing when (1) the plaintiff has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) the court can redress the injury. Id.; Friends of the Earth v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Additionally, plaintiffs need only establish that one party has standing. Military Toxics Project v. EPA, 146 F.3d 948, 954 (D.C. Cir. 1998) (stating that "[I]f one party has standing in an action, a court need not reach the issue of standing of other parties when it makes no difference to the merits of the case.") (internal quotations omitted). Thus, although only one member of the Plaintiff organizations must establish standing in his own right, each of Plaintiffs' witnesses demonstrates standing:

1. Stan Skrypzak is a member of The GAIA Defense League since February 2005, and a member of the Save Our Native Species of Lake Erie, a non-voting member of The Erie County Environmental Coalition since the 1980's. (Doc. 17, Ex. 1, Skrypzak Dec. at 1, ¶ 1.)[1]  Mr. Skrypzak owns 120 acres of shoreline on Walnut Creek and is a Fisherman who enjoys recreational use of Walnut Creek approximately 40 times a year. (Skrypzak Dec. at 2, ¶ 6-8.)  Mr. Skrypzak's use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, which have diminished the quantity of steelhead in the Creek. (Skrypzak Dec.at 2, ¶ 8.)  Mr. Skrypzak believes his loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Skrypzak Dec. at 2, ¶ 9.)

---

[1] For purposes of efficiency, Plaintiffs have not attached the standing declarations to this Brief because each was already produced as an exhibit for Document 17- Plaintiffs' Brief in Support of Motion for Protective Order.

2. Jimmy Dallas is a member of The GAIA Defense League since February 2005, and a member of the Save Our Native Species of Lake Erie, a non-voting member of The Erie County Environmental Coalition since the 1980's. (Doc. 17, Ex. 2, Dallas Dec. at 1, ¶ 1.) Mr. Dallas uses Walnut Creek for fishing and recreational use approximately 5 times a week. (Dallas Dec. at 2, ¶ 6, 7.) Mr. Dallas' use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, which no longer allow Mr. Dallas to eat any fish he catches in Walnut Creek. (Dallas Dec. at 2, ¶ 8.) Mr. Dallas believes his loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Dallas Declaration at 2, ¶ 9.)

3. James Gwinn is a member of The GAIA Defense League and The Erie County Environmental Coalition since February 2005 and a member of the Save Our Native Species of Lake Erie, a non-voting member of The Erie County Environmental Coalition since the early 1990's. (Doc. 17, Ex. 3, Gwinn Dec. at 1, ¶ 1.) Mr. Gwinn uses Walnut Creek for fishing and conservation activities to monitor, measure and report causes of pollution, approximately 450 to 600 hours a year. (Gwinn Dec. at 2, ¶¶ 6, 7.) Mr. Gwinn's use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, which no longer allow Mr. Gwinn to eat any fish taken in Walnut Creek. (Gwinn Dec. at 2, ¶ 8.) Mr. Gwinn believes his loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Gwinn Dec. at 2, ¶ 10.)

4. Cathy Pedler is a member of The GAIA Defense League since November 2004 and a member of The Erie County Environmental Coalition since 2000. (Doc. 17, Ex. 4, Pedler Dec. at 1, ¶ 1.) Ms. Pedler uses Lake Erie and its tributaries, including Walnut Creek, for swimming, scuba diving and for a project to create an underwater preserve. (Pedler Dec. at 2, ¶ 6.) Ms. Pedler's use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, which no longer allow Ms. Pedler to swim in Lake Erie and have jeopardized project efforts and undermines conservation and restoration efforts of her member organizations. (Pedler Dec. at 2, ¶¶ 6, 7.) Ms. Pedler believes her loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Pedler Dec. at 2, ¶ 8.)

5. Martin Visnosky is a member of The GAIA Defense League since November 2004 and a member of The Erie County Environmental Coalition since 1985. (Doc. 17, Ex. 5, Visnosky Dec. at 1, ¶ 1.) Mr. Visnosky uses Walnut Creek for hiking, fishing, and bird watching activities, approximately 30 times a year. (Visnosky Dec. at 2, ¶¶ 6, 7.) Mr. Visnosky's use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, which significantly alter the aquatic life and wildlife associated with Mr. Visnosky's recreational activities. (Visnosky Dec. at 2, ¶ 8.) Mr. Visnosky believes his loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Visnosky Dec. at 2, ¶ 9.)

6. Jesse T. Davis III is a member of The GAIA Defense League since October 2005. (Davis Dec. at 1, ¶ 1.) Mr. Davis uses Walnut Creek to fish for steelhead and numerous species of bass and trout, approximately 12 times a month. (Doc. 17, Ex. 6, Davis Dec. at 2, ¶¶ 6, 7.)

    Mr. Davis' use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, which limit his ability to fish and eat fish that have been caught in the Creek. (Davis Dec. at 2, ¶ 8.) Mr. Davis believes his loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Davis Dec. at 2, ¶ 9.)

7. Paul F. Burroughs is a member of The GAIA Defense League since October 2005. (Burroughs Dec. at 1, ¶ 1.) Mr. Burroughs Owns property on Walnut Creek and uses the creek for recreational enjoyment, including fishing. (Burroughs Dec. at 2, ¶ 5.) Mr. Davis' use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, causing him to reduce his recreational use of the creek, and handle trespass as a landowner. (Burroughs Dec. at 2-3, ¶ 7-10.) Mr. Burroughs believes his loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Burroughs Dec. at 4, ¶ 11.)

8. Audrey S. Weber is a member of PennEnvironment, Inc. since May 18, 2004. (Weber Dec. at 1, ¶ 1.) Ms. Weber has used and continues to use Walnut Creek, and her use and enjoyment has been adversely impacted by Millcreek discharges. (Weber Dec. at 1, ¶¶ 5, 7.) Ms. Weber believes her loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Weber Dec. at 2, ¶ 8.)

9. H.P. Lim is a member of PennEnvironment since May 18, 2004. (Lim Dec. at 1, ¶ 1.) Mr. Lim uses Walnut Creek for fishing activities, approximately 6 times per month. (Lim Dec. at 1, ¶¶ 5, 6.) Mr. Davis' use and enjoyment of Walnut Creek has been adversely impacted by Millcreek discharges, limiting his ability to fish in the creek. (Lim Dec. at 2, ¶ 7.) Mr. Lim believes his loss of enjoyment is a direct result of Millcreek's failure to implement water quality standards within the Township. (Lim Dec. at 2, ¶ 8.)

As discussed in detail below, Plaintiffs' members have standing because they satisfy the three requirements for individual standing: (a) injury; (b) causation; and (c) redressability.

    a. Injury

Plaintiffs have suffered an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and actual or imminent. Defenders of Wildlife, 504 U.S. at 560 (internal citations and quotations omitted). In an environmental suit, a plaintiff can establish injury in fact "by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed." Sierra Club v. Tennessee Valley Auth., 430 F.3d. 1337, 1344. (11th Cir. 2005) ("Sierra

11

Club v. TVA"). To establish such an injury, a plaintiff need not make any showing as to the severity of the injury suffered, and may satisfy the requirement by merely establishing that "identifiable trifle" of an injury has, or will imminently, occur as a result of the challenged conduct. Sierra Club v. Corps, 935 F. Supp. 1556, 1565 (S.D. Ala. 1996) citing United States v. SCRAP, 412 U.S. 669, 689 n.14 (1973).

Plaintiffs have standing because their present and future use and enjoyment of the Creek is impeded by illegal discharges from Millcreek. All of Plaintiffs' standing declarants have stated that their use and enjoyment of Walnut Creek, including recreational and aesthetic, have been impaired due to the illegal discharges of pollutants by Millcreek. These facts are sufficient to establish injury in fact of an individual plaintiff as a member of an organization.

 b. Causation

Causation, the second requirement of individual standing, requires Plaintiffs to show that their injuries are "fairly traceable" to the challenged action by the Defendants. Lujan, 504 U.S. at 560. Simply stated, Plaintiffs "must tie the asserted injury, namely its members' reduced aesthetic and recreational enjoyment, to the challenged conduct," of the defendant. Tex. Indep. Producers & Royalty Owners Assoc. v. United States EPA, 410 F.3d 964, 972 (7th Cir. 2005). Here, Plaintiffs' standing declarants have shown that their recreational and aesthetic injuries are not just fairly traceable, but directly related to the illegal and unregulated discharges of sewage by Millcreek, which inevitably adversely impacts the quality and health of Walnut Creek. By showing Plaintiffs' injuries are fairly traceable to Millcreek's illegal discharges, Plaintiffs have Proved the second element of individual standing, necessary to establish organizational standing.

    c.  Redressability

The third requirement of individual standing, redressability, requires that the plaintiff's injuries are likely, beyond mere speculation, to be redressed by a favorable decision. Lujan, 540 U.S. at 561. Redressability is met in this present case; injunctive relief will stop Millcreek's illegal discharges, and reduce Plaintiffs' recreational and aesthetic injuries. Administrative penalties will likely redress injuries as well, by deterring illegal discharges and preventing future violations. Since it is likely that the Plaintiffs injuries will be redressed by favorable outcome, Plaintiffs have established the third element of individual standing, thus have proven organizational standing.

## IV.     Plaintiffs are entitled to the Requested Relief

According to the arguments set forth above, Plaintiffs respectfully request that this Court declare, pursuant to 28 U.S.C. § 2201, the Defendants are in violation of the Clean Water Act. Plaintiffs also request this Court to enjoin the Defendants from further violating the CWA, and require Defendants to implement the NMC outlined in the CSO Policy until injunctive relief can be fully attained. Additionally, administrative penalties should be issued to Defendants, in accordance with the Section 309 of the CWA, 33 U.S.C. § 1319(d), of up to twenty-seven thousand five hundred dollars ($27,500) per violation occurring prior to March 15, 2004 and thirty-two thousand five hundred ($32,500) for each violation occurring after March 15, 2004. Additionally, Plaintiffs request a reasonable amount of money for a supplemental environmental project to improve the diminished water quality of Walnut Creek after years of uncontrolled sewage discharge and pollution. Lastly, Plaintiffs request litigation costs and attorneys' fees as authorized under § 1365(d) of the CWA.

## Conclusion

The undisputed evidence demonstrates that Millcreek acted contrary to the CWA in discharging raw and untreated sewage into Walnut Creek without a permit. Because there are no genuine issues of material fact and Plaintiffs have adequately demonstrated standing to sue under the CWA, Plaintiffs are entitled to summary judgment. The appropriate remedy is for the Court to grant both injunctive and declaratory relief as outlined herein.

Respectfully submitted,

s/ Jennifer A. Murphy
Jennifer A. Murphy, Esquire
PA90851
Matthew Sack, Legal Intern
Mid-Atlantic Environmental Law Center
4601 Concord Pike, P.O. Box 7474
Wilmington, DE 19803-0474
(302) 477-2182
(302) 477-2032 (fax)
jennifer.a.murphy@law.widener.edu
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing document by electronic means utilizing the Court's CM/ECF system that will serve notice of electronic filing to Mark J. Shaw, Esq., McDonald, Illig, Jones & Britton, LLP, Attorney for Defendants on this 31st day of March, 2006.

   /s/ Jennifer A. Murphy
Jennifer A. Murphy
PA90851
Mid-Atlantic Environmental Law Center
c/o Widener University School of Law
4601 Concord Pike
P.O. Box 7474
Wilmington, DE  19803