IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIE COUNTY ENVIRONMENTAL | ) | |
| COALITION, PENNENVIRONMENT, | ) | |
| INC. and THE GAIA DEFENSE LEAGUE, | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-59 ERIE |
| | ) | ELECTRONICALLY FILED |
| MILLCREEK TOWNSHIP SEWER | ) | |
| AUTHORITY AND MILLCREEK | ) | JUDGE COHILL |
| TOWNSHIP, | ) | |
| Defendants | ) | |

**CONCISE STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF
<u>MILLCREEK TOWNSHIP SEWER AUTHORITY AND MILLCREEK TOWNSHIP</u>**

Defendants MILLCREEK TOWNSHIP SEWER AUTHORITY and MILLCREEK TOWNSHIP, by their attorneys, MacDonald, Illig, Jones & Britton LLP, file this Concise Statement of Material Facts in Support of the Motion for Summary Judgment on Behalf of Defendants Millcreek Township Sewer Authority and Millcreek Township, pursuant to LR 56.1.B.1 of the Local Civil Rules of the United States District Court for the Western District of Pennsylvania:

1.      Plaintiffs sent a notice of intent to sue to Defendants on December 9, 2004. (Complaint ¶ 3).

2.      Plaintiffs filed this suit on February 14, 2005, 67 days after the notice of intent to sue was sent.  (See Summons, App. 1-2).

3.    In their Complaint, Plaintiffs allege 16 discharges from the Kearsarge Pump Station between December 14, 1999 and September 17, 2004; Plaintiffs allege seven discharges from the 51st and 52nd Streets and Zimmerly Road Pumping Station between August 2000 and September 9, 2004; Plaintiffs allege 3 discharges from the Larchmont and Beaver Street Pumping Station between February 1, 2002 and September 9, 2004; and Plaintiffs allege three discharges from the Church and Patton and Pershing Street Pumping Stations between April 14, 2002 and September 9, 2004.  (Complaint ¶ 34).

4.    In their Complaint, Plaintiffs seek the following relief:  First, Plaintiffs ask this Court to declare that Defendants are in violation of the CWA; second, Plaintiffs ask this Court to enjoin Defendants from further violating the CWA; third, Plaintiffs ask this Court to order Defendants to assess and mitigate any environmental injuries caused by Defendants' discharges; fourth, Plaintiffs ask this Court to order Defendants to hire an independent expert to determine how Defendants can best comply with the requirements of the CWA; fifth, Plaintiffs ask the Court to order Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance. Sixth, Plaintiffs seek "significant" civil penalties; and lastly, Plaintiffs seek an amount of the costs of litigation, including attorneys' fees and expert witness expenses.  (Complaint, Prayer for Relief).

5.    Brian P. McGrath is Supervisor of Millcreek Township ("Millcreek") and was first elected a Supervisor of Millcreek Township Supervisor in 1994.   There are three Supervisors in Millcreek.  (Aff. of B. McGrath, ¶ 1).

6.    George Riedesel is the current Executive Director of the Millcreek Township Sewer Authority ("MTSA") and the Millcreek Water Authority.  (Aff. of G. Riedesel, ¶ 1).

7.      Mr. Riedesel has been Executive Director/Manager since June 8, 1998.  (Aff. of G. Riedesel, ¶ 1).

8.      Mr. Riedesel is a Registered Professional Engineer in the states of Pennsylvania, New York and Ohio.  (Aff. of G. Riedesel, ¶ 2).

9.      Mr. Riedesel received a B.S. Degree in Civil Engineering from the University of Cincinnati in 1972.  (Aff. of G. Riedesel, ¶ 2).

10.     Since receiving his degree in civil engineering, Mr. Riedesel has spent much of his professional life working on the operation, planning and construction of sanitary sewer systems.  (Aff. of G. Riedesel, ¶ 2).

11.     Upon graduation from college, Mr. Riedesel was employed with a private consulting firm in Columbus, Ohio, where he was assigned to be the City Engineer for Worthington, Ohio.  (Aff. of G. Riedesel, ¶ 3).

12.     In that capacity, Mr. Riedesel began his work related to sewer systems.  (Id.)

13.     From 1974 to 1977, Mr. Riedesel was the Planning and Department Head for Portage County, Ohio.  (Id.)

14.     From 1977 to 1982, as an engineer employed by Consoer Townsend & Associates, Mr. Riedesel was involved in all aspects of sanitary sewer work for the New Castle Sanitation Authority, Shenango Township Sewer Authority and the Union Township Sewer Authority.  (Id.)

15.     From 1982 to 1998, Mr. Riedesel was the Director of Public Works and County Engineer for Chautauqua County, New York.  (Aff. of G. Riedesel, ¶ 4).

16.     As Director of Public Works and County Engineer, Mr. Riedesel was responsible for the direct operation of two existing sewer systems in Chautauqua County.  (Id.)

17.     Mr. Riedesel's work also included planning and feasibility studies, consolidation, pretreatment, industrial development and expansion for various sewer systems.  (Id.)

18.     Prior to Mr. Riedesel, David Wright served as Acting Manager of MSTA from January 1998 -- June 1998.  (Aff. of G. Allender, ¶ 3).

19.     Prior to Mr. Wright, Bruce Yount served as Manager of the MTSA.  (Id.)

20.     Mr. Yount served in that capacity from September 1996 until his untimely death in January 1998.  (Id.)

21.     Mr. Yount was previously the Chief of the Bureau of Sewers of the City of Erie.  (Id.)

22.     Prior to Mr. Yount, Max Gill was the Manager of the MTSA.  (Id.)

23.     Mr. Gill was manager for over 18 years, and was the manager of MTSA at the time the Kearsarge force main overflow was installed.  (Id.)

24.     The MTSA is a municipal authority organized and existing under the Pennsylvania Municipality Authorities Act since June 4, 1956.  (Aff. of G. Riedesel, ¶ 5).

25.     Millcreek is a political subdivision of the Commonwealth of Pennsylvania.  (Aff. of B. McGrath, ¶ 1).

26.     The MTSA owns the Millcreek sanitary sewer system ("Millcreek sewer system").  (Aff. of G. Riedesel, ¶ 5).

27.     Pursuant to an agreement with Millcreek, the MTSA leases the Millcreek sewer system to Millcreek.  (Aff. of G. Riedesel, ¶ 5).

28.     Under the agreement between the MTSA and Millcreek, Millcreek is responsible for operating and managing the Millcreek sewer system.  (Aff. of G. Riedesel, ¶ 5).

29.    The Millcreek sewer system serves most of the residents and businesses located within Millcreek Township.  (Aff. of G. Riedesel, ¶ 6).

30.    There remain areas of Millcreek Township that are not served by the Millcreek sewer system, but instead rely upon on-site septic or other types of on-site sanitary disposal systems.  (Aff. of G. Riedesel, ¶ 6).

31.    The Millcreek sewer system is comprised of 374 miles of sewer lines serving Millcreek Township.  (Aff. of G. Riedesel, ¶ 7).

32.    The Millcreek sewer system is designed to accept only sanitary and certain approved industrial wastewater.  (Id.)

33.     The Millcreek sewer system is not a "combined sewer system."  (Aff. of G. Riedesel, ¶ 8).

34.    A combined sewer system is a sewer system intentionally designed to transport both wastewater and storm water.  (Aff. of G. Riedesel, ¶ 8).

35.    A combined sewer system is designed with overflows that allow the system to discharge, into a nearby body of water, when storm water flows in the system exceed the capacity of the system; these are known as "combined sewer overflows" or "CSOs".  (Aff. of G. Riedesel, ¶ 8).

36.    The City of Erie, for example, has several combined sewer overflows that are allowed under its NPDES Permit.  (Aff. of G. Allender, ¶ 9; Aff. of D. Range, ¶ 9; City of Erie NPDES Permit, App. at 7- 66).

37.    Douglas D. Range is the Director of Environmental Health Services for the Erie County Department of Health ("ECDH").  (Aff. of D. Range, ¶ 1).

38.     As Director of Environmental Health Services, Mr. Range is responsible for all aspects of the ECDH's Environmental Program, including water quality monitoring, inspections, enforcement and other activities relating to NPDES permits and un-permitted discharges within Erie County.  (Aff. of D. Range, ¶ 2).

39.     Millcreek Township is located in Erie County and falls under the scope of Mr. Range's responsibilities.  (Aff. of D. Range, ¶ 3).

40.     In Mr. Range's role as Director of the Environmental Program, he is responsible for overseeing the compliance of the City of Erie with its NPDES permits.  (Aff. of D. Range, ¶ 8).

41.     A true and correct copy of the City of Erie NPDES permit is included in the Appendix to the Motion for Summary Judgment at App. 7 – 66.  (Aff. of D. Range, ¶ 9).

42.     Although the Millcreek sewer system is not a "combined sewer system," storm water finds its way into the system through inflow and infiltration.  (Aff. of G. Riedesel, ¶ 9).

43.     Inflow is surface storm water that enters a sewer system through direct connections, such as illegal hookups from roof drains, basement sumps, damaged manholes or accidental connections with the storm sewer. (Aff. of G. Riedesel, ¶ 9).

44.     Millcreek's ordinances have historically prohibited discharges of storm water and other non-wastewater into the Millcreek sewer system.  (See Millcreek Township Ordinance 89-29, App. at 69– 86; Aff. of B. McGrath, ¶ 11; Millcreek Township Ordinance 2002-23, App. at 425– 440; Aff. of B. McGrath, ¶ 13).

45.     A true and correct copy of Ordinance 89-29 is included in the Appendix to Motion for Summary Judgment at App. 69 - 86.  (Aff. of B. McGrath, ¶ 12).

46.    A true and correct copy of Ordinance 2002-23 is included in the Appendix to Motion for Summary Judgment at App. 425 - 440.  (Aff. of B. McGrath, ¶ 13).

47.    Infiltration is groundwater that enters through cracks in the sewer system piping. (Aff. of G. Riedesel, ¶ 9).

48.    The drawing attached at App. 67 illustrates how inflow and infiltration penetrate a sanitary sewer system.  (Aff. of G. Riedesel, ¶ 9; App. at 67).

49.    The portion of the Millcreek sewer system that feeds into the Kearsarge pump station has a high amount of inflow and infiltration.  (Aff. of G. Riedesel, ¶ 9).

50.    The Millcreek sewer system is part of a regional sewer system that is comprised of sewer systems from the City of Erie, Lawrence Park, Wesleyville, Harborcreek Township, Fairview Township, Fairview Borough and Summit Township, as well as Millcreek Township. (Aff. of G. Riedesel, ¶ 10).

51.    All of the wastewater from these locations is sent to the wastewater treatment plant owned by the Erie Sewer Authority, and operated by the City of Erie.  (Id.)

52.    The Millcreek sewer system feeds into the City of Erie sewer system at several locations.  (Aff. of G. Allender, ¶ 4; Erie Regional Interceptor Map, App. at 68).

53.    A true and correct copy of a drawing that shows the major locations where the Millcreek sewer system feeds into the Erie system is included in the Appendix to Motion for Summary Judgment at App. 68.  (Aff. of G. Allender, ¶ 3).

54.    Of relevance to the claims raised by the Plaintiffs in this action, the wastewater from areas of Millcreek Township served by the Kearsarge pump station is now transported to the City of Erie's system through the Pittsburgh Avenue/Manor sewer (and previously the

Ellsworth sewer) and then is transported to the City's wastewater treatment plant by the Westside Interceptor.  (Aff. of G. Allender, ¶ 4).

55.     Attached at App. 87 is a drawing showing the sewer lines fed by the Kearsarge pump station.  (Aff. of G. Allender, ¶ 4; App. at 87).

56.     A true and correct copy of a drawing that shows the sewer lines fed by the Kearsarge pump station is included in the Appendix to Motion for Summary Judgment at App. 87.  (Aff. of G. Allender, ¶ 4).

57.     The sewer line immediately leaving the pump station (and marked FM) and connecting to the Pittsburgh Avenue sewer line at 38th Street is what is called a force main. (Id.).

58.     A force main uses pressure created by pumps to transport wastewater through a pipe.  (Aff. of G. Allender, ¶ 4).

59.     The force main feeds into what is called a gravity main on Pittsburgh Avenue. (Id.).

60.     A gravity main relies on the forces of gravity to transport wastewater though a pipe.  (Id.).

61.     The remainder of the sewer lines that transport the wastewater from the Kearsarge pump station are gravity mains.  (Id.).

62.     In addition to areas of Millcreek Township, the Kearsarge pump station is fed by sewer lines that serve areas of Summit Township.  (Aff. of G. Allender, ¶ 5).

63.     The Millcreek sewer lines that directly feed the Kearsarge pump station are all gravity sewer lines.  (Id.)

64.     With respect to Summit Township, the Kearsarge pump station serves the upper Peach Street area of Summit Township, primarily populated by shopping areas with residential and business areas south of that shopping district.  (Id.)

65.     The Summit Township sewer lines are a mix of gravity fed and force mains.  (Id.)

66.     Attached at App. 88-89 are two drawings showing the sewer lines that feed into the Kearsarge pump station from both Millcreek Township (Figure VII-b) and Summit Township (Figure VII-a).  (Aff. of G. Allender, ¶ 5; App. at 88-89).

67.     True and correct copies of two drawings showing the sewer lines that feed into the Kearsarge pump station from both Millcreek Township (Figure VII-b) and Summit Township (Figure VII-a) are included in the Appendix to Motion for Summary Judgment at App. 88 and 89.  (Aff. of G. Allender, ¶ 5).

68.     The Millcreek sewer system, therefore, is in the middle of the regional sewer system that ultimately is served by the City of Erie wastewater treatment plant.  (Aff. of G. Allender, ¶ 6).

69.     To the north, which is downstream, the Kearsarge pump station is subject to the capacity limitations imposed by the City of Erie sewer system.  (Id.)

70.     To the south, which is upstream, the Kearsarge pump station is subject to the future flow possibilities of Summit Township.  (Id.)

71.     The Kearsarge pump station itself was constructed in the mid-1950s.  (Aff. of G. Allender, ¶ 7).

72.     At that time, there was a gravity fed overflow built into the Kearsarge pump station to handle overflow situations during severe storm events, which was standard practice to protect against damage to the system and its customers under severe operating conditions.  (Id.)

73.     The pump station was then upgraded in the mid-1980s due to increasing development in the areas of Millcreek Township and Summit Township it served.  (Id.)

74.     The gravity overflow was plugged with concrete.  (Id.)

75.     In the late 1980s, due to a significant storm event that caused widespread sewage backups in numerous homes and businesses in the area of the Kearsarge pump station (including a hospital and a senior citizen home), an overflow was installed on the force main sewer line that transports the wastewater from the Kearsarge pump station toward the City of Erie sewer system. (Aff. of G. Riedesel, ¶ 12; M. Gill 6/21/91 letter, App. at 90-91).

76.     A true and correct copy of the June 21, 1991 letter to the Department is included in the Appendix to Motion for Summary Judgment at App. 90 - 91.  (Aff. of G. Riedesel, ¶ 12).

77.     The overflow is operated manually during severe storm events when the water levels at the Kearsarge pump station rise high enough to cause sewage backups in customers' residences and businesses.  (App. at 90-91).

78.     The overflow, when used, discharges into Walnut Creek.  (Id.)

79.     Investigations conducted in the early 1990s into the causes of the overflows at the Kearsarge pump station concluded that the pump station had sufficient pumping capacity during storm events, if its pump head was reduced.  (Aff. of G. Allender, ¶ 8).

80.     However, there was not enough transport capacity in both the Millcreek sewer system and the City of Erie sewer system downstream of the Kearsarge pump station.   (Id.)

81.     During dry weather, the Kearsarge pump station has more than enough capacity to handle the normal sewage flows that enter it.  (Aff. of G. Riedesel, ¶ 11).

82.     The current capacity of the pump station is 3750 gpm and the normal dry weather flows are between 700 gpm and 1200 gpm.  (Aff. of G. Riedesel, ¶ 11).

83.     Accordingly, MTSA and Millcreek began to explore in 1991 how they could solve this capacity problem and, in March 1991, MTSA submitted to the Pennsylvania Department of Environmental Resources, now known as the Pennsylvania Department of Environmental Protection ("Department"), a Task Activity Report for a proposed Special Study. (Aff. of G. Allender, ¶ 8; M. Gill 3/27/91 letter, App. 92-98).

84.     A copy of the MTSA's letter and the Report, which the Erie office of CTE completed, is included in the Appendix to Motion for Summary Judgment at App. 92 - 98. (Aff. of G. Allender, ¶ 8).

85.     At this same time, the City of Erie was having capacity problems within its sewer system, in terms of both conveyance capacity and treatment capacity, and was investigating what it should do. (Aff. of G. Allender, ¶ 9).

86.     At the time, the City of Erie also had entered into a Consent Order and Agreement with the Department. (Aff. of G. Allender ¶ 9).

87.     In 1992, MTSA and Millcreek entered into a Consent Order and Agreement ("1992 COA") with the Department to address the overflow problem at the Kearsarge pump station as well as address capacity issues in other areas of the Millcreek sewer system. (Aff. of G. Allender, ¶ 10; 1992 COA, App. at 99-120; Aff. of G. Riedesel, ¶ 13).

88.     A true and correct copy of the 1992 COA is included in the Appendix to Motion for Summary Judgment at App. 99 - 120. (Aff. of G. Riedesel, ¶ 13)

89.     Under the 1992 COA, MTSA and Millcreek proposed two basic alternative solutions to the Kearsarge problem. (Aff. of G. Allender, ¶ 10).

90.     First, MTSA and Millcreek proposed to construct a new sewer line directly from the Millcreek sewer system to the wastewater treatment plant, thereby bypassing most of the

conveyance portion of the City of Erie sewer system.  (Aff. of G. Allender, ¶ 10; Alternative Selection Report, App. 121-159).

91.    Under the second alternative, MTSA and Millcreek proposed to expand the capacity of its sewer lines downstream of the Kearsarge pump station, and work with the City of Erie to expand the capacity of the City's sewer lines downstream of the Kearsarge pump station, and increase the capacity of the wastewater treatment plant to handle high wet weather flows. (Aff. of G. Allender, ¶ 11; Alternative Selection Report, App. 121-159).

92.    The Kearsarge pump station capacity was then to be increased.  (Aff. of G. Allender, ¶ 11).

93.    Under either scenario, it was recognized that it would take a substantial amount of time to solve the overflow problem and remove the Kearsarge overflow.  (Id.)

94.    A true and correct copy of MTSA's Alternative Selection and Implementation Schedule, Sewage Facilities Plan is included in the Appendix to Motion for Summary Judgment at App. 121 -159.  (Aff. of G. Allender, ¶ 10).

95.    The Department approved the alternative under which the MTSA, Millcreek and the City of Erie worked together on the regional solution.  (Aff. of G. Allender, ¶ 12; Department letter 3/11/93, App. 160-161).

96.    A true and correct copy of the Department's 3/11/93 letter, on which Mr. Allender is copied, is included in the Appendix to Motion for Summary Judgment at App. 160 - 161. (Aff. of G. Allender, ¶ 12).

97.    Pursuant to the 1992 COA, MTSA, Millcreek and the City engaged in an eight-year period of sewer investigation, construction and repair, ranging from cleaning existing sewer lines, to constructing new sewer lines, to performing studies and abatement of inflow and

infiltration, to constructing a significant upgrade of the City's wastewater treatment plant.  (Aff. of G. Allender, ¶ 13).

98.    MTSA and Millcreek performed 22 projects during this period.  (Id.)

99.    On those 22 projects, MTSA and Millcreek spent approximately $8.9 million. (Aff. of G. Riedesel, ¶ 14).

100.    In addition, MTSA's and Millcreek's share of the work performed by the City of Erie during that time period is approximately $20.8 million, of which, MTSA and Millcreek already have paid $6.2 million.  (Aff. of G. Riedesel, ¶ 14).

101.    MTSA and Millcreek also paid a civil penalty to the Department in the amount of $15,000.  The 1992 COA also imposed stipulated penalties for each overflow.  (Aff. of G. Riedesel, ¶ 15).

102.    Under the life of the 1992 COA, MTSA and Millcreek paid $20,100.00 in stipulated penalties to the Department for overflows, and paid $500.00 to the Pennsylvania Fish and Boat Commission ("PA Fish Commission") for those same overflows.  (Aff. of G. Riedesel, ¶ 15).

103.    Thus, the total amount of civil penalties paid under the 1992 COA to the Department and to the PA Fish Commission was $35,600.00.  (Aff. of G. Riedesel, ¶ 15).

104.    Despite having spent and being committed to spend nearly $30 million, by the end of 2000, the capacity problem at the Kearsarge pump station was not solved.  (Aff. of G. Riedesel, ¶ 16; Aff. of G. Allender ¶ 14).

105.    Thus, the removal of the Kearsarge overflow, which was the only project remaining to be completed under the 1992 COA, could not be completed.  (Id.)

106.    It was discovered that although the millions of dollars spent increased the capacity of the sewer system downstream of the Kearsarge pump station, there still was insufficient available capacity downstream of the Kearsarge pump station to accommodate the overflows at the pump station.  (Id.)

107.    Essentially, the projects that were completed did not work.  (Id.)

108.    The wet weather flows that the Millcreek sewer system was receiving from other areas that fed into the same sewer line as the Kearsarge pump station proved to be much higher than the monitoring performed in the early-mid 1990s established, and upon which many of the projects were based.  (Aff. of G. Allender ¶ 14).

109.    When the projects completed under the 1992 COA still did not enable MTSA and Millcreek to remove the overflow, MTSA and Millcreek began to examine whether they could eliminate enough inflow and infiltration from the areas served by the Kearsarge pump station to reduce the flows into the Kearsarge pump station and eliminate the overflows.  (Aff. of G. Riedesel, ¶ 17).

110.    Shortly after that effort began, the Department approached MTSA and Millcreek inquiring why the Kearsarge overflow had not been removed.  (Id.)

111.    At that time, the Department informed MTSA and Millcreek that inflow and infiltration work alone would not be acceptable to the Department to eliminate the overflow. (Id.)

112.    As a result, MTSA, Millcreek and the Department entered into a new Consent Order and Agreement dated October 31, 2003 ("2003 COA").  (Aff. of G. Riedesel, ¶ 17; 2003 COA, App. at 162-184).

113.    On October 31, 2003, Mr. Ricardo F. Gilson executed, on behalf of the Department, a Consent Order and Agreement between the Department and the Millcreek Township Sewer Authority ("MTSA") and Millcreek Township ("2003 COA").  (Aff. of R. Gilson, ¶ 5).

114.    Mr. Gilson is the Program Manager for the Water Quality Section of the Northwest Regional Office of the Pennsylvania Department of Environmental Protection ("Department").  (Aff. of R. Gilson, ¶ 1).

115.    As Program Manager, Mr. Gilson is responsible for all aspects of the Department's Water Quality Program, ranging from approving NPDES permits and sewer construction permits to enforcement and approving Consent Orders and Agreements in the Department's Northwest Region.  (Aff. of R. Gilson, ¶ 2).

116.    Millcreek Township is located in the Department's Northwest Region and falls under the scope of Mr. Gilson's responsibilities.  (Aff. of R. Gilson, ¶ 3).

117.    A true and correct copy of the 2003 COA is included in the Appendix to Motion for Summary Judgment at App. 162 - 184. (Aff. of G. Riedesel, ¶ 17; Aff. of R. Gilson, ¶ 6).

118.    The 2003 COA was entered into by MTSA and Millcreek on October 31, 2003, approximately 16 months before the Plaintiffs filed their Complaint.  (Aff. of R. Gilson, ¶¶ 5 - 6; 2003 COA App. at 162).

119.    On October 23, 2003, MTSA approved the execution of the 2003 COA at a public meeting.  (Aff. of G. Riedesel, ¶ 18).

120.    A true and correct copy of the October 23, 2003 meeting minutes and Resolution 2003-08 of the MTSA approving execution of the 2003 COA is included in the Appendix to Motion for Summary Judgment at App. 741 - 743.  (Aff. of G. Riedesel, ¶ 18).

121.    On October 28, 2003, at a publicly noticed Supervisors' meeting, Millcreek approved the execution of the Consent Order and Agreement entered into between MTSA, Millcreek and the Pennsylvania Department of Environmental Protection ("Department") dated October 31, 2003 ("2003 COA").  (Aff. of B. McGrath, ¶ 2).

122.    The execution of the 2003 COA was the subject of a newspaper article in the Erie Times-News, the City of Erie's only daily newspaper.  (Aff. of B. McGrath, ¶ 3; 10/29/03 News Article App. at 681 - 682).

123.    A true and correct copy of the October 29, 2003 newspaper article is included in the Appendix to Motion for Summary Judgment at App. 681 - 682.  (Aff. of B. McGrath, ¶ 3).

124.    The 2003 COA actually was appealed to the Environmental Hearing Board by Summit Township, which has a sewer system that feeds into the Millcreek sewer system.  (Aff. of G. Riedesel, ¶ 20; Notice of Appeal, App. at 683 - 689).

125.    A true and correct copy of the Notice of Appeal filed by Summit Township is included in the Appendix to Motion for Summary Judgment at App. 683 - 689.  (Aff. of G. Riedesel, ¶ 20).

126.    This appeal was filed on December 1, 2003.  (Aff. of G. Riedesel, ¶ 20; Notice of Appeal, App. at 683).

127.    The concerns raised by Summit ultimately were resolved, and the appeal was ordered withdrawn on March 2, 2004.  (Aff. of G. Riedesel, ¶ 20).

128.    Under the 2003 COA, MTSA and Millcreek were to conduct a "Special Study" to evaluate the Kearsarge pump station and present a plan for improving the capacity of the pump station and sewer system served by the pump station and for eliminating the overflows at the

Kearsarge pump station and overflows associated with the pump station. (App. at 167-168, ¶ 3(a)).

129. Paragraph 3 of the 2003 COA required that MTSA and Millcreek submit a "complete and final Special Study" on or before July 1, 2004 that at a minimum was required to include:

    i.    An evaluation of the following three alternatives to address the removal of the Kearsarge Overflow and elimination of overflow events tributary to the Kearsarge pump station: 1) the construction of a retention facility at the Kearsarge pump station; 2) the installation of an in-line booster on the Kearsarge force main; 3) the replacement of the Kearsarge pump station. Additional alternatives may be addressed in the Special Study.

    ii.    Selection of the most feasible alternative of those identified in the Special Study pursuant to Paragraph 3.a.i above, which will result in the timely removal of the Kearsarge Overflow and elimination of overflow events tributary to the Kearsarge pump station.

    iii.    An implementation schedule which includes a date when the Kearsarge Overflow will be removed and overflow events from other areas tributary to the Kearsarge pump station will be eliminated. Said date shall be within 30 days of complete installation of the alternative chosen pursuant to Paragraph 3.a.i above.

(2003 COA, App. at 167-169).

130. The Special Study performed by MTSA and Millcreek in this case was performed pursuant to Act 537. (Aff. of G. Allender, ¶ 18).

131. The 2003 COA presented three alternatives for MTSA and Millcreek to consider in the Special Study: (1) the construction of a retention facility at the Kearsarge pump station; (2) the installation of an in-line booster on the Kearsarge force main; or (3) the replacement of the Kearsarge pump station. (App. at 167-168, ¶ 3(a)).

132. Under the 2003 COA, the Special Study was due on or before July 1, 2004. (Id.)

133.    The 2003 COA also provides that MTSA and Millcreek were to apply for any necessary permits for work recommended in the Special Study within nine months of receiving approval by the Department of the Special Study.  (App. at 168, ¶ 3(b)).

134.    The 2003 COA then requires MTSA and Millcreek to complete construction of the work within 18 months after receiving the permits from the Department.  (App. at 168, ¶ 3(c)).

135.    The 2003 COA requires MTSA and Millcreek to remove the Kearsarge overflow within 30 days after construction of the work is complete.  (App. at 169, ¶ 3(d)).

136.    The 2003 COA also requires MTSA and Millcreek to continue their efforts to reduce inflow and infiltration in the Millcreek Sewer system.  (App. at 169, ¶ 3(f)).

137.    It also places limits on the number of sewer connections that can be made each year in areas that feed into the Kearsarge pump station.  (App. at 169-172, ¶ 4).

138.    Under Paragraph 22 of the COA, the MTSA's and Millcreek's obligations under the COA terminate only if the MTSA and Millcreek have completed all of the tasks set forth in the COA <u>and</u> MTSA and Millcreek have achieved compliance by having no overflows from any areas tributary from the Kearsarge pump station, including manual pumping, for a period of 24 months after March 30, 2007 <u>and</u> MTSA and Millcreek have paid all of the outstanding penalties due under the COA.  (2003 COA, App. at 177).

139.    Under Paragraph 22 of the COA, the Department is the sole arbiter of whether MTSA and Millcreek have complied with the COA, without any right of MTSA or Millcreek to appeal.  (2003 COA, App. at 177).

140.    The 2003 COA imposed a civil penalty of $25,000.00 upon MTSA and Millcreek, which they paid.  (Aff. of G. Riedesel, ¶ 19; App. at 173, ¶ 8).

141.    In addition, the 2003 COA imposes stipulated penalties for each future overflow. (App. at 173-174; ¶ 9).

142.    To date, MTSA and Millcreek have paid $42,500.00 in additional civil penalties under the stipulated penalty provisions of the 2003 COA. (Aff. of G. Riedesel, ¶ 19).

143.    Thus, the total civil penalties under the 2003 COA paid to date are $67,500.00. (Id.)

144.    In addition, the PA Fish Commission has imposed fines totaling $21,250.00 since the execution of the 2003 COA, which have been paid. (Id.)

145.    Pursuant to the Pennsylvania Clean Streams Law and regulations, on May 26, 2004, MTSA and Millcreek published a public notice of the Special Study to enable interested persons to make public comments. (Aff. of G. Allender, ¶ 18; App. at 690).

146.    A true and correct copy of the May 26, 2004 public notice is included in the Appendix to Motion for Summary Judgment at App. 690. (Aff. of G. Allender, ¶ 18).

147.    The Notice stated, "The purpose of this Special Study is to define the facilities necessary to provide capacity to eliminate existing and future station overflows." (Id.)

148.    The Notice gave parties from May 26, 2004 to June 25, 2004 to submit comments. (Id.)

149.    No member of the public, including anyone from the three Plaintiffs, submitted any public comments. (Aff. of G. Allender, ¶ 18).

150.    In accordance with the 2003 COA, MTSA and Millcreek timely submitted the Special Study, which was nearly eight months prior to the date Plaintiffs instituted this action. (Aff. of G. Riedesel, ¶ 21; App. at 185).

151.    On June 29, 2004, the MTSA and Millcreek submitted the Special Study to the Department for its review and approval.  (Aff. of G. Riedesel, ¶ 21; Riedesel letter 6/29/04, App. at 185; Act 537 Special Study, Vol. I, App. at 186-413).

152.    A true and correct copy of Volume I of the Special Study is included in the Appendix to Motion for Summary Judgment at App. 186 - 413.  (Aff. of G. Riedesel, ¶ 21; Aff. of G. Allender, ¶ 17).

153.    As required by the 2003 COA, by July 1, 2004, MTSA and Millcreek submitted the Special Study outlining its proposed solution and indicating that the work would be completed within 18 months after the Department issued the construction permit, and that the overflow would be eliminated within 30 days after construction was completed, all of which was consistent with the 2003 COA.  (Aff. of G. Allender, ¶ 17; Special Study, App. at 186-413).

154.    The Special Study recommended several projects to address the overflows at the Kearsarge pump station and the area served by the Kearsarge pump station.  (App. at 213).

155.    The main project proposed was an upgrade to the electronics and pumping capacity of the Kearsarge pump station together with an overflow retention tank.  (App. at 278, 285, 293-295, 308-309).

156.    The pump station upgrade would increase the capacity of the pump station to send flows to the City of Erie system to 4,500 gpm from the existing 3,750 gpm.  (App. at 285, 293).

157.    Any flows above the new 4,500 gpm capacity that would enter the Kearsarge pump station would be redirected to an overflow retention tank.  (App. at 285, 309).

158.    At the time of the Special Study, Millcreek was still evaluating the size of the tank, but it was expected to be at least 500,000 gallons.  (Aff. of G. Allender, ¶ 17; App. at 309; Aff. of R. Gilson, ¶ 10; Department Internal Review Memo, App. at 414-417).

159.    In addition to the pump station upgrade and overflow retention tank, the Special Study found that the 10" sewer line along Zimmerly Road ("the Zimmerly Road line") and the 18" Beaver Run Interceptor were at or over capacity and needed to be relieved.  (App. at 208, 212, 248, 251).

160.    A capacity problem in the Zimmerly Road line caused the need to discharge from the 51st and 52nd Streets and Zimmerly Road location in order to protect nearby homes from having sewer backups in their basements.  (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25).

161.    A capacity problem in the Beaver Run Interceptor caused the need to discharge from both the Larchmont and Beaver Streets and the Church, Patton and Pershing locations in order to protect nearby homes from having sewer backups in their basements.  (Aff. of G. Riedesel, ¶ 24; Aff. of G. Allender, ¶ 26).

162.    The Special Study recommended several projects that would enable MTSA and Millcreek to eliminate the overflow events from those three locations.  (App. at 208, 212).

163.    The Study recommended diverting flows from the Peach Street Interceptor (which is tributary to the 18" Beaver Run Interceptor) to resolve capacity issues in the Beaver Run Interceptor.  (Aff. of G. Allender, ¶ 17).

164.    This relief sewer is known as the Peach Street Diversion.  (Id.)

165.    In addition, Millcreek committed to continue its efforts to remove storm water in the system from illegal storm water connections and to install backflow preventors on the homes most at risk for basement sewer backups in the event a catastrophic event caused a surcharge at the Kearsarge pump station.  (App. at 303-304).

166.    The Special Study also recommended back flow preventors in homes that would be flooded if the pump station surcharged due to a catastrophic event.  (App. at 212).

167.    On September 30, 2004, the Department approved the Special Study submitted by MTSA and Millcreek.  (Aff. of R. Gilson, ¶¶ 11 - 12; R. Gilson letter 9/30/04, App. at 418-419).

168.    A true and correct copy of the Department's 9/30/04 letter approving the Special Study is included in the Appendix to the Motion for Summary Judgment at App. 418 - 419. (Aff. of R. Gilson, ¶ 12).

169.    In the Department's internal review memo on the Special Study, the Department concluded that the plan was consistent with the requirements of Pennsylvania law and approval was recommended.  (Aff. of R. Gilson, ¶ 10; App. at 414-417).

170.    A true and correct copy of the Department's September 28, 2004 internal review memo on the Special Study is included in the Appendix to the Motion for Summary Judgment at App. 414 - 417.  (Aff. of R. Gilson, ¶ 10).

171.    Under Paragraph 3.b. of the 2003 COA, once the Department approved the Special Study in writing, MTSA and Millcreek had to submit their permit for construction within nine months.  (2003 COA, App. at 168).

172.    To date, MTSA and Millcreek have accomplished significant portions of their obligations under the 2003 COA.  (Aff. of G. Riedesel, ¶ 22; Aff. of G. Allender ¶ 15).

173.    First, even before the Department approved the Special Study, MTSA and Millcreek completed the Zimmerly Road relief sewer and it was operational by September 20, 2004.  (Aff. of G. Riedesel, ¶ 23).

174.    By September 20, 2004, MTSA and Millcreek had completed the Zimmerly Road relief sewer, which addressed the cause of the overflows at the 51st and 52nd Streets and Zimmerly Road location - namely, the sewer line size was under capacity.  (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25).

175.    The Special Study concluded that the Zimmerly Road line was a 10" sewer line that had a capacity of 0.65 MGD, but was receiving flows of 0.4 to 1.5 MGD during storm events.  (App. at 251).

176.    Further, the estimated future peak flow of that line was 1.72 MGD. (App. at 251).

177.    Accordingly, the Zimmerly Road sewer line size was under capacity.  (Aff. of G. Allender, ¶ 25).

178.    The proposed Zimmerly relief sewer, together with the existing Zimmerly Road sewer, provide a capacity of 2.07 MGD.  (Aff. of G. Allender, ¶ 25; App. at 251).

179.    Based upon the analysis in the Special Study, the new capacity of the overall Zimmerly Road sewer is sufficient to handle both the existing and projected peak flows.  (Aff. of G. Allender, ¶ 25).

180.    The Zimmerly Road relief sewer has been operational since September 20, 2004. (Aff. of G. Riedesel, ¶ 23).

181.    Since that time, the Zimmerly Road sewer has, in fact, had adequate capacity to handle both normal flows and storm flows, and there have been no instances of overflows associated with the 51st and 52nd Streets and Zimmerly Road location since the relief line became operational.  (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25).

182.    The project completed by MTSA and Millcreek fixed the capacity problem at that location.  (Aff. of G. Riedesel, ¶ 23).

183.    This work was completed at a cost of $125,995.04.  (Id.)

184.    Second, with respect to the Beaver Run Interceptor, the Special Study concluded that the Beaver Run Interceptor has a capacity of 4.3 MGD; however, during storm events the peak flows could be 5.8 MGD.  (Aff. of G. Allender, ¶ 26; Special Study, App. at 248).

185.    Thus, the line would be under capacity by 1.5 MGD during those events.  (Aff. of G. Allender, ¶ 26).

186.    The Special Study proposed that the Peach Street Diversion be built to take flows of 1.2 MGD from the Beaver Run Interceptor to the Beaver Run relief sewer that has more than enough capacity to handle those flows.  (Aff. of G. Allender, ¶ 26; Special Study, App. at 285).

187.    The Beaver Run Interceptor then would be able to accommodate the 0.3 MGD it would be under capacity (in essence, the line would act as storage until the flows subsided), and no overflows would be needed to protect any homes.  (Special Study, App. at 285).

188.    The inflow and infiltration investigation work performed by MTSA and Millcreek to date has already made up that 0.3 MGD shortfall of capacity for peak flows in the Beaver Run Interceptor.  (Aff. of G. Riedesel, ¶ 30).

189.    Until the Diversion can be built, in the interim and to ensure that no further discharges will occur at the two locations impacted by the lack of capacity of the Beaver Run Interceptor, MTSA and Millcreek has developed a system to shift flows from the Peach Street Interceptor to the Beaver Run relief sewer.  (Aff. of G. Riedesel, ¶ 25; Aff. of G. Allender, ¶ 27).

190.    MTSA and Millcreek have created a temporary relief sewer for the 18" Beaver Run Interceptor until the Peach Street Diversion is constructed.  (Aff. of G. Riedesel, ¶ 24; Aff. of G. Allender ¶ 27).

191.    MTSA and Millcreek accomplished this by acquiring a pump and hose system to pump from the Peach Street Interceptor during significant storm events to the Beaver Run relief sewer that has enough capacity to carry those flows.  (Aff. of G. Riedesel, ¶ 25; Aff. of G. Allender ¶ 27).

192.    MTSA found a location on the Peach Street Interceptor in the area of the Millcreek Mall that was only approximately 60 feet away from the Beaver Run relief sewer that could serve as a point to transfer flows over the surface via a pump and flexible hose.  (Aff. of G. Riedesel, ¶ 25).

193.    This "over the surface" solution acts in the same fashion as the Peach Street Diversion.  (Aff. of G. Allender, ¶ 27).

194.    Consequently MTSA purchased a 6" pump, 60 feet of 6" flexible hose and made modifications to the Beaver Run line to accept the suction line of the pump.  (Id.)

195.    The pump has the capacity to pump 2.0 MGD, which is more than what is needed to ensure that the Beaver Run Interceptor will not exceed its capacity and cause overflows at those two locations.  (Id.)

196.    The cost of this equipment and work was in excess of $25,325.00.  (Aff. of G. Riedesel, ¶ 25).

197.    The MTSA also has contracted with Chivers Construction Company ("Chivers") to operate the system when it is needed.  (Aff. of G. Riedesel, ¶ 26).

198.    Once it is recognized that flows are backing up in the Beaver Run line during a storm event, Chivers is contacted and they immediately bring the pump system to the Millcreek Mall location and begin operating it.  (Id.)

199.    The cost to MTSA and Millcreek to have Chivers operate this pump station is approximately $136.00 per hour or $3,264.00 per 24-hour period.  (Aff. of G. Riedesel, ¶ 26).

200.    Under the 2003 COA, MTSA and Millcreek must pay stipulated penalties in the amount of $5,000.00 to the Department for discharges from the two affected locations.  (Aff. of G. Riedesel, ¶ 27).

201.    In addition, the PA Fish Commission has been fining MTSA $2,500.00 for each event.  (Id.)

202.    Thus, a discharge from these locations would cost MTSA and Millcreek $7,500.00 in penalties.  (Id.)

203.    Therefore, it costs MTSA and Millcreek significantly less to operate the "over the surface" pump system than it would be to have an overflow from these two locations.  (Id.)

204.    Consequently, there is an economic incentive for MTSA and Millcreek to operate the "over the surface" pump system and prevent discharges from the two affected locations.  (Id.)

205.    In most cases, the length of time for an overflow is much less than a full 24-hour period, and as such, in most cases the economic incentive for MTSA and Millcreek to use the "over the surface" pump system is significant.  (Id.)

206.    Since September 9, 2004, there have been no instances of overflows associated with the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations. (Aff. of G. Riedesel, ¶ 30).

207.    The proof of the success of the efforts taken by MTSA and Millcreek to date is that there have been no discharges from any of these three locations since well before the complaint was filed.  (Aff. of G. Riedesel, ¶ 30).

208.    In fact, the last discharge from these locations occurred during the remnants of the hurricane that hit the Millcreek area on September 9, 2004, which was determined to be the equivalent of an estimated 50-year storm.  (Aff. of A. Maas, ¶ 9, App. at 725; Aff. of G. Allender ¶ 19, App. at 738).

209.    Thus, it has been nearly 19 months since there has been an overflow at these three locations.  (Aff. of G. Riedesel, ¶ 30).

210.    On January 17, 2006, The Department issued to MTSA and Millcreek the permit to construct the Peach Street Diversion. (Aff. of R. Gilson, ¶¶ 36 - 37; 1/17/06 Permit, App. at 420 - 424).

211.    A true and correct copy of the 1/17/06 Peach Street Diversion construction permit is included in the Appendix to the Motion for Summary Judgment at App. 420 - 424. (Aff. of R. Gilson, ¶ 37).

212.    The work for the Diversion has been put out to bid and bids are to be received on April 18, 2006. (Aff. of G. Riedesel, ¶ 28; Aff. of G. Allender ¶ 28).

213.    The Peach Street Diversion is expected to be operational by mid-late summer 2006. (Aff. of G. Riedesel, ¶ 28).

214.    This Diversion is expected to cost approximately $129,000.00. (Id.)

215.    Third, MTSA and Millcreek have made significant strides in their efforts to investigate and eliminate inflow and infiltration in the sewer system that is served by the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 29; Aff. of B. McGrath, ¶ 4).

216.    MTSA and Millcreek have engaged in a significant program to detect and correct illegal storm water connections to its sewer system. (Aff. of G. Riedesel, ¶ 29).

217.    As a necessary predicate to that effort, Millcreek and the MTSA passed and adopted a variety of ordinances, resolutions and rules and regulations to enable them to more effectively enforce against properties that discharged storm water into the sanitary sewer system. (Id.).

218.    In March 2004, MTSA and Millcreek passed new ordinances, resolutions and rules and regulations to enable them to better enforce against illegal connection to their sanitary sewer system. (Aff. of G. Riedesel, ¶ 29; Aff. of B. McGrath, ¶ 4; Ordinance 2004-4, App. at

441-459; Resolution 2004-R-13, App. at 460-468; Resolution 2004-R-14, App. at 469-470; Rules and Regulations, App. at 471-525).

219.    A true and correct copy of Ordinance 2004-4 is included in the Appendix to Motion for Summary Judgment at App. 441 - 459.  (Aff. of B. McGrath, ¶ 6).

220.    A true and correct copy of Resolution 2004-R-13 is included in the Appendix to Motion for Summary Judgment at App. 460 - 468.  (Aff. of B. McGrath, ¶ 8).

221.    A true and correct copy of Resolution 2004-R-14 is included in the Appendix to Motion for Summary Judgment at App. 469 - 470.  (Aff. of B. McGrath, ¶ 9).

222.    A true and correct copy of the Rules and Regulations is included in the Appendix to Motion for Summary Judgment at App. 471 - 525.  (Aff. of B. McGrath, ¶ 11).

223.    On March 30, 2004, Millcreek passed Ordinance 2004-4.  (Aff. of B. McGrath, ¶¶ 5-6; App. at 441 - 459).

224.    Under Section 1.14.5 of Ordinance 2004-4, it is unlawful to discharge  "any storm water, surface drainage, ground drainage, roof runoff, subsurface drainage or unpolluted industrial process waters into any public sanitary sewer system." (App. at 453).

225.    Under Section 1.13.1 of Ordinance 2004-4, MTSA is authorized to establish rules and regulations governing the sanitary sewer system and to be used to implement the Ordinance. (App. at 452).

226.    In addition, under Section 1.13.5, the Manager of the MTSA is authorized to issue enforcement notices and commence enforcement actions.  (App. at 452).

227.    Finally, Section 1.16 outlines the penalties that can be taken against anyone in violation of the Ordinance, which includes a $600.00 penalty per violation.  (App. at 456).

228.    Section 1.17 outlines the enforcement actions that can be taken by Millcreek, including issuance of a cease and desist order.  (App. at 457-458).

229.    In conjunction with Ordinance 2004-4, Millcreek also passed two resolutions: Resolution 2004-R-13 and Resolution 2004-R-14.  (Aff. of B. McGrath, ¶¶ 7-9; App. at 460 - 468, 469 - 470).

230.    Resolution 13 establishes a program to identify and terminate unlawful connections to the sanitary sewer system.  (Aff. of B. McGrath, ¶ 10; App. at 469-470).

231.    The resolution sets forth the procedures to be followed for conducting inspections and for thereafter terminating any discovered illegal connections.  (Id.)

232.    In Resolution 14, Millcreek formally adopted the Rules and Regulations Governing the Sanitary Sewer System ("Rules & Regulations").  (Aff. of B. McGrath, ¶ 10; App. at 469 – 470, App. at 471 - 525).

233.    Section VIII of the Rules and Regulations deals with the inspections and terminations of unlawful connections.  (Aff. of B. McGrath, ¶ 10; App. at 490-495).

234.    As with Resolution 13, the Rules and Regulations lay out the process and procedures for inspecting for illegal connections and terminating any illegal connections that are discovered.  (Id.)

235.    As part of the inspection program, MTSA and Millcreek were to determine areas of priority to initiate the program.  (Id.).

236.    Based on a comprehensive inflow and infiltration study conducted on the Kearsarge pump station area from 2000 to 2002 by the MTSA, MTSA and Millcreek identified a number of areas where it was suspected that large amounts of storm water were entering the

sewer system and impacting the Kearsarge pump station area. (Aff. of G. Riedesel, ¶ 29; Project Study Area, App. at 699).

237.    As a result of that study, and armed with the new authority given to it by the Ordinance, Resolutions and Rules and Regulations, MTSA and Millcreek began to systematically inspect neighborhoods and individual homes for illegal connections. (Aff. of G. Riedesel, ¶ 29).

238.    Pursuant to those new ordinances, resolutions and rules and regulations, MTSA and Millcreek have conducted inspections at 420 residences and businesses in the area served by the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 29; I&I Summary, App. at 526-541).

239.    A true and correct copy of a summary of the inspections and enforcement taken to date by MTSA and Millcreek is included in the Appendix to Motion for Summary Judgment at App. 526 - 541. (Aff. of G. Riedesel, ¶ 29).

240.    Under Paragraph 9.d of the 2003 COA, MSA and Millcreek are subject to stipulated penalties in the amount of $1,250 per calendar quarter for each quarter during which they fail to continue their program of identifying and securing termination of unlawful connections. (2003 COA, App. at 173-174).

241.    As a result of those inspections and subsequent enforcement actions, 72 illegal connections have been removed to date, with more expected to come. (Id.)

242.    It is estimated that the removal of these 72 illegal connections removed a minimum of 104,000 gpd and an estimated peak flow of 0.5 million gallons per day ("MGD") during a normal storm event. (Aff. of G. Riedesel, ¶ 29).

243.    With respect to the areas that impact the Zimmerly Road sewer line (and hence the overflows at the 51st and 52nd Streets and Zimmerly Road location), MTSA and Millcreek

have eliminated more than 31 illegal peak connections that were impacting that area during storm events. (Aff. of G. Riedesel, ¶ 30).

244.    It is estimated that on average, the removal of these illegal connections has reduced peak flows through the Zimmerly Road line by at least 0.22 MGD instantaneous peak flow. (Id.)

245.    With respect to the areas that impact the Beaver Run sewer (and hence the overflows at the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations), MTSA and Millcreek have eliminated 41 illegal storm water connections that were impacting that area during storm events. (Id.)

246.    It is estimated that on average, the removal of these illegal connections has reduced peak flows through the Beaver Run Interceptor by at least 0.295 MGD instantaneous peak flow. (Id.)

247.    The elimination of these illegal connections has removed a significant volume of storm water that was contributing to the overflows, which had to be pumped out of each of the three locations. (Id.)

248.    In fact, since September 9, 2004, there have been no overflows at any of these three locations, even though the Kearsarge pump station has had overflows on six occasions since that time due to storm events. (Id.)

249.    Since 2000, the investigation and abatement work related to the Kearsarge area have cost $381,176.85. (Id.)

250.    Fourth, MTSA and Millcreek completed the first phase of electrical renovations needed at the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 31).

251.    These renovations included new variable frequency drives, controls and wiring. (Id.)

252.    The cost of these renovations was $222,843.15.  (Id.)

253.    Fifth, MTSA and Millcreek have completed their investigation of the homes that need backflow preventors.  (Aff. of G. Riedesel, ¶ 32).

254.    Ultimately, it was determined that only six homes needed backflow preventors. (Id.)

255.    It was discovered that the sewer pipes from these homes were at an elevation that was lower than the hydraulic grade line of the Kearsarge pump station.  (Id.)

256.    Accordingly, these homes were especially susceptible to sewer backups in their basements.  (Id.)

257.    This work provides further assurance that basements will not be flooded, thereby eliminating the need to have overflows in this area.  (Id.)

258.    MTSA completed installation of those backflow preventors in February 2006. (Id.)

259.    The cost of the investigation and installation of the backflow preventors was $14,539.70. (Id.)

260.    Sixth, MTSA and Millcreek have made significant progress on the major project of the Special Study.  (Aff. of G. Riedesel, ¶ 33; Aff. of G. Allender ¶ 21).

261.    Subsequent to the submission of the Special Study, the Millcreek Township area was hit with the remnant of a hurricane on September 9-10, 2004, which caused overflows at the Kearsarge pump station of volumes and duration that had never been experienced in the past. (Aff. of G. Allender, ¶ 19).

262.    As a result of those events, MTSA and Millcreek submitted an Act 537 Special Study Addendum to the Department on June 28, 2005.  (Aff. of G. Allender, ¶ 19; Addendum, App. at 542-599).

263.    Subsequent to the approval of the Special Study, MTSA and Millcreek submitted an Act 537 Special Study Addendum to the Department on June 28, 2005.  (Aff. of G. Allender, ¶ 19, Special Study Addendum, App. at 542-599).

264.    A true and correct copy of the Special Study Addendum is included in the Appendix to Motion for Summary Judgment at App. 542 - 599.  (Aff. of G. Riedesel, ¶ 33; Aff. of G. Allender, ¶ 18).

265.    In this addendum, the size of the storage tank was increase to 2.3 million gallons.  (Aff. of G. Allender, ¶ 19; App. at 575).

266.    The increase in the size of the storage tank was made necessary by an overflow event that occurred at the Kearsarge pump station on September 9-10, 2006, as well as other overflow events that occurred after the Special Study was submitted to the Department.  (Aff. of G. Allender, ¶ 19; App. at 547).

267.    In September, 2004, the Millcreek Township area was hit with the remnants of a hurricane, which caused flooding throughout the region.  (Aff. of G. Allender; ¶ 19).

268.    The storm was estimated to be the equivalent of an approximate 50-year storm event.  (Aff. of A. Maas, ¶ 9; App. at 725; Aff. of G. Allender, ¶ 19; App. at 572, 574, 738).

269.    The size of the storage tank was determined using that storm event.  (Aff. of G. Allender, ¶ 19; App. at 572, 574).

270.    It is believed that the 2.3 million gallon design for the overflow retention tank is quite conservative and contains a significant safety factor.  (Aff. of G. Allender, ¶19).

271.     As part of the Special Study Addendum, MTSA and Millcreek again published a public notice for comments on May 23, 2005.  (Aff. of G. Allender, ¶ 20; App. at 691).

272.     A true and correct copy of the May 23, 2005 public notice is included in the Appendix to Motion for Summary Judgment at App. 691.  (Aff. of G. Allender, ¶ 20).

273.     The public notice stated, in pertinent part,

> The purpose of this update is to advise the public of changes in the facilities necessary to provide capacity to eliminate existing and future station overloads.
> …
> The original study called for continuing review of facility sizing during the design and review processes.  Overflow events observed during that period revealed that facility sizing was not sufficient to protect against extreme future events.  The update describes the increase in storage sizing and forward flow capabilities to be necessary to protect against those events.

> (App. at 691).

274.     The public had from May 23, 2005 to June 22, 2005 to comment on the proposed changes.  (Id.)

275.     No member of the public, including anyone from the three Plaintiffs, submitted a public comment.  (Aff. of G. Allender, ¶ 20).

276.     The Special Study, its addendum and associated work cost approximately $270,000.00.  (Aff. of G. Riedesel, ¶ 33).

277.     The Department approved the Special Study Addendum on July 12, 2005.  (Aff. of R. Gilson, ¶¶ 16-17; R. Gilson letter 7/12/05, App. at 600).

278.     A true and correct copy of the Department's July 12, 2005 letter approving the Special Study Addendum is included in the Appendix to Motion for Summary Judgment at App. 600.  (Aff. of R. Gilson, ¶ 17).

279.    In the Department's internal review memo on the Special Study Addendum, the Department concluded that the Addendum was consistent with the requirements of Pennsylvania law and approval was recommended.  (Aff. of R. Gilson, ¶¶ 14 - 15; App. at 601-602).

280.    A true and correct copy of the Department's July 7, 2005 internal review memo on the Special Study Addendum is included in the Appendix to Motion for Summary Judgment at App. 601 - 602.  (Aff. of R. Gilson, ¶ 15).

281.    The sewer system improvements to be performed by MTSA and Millcreek under the 2003 COA were publicly noticed on two occasions in the Erie Times-News, providing a 30-day comment period during which interested persons could submit comments.  (Aff. of G. Allender, ¶¶ 18, 20).

282.    The Special Study required by the Department under the 2003 COA ultimately constituted revisions to Millcreek Township's state-approved Act 537 Plan and, as such, had to be publicly noticed.  (Aff. of G. Allender, ¶ 18).

283.    These notices were published on May 26, 2004 and May 23, 2005.  (Aff. of G. Allender, ¶¶ 18, 20; App. at 690 - 691).

284.    No public comments were received, nor did Plaintiffs submit any public comments.  (Aff. of G. Allender, ¶¶ 18, 20).

285.    The Department approved each submission.  (Aff. of R. Gilson, ¶¶ 11–12, 16-17; R. Gilson letter 9/30/04, App. at 418 - 419; R. Gilson letter 7/12/05, App. at 600).

286.    Each of the Department's approvals of the submissions publicly noticed was itself publicly noticed in Pennsylvania Bulletin notices on November 6, 2004 and July 30, 2005 (Aff. of R. Gilson, ¶¶ 18 - 19; App. at 692 - 693).

287.    A true and correct copy of the Pennsylvania Bulletin notices dated November 6, 2004 and July 30, 2005 regarding the Department's approvals of the Special Study and Special Study Addendum are included in the Appendix to Motion for Summary Judgment at App. 692 - 693.  (Aff. of R. Gilson, ¶ 19).

288.    No action was taken by any member of the public in response to these notices, including any of the Plaintiffs.  (Aff. of R. Gilson, ¶ 18).

289.    On June 28, 2005, in compliance with the deadline in the 2003 COA, MTSA and Millcreek submitted a permit application for the Kearsarge pump station upgrades and overflow retention tank.  (Aff. of G. Allender, ¶ 22; App. at 603).

290.    A true and correct copy of the cover letter accompanying the permit application is included in the Appendix to Motion for Summary Judgment at App. 603. (Aff. of G. Allender, ¶ 22).

291.    On August 6, 2005, notice of this application appeared in the Pennsylvania Bulletin.  (Aff. of R. Gilson, ¶¶ 21 - 22; App. at 734).

292.    A true and correct copy of the August 6, 2005 Pennsylvania Bulletin notice is included in the Appendix to Motion for Summary Judgment at App. 734.  (Aff. of R. Gilson, ¶ 22).

293.    The Department issued the construction permit on September 26, 2005.  (Aff. of R. Gilson, ¶¶ 26 - 27; Part II Permit, App. at 604-608).

294.    A true and correct copy of the Department's September 26, 2005 construction permit for the Kearsarge pump station upgrades and overflow retention facility is included in the Appendix to Motion for Summary Judgment at App. 604 - 608.  (Aff. of R. Gilson, ¶ 27).

295.    Thus, the storage tanks and the accompanying improvements to the pump station must be completed on or before March 26, 2007, with the overflow removed by April 25, 2007. (Aff. of G. Riedesel, ¶ 36).

296.    In the Department's internal review and recommendation document, the Department recommended approval of the permit and stated, "The proposed work will provide flow equalization during heavy storm water events, eliminate an overflow and reduce the potential of sewage contamination of Walnut Creek."  (Aff. of R. Gilson, ¶ 25; App. at 609–611, 611).

297.    A true and correct copy of the Department's September 26, 2005 internal review and recommendation document is included in the Appendix to Motion for Summary Judgment at App. 609 - 611.  (Aff. of R. Gilson, ¶ 25).

298.    On October 8, 2005, notice of the Department's issuance of the permit appeared in the Pennsylvania Bulletin.  (Aff. of R. Gilson, ¶¶ 28 - 29; App. at 735).

299.    A true and correct copy of the October 8, 2005 Pennsylvania Bulletin notice is included in the Appendix to Motion for Summary Judgment at App. 735.  (Aff. of R. Gilson, ¶ 29).

300.    No one from the public, including anyone from the Plaintiffs, submitted any comments on the application or appealed the permit.  (Aff. of R. Gilson, ¶¶ 23, 30).

301.    In late 2005, MTSA and Millcreek encountered a problem with the site location for the 2.3 million gallon tank.  (Aff. of G. Riedesel, ¶ 34).

302.    The property on which the tank was to be located is owned by Millcreek Township, but it contains use restrictions that would prohibit the placement of the tank on that property.  (Aff. of G. Riedesel, ¶ 34; Aff. of B. McGrath, ¶ 13).

303.    The property had been donated to Millcreek many years ago, subject to these restrictions. (Id.)

304.    MTSA and Millcreek sought to obtain court approval to lift the restrictions, but neighbors living across from the Kearsarge pump station objected.  (Aff. of G. Riedesel, ¶ 34).

305.    As a result of the delays caused by the neighbors' intervention, MTSA and Millcreek acquired property adjacent to the restricted property and to the Kearsarge pump station that does not have any use restrictions.  (Aff. of G. Riedesel, ¶ 35).

306.    Due to the configuration of this new property, MTSA and Millcreek had to modify the retention tank system from one 2.3 million gallon tank to two tanks that equal 2.3 million gallons.  (Id.)

307.    MTSA notified the Department of the problem in writing on December 8, 2005. (Aff. of G. Riedesel, ¶ 35; G. Riedesel letter 12/8/05, App. at 612-613).

308.    A true and correct copy of the December 8, 2005 letter to the Department is included in the Appendix to Motion for Summary Judgment at App. 612 - 613.  (Aff. of G. Riedesel, ¶ 35).

309.    Due to the change in the tank configuration from one tank to two tanks, MTSA and Millcreek submitted an amended permit application to the Department on December 28, 2005.  (Aff. of G. Allender, ¶ 24).

310.    Also, on January 14, 2006, MTSA and Millcreek submitted an update to its Act 537 Plan to cover the new two-tank design.  (Id.).

311.    On March 1, 2006, the Department approved the changes proposed by MTSA and Millcreek and issued an amended permit.  (Aff. of R. Gilson, ¶¶ 32 - 35; R. Gilson 3/1/06 letter, App. at 614; 3/1/06 Part II Permit, App. at 615-619).

312.   A true and correct copy of the Department's March 1, 2006 letter approving the change from one tank to two tanks is included in the Appendix to Motion for Summary Judgment at App. 614.  (Aff. of R. Gilson, ¶ 33).

313.   A true and correct copy of the March 1, 2006 amended construction permit is included in the Appendix to Motion for Summary Judgment at App. 615 - 619.  (Aff. of R. Gilson, ¶ 37).

314.   Thus, MTSA and Millcreek have received all the necessary approvals from the Department to construct the storage tanks and accompanying improvements to the Kearsarge pump station, which are designed to remove the Kearsarge overflow and eliminate the overflow events tributary to the Kearsarge pump station.  (Aff. of R. Gilson, ¶ 35).

315.   On March 16, 2006, MTSA and Millcreek awarded the bids for the work to be completed under the permit.  (Aff. of G. Riedesel, ¶ 36).

316.   The estimated cost of that work, based on the awarded bids is $3,194,165.80.  (Id.)

317.   The work is expected to begin this summer and be completed no later than the deadline under the 2003 COA.  (Aff. of G. Riedesel, ¶ 36; Aff. of G. Allender, ¶ 24).

318.   In summary, the total cost to MTSA and Millcreek under the 2003 COA, including civil penalties, is $4,451,795.54.  (Aff. of G. Riedesel, ¶ 37).

319.   MTSA and Millcreek have paid a total of $67,500.00 in civil penalties.  (Id.)

320.   In addition, MTSA and Millcreek have paid fines totaling $21,250.00 to the PA Fish Commission. (Id.)

321.   Lastly, the work required under the 2003 COA has and will cost MTSA and Millcreek approximately $4,363,045.54.  (Id.)

322.    The 2003 COA was fully executed and in effect by October 31, 2003, more than one year prior to the Plaintiffs sending their required 60-day notice letter on December 9, 2004. (Aff. of R. Gilson, ¶¶ 5 - 6; 2003 COA, App. at 162 -184).

323.    Pursuant to the 2003 COA, MTSA has already spent or committed in excess of $4.36 million on corrective measures to address the violations alleged by the Plaintiffs in their Complaint. (Aff. of G. Riedesel, ¶ 37).

324.    MTSA also has paid $67,500.00 in civil penalties to date, plus another $21,250.00 to the PA Fish Commission. (Aff. of G. Riedesel, ¶ 19).

325.    These penalties include penalties for violations that occurred before the execution of the 2003 COA and stipulated civil penalties that the Defendants agreed to pay to the Department for any overflows that occurred subsequent to the execution of the 2003 COA. (Aff. of G. Riedesel, ¶ 19; 2003 COA, ¶¶ Q, S, V and 8, App. at 165, 166, 173).

326.    To date, MTSA and Millcreek have met all of the deadlines imposed by the 2003 COA for the work that is to be performed under the 2003 COA and have paid all of the civil penalties and stipulated civil penalties imposed under the 2003 COA. (Aff. of R. Gilson, ¶ 7).

327.    With respect to the final order requirement under Section 1319(g)(6)(A)(iii), both the 1992 COA and the 2003 COA are final orders under which MTSA and Millcreek have paid civil penalties to the Department under the Pennsylvania Clean Streams Law. First, the 30-day appeal period under either order has long expired. (1992 COA, App. at 99; 2003 COA, App. at 162).

328.    Second, under the 1992 COA, MTSA and Millcreek paid civil penalties amounting to $35,100.00; in the 2003 COA, MTSA and Millcreek have paid civil penalties amounting to $67,500.00. (Aff. of G. Riedesel, ¶¶ 15, 19).

329.    The state law requiring public access to the records appears to be effective, as at least one member of the Plaintiff organizations, Catherine Pedler, has reviewed the MTSA and Millcreek file at the Department's offices on several occasions beginning on July 2, 2004. (Depo. of C. Pedler, App. at 621-637).

330.    Ms. Pedler also reviewed public files regarding the 2003 COA in June of 2004 at the Erie County Health Department.  (Depo. of C. Pedler, App. at 621, 638-640).

331.    With respect to the November 7, 2000 discharge, this was caused by a malfunction in the seal on the overflow at the Kearsarge pump station.  (Aff. of G. Riedesel, ¶ 40; 12/5/00 letter, App. at 694).

332.    This problem was solved shortly after it was discovered and there have been no seal failures since November 7, 2000.  (Aff. of G. Riedesel, ¶ 40).

333.    A true and correct copy of the December 5, 2000 letter sent to the Department by MTSA at the time explaining the problem is included in the Appendix to Motion for Summary Judgment at App. 694.  (Aff. of G. Riedesel, ¶ 40).

334.    Contrary to Plaintiffs' allegation, the overflow that occurred on August 16, 2001 did not occur at the Kearsarge pump station and was not even associated with the area served by the Kearsarge pump station.  (Aff. of G. Riedesel, ¶ 41).

335.    Rather, the overflow was caused at a different pumping station by a power surge that caused the pumps to shut down and then not restart.  (Aff. of G. Riedesel, ¶ 41; App. at 695 - 698).

336.    The suspected problem has been since repaired.  (Aff. of G. Riedesel, ¶ 41).

337.    A true and correct copy of the August 23, 2001 letter sent to the Department by MTSA at the time explaining the problem is included in the Appendix to Motion for Summary Judgment at App. 695 - 698.  (G. Riedesel, ¶ 41).

338.    In their Complaint, Plaintiffs assert that Defendants discharged from the bypass at the Kearsarge Pumping Station on December 14, 1999.  (Complaint, ¶ 34).

339.    Here, the alleged violation occurred on December 14, 1999.  (Aff. of G. Riedesel, ¶ 42).

340.    On that same date, MTSA submitted a written notification to the Erie County Department of Health ("ECDH").  (Aff. of G. Riedesel, ¶ 42; App. at 700; Aff. of D. Range, ¶ 5).

341.    A true and correct copy of the December 14, 1999 written notification to ECDH is included in the Appendix to Motion for Summary Judgment at App. 700.  (Aff. of G. Riedesel, ¶ 42).

342.    This notification was made pursuant to an arrangement worked out with the Department under which the ECDH would be notified when bypasses occurred.  (Aff. of G. Riedesel, ¶ 42; 12/28/90 letter, App. at 701-703).

343.    A true and correct copy of the December 28, 1990 letter from MTSA to the Department outlining the notification procedure is included in the Appendix to Motion for Summary Judgment at App. 701 - 703.  (Aff. of G. Riedesel, ¶ 42).

344.    Pursuant to an agreement between the Department and the ECDH, the ECDH acts as the agent of the Department in Erie County for, among other things, inspections and some permitting reviews.  (Aff. of R. Gilson, ¶ 4; Aff. of D. Range, ¶ 4).

345.    Millcreek Township is located in Erie County and falls under the scope of Mr. Range's responsibilities.  (Aff. of D. Range, ¶ 3).

346.    A true and correct copy of the December 14, 1999 notice is included in the Appendix to the Motion for Summary Judgment at App. 704.  (Aff. of D. Range, ¶ 6).

347.    The ECDH immediately notified the Department of the use of the bypass.  (Aff. of D. Range, ¶ 7; App. at 704).

348.    On December 14, 1999, Mr. Range reviewed the notice from the Millcreek Township Sewer Authority and that same day Mr. Range notified Walt Sarsfield at the Department of the overflow event.  (Aff. of D. Range, ¶ 7).

349.    Sixty (60) days prior to February 14, 2005 is December 16, 2004.  (Summons, App. 1 - 2).

350.    Plaintiffs request the following mandatory injunctive relief:

1.   Order the Defendants to assess and mitigate the environmental injuries caused by their illegal discharges;

2.   Order the Defendants to obtain a publicly available independent assessment of the facility by a qualified individual or organization, agreed upon by all parties, to determine how the Defendants can best comply with the requirements of the CWA; and

3.   Order the Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance.

(Complaint, Request for Relief).

351.    In Interrogatory No. 6 Defendants asked Plaintiffs to identify each adverse effect, environmental harm or degradation to Walnut Creek that Plaintiffs' claim were caused by Defendants' discharges.  (App. at 706).

352.    Plaintiffs responded to Interrogatory No. 6 by objecting and stating that they did not need to make any showing of adverse effects, environmental harm or degradation.  (App. at 706-707).

353.    Plaintiffs provided this response despite the fact that they alleged such adverse effects, environmental harm and degradation in Paragraphs 1 and 9 of their Complaint. (Complaint, ¶¶ 1, 9).

354.    Plaintiffs also generally state that the negative impacts of raw sewage are obvious and refer to a general guidance document on combined sewer overflows published by USEPA. (App. at 707).

355.    Plaintiffs failed to identify any specific harm they claim the Defendants' discharges caused to Walnut Creek.  (App. at 706-707).

356.    In Interrogatory No. 9, Defendants asked Plaintiffs to identify all facts that supported their contention in Paragraph 14 of their complaint that "Without the issuance of injunctive relief …, Defendants will continue to degrade the quality of Walnut Creek …".  (App. at 711-712).

357.    In response to Interrogatory No. 9, Plaintiffs stated, "In regard to injunctive relief, such relief would prohibit Millcreek from continuing to violate the Clean Water Act; i.e., prohibit the unpermitted discharge of pollutants into Walnut Creek.  It is obvious that the elimination of illegal discharge will stop the continuous degradation and prevent further aesthetic and recreational injury to Plaintiffs."  (App. at 714).

358.    Again, Plaintiffs failed to identify any specific harm they claim the Defendants' discharges caused to Walnut Creek.  (App. at 711-714).

359.    Lastly, in Interrogatory No. 20, Defendants asked Plaintiffs to identify the specific mitigation Plaintiffs claim Defendants must perform.  (App. at 715-716).

360.    In response to Interrogatory No. 20, Plaintiffs stated, "Plaintiffs are currently formulating a proposal for a project that will help improve the water quality in Walnut Creek.

Plaintiffs will supplement this response at such time as they have developed a specific project." (App. at 716).

361.     Discovery closed in this case on February 28, 2006, and as of that date, Plaintiffs had not supplemented their response.  (Case Management Order).

362.     In the month since discovery closed, Plaintiffs have not supplemented their response.  Thus, Plaintiffs failed to identify what mitigation was necessary.

363.     Under the Case Management Order, this Court Ordered that all expert disclosures be provided to the opposing party on or before January 31, 2006.  (Case Management Order).

364.     Plaintiffs submitted no expert disclosures.  (Docket).

365.     Defendants, however, identified two outside experts and submitted their reports to this Court and Plaintiffs.  (Docket; A. Maas Expert Report, App. at 722 - 733; G. Allender Expert Report, App. at 736 - 740).

366.     Of particular importance to the issue now raised before this Court is the expert report of August E. Maas, P.E.  (Aff. of A. Maas, ¶ 4; Expert Report, App. at 722 - 733).

367.     A true and correct copy of the Expert Report I submitted in this case is included in the Appendix to Motion for Summary Judgment at App. 722 - 733.  (Aff. of A. Maas, ¶ 4).

368.     Mr. Maas is currently President of Hill Engineering, Inc., and has been in that position for approximately one year.  Prior to that, he was Vice-President of Hill Engineering. (Aff. of A. Maas, ¶ 1).

369.     Mr. Maas has a Bachelor of Science Degree in Civil Engineering from the University of Pittsburgh.  (Aff. of A. Maas, ¶ 2; App. at 732).

370.     Mr. Maas holds a Professional Engineering ("P.E.") license in four states: Pennsylvania, Ohio, New York and Georgia.  (Id.)

371.    Mr. Maas is a professional engineer who plans and designs municipal public works projects, specializing in wastewater treatment.  (Id.)

372.    Mr. Maas has over 25 years of experience in this field, having worked for the Pennsylvania Department of Environmental Resources for five years before entering private practice for the balance of his career.  (Aff. of A. Maas, ¶ 3; App. at 732).

373.    When he was with the Department, Mr. Maas was responsible for reviewing plans for permitting wastewater systems, performing stream modeling studies to determine effluent limits and performing value engineering cost recommendations.  (Id.)

374.    As part of his stream modeling work, Mr. Maas conducted stream surveys to prepare the computer models to analyze the impacts of effluent discharges.  (Aff. of A. Maas, ¶ 3, App. at 733).

375.    Mr. Maas also participated in aquatic surveys and studies.  (Aff. of A. Maas, ¶ 3; App. at 733).

376.    In private practice, Mr. Maas has overseen a number of significant public sewer projects, including a $20 million project for the Borough of Ellwood City and a $16 million project at the Borough of North East.  (Aff. of A. Maas, ¶ 3; App. at 732-733).

377.    Mr. Maas has developed stream monitoring programs and has reviewed numerous aquatic stream surveys which analyzed aquatic impact.  (Aff. of A. Maas, ¶ 3; App. at 733).

378.    In addition, Mr. Maas has reviewed data from several dischargers to determine potential stream impacts in order to analyze required treatment facilities. (Id.)

379.    Based on his education and experience, Mr. Maas is qualified to testify regarding the need for the type of mandatory injunctive relief that Plaintiffs seek.  (Aff. of A. Maas, ¶ 5).

380.    Mr. Maas has reviewed whether the mandatory injunction requested by Plaintiffs to order Defendants to assess and mitigate the environmental injuries caused by the Defendants' discharges is necessary.  (Aff. of A. Maas, ¶ 6).

381.    Mr. Maas opined that such an assessment is not necessary because there is no evidence of any measurable harm that Defendants' discharges have caused to Walnut Creek. (Aff. of A. Maas, ¶ 6; App. at 731).

382.    Mr. Maas based his opinion on a number of factors.  (Aff. of A. Maas, ¶ 7; App. at 729- 731).

383.    First, the overflows are not frequent, both in number of overflows and in duration of overflows.  (Id.)

384.    During the period of time covered by Plaintiffs' Complaint, the overflows at the Kearsarge pump station amount to 0.23% of the total time during that period -- time during which Walnut Creek continues to flow.  (Id.)

385.    This indicates that the overflows are not frequent or chronic.  (Id.)

386.    Second, the overflow events occur during significant wet weather events or conditions.  (Id.)

387.    Thus, the overflow is significantly diluted by a factor of at least 5 to 1.  (Id.)

388.    Third, during the overflow events, Walnut Creek has a high stream flow.  (Id.)

389.    Both of these factors minimize the impact of any overflows.  (Id.)

390.    Fourth, the overall volume of the discharges is insignificant in relation to the flow of Walnut Creek.  (Aff. of A. Maas, ¶ 7; App. at 729 - 730).

391.    The volume of discharges is approximately 0.0004% of the total flow of Walnut Creek during the last 12+ years.  (Aff. of A. Maas, ¶ 7; App. at 730).

392.    This large difference in flows indicates that there is no significant potential for long-term water quality impacts due to the overflows. (<u>Id.</u>)

393.    Fifth, sampling that has been performed of Walnut Creek does not indicate that there has been any water quality degradation due to the overflow. (Aff. of A. Maas, ¶ 7; App. at 730-731).

394.    Sampling performed on Walnut Creek downstream of the overflows during dry weather produced results that indicate the overflows have caused no continuing problem. (<u>Id.</u>)

395.    Lastly, Mr. Maas made personal observations of Walnut Creek, and based on his experience, did not see any visible signs of water quality degradation. (Aff. of A. Maas, ¶ 7; App. at 731).

396.    It is Mr. Maas professional opinion that an assessment is not necessary because there is no evidence of any measurable harm that Defendants' discharges have caused to Walnut Creek. (Aff. of A. Maas, ¶ 6; App. at 731).

397.    In discovery, Plaintiffs have failed to identify what actions Plaintiffs believe the Defendants must take to best comply with the requirements of the CWA, or any facts that support the need for any action beyond what already is being done under the 2003 COA.

398.    In Interrogatory No. 21, Defendants asked Plaintiffs to "Identify all actions Plaintiffs claim Defendants must take to best comply with the requirements of the Clean Water Act, explain how such actions will make Defendants comply with the Clean Water Act and identify any and all facts and documents, and all persons with knowledge of such facts and documents, that support such action." (App. at 716).

399.    In response to Interrogatory No. 21, Plaintiffs simply recited some provisions of the CWA and objected asserting that the Interrogatory sought factual information for issues that were legal questions.  (App. at 715-716).

400.    Expert Gerald C. Allender is the designer of the project.  (Aff. of G. Allender, ¶ 19).

401.    Gerald C. Allender is the Business Unit Leader of the Erie office for Metcalf & Eddy/AECOM, which formerly was Consoer Townsend Envirodyne Engineers/AECOM.  (Aff. of G. Allender, ¶ 1).

402.    Mr. Allender has worked for the last 40-plus years on issues involving sanitary sewers.  (Aff. of G. Allender, ¶ 2).

403.    Mr. Allender is a Registered Professional Engineer in the state of Pennsylvania. (Aff. of G. Allender, ¶ 2; Expert Report, App. at 736).

404.    Mr. Allender has a Master's Degree in sanitary engineering from Penn State University.  (Id.)

405.    Mr. Allender worked for the Department for approximately seven years as Chief of Planning, Operations and Facilities in three different regional offices of the Department.  (Id.)

406.    Mr. Allender also worked as the Director of Sanitary Engineering for the Erie County Department of Health for five years.  (Id.)

407.    For the last 30 years, Mr. Allender worked in private practice for Consoer Townsend Envirodyne Engineers/AECOM, which is now Metcalf & Eddy/AECOM.  (Aff. of G. Allender, ¶ 2; Expert Report, App. at 737).

408.    In his years of private practice, Mr. Allender has worked on sewer collection and treatment for numerous municipal clients, including the Millcreek Township Sewer Authority ("MTSA") and the City of Erie Sewer Authority.  (Aff. of G. Allender, ¶ 2).

409.    Mr. Allender has performed work on behalf of MTSA since the mid-1980s, and is familiar with both the operation of the Millcreek sewer system and the operators of the Millcreek sewer system from the mid-1980s to the present.  (Aff. of G. Allender, ¶ 2).

410.    Mr. Allender is the author of the Special Study and the Addendum to Special Study submitted by MTSA and Millcreek and approved by the Department.    (Aff. of G. Allender, ¶¶ 17, 19).

411.    The design of the proposed project has two main components.    (Aff. of G. Allender, ¶ 23).

412.    First, the existing pumps at the Kearsarge pump station will be replaced with pumps of greater capacity to pump flows forward to the City of Erie sewer system.  (Aff. of G. Allender, ¶ 23; Expert Report, App. at 738).

413.    These pumps will have a capacity of 4,500 gpm.  (Id.)

414.    Second, MTSA and Millcreek will construct two overflow retention tanks that will have a combined capacity of 2.3 million gallons.  (Aff. of G. Allender, ¶ 23; Expert Report, App. at 738-739).

415.    When the flows at the Kearsarge pump station reach 4,500 gpm, any flows above 4,500 gpm will be diverted to the storage tanks.  (Aff. of G. Allender, ¶ 23; Expert Report, App. at 739).

416.    Once flows through the pump station fall below 4,500 gpm, the tanks will automatically begin to feed stored volumes back into the system to be transported forward to the City of Erie sewer system.  (Id.)

417.    Based upon his expertise and experience, it is Mr. Allender's opinion that the proposed project will handle the overflows at the Kearsarge pump station and enable MTSA and Millcreek to remove the overflow.  (Id.)

418.    A true and correct copy of the Expert Report that Mr. Allender submitted in this case is included in the Appendix to Motion for Summary Judgment at App. 736-740.  (Aff. of G. Allender, ¶ 29).

419.    MTSA and Millcreek also retained the services of Mr. August E. Maas to review the proposed design.  (Aff. of A. Maas, ¶ 8; Expert Report, App. at 725).

420.    As detailed earlier, Mr. Maas has expertise in municipal sewer treatment and conveyance systems.  (Aff. of A. Maas, ¶¶ 2-3; Expert Report, App. at 732-733).

421.    Mr. Maas reviewed the situation confronting the MTSA and Millcreek and concluded that, in his professional opinion, the only alternative that MTSA and Millcreek could pursue to eliminate the overflow would be an overflow retention facility.  (Aff. of A. Maas, ¶ 8; Expert Report, App. at 724).

422.    Mr. Maas then reviewed the facility designed by Mr. Allender.  (Aff. of A. Maas, ¶ 9; Expert Report, App. at 725-727).

423.    Mr. Maas first reviewed the design standards relied upon by Mr. Allender in sizing the overflow retention basin; namely, Mr. Allender's use of the September 8-9, 2004 storm event, which was approximately a 50-year storm event.  (Aff. of A. Maas, ¶ 9; Expert Report, App. at 725).

- 51 -

424.    Mr. Maas opined that, based on his experience and guidelines followed by the Department and USEPA (which call for design for a 2-year, 24-hour storm event), the 2.3 million gallon size of the overflow retention facility far exceeds industry standards and will be sufficient to eliminate overflows at the Kearsarge pump station.  (Aff. of A. Maas, ¶ 9; Expert Report, App. at 727).

425.    In addition, it is Mr. Maas professional opinion that the design of the project will allow MTSA and Millcreek to remove the overflow at the Kearsarge pump station.  (Aff. of A. Maas, ¶ 9; Expert Report, App. at 727).

426.    In discovery, Plaintiffs have refused to identify any particular standard operating procedure or environmental management system that Plaintiffs believe Defendants should implement, and have also failed to identify any facts that support implementing such procedure or system.  (App. at 638 - 640).

427.    In Interrogatory No. 22, Defendants asked Plaintiffs to identify each standard operating procedure that Plaintiffs claimed Defendants must implement to attain and maintain compliance and any facts supporting implementing such a procedure.  (App. at 638).

428.    Plaintiffs objected to Interrogatory No. 22, but stated that it did not advocate one strategy over another.  (App. at 638).

429.    Plaintiffs simply assert that Defendants must put something in place to discontinue all discharges to Walnut Creek.  (App. at 638).

430.    Plaintiffs "encourage[d]" Defendants to implement the nine controls recommended by USEPA for Combined Sewer Systems.  (App. at 638).

431.     In Interrogatory No. 23, Defendants asked Plaintiffs to identify each environmental management system that Plaintiffs claimed Defendants must implement to attain and maintain compliance and any facts supporting implementing such a system.  (App. at 639).

432.     Plaintiffs objected to Interrogatory No. 23, and stated that they did not advocate one management system over another.  (App. at 639-640).

433.     Plaintiffs then simply cite Defendants to USEPA's website on ISO 14001. (Id.)

434.     The combined sewer overflow ("CSO") guidance published by USEPA that Plaintiffs "encourage" Defendants to implement does not even apply to the Millcreek sewer system.  (Aff. of G. Riedesel, ¶ 18).

435.     The CSO guidance applies to sewer systems with "combined sewer overflows". (Aff. of G. Riedesel, ¶ 8).

436.     The Millcreek sewer system is not a combined sewer system.  (Id.)

437.     Thus, because the Millcreek sewer system is not a combined sewer system, USEPA's CSO guidance does not apply to the Millcreek sewer system.  (Id.)

438.     Mr. Maas reviewed the operating procedures that will be in place for the updated Kearsarge pump station and overflow retention facilities, and concluded that they should provide reliable operation in order to maintain compliance with the CWA.  (Aff. of A. Maas, ¶ 10; Expert Report, App. at 728).

439.     In particular, Mr. Maas reviewed the following aspects of the project.  First, when the flows into the pump station exceed the new pump capacity of 4,500 gpm, the water will automatically go to a wet well.  (Aff. of A. Maas, ¶ 11; Expert Report, App. at 728).

440.     Once in the wet well, when the water hits a certain level, the water will then be automatically pumped to the overflow retention facilities.  (Id.)

441.    Once the flows entering the station have decreased to below the 4,500 gpm maximum pumping rate, the water in the overflow retention facilities will automatically be returned to the station to be forwarded to the City of Erie system. (Id.)

442.    The system also will have automatic alarms monitored by a Supervisory Control and Data Acquisition ("SCADA") system.  (Id.)

443.    A SCADA system is a computer system which monitors critical functions and alerts a dispatcher if a problem is detected.  (Id.)

444.    The SCADA system operates 24 hours a day, 7 days a week.  (Id.).

445.    The SCADA system will have alarms for wet well levels, flow set points, storage tank levels, pump faults and other parameters critical to the operation of the system. (Id.)

446.    Thus, if something goes wrong, someone from the MTSA or Millcreek will be contacted immediately so the problem can be addressed.  (Id.)

447.    Equipped with these operating procedures and controls, MTSA and Millcreek will be able to attain and maintain compliance with the CWA.  (Id.)

                s / Mark J. Shaw
Mark J. Shaw
PA50763
Robert E. Gandley
PA82524
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7607
(814) 454-4647 (Facsimile)
mshaw@mijb.com

Attorneys for Defendants
   Millcreek Township Sewer Authority
   and Millcreek Township

Dated:   March 31, 2006