IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIE COUNTY ENVIRONMENTAL | ) | |
| COALITION, PENNENVIRONMENT, | ) | |
| INC. and THE GAIA DEFENSE LEAGUE, | ) | |
|     Plaintiffs | ) | |
| | ) | |
|       v. | ) | CIVIL ACTION NO. 05-59 ERIE |
| | ) | ELECTRONICALLY FILED |
| MILLCREEK TOWNSHIP SEWER | ) | |
| AUTHORITY AND MILLCREEK | ) | JUDGE COHILL |
| TOWNSHIP, | ) | |
|     Defendants | ) | |

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants MILLCREEK TOWNSHIP SEWER AUTHORITY and MILLCREEK TOWNSHIP, by and through their attorneys, MacDonald, Illig, Jones & Britton LLP, file this Brief in Support of Motion for Summary Judgment:

I.    <u>Questions Presented</u>

      A.    WHETHER PLAINTIFFS' CIVIL PENALTY ACTION IS BARRED BY 33 U.S.C.§ 1319(g)(6)(A)(ii) AND (iii) WHERE THE DEPARTMENT WAS DILIGENTLY PROSECUTING DEFENDANTS UNDER A STATE LAW COMPARABLE TO 33 U.S.C. § 1319(g) PRIOR TO THE COMMENCEMENT OF PLAINTIFFS' CITIZEN SUIT AND WHERE THE DEPARTMENT HAS ISSUED A FINAL ORDER UNDER WHICH DEFENDANTS PAID CIVIL PENALTIES UNDER A COMPARABLE STATE LAW?

    B.    WHETHER THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES RELATING TO THE DISCHARGES FROM THE MANHOLES AT 51ST, AND 52ND STREETS AND ZIMMERLY ROAD BECAUSE THE MTSA AND MILLCREEK HAVE COMPLETED THE PROJECT REQUIRED BY THE 2003 COA THAT ENSURES THAT SUCH DISCHARGES CANNOT REASONABLY BE EXPECTED TO OCCUR AT THAT LOCATION IN THE FUTURE?

    C.    WHETHER PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES RELATING TO THE DISCHARGES FROM THE MANHOLES AT VARIOUS LOCATIONS ARE MOOT AS THE MTSA AND MILLCREEK HAVE COMPLETED PROJECTS REQUIRED BY THE 2003 COA THAT ENSURE THAT SUCH DISCHARGES CANNOT REASONABLY BE EXPECTED TO OCCUR AT THOSE LOCATIONS IN THE FUTURE?

    D.    WHETHER PLAINTIFFS' CLAIM RELATING TO THE DECEMBER 14, 1999 DISCHARGE IS BARRED BY THE STATUTE OF LIMITATIONS?

    E.    WHETHER PLAINTIFFS' REQUEST TO ORDER DEFENDANTS TO ASSESS AND MITIGATE THE ENVIRONMENTAL HARM CAUSED BY THE ALLEGED ILLEGAL DISCHARGES MUST BE REJECTED BECAUSE PLAINTIFFS HAVE FAILED TO MEET THE STANDARDS REQUIRED FOR THE ISSUANCE OF A MANDATORY INJUNCTION?

    F.    WHETHER PLAINTIFFS' REQUEST TO ORDER DEFENDANTS TO OBTAIN A PUBLICLY AVAILABLE INDEPENDENT ASSESSMENT OF THE FACILITY BY A QUALIFIED INDIVIDUAL OR ORGANIZATION, AGREED UPON BY ALL PARTIES, TO DETERMINE HOW THE DEFENDANTS CAN BEST COMPLY WITH THE REQUIREMENTS OF THE CWA MUST BE REJECTED BECAUSE PLAINTIFFS HAVE FAILED TO MEET THE STANDARDS REQUIRED FOR THE ISSUANCE OF A MANDATORY INJUNCTION?

G.    WHETHER PLAINTIFFS' REQUEST TO ORDER THE DEFENDANTS TO DEVELOP ADEQUATE STANDARD OPERATING PROCEDURES AND AN ENVIRONMENTAL MANAGEMENT SYSTEM TO ENABLE DEFENDANTS TO ATTAIN AND MAINTAIN COMPLIANCE MUST BE REJECTED BECAUSE PLAINTIFFS HAVE FAILED TO MEET THE STANDARDS REQUIRED FOR THE ISSUANCE OF A MANDATORY INJUNCTION?

II.    Statement of Case

This action is a citizen suit filed by the Erie County Environmental Coalition, PennEnvironment, Inc. and the Gaia Defense League (collectively referred to as the "Plaintiffs") against the Millcreek Township Sewer Authority ("MTSA") and Millcreek Township ("Millcreek") (collectively the "Defendants") under Section 1365 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365.    Plaintiffs sent a notice of intent to sue to Defendants on December 9, 2004.  (Complaint ¶ 3.)  Plaintiffs filed this suit on February 14, 2005, 67 days after the notice of intent to sue was sent.  (See Summons, App. 1-2)

In their Complaint, Plaintiffs allege that MTSA and Millcreek are in violation of the CWA.  Specifically, Plaintiffs allege that MTSA and Millcreek have discharged sewage from their sewer system into Walnut Creek without a National Pollutant Discharge Elimination System Permit ("NPDES Permit")[1] required by Section 1311 of the CWA, 33 U.S.C. § 1311 and, therefore, are in violation of the CWA.

---

[1]    The Clean Water Act established a permitting system for discharges from point sources, known as the NPDES permit system.    33 U.S.C. § 1342.    In Pennsylvania, the Pennsylvania Department of Environmental Protection ("Department") operates the NPDES permit system because the United States Environmental Protection Agency ("USEPA") approved the NPDES program submitted by the Commonwealth of Pennsylvania to USEPA.  (App. at 3-6).  Under the NPDES permit system, persons who discharge into the waters of the United States can obtain NPDES permits from the

In their Complaint, Plaintiffs allege 16 discharges from the Kearsarge Pump Station between December 14, 1999 and September 17, 2004; Plaintiffs allege seven discharges from the 51st and 52nd Streets and Zimmerly Road Pumping Station between August 2000 and September 9, 2004; Plaintiffs allege 3 discharges from the Larchmont and Beaver Street Pumping Station between February 1, 2002 and September 9, 2004; and Plaintiffs allege three discharges from the Church and Patton and Pershing Street Pumping Stations between April 14, 2002 and September 9, 2004.  Complaint ¶ 34.

In their Complaint, Plaintiffs seek the following relief.  First, Plaintiffs ask this Court to declare that Defendants are in violation of the CWA.  Second, Plaintiffs ask this Court to enjoin Defendants from further violating the CWA.  Third, Plaintiffs ask this Court to order Defendants to assess and mitigate any environmental injuries caused by Defendants' discharges.  Fourth, Plaintiffs ask this Court to order Defendants to hire an independent expert to determine how Defendants can best comply with the requirements of the CWA.  Fifth, Plaintiffs ask this Court to order Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance.  Sixth, Plaintiffs seek "significant" civil penalties.  Lastly, Plaintiffs seek an amount of the costs of litigation, including attorneys' fees and expert witness expenses.  (Complaint, Prayer for Relief).

On May 13, 2005, MTSA and Millcreek filed their Answer, raising several defenses, including that some or all of Plaintiffs' claims were moot, wholly past or barred by the statute of limitations and that Plaintiffs' action was barred by the Commonwealth of Pennsylvania's

---

Department that allow the discharger to discharge certain levels of pollutants.  35 P.S. § 691.202; 25 Pa. Code Chapter 92.

diligent prosecution of an action under the Pennsylvania Clean Streams Law, which is comparable to the CWA.

On June 23, 2005, this Court issued a Case Management Order. ("CMO")  The CMO provided that discovery in this case closed on February 28, 2006.  The CMO also provided that all Motions for Summary Judgment be filed on or before March 31, 2006.  Defendants' Motion for Summary Judgment is being filed pursuant to the CMO.

III.    Statement of Facts

The MTSA is a municipal authority organized and existing under the Pennsylvania Municipality Authorities Act since June 4, 1956.  (Aff. of G. Riedesel, ¶ 5).  Millcreek is a political subdivision of the Commonwealth of Pennsylvania.  (Aff. of B. McGrath, ¶ 1).  The MTSA owns the Millcreek sanitary sewer system ("Millcreek sewer system").  (Aff. of G. Riedesel, ¶ 5).  The Millcreek sewer system serves most of the residents and businesses located within Millcreek Township.[2]  (Aff. of G. Riedesel, ¶ 6).  Pursuant to an agreement with Millcreek, the MTSA leases the Millcreek sewer system to Millcreek.  (Aff. of G. Riedesel, ¶ 5).  Under the agreement between the MTSA and Millcreek, Millcreek is responsible for operating and managing the Millcreek sewer system.  (Aff. of G. Riedesel, ¶ 5).

George Riedesel is the current Executive Director of the Millcreek Township Sewer Authority and the Millcreek Water Authority.  (Aff. of G. Riedesel, ¶ 1).  He has been Executive Director/Manager since June 8, 1998.  (Aff. of G. Riedesel, ¶ 1).  Mr. Riedesel is a Registered

---

[2]    There remain areas of Millcreek Township that are not served by the Millcreek sewer system, but instead rely upon on-site septic or other types of on-site sanitary disposal systems.  (Aff. of G. Riedesel, ¶ 6).

Professional Engineer in the states of Pennsylvania, New York and Ohio.  (Aff. of G. Riedesel, ¶ 2). [3]

Prior to Mr. Riedesel, David Wright served as Acting Manager from January 1998 to June 1998.  (Aff. of G. Allender, ¶ 3).  Prior to Mr. Wright, Bruce Yount served as Manager of the MTSA.  (Id.)  He served in that capacity from September 1996 until his untimely death in January 1998.  (Id.)  Mr. Yount was previously the Chief of the Bureau of Sewers of the City of Erie.  (Id.)  Prior to Mr. Yount, Max Gill was the Manager of the MTSA.  (Id.)  He was in that position for over 18 years, and was the manager of MTSA at the time the Kearsarge force main overflow was installed.  (Id.)

The Millcreek sewer system is comprised of 374 miles of sewer lines serving Millcreek Township.  (Aff. of G. Riedesel, ¶ 7).  The Millcreek sewer system is designed to accept only sanitary and certain approved industrial wastewater.  (Id.)  The Millcreek sewer

---

[3]  Mr. Riedesel received a B.S. Degree in Civil Engineering from the University of Cincinnati in 1972.  (Aff. of G. Riedesel, ¶ 2).  Since receiving his degree in civil engineering, Mr. Riedesel has spent much of his professional life working on the operation, planning and construction of sanitary sewer systems.  (Id.)  Upon graduation from college, he was employed with a private consulting firm in Columbus, Ohio, where he was assigned to be the City Engineer for Worthington, Ohio.  (Aff. of G. Riedesel, ¶ 3).  In that capacity, he began his work related to sewer systems.  (Id.)  From 1974 to 1977, he was the Planning and Department Head for Portage County, Ohio.  (Id.)  From 1977 to 1982, as an engineer employed by Consoer Townsend & Associates, Mr. Riedesel was involved in all aspects of sanitary sewer work for the New Castle Sanitation Authority, Shenango Township Sewer Authority and the Union Township Sewer Authority.  (Id.)  From 1982 to 1998, Mr. Riedesel was the Director of Public Works and County Engineer for Chautauqua County, New York.  (Aff. of G. Riedesel, ¶ 4).  As Director of Public Works and County Engineer, Mr. Riedesel was responsible for the direct operation of two existing sewer systems in Chautauqua County.  (Id.)  His work also included planning and feasibility studies, consolidation, pretreatment, industrial development and expansion for various sewer systems.  (Id.)

system is not a "combined sewer system". (Aff. of G. Riedesel, ¶ 8).[4] A combined sewer system is a sewer system intentionally designed to transport both wastewater <u>and</u> storm water. (<u>Id.</u>)

Although the Millcreek sewer system is not a "combined sewer system," storm water finds its way into the system through inflow and infiltration. (Aff. of G. Riedesel, ¶ 9). Inflow is surface storm water that enters a sewer system through direct connections, such as illegal hookups from roof drains, basement sumps, damaged manholes or accidental connections with the storm sewer.[5] (<u>Id.</u>) Infiltration is groundwater that enters through cracks in the sewer system piping. (<u>Id.</u>) The drawing attached at App. 67 illustrates how inflow and infiltration penetrate a sanitary sewer system. (Aff. of G. Riedesel, ¶ 9; App. at 67). The portion of the Millcreek sewer system that feeds into the Kearsarge pump station has a high amount of inflow and infiltration. (Aff. of G. Riedesel, ¶ 9).

The Millcreek sewer system is part of a regional sewer system that is comprised of sewer systems from the City of Erie, Lawrence Park, Wesleyville, Harborcreek Township, Fairview Township, Fairview Borough and Summit Township, as well as Millcreek Township. (Aff. of G. Riedesel, ¶ 10). All of the wastewater from these locations is sent to the wastewater treatment plant owned by the Erie Sewer Authority, and operated by the City of Erie. (<u>Id.</u>)

---

[4]    Typically, such a combined sewer system is designed with overflows that allow the system to discharge, into a nearby body of water, when storm water flows in the system exceed the capacity of the system; these are known as "combined sewer overflows" or "CSOs". (Aff. of G. Riedesel, ¶ 8). The City of Erie, for example, has several combined sewer overflows that are allowed under its NPDES Permit. (Aff. of G. Allender, ¶ 9; Aff. of D. Range, ¶ 9; City of Erie NPDES Permit, App. at 7- 66).

[5]    Millcreek's ordinances have historically prohibited discharges of storm water and other non-wastewater into the Millcreek sewer system. (See Millcreek Township Ordinance 89-29, App. at 69– 86; Millcreek Township Ordinance 2002-23, App. at 425– 440, Aff. of B. McGrath, ¶¶ 11, 13)

The Millcreek sewer system feeds into the City of Erie sewer system at several locations.  (Aff. of G. Allender, ¶ 4; Erie Regional Interceptor Map, App. at 68).  Of relevance to the claims raised by the Plaintiffs in this action, the wastewater from areas of Millcreek Township served by the Kearsarge pump station is now transported to the City of Erie's system through the Pittsburgh Avenue/Manor sewer (previously the Ellsworth sewer) and then is transported to the City's wastewater treatment plant by the Westside Interceptor.  (Aff. of G. Allender, ¶ 4).  Attached at App. 87 is a drawing showing the sewer lines fed by the Kearsarge pump station.  (Aff. of G. Allender, ¶ 4; App. at 87).  The sewer line immediately leaving the pump station (and marked FM) and connecting to the Pittsburgh Avenue sewer line at 38th Street is what is called a force main.  (Id.).  A force main uses pressure created by pumps to transport wastewater through a pipe.  (Aff. of G. Allender, ¶ 4).  The force main feeds into what is called a gravity main on Pittsburgh Avenue.  (Id.).  A gravity main relies on the forces of gravity to transport wastewater though a pipe.  (Id.).  The remainder of the sewer lines that transport the wastewater from the Kearsarge pump station are gravity mains.  (Id.).

In addition to areas of Millcreek Township, the Kearsarge pump station is fed by sewer lines that serve areas of Summit Township.  (Aff. of G. Allender, ¶ 5).  The Millcreek sewer lines that directly feed the Kearsarge pump station are all gravity sewer lines.  (Id.)  With respect to Summit Township, the Kearsarge pump station serves the upper Peach Street area of Summit Township, primarily populated by shopping areas with residential and business areas south of that shopping district.  (Id.)  The Summit Township sewer lines are a mix of gravity fed and force mains.  (Id.)  Attached at App. 88-89 are two drawings showing the sewer lines that feed into the Kearsarge pump station from both Millcreek Township (Figure VII-b) and Summit Township (Figure VII-a).  (Aff. of G. Allender, ¶ 5; App. at 88-89).

The Millcreek sewer system, therefore, is in the middle of the regional sewer system that ultimately is served by the City of Erie wastewater treatment plant. (Aff. of G. Allender, ¶ 6). To the north, which is downstream, the Kearsarge pump station is subject to the capacity limitations imposed by the City of Erie sewer system. (Id.) To the south, which is upstream, the Kearsarge pump station is subject to the future flow possibilities of Summit Township. (Id.)

The Kearsarge pump station itself was constructed in the mid-1950s. (Aff. of G. Allender, ¶ 7). At that time, there was a gravity fed overflow built into the station to handle overflow situations during severe storm events, which was standard practice to protect against damage to the system and its customers under severe operating conditions. (Id.) The pump station was then upgraded in the mid-1980s due to increasing development in the areas of Millcreek Township and Summit Township it served. (Id.) The gravity overflow was plugged with concrete. (Id.)

In the late 1980s, due to a significant storm event that caused widespread sewage backups in numerous homes and businesses in the area of the Kearsarge pump station (including a hospital and a senior citizen home), a new overflow was installed, which was located on the force main sewer line that transports the wastewater from the Kearsarge pump station toward the City of Erie sewer system. (Aff. of G. Riedesel, ¶ 12; M. Gill 6/21/91 letter, App. at 90-91). The overflow is operated manually during severe storm events when the water levels at the Kearsarge pump station rise high enough to cause sewage backups in customers' residences and businesses. (App. at 90-91). The overflow, when used, discharges into Walnut Creek. Id.

Investigations conducted in the early 1990s into the causes of the overflows at the Kearsarge pump station concluded that the pump station had sufficient pumping capacity during storm events, if its pump head was reduced. (Aff. of G. Allender, ¶ 8). However, there was not

enough transport capacity in both the Millcreek sewer system and the City of Erie sewer system downstream of the Kearsarge pump station.[6]  (Id.)  Accordingly, MTSA and Millcreek began to explore in 1991 how they could solve this capacity problem and, in March 1991, MTSA submitted to the Pennsylvania Department of Environmental Resources, now known as the Pennsylvania Department of Environmental Protection ("Department"), a Task Activity Report for a proposed Special Study.  (Aff. of G. Allender, ¶ 8; M. Gill 3/27/91 letter, App. 92-98).  At this same time, the City of Erie was having capacity problems within its sewer system, in terms of both conveyance capacity and treatment capacity, and was investigating what it should do.[7] (Aff. of G. Allender, ¶ 9).

In 1992, MTSA and Millcreek entered into a Consent Order and Agreement ("1992 COA") with the Department to address the overflow problem at the Kearsarge pump station as well as address capacity issues in other areas of the Millcreek sewer system.  (Aff. of G. Allender, ¶ 10; 1992 COA, App. at 99-120; Aff. of G. Riedesel, ¶ 13).  Under the 1992 COA, MTSA and Millcreek proposed two basic alternative solutions to the Kearsarge problem.  (Aff. of G. Allender, ¶ 10).  First, MTSA and Millcreek proposed to construct a new sewer line directly from the Millcreek sewer system to the wastewater treatment plant, thereby bypassing most of the conveyance portion of the City of Erie sewer system.  (Aff. of G. Allender, ¶ 10; Alternative Selection Report, App. 121-159).  Under the second alternative, MTSA and

---

[6]    During dry weather, the Kearsarge pump station has more than enough capacity to handle the normal sewage flows that enter it.  The current capacity of the pump station is 3750 gpm and the normal dry weather flows are between 700 gpm and 1200 gpm.  (Aff. of G. Riedesel, ¶ 11).

[7]    At the time, the City of Erie also had entered into a Consent Order and Agreement with the Department.  (Aff. of G. Allender ¶ 9).

Millcreek proposed to expand the capacity of its sewer lines downstream of the Kearsarge pump station, and work with the City of Erie to expand the capacity of the City's sewer lines downstream of the Kearsarge pump station, and increase the capacity of the wastewater treatment plant to handle high wet weather flows. (Aff. of G. Allender, ¶ 11; Alternative Selection Report, App. 121-159). The Kearsarge pump station capacity was then to be increased. (Aff. of Allender, ¶ 11). Under either scenario, it was recognized that it would take a substantial amount of time to solve the overflow problem and remove the Kearsarge overflow. (Id.) The Department approved the alternative under which the MTSA, Millcreek and the City of Erie worked together on the regional solution. (Aff. of G. Allender, ¶ 12; Department letter 3/11/93, App. 160-161).

Pursuant to the 1992 COA, MTSA, Millcreek and the City engaged in an eight-year period of sewer investigation, construction and repair, ranging from cleaning existing sewer lines, to constructing new sewer lines, to performing studies and abatement of inflow and infiltration, to constructing a significant upgrade of the City's wastewater treatment plant. (Aff. of G. Allender, ¶ 13). MTSA and Millcreek performed 22 projects during this period. (Id.) On those 22 projects, MTSA and Millcreek spent approximately $8.9 million. (Aff. of G. Riedesel, ¶ 14). In addition, MTSA's and Millcreek's share of the work performed by the City of Erie during that time period is approximately $20.8 million, of which, MTSA and Millcreek already have paid $6.2 million.[8] (Aff. of G. Riedesel, ¶ 14).

---

[8]    MTSA and Millcreek also paid a civil penalty to the Department in the amount of $15,000. The 1992 COA also imposed stipulated penalties for each overflow. Under the life of the 1992 COA, MTSA and Millcreek paid $20,100.00 in stipulated penalties to the Department for overflows, and paid $500.00 to the Pennsylvania Fish and Boat Commission ("PA Fish Commission") for those same overflows. Thus, the total amount of civil penalties paid under

Despite having spent and being committed to spend nearly $30 million, by the end of 2000, the capacity problem at the Kearsarge pump station was not solved. (Aff. of G. Riedesel, ¶ 16; Aff. of G. Allender ¶ 14). Thus, the removal of the Kearsarge overflow, which was the only project remaining to be completed under the 1992 COA, could not be completed. (Id.) It was discovered that although the millions of dollars spent increased the capacity of the sewer system downstream of the Kearsarge pump station, there still was insufficient available capacity downstream of the Kearsarge pump station to accommodate the overflows at the pump station. (Id.) Essentially, the projects that were completed did not work. (Id.) The wet weather flows that the Millcreek sewer system was receiving from other areas that fed into the same sewer line as the Kearsarge pump station proved to be much higher than the monitoring performed in the early-mid 1990s established, and upon which many of the projects were based. (Aff. of G. Allender ¶ 14).

When the projects completed under the 1992 COA still did not enable MTSA and Millcreek to remove the overflow, MTSA and Millcreek began to examine whether they could eliminate enough inflow and infiltration from the areas served by the Kearsarge pump station to reduce the flows into the Kearsarge pump station and eliminate the overflows. (Aff. of G. Riedesel, ¶ 17). Shortly after that effort began, the Department approached MTSA and Millcreek inquiring why the Kearsarge overflow had not been removed. (Id.) At that time, the Department informed MTSA and Millcreek that inflow and infiltration work alone would not be acceptable to the Department to eliminate the overflow. (Id.) As a result, MTSA, Millcreek and

the 1992 COA to the Department and to the PA Fish Commission was $35,600.00. (Aff. of G. Riedesel, ¶ 15).

the Department entered into a new Consent Order and Agreement dated October 31, 2003 ("2003 COA").  (Aff. of G. Riedesel, ¶ 17; 2003 COA, App. at 162-184).

Under the 2003 COA, MTSA and Millcreek were to conduct a "Special Study"[9] to evaluate the Kearsarge pump station and present a plan for improving the capacity of the pump station and sewer system served by the pump station and for eliminating the overflow at the Kearsarge pump station and overflows associated with the pump station.  (App. at 167-168, ¶ 3(a)).  The 2003 COA presented three alternatives for MTSA and Millcreek to consider in the Special Study: (1) the construction of a retention facility at the Kearsarge pump station; (2) the installation of an in-line booster on the Kearsarge force main; or (3) the replacement of the Kearsarge pump station.  (Id.)  Under the 2003 COA, the Special Study was due on or before July 1, 2004.  (Id.)

The 2003 COA also provides that MTSA and Millcreek were to apply for any necessary permits for work recommended in the Special Study within nine months of receiving

---

[9]    Under the Pennsylvania Sewage Facilities Act, also known as "Act 537", a municipality that is providing sewage services within its jurisdiction must adopt an Official Plan for such sewage services.  35 P.S. § 750.5(a).  The Official Plan is required to provide for adequate sewage treatment facilities to prevent the discharge of untreated or inadequately treated into any waters.  35 P.S. § 750.5(d)(3).  The Official Plan is to be revised whenever the municipality or the Department determines that the existing plan is inadequate to meet the sewage needs of the municipality.  35 P.S. § 750.5(a); 25 Pa. Code §§ 71.12(a) - 71.13(a).  A "Special Study" is a "study, survey, investigation, inquiry, research report or analysis" that "provides documentation or other support necessary to solve specific problems." 35 P.S. § 750.2.  A Special Study is part of an Official Plan revision required by the Department when it determines that any part of an Official Plan is inadequate for the existing or future sewage needs of the municipality.  35 P.S. § 750.2.  When proposing revisions to the Official Plan, the municipality must publish notice of the proposed action in a newspaper of general circulation giving a 30-day public comment period.  25 Pa. Code § 71.31(c).  The municipality then must respond in writing to each public comment received and provide them to the Department for its review in determining whether to approve the proposed revision.  25 Pa. Code § 71.31(c).  The Special Study performed by MTSA and Millcreek in this case was performed pursuant to Act 537.  (Aff. of G. Allender, ¶ 18).

approval by the Department of the Special Study.  (App. at 168; ¶ 3(b)).  The 2003 COA then requires MTSA and Millcreek to complete construction of the work within 18 months after receiving the permits from the Department.  (App. at 168; ¶ 3(c)).  The 2003 COA requires MTSA and Millcreek to remove the Kearsarge overflow within 30 days after construction of the work is complete.  (App. at 169; ¶ 3(d)).

The 2003 COA also requires MTSA and Millcreek to continue their efforts to reduce inflow and infiltration in the Millcreek Sewer system.  (App. at 169; ¶ 3(f)).  It also places limits on the number of sewer connections that can be made each year in areas that feed into the Kearsarge pump station.  (App. at 169-172; ¶ 4).

The 2003 COA imposed a civil penalty of $25,000.00 upon MTSA and Millcreek, which they paid.  (Aff. of G. Riedesel, ¶ 19; App. at 173; ¶ 8).  In addition, the 2003 COA imposes stipulated penalties for each future overflow. (App. at 173-174; ¶ 9).  To date, MTSA and Millcreek have paid $42,500.00 in additional civil penalties under the stipulated penalty provisions of the 2003 COA.  (Aff. of G. Riedesel, ¶ 19).  Thus, the total civil penalties under the 2003 COA paid to date are $67,500.00.  (Id.)  In addition, the PA Fish Commission has imposed fines totaling $21,250.00 since the execution of the 2003 COA, which have been paid.  (Id.)

On June 29, 2004, the MTSA and Millcreek submitted the Special Study to the Department for its review and approval.  (Aff. of G. Riedesel, ¶ 21; Riedesel letter 6/29/04, App. at 185; Act 537 Special Study, Vol. I, App. at 186-413).  The Special Study recommended several projects to address the overflows at the Kearsarge pump station and the area served by the Kearsarge pump station.  (App. at 213).  The main project proposed was an upgrade to the electronics and pumping capacity of the Kearsarge pump station together with an overflow retention tank.  (App. at 278, 285, 293-295, 308-309).  The pump station upgrade would increase

the capacity of the pump station to send flows to the City of Erie system to 4,500 gpm from the existing 3,750 gpm.  (App. at 285, 293).  Any flows above the new 4,500 gpm capacity that would enter the Kearsarge pump station would be redirected to an overflow retention tank. (App. at 285, 309).  At the time of the Special Study, Millcreek was still evaluating the size of the tank, but it was expected to be at least 500,000 gallons.  (Aff. of G. Allender, ¶ 17; App. at 309; Aff. of R. Gilson, ¶ 10, Department Internal Review Memo, App. at 414-417).

In addition to the pump station upgrade and overflow retention tank, the Special Study recommended a relief sewer for Zimmerly Road to resolve capacity issues in that sewer.  (App. at 208).  The Study also recommended diverting flows from the Peach Street Interceptor (which is tributary to the 18" Beaver Run Interceptor) to resolve capacity issues in the Beaver Run Interceptor.  (Aff. of G. Allender, ¶ 17).  This relief sewer is known as the Peach Street Diversion.  (Id.)  The Special Study also recommended back flow preventors in homes that would be flooded if the pump station surcharged due to a catastrophic event.  (App. at 212).

On September 30, 2004, the Department approved the Special Study submitted by MTSA and Millcreek.  (Aff of R. Gilson, ¶¶ 11 - 12; 9/30/04 letter, App. at 418-419).  In the Department's internal review memo on the Special Study, the Department concluded that the plan was consistent with the requirements of Pennsylvania law and approval was recommended. (Aff. of R. Gilson, ¶ 10, App. at 414-417).

To date, MTSA and Millcreek have accomplished significant portions of their obligations under the 2003 COA.  (Aff. of G. Riedesel, ¶ 22; Aff. of G. Allender ¶ 15).  First, even before the Department approved the Special Study, MTSA and Millcreek completed the Zimmerly Road relief sewer and it was operational by September 20, 2004.  (Aff. of G. Riedesel, ¶ 23). This work was completed at a cost of $125,995.04.  (Id.)

Second, MTSA and Millcreek have created a temporary relief sewer for the 18" Beaver Run Interceptor until the Peach Street Diversion is constructed. (Aff. of G. Riedesel, ¶ 24; Aff. of G. Allender ¶ 27). MTSA and Millcreek accomplished this by acquiring a pump and hose system to pump from the Peach Street Interceptor during significant storm events to the Beaver Run relief sewer that has enough capacity to carry those flows. (Aff. of G. Riedesel, ¶ 25; Aff. of G. Allender ¶ 27). This system cost MTSA and Millcreek approximately $25,000.00. (Aff. of G. Riedesel, ¶ 25). In addition, on January 17, 2006, the Department issued the permit to construct the Peach Street Diversion to MTSA. (Aff of R. Gilson, ¶¶ 36 - 37; Part II Permit, App. at 420-424). The work for the Diversion has been put out to bid and bids are to be received on April 18, 2006. (Aff. of G. Riedesel, ¶ 28; Aff. of G. Allender ¶ 28). This work is expected to cost approximately $129,000.00. (Id.)

Third, MTSA and Millcreek have made significant strides in their efforts to investigate and eliminate inflow and infiltration in the sewer system that is served by the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 29; Aff. of B. McGrath, ¶ 4). In March 2004, MTSA and Millcreek passed new ordinances, resolutions and rules and regulations to enable them to better enforce against illegal connection to their sanitary sewer system. (Aff. of G. Riedesel, ¶ 29, Aff. of B. McGrath, ¶ 4; Ordinance 2004-4, App. at 441-459; Resolution 2004-R-13, App. at 460 - 468; Resolution 2004-R-14, App. at 469-470; Rules and Regulations, App. at 471-525). Pursuant to those new ordinances, resolutions and rules and regulations, MTSA and Millcreek have conducted inspections at 420 residences and businesses in the area served by the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 29; I&I Summary, App. at 526-541). As a result of those inspections and subsequent enforcement actions, 72 illegal connections have been removed to date, with more expected to come. (Id.) It is estimated that the removal of these 72 illegal

connections removed a minimum of 104,000 gpd and an estimated peak flow of 0.5 million gallons per day ("MGD") during a normal storm event. (Aff. of G. Riedesel, ¶ 29). Since 2000, the investigation and abatement work related to the Kearsarge area have cost $381,176.85. (Id.)

Fourth, MTSA and Millcreek completed the first phase of electrical renovations needed at the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 31). These renovations included new variable frequency drives, controls and wiring. (Id.) The cost of these renovations was $222,843.15. (Id.)

Fifth, MTSA and Millcreek have completed their investigation of the homes that need backflow preventors. (Aff. of G. Riedesel, ¶ 32). Ultimately, it was determined that only six homes needed backflow preventors. (Id.) MTSA completed installation of those backflow preventors in February 2006. (Id.) The cost of the investigation and installation of the backflow preventors was $14,539.70. (Id.)

Sixth, MTSA and Millcreek have made significant progress on the major project of the Special Study. (Aff. of G. Riedesel, ¶ 33; Aff. of G. Allender ¶ 21). Subsequent to the approval of the Special Study, MTSA and Millcreek submitted an Act 537 Special Study Addendum ("Addendum") to the Department on June 28, 2005. (Aff. of G. Allender, ¶ 19, Addendum, App. at 542-599). In this Addendum, the size of the storage tank was increase to 2.3 million gallons. (Aff. of G. Allender, ¶ 19, App. at 575). The increase in the size of the storage tank was made necessary by an overflow event that occurred at the Kearsarge pump station on September 9-10, 2004, as well as other overflow events that occurred after the Special Study was submitted to the Department. (Aff. of G. Allender, ¶ 19, App. at 547).[10] It is believed that the 2.3 million gallon

---

[10]    In September, 2004, the Millcreek Township area was hit with the remnants of a hurricane, which caused flooding throughout the region. (Aff. of G. Allender, ¶19). The storm was

design for the overflow retention tank is quite conservative and contains a significant safety factor. (Aff. of G. Allender, ¶ 19). The Special Study, its Addendum and associated work cost approximately $270,000.00. (Aff. of G. Riedesel, ¶ 33).

The Department approved the Addendum on July 12, 2005. (Aff. of R. Gilson, ¶¶ 16-17; 7/12/05 letter, App. at 600). In the Department's internal review memo on the Addendum, the Department concluded that the Addendum was consistent with the requirements of Pennsylvania law and approval was recommended. (Aff. of R. Gilson, ¶¶ 14 - 15, App. at 601-602).

On June 28, 2005, in compliance with the deadline in the 2003 COA, MTSA and Millcreek submitted a permit application for the Kearsarge pump station upgrades and overflow retention tank. (Aff. of G. Allender, ¶ 22, App. at 603). The Department issued the construction permit on September 26, 2005. (Aff of R. Gilson, ¶¶ 26 - 27; Part II Permit, App. at 604-608). In the Department's internal review and recommendation document, the Department recommended approval of the permit and stated, "The proposed work will provide flow equalization during heavy storm water events, eliminate an overflow and reduce the potential of sewage contamination of Walnut Creek." (Aff. of R. Gilson, ¶ 25; App. at 609–611, 611).

In late 2005, MTSA and Millcreek encountered a problem with the site location for the 2.3 million gallon tank. (Aff. of G. Riedesel, ¶ 34). The property on which the tank was to be located is owned by Millcreek Township, but it contains use restrictions that would prohibit the placement of the tank on that property. (Aff. of G. Riedesel, ¶ 34; Aff. of B. McGrath, ¶ 13). The property had been donated to Millcreek many years ago, subject to these restrictions. (Id.) MTSA and Millcreek sought to obtain court approval to lift the restrictions, but neighbors living

_____

estimated to be the equivalent of an approximate 50-year storm event. (Aff. of A. Maas, ¶9; App. at 725; Aff. of G. Allender, ¶ 19, App. at 572, 574, 738). The size of the storage tank was determined using that storm event. (Aff. of G. Allender, ¶19, App. at 572, 574).

across from the Kearsarge pump station objected. (Aff. of G. Riedesel, ¶ 34). As a result of the delays caused by the neighbors' intervention, MTSA and Millcreek acquired property adjacent to the restricted property and to the Kearsarge pump station that does not have any use restrictions. (Aff. of G. Riedesel, ¶ 35). Due to the configuration of this new property, MTSA and Millcreek had to modify the retention tank system from one 2.3 million gallon tank to two tanks that equal 2.3 million gallons. (Id.) MTSA notified the Department of the problem in writing on December 8, 2005. (Aff. of G. Riedesel, ¶ 35; G. Riedesel letter 12/8/05, App. at 612-613).

Due to the change in the tank configuration from one tank to two tanks, MTSA and Millcreek submitted an amended permit application to the Department on December 28, 2005. (Aff. of G. Allender, ¶ 24). Also, on January 14, 2006, MTSA and Millcreek submitted an update to its Act 537 Plan to cover the new two-tank design. (Id.). On March 1, 2006, the Department approved the changes proposed by MTSA and Millcreek and issued an amended permit. (Aff of R. Gilson, ¶¶ 32 - 35; 3/1/06 letter, App. at 614; 3/1/06 Part II Permit, App. at 615-619).

On March 16, 2006, MTSA and Millcreek awarded the bids for the work to be completed under the permit. (Aff. of G. Riedesel, ¶ 36). The estimated cost of that work, based on the awarded bids is $3,194,165.80. (Id.) The work is expected to begin this summer and be completed no later than the deadline under the 2003 COA. (Aff. of G. Riedesel, ¶ 36; Aff. of G. Allender, ¶ 24).

In summary, the total cost to MTSA and Millcreek under the 2003 COA, including civil penalties, is $4,451,795.54. (Aff. of G. Riedesel, ¶ 37). MTSA and Millcreek have paid a total of $67,500.00 in civil penalties. (Id.) In addition, MTSA and Millcreek have paid fines totaling

$21,250.00 to the PA Fish Commission. (Id.)   Lastly, the work required under the 2003 COA

has and will cost MTSA and Millcreek approximately $4,363,045.54.  (Id.)


IV.    Standard for Summary Judgment


        A defendant may seek summary judgment when the Plaintiffs are unable to support their

claim with sufficient evidence.   F.R.C.P. 56(c).  Pursuant to Federal Rule of Civil Procedure

56(c), summary judgment must be granted with respect to a claim:

> …if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with affidavits, if any, show that there
> is no genuine issue as to any material fact and that the moving
> party is entitled to a judgment as a matter of law.

Lujan v. National Wildlife Federation, 497 U.S. 871, 884, 110 S.Ct. 3177, 3186 (1990); Celotex

Corp v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986).

        In applying that standard

> the judge must ask … not whether … the evidence unmistakably
> favors one side or the other but whether a fair-minded jury could
> return a verdict for the [nonmoving] party on the evidence
> presented.  The mere existence of a scintilla of evidence in support
> of the [nonmovant's] position will be insufficient; there must be
> evidence on which the jury could reasonably find for the
> [nonmoving party].   The judge's inquiry, therefore, unavoidably
> asks whether reasonable jurors could find by a preponderance of
> the evidence that the [non-movant] is entitled to a verdict.

Anderson, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986).

        In order to avoid summary judgment, a plaintiff must point to admissible evidence

sufficient to establish all elements of a prima facie case under applicable substantive law.  Clark

v. Modern Group Ltd, 9 F.3d 321, 326 (3d Cir. 1993). Rule 56 does not require the moving

party to negate the elements of the non-moving party's case. Lujan, 497 U.S. 871, 885, 110 S.Ct.

317, 3187 (1990); Celotex, 477 U.S. at 323, 106 S.Ct. at 2553 (1986). Rather, as held by the

Supreme Court of the United States:

> The plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion,
> against a party who fails to make a showing sufficient to establish
> the existence of an element essential to the party's case, and on
> which that party will bear the burden of proof at trial.

Lujan, 497 U.S. at 884, 110 S.Ct. at 3186.


V.      Argument


        A.      PLAINTIFFS' CIVIL PENALTY ACTION IS BARRED
                BY 33 U.S.C.§ 1319(g)(6)(A)(ii) AND (iii) WHERE THE
                DEPARTMENT WAS DILIGENTLY PROSECUTING
                DEFENDANTS UNDER A STATE LAW
                COMPARABLE TO 33 U.S.C. § 1319(g) PRIOR TO THE
                COMMENCEMENT OF PLAINTIFFS' CITIZEN SUIT
                AND WHERE THE DEPARTMENT HAS ISSUED A
                FINAL ORDER UNDER WHICH DEFENDANTS PAID
                CIVIL PENALTIES UNDER A COMPARABLE STATE
                LAW.


        Citizen suit provisions were included in the CWA to provide a mechanism for citizens to

require compliance with the Act's requirements where the appropriate federal and state

authorities appear unwilling to act. Lockett v. EPA, 319 F.3d 678, 684 (5th Cir. 2003), citing

North and South Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d 552, 555 (1st Cir.

1991). Thus, the CWA contains several provisions under which citizen suits are barred when the

appropriate federal or state authorities are acting or have acted.  In this case, Section 1319(g)(6) of the CWA bars the Plaintiffs' citizen suit.

Section 1319(g)(6) was added to the CWA in 1987 to prevent violators of the Act from being subject to dual enforcement actions or penalties for the same violation.  L.E.A.D. (Lead Environmental Awareness Development v. Exide Corp., 1999 WL 124473, at 30 (E.D.Pa. 1999) citing S.Rep. No. 99-50, at 28 (1985).  "While courts have wrestled with the interpretation of this amendment, many have pointed to its function in preventing suits from significantly curtailing the governing agency's discretion to act in the public interest."  Id.  (citations omitted).  These views are all consistent with the United States Supreme Court's view in Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 60, 108 S.Ct. 376, 383 (1987), that "the citizen suit is meant to supplement rather than to supplant government action" and that citizen suits are proper only where the appropriate agencies fail to exercise their enforcement responsibility.

The Supreme Court in Gwaltney went on further to explain how a citizen suit could undermine governmental enforcement:

> Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obligated to take.  If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forego, then the Administrator's discretion to enforce the act in the public interest would be curtailed considerably.  The same might be said of the discretion of state enforcement authorities.  Respondents' interpretation of the scope of the citizen suit would change the nature of the citizen's role from interstitial to potentially intrusive.  We cannot agree that Congress intended such a result.

Id.  "An Administrator unable to make concessions is unable to obtain them.  A private plaintiff waiting in the wings is then the captain of the litigation."  Supporters to Oppose Pollution, Inc. v. Heritage Group, 973 F.2d 1320, 1324 (7th Cir. 1992).

Under Section 1365(a) of the CWA, a citizen may commence an action except as provided in Section 1319(g)(6) of the Act.  33 U.S.C. §1365(a).  Section 1319(g)(6) provides, in pertinent part,

> (6) Effect of order
>
> (A) Limitation on actions under other sections
>
> > Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation--
>
> …
>
> > (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or
>
> > (iii) for which the Administrator, the Secretary, or the State as issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,
>
> shall not be the subject of a civil penalty action under … section 1365 of this title.

33 U.S.C. §1319(g)(6).

In this case, both § 1319(g)(6)(A)(ii) and (iii) apply to bar plaintiffs' citizen suit.  The state has commenced and is diligently prosecuting an action under a comparable state law, and the state has issued a final order not subject to further review and the Defendants have paid a penalty assessed under a comparable state law.

With respect to the diligent prosecution required under Section 1319(g)(6)(A)(ii), the 2003 COA was fully executed and in effect by October 31, 2003, more than one year prior to the Plaintiffs sending their required 60-day notice letter on December 9, 2004.  (Aff. of R. Gilson, ¶¶ 5 - 6; 2003 COA, App. at 162 -184).  Pursuant to the 2003 COA, MTSA already has spent or committed in excess of $4.36 million on corrective measures to address the violations alleged by the Plaintiffs in their Complaint.  (Aff. of G. Riedesel, ¶ 37).  MTSA also has paid $67,500.00 in civil penalties to date, plus another $21,250.00 to the PA Fish Commission.  (Aff. of G. Riedesel, ¶ 19).  These penalties include penalties for violations that occurred before the execution of the 2003 COA and stipulated civil penalties that the Defendants agreed to pay to the Department for any overflows that occurred subsequent to the execution of the 2003 COA.  (Aff. of G. Riedesel, ¶ 19; 2003 COA, ¶¶ Q, S, V and 8, App. at 165, 166, 173).  To date, MTSA and Millcreek have met all of the deadlines imposed by the 2003 COA for the work that is to be performed under the 2003 COA and have paid all of the civil penalties and stipulated civil penalties imposed under the 2003 COA.  (Aff. of R. Gilson, ¶ 7).

The fact that the Department has chosen in part to penalize the Defendants through stipulated civil penalties rather than separate civil enforcement actions does not make their prosecution any less diligent.  *See* Hudson River Sloop Clearwater, Inc. v. Consolidated Rail Corp., 591 F.Supp. 345, 351, n. 5 (N.D.N.Y. 1984), *rev'd on other grounds sub nom.*, Friends of the Earth v. Consolidated Rail Corp., 768 F.2d 57 (2d Cir. 1985).  Large monetary penalties are not a requirement of diligent prosecution.  *See* Arkansas Wildlife Federation, 29 F.3d 376, 378 (8th Cir. 1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1094 (1995); Hudson River, 591 F.Supp. at 352.  The test for diligent prosecution is not whether Department's prosecution was identical to the Plaintiffs' demands, but rather whether it is "totally unsatisfactory."  Supporters to Oppose

Pollution, Inc. v. Heritage Group, 973 F.2d 1320, 1324 (7th Cir. 1992).  Here, the Department already was diligently prosecuting the Defendants where, prior to Plaintiffs' notice letter, the Department had entered into the 2003 COA requiring $4.36 million in significant system improvements in addition to imposing $25,000.00 in civil penalties for past violations and stipulated civil penalties for future violations (to date amounting to $42,500.00), which together address each of the violations alleged in the Plaintiffs' Complaint, and where the Defendants are in compliance with the 2003 COA.

With respect to the final order requirement under Section 1319(g)(6)(A)(iii), both the 1992 COA and the 2003 COA are final orders under which MTSA and Millcreek have paid civil penalties to the Department under the Pennsylvania Clean Streams Law.  First, the 30-day appeal period under either order has long expired.  (1992 COA, App. at 99; 2003 COA, App. at 162).  Second, under the 1992 COA, MTSA and Millcreek paid civil penalties amounting to $35,100.00; in the 2003 COA, MTSA and Millcreek have paid civil penalties amounting to $67,500.00.  (Aff. of G. Riedesel, ¶¶ 15, 19).  Therefore, the only remaining question is whether the Pennsylvania Clean Streams Law is comparable to Section 1319 of the CWA.

The federal circuit courts of appeals that have examined the comparability of a state law to Section 1319 of the CWA have applied two different tests, the overall comparability test, utilized by the First, Fifth, Sixth and Eighth Circuit Courts of Appeal, and the rough comparability test utilized by the Tenth and Eleventh Circuit Courts of Appeal.[11]  North and

---

[11]   The Third Circuit Court of Appeals has never decided the comparability of Pennsylvania's Clean Streams Law to the CWA for purposes of the citizen suit bar in subsection 1319(g). The Third Circuit has examined the preclusive effect of administrative enforcement actions on citizen suits on two occasions; however, both instances occurred prior to Congress adding Section 1319(g) to the CWA in 1987.  See Baughman v. Bradford Coal, Inc., 592 F.2d 215 (3d Cir. 1979); Student Public Interest Research Group of New Jersey, Inc. v. Fritzsche,

South Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d 552, 557 (1st Cir. 1991); Lockett, 319 F.3d at 683-84 (5th Cir. 2003); Jones v. City of Lakeland, Tennessee, 224 F.3d 518, 523 (6th Cir. 2000); Arkansas Wildlife Federation, 29 F.3d 376, 380 (8th Cir. 1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1094 (1995); Paper, Allied-Industrial, Chemical and Energy Workers International Union v. Continental Carbon Company, 428 F.3d 1285, 1294-95 (10th Cir. 2005); McAbee v. City of Fort Payne, 318 F.3d 1248, 1256 (11th Cir. 2003).

The overall comparability standard finds comparability so long as the state law "contains comparable penalty provisions which the state is authorized to enforce, has the same overall enforcement goals as the federal CWA, provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests." Arkansas Wildlife Federation, 29 F.3d at 381.

The rough comparability approach looks at each of the three categories of provisions in 1319(g) (penalty assessment, public participation, and judicial review), and determines whether each has a roughly comparable provision under the applicable state law as required to bar citizens suits. Paper, 428 F.3d at 1294, *citing* McAbee, 318 F.3d at 1256. This factor-by-factor analysis is less forgiving than the "overall comparability" standard used by the First and Eighth Circuits. Id., *citing* Arkansas Wildlife Federation, 29 F.3d at 380; North and South Rivers, 949 F.2d at 557.

Defendants believe that the overall comparability test used by the First, Fifth, Sixth and Eighth Circuit Courts of Appeal is more consistent with what is required under Section 1319(g). Section 1319(g)(6)(A)(2) provides that the state law be "comparable to this subsection".

_____

Dodge & Olcott, Inc., 759 F.2d 1131 (3d Cir. 1985). Thus, the Baughman and Student opinions have little current relevance because they pre-date the passage of the 1987 CWA amendment that added Section 1319(g), which is at issue in this case.

Comparable is defined as "having features in common with something else to permit or suggest comparison; similar."  Random House Webster's Unabridged Dictionary, 2nd Ed. 1998.  Thus, using the common understanding of "comparable", Section 1319(g)(6)(A) does not require that the state law be identical to Section 1319(g), but rather that it accomplish the same goals.  <u>Arkansas Wildlife Federation</u>, 29 F.3d at 381-82, <u>North and South Rivers</u>, 949 F.2d at 556.  The rough comparability test imposes a more exact standard than the term "comparable" would require or suggest.  Further, the rough comparability test precludes the court from considering the ability of strengths in certain areas to overcome weaknesses in others such that the state law as a whole is "comparable to" Section 1319(g).  Thus, the overall comparability test is more consistent with the term "comparable."  However, regardless of the test used by the Court in this case, the Pennsylvania Clean Streams Law is comparable to Section 1319(g) of the CWA.

The civil penalty provisions under the Section 1319(g) of the CWA and the Pennsylvania Clean Streams Law are comparable.  Under Section 1319(g)(2) of the CWA, the United States Environmental Protection Agency ("USEPA") may assess either Class I or Class II civil penalties against alleged violators.  A Class I civil penalty may not exceed $10,000.00 per day and the maximum amount of any Class I civil penalty cannot exceed $25,000.00.  33 U.S.C. § 1319(g)(2)(A).  A Class II civil penalty also cannot exceed $10,000.00 per day, but its maximum penalty limit is $125,000.00.  33 U.S.C. § 1319(g)(2)(B).  The 2003 COA was predicated upon the Department's enforcement authority under Pennsylvania's Clean Streams Law, 35 P.S. § 691.1 <u>et seq</u>.  The Clean Streams Law authorizes the Department to assess civil penalties up to $10,000.00 per day for violations of that Law.  35 P.S. § 691.605.  However, unlike the CWA, there are no limits on the maximum amount of total civil penalties that can be assessed by the Department under the Clean Streams Law.  Thus, although the amount of daily

penalties under both the CWA and the Clean Streams Law are the same, Pennsylvania's maximum penalties are significantly more stringent that those under the CWA. Further, the total civil penalties paid under the 1992 COA was $35,100.00 and under the 2003 COA is $67,500.00, both of which are well above the maximum civil penalty available under a Class I penalty and well within the range of civil penalties available under a Class II penalty.

The public participation and the judicial review provisions of Section 1319(g) of the CWA and the Clean Streams Law also are comparable. Under Sections 1319(g)(4) and 1319(g)(8) of the CWA, interested persons are given the opportunity to participate in the enforcement process. Section 1319(g)(4) requires USEPA to publicly notice a proposed order assessing a civil penalty and allows an interested person to submit comments on that proposed order. Section 1319(g)(8) then allows only persons who submitted comments to appeal the decision of the USEPA within 30 days of the date the order is issued. Section 1319(g) does not require USEPA to publicly notice the issuance of its order. Thus, in order to get judicial review under Section 1319 you must have submitted public comments, and you must appeal within 30 days of an order whose issuance is not publicly noticed.

The Clean Streams Law handles the public's opportunity to participate differently than the CWA, but it nonetheless provides the same, if not greater, opportunity for meaningful public participation as Section 1319(g). Under the Clean Streams Law, the Department is not required to publicly notice any proposed Consent Order and Agreement; however, the appeal procedure adopted under the Clean Streams Law gives any aggrieved party the right to appeal such a Consent Order and Agreement within 30 days of actually receiving notice of it.

Section 691.7 of the Clean Streams Law provides as follows:

(a) Any person or municipality having an interest which is or may be adversely affected by any action of the department[12] under this act shall have the right to appeal such action to the Environmental Hearing Board.

(b) The department may adopt rules and regulations establishing the procedure for, and limiting the time of, the taking of such appeals.

35 P.S. § 691.7.    The rules regarding the taking of appeals provides, in pertinent part,

(2) Any other person aggrieved by an action of the Department shall file its appeal with the Board within one of the following:

(i) Thirty days after the notice of the action has been published in the Pennsylvania Bulletin.

(ii) Thirty days after actual notice of the action if a notice is not published in the Pennsylvania Bulletin.

25 Pa. Code § 1021.52.[13]    Thus, the Clean Streams Law allows any aggrieved party to appeal a

Consent Order and Agreement to the Environmental Hearing Board ("EHB") within 30 days of

---

[12]    An executed Consent Order and Agreement is an "action" of the Department appealable under 35 P.S. 691.7.  Lang v. DEP, 2004 EHB 584.

[13]    Section 1021.52 was amended in September of 1999.  The previous version of 25 Pa. Code § 1021.52 provided in relevant part as follows:

(a) Except as specifically provided in § 1021.53 (relating to appeal nunc pro tunc), jurisdiction of the Board will not attach to an appeal from an action of the Department unless the appeal is in writing and is filed with the Board within 30 days after the party appellant has received written notice of the action or within 30 days after notice of the action has been published in the Pennsylvania Bulletin unless a different time is provided by statute, and is perfected in subsection (b).

24 Pa.B. 3823, 3828.  Under this version, third parties had no rights to appeal or participate in a COA.  This provision was amended approximately six months after the United States District Court for the Eastern District of Pennsylvania held that Pennsylvania's Clean Streams Law did not provide adequate public participation in the civil penalty phase of the administrative enforcement process.  L.E.A.D., 1999 WL 124473 at 31 (E.D.Pa. 1999).  In

receiving actual notice of the action.[14]   This actually is more protective than the federal regulation under which a citizen has to read the particular federal register the date the public notice was printed, and actually submit a written comment.  Further, once a Consent Order and Agreement is appealed to the EHB, the EHB has the power to vacate all or a portion of the Consent Order and Agreement, and it may change the terms of the Consent Order and Agreement where the Department has been found to have abused its discretion.  Lang v. DEP, 2004 EHB 584, 589.

---

L.E.A.D., the Court observed, "the large majority of courts agree that a state law must include public participation or public notice relating to the administrative enforcement procedure."  L.E.A.D., 1999 WL 124473 at 31.  The amended language assures the ability of aggrieved third parties to intervene as of right in decisions that are not published in the Pennsylvania Bulletin.

[14]   In Lang v. DEP, 2004 EHB 584, 590, the EHB discussed the impact of this right of third parties to appeal:

Moreover, Section 4(c) of the Environmental Hearing Board Act, Act of July 13, 1988, P.L. 530, as amended, 35 P.S. § 7514(c), states that no action of the Department adversely affecting a person shall be final until that person has had the opportunity to appeal the action to the Board or until 30 days have passed.  An appellant's right to a hearing before the Board provides the appellant with due process.  Smedley v. EHB, 2001 EHB 131.  Thus, no party can enter into an "agreement" with the Department that allows the constitutional due process rights of the third party to be bypassed.  As noted in Smedley,

The Board protects the procedural due process rights of persons who allege and can prove that they are adversely affected by an action of DEP, a government agency.  Under the Environmental Hearing Board Act the Board is established as a quasi-judicial body to review appeals from DEP actions and no action of the Department adversely affecting a person shall be final until the Board has heard the appeal.

Id. at 156 (citing 35 P.S. § 7514(c); Fiore v. DER, 665 EHB 1081, 1086 (Pa. Comwlth. 1995).  Any party who enters into a CO&A does so knowing and accepting the full risk that the CO&A may not stand as is or may not stand at all.

The public participation procedures utilized under the Clean Streams Law also are consistent with USEPA's regulations under the CWA for the type of public participation required under the Act. Pursuant to Section 1342 of the CWA, the Department is authorized by USEPA to implement and enforce the NPDES Permit Program in Pennsylvania. As part of the approval process, USEPA had to determine that Pennsylvania had adequate authority "[t]o abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement". 33 U.S.C. § 1342(b)(7). The federal regulations that govern USEPA's approval of state programs specify minimum requirements for federal approval of state enforcement authority. 40 C.F.R. § 123.27. These regulations specifically include the following requirements for public participation:

> (d) Any State administering a program shall provide for public participation in the state enforcement process by providing **either**:
>
> (1) Authority which allows intervention as of right in any civil or administrative action to obtain remedies specified in paragraphs (a)(1), (2) or (3) of this section by any citizen having an interest which is or may be adversely affected; **or**
>
> (2) Assurance that the State agency or enforcement authority will:
>
> (i) Investigate and provide written responses to all citizen complaints submitted pursuant to the procedures specified in § 123.26(b)(4);
>
> (ii) Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule or regulation; and
>
> (iii) Publish notice of and provide at least 30 days for public comment on any proposed settlement of a State enforcement action.

40 C.F.R. § 123.27(d) (emphasis added). It is important to recognize that the language of Section 123.27(d) expressly provides that either intervention as of right or permissive

intervention coupled with public notice is sufficient to meet USEPA's public participation requirements. Pennsylvania has elected to meet this requirement by providing intervention as of right consistent with 40 C.F.R. § 123.27(d)(1). 35 P.S. § 691.7, combined with 25 Pa. Code § 1021.52(2), gives parties the right to appeal right any Clean Streams Law enforcement action.[15]

Similar State enforcement programs that provide for intervention as of right have been approved as comparable to federal law with respect to public participation under both the overall comparability test and the rough comparability test adopted by the different circuits. *See* Paper, 428 F.3d 1285, 1296 (The Tenth Circuit holding that, because the language of 40 C.F.R. § 123.27(d) is phrased in the disjunctive, the Oklahoma statute providing intervention as of right is sufficient to demonstrate comparability even though it does not contain public notice and comment provisions similar to those contained in § 123.27(d)(2)(iii)); Arkansas Wildlife Federation v. ICI Americas, Inc., 842 F.Supp. 1140, 1146 (E.D. Ark. 1993) *aff'd*, 29 F.3d 376 (8th Cir. 1994) (Holding that a statute providing intervention as of right was sufficient to demonstrate comparability.)

Beyond providing for intervention as of right, the Department, as a commonwealth agency, is covered by Pennsylvania's Right-to-Know Law, 65 P.S. § 66.1-66.9. The Right-to-Know Law provides in relevant part as follows:

> § 66.2. Procedure for access to public records
>
> (a) General rule. Unless otherwise provided by law, a public record shall be accessible for inspection and duplication by a requester in accordance with this act. A public record shall be provided to a requester in the medium requested if the public

---

[15] Further, 25 Pa. Code § 1021.62 gives a person the right to intervene in an EHB proceeding, which is comparable to the right of a person who submits a comment to intervene in a hearing under Section 1319(g)(4)(b).

record exists in that medium; otherwise, it shall be provided in the medium in which it exists. …

The Right-to-Know Law broadly defines "public records" with language that includes "any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons" among the items covered. 35 P.S. § 66.1.   The Right-to-Know Law was revised in 2002 (also subsequent to the 1999 L.E.A.D. opinion) to strengthen the public's right to obtain information.   The law provides an opportunity for judicial review in the event an agency denies a request to review public records. 35 P.S. § 66.4.   Thus, the records relating to and including the 2003 COA were available for public review by any interested party at the Department's offices.

This mechanism for providing public access to the records appears to be effective, as at least one member of the Plaintiff organizations, Catherine Pedler, has reviewed the MTSA and Millcreek file at the Department's offices on several occasions beginning on July 2, 2004.[16] (Depo. of C. Pedler, App. at 621-637).   In finding Arkansas' law comparable, the Eighth Circuit in Arkansas Wildlife Federation noted that the plaintiffs in that action had inspected the agency files five months before filing the citizen suit, and that the plaintiffs could have intervened in the state enforcement action but instead chose to collaterally attack the enforcement action through a federal lawsuit.   Arkansas Wildlife Federation, 29 F.3d at 382.   Likewise, in this case, Plaintiffs inspected the Department's files nearly eight months before filing their citizen suit, knew of the

---

[16]   Ms. Pedler also reviewed public files regarding the 2003 COA in June of 2004 at the Erie County Health Department.   (Depo. of K. Pedler, App. at 621, 638-640).

existence of the 2003 COA at least 9 (June, 2004 – February 2005), and possibly 14 months,[17] before filing suit, and under Pennsylvania law would have been able to appeal the 2003 COA within 30 days of receiving actual notice of its existence.  Instead, Plaintiffs have chosen to collaterally attack the Department's action.

In the case of the 2003 COA, there also were additional public notices and opportunities for participation (beyond the basic ability to intervene as of right).  First, the participation of MTSA and Millcreek under the 2003 COA meant that the 2003 COA had to be discussed and approved at a publicly noticed sewer authority meeting and a publicly noticed township supervisor meeting, respectively.   65 Pa.C.S.A. § 710.1(a).   These meetings are subject to Pennsylvania's Sunshine Act, which requires prior notice of the meeting schedule and an opportunity for public participation in the meetings.[18]  (Id.)   On October 23, 2003, MTSA approved the execution of the 2003 COA at a public meeting.  (Aff. of G. Riedesel, ¶ 18).  On October 28, 2003, Millcreek approved the execution of the 2003 COA at a public meeting.  (Aff. of B. McGrath, ¶ 2).

Second, the 2003 COA actually was appealed to the Environmental Hearing Board by Summit Township, which has a sewer system that feeds into the Millcreek sewer system.  (Aff. of G. Riedesel, ¶ 20; Notice of Appeal, App. at 683 - 689).   This appeal was filed on

---

[17]   Paul Burroughs, one of the persons identified by the Plaintiffs as a witness in support of standing and who is a member of two of the Plaintiffs, is a partner in the law firm that represented Summit Township in its appeal of the 2003 COA.  (Aff. of G. Riedesel, ¶ 20).  In addition, Attorney Burroughs personally appealed the 1992 COA.   Burroughs v. DER, 1992 EHB 1084.

[18]   In addition, the execution of the 2003 COA was the subject of a newspaper article in the Erie Time-News, the City of Erie's only daily newspaper.  (Aff. of B. McGrath, ¶3; 10/29/03 News Article App. at 681 - 682).

December 1, 2003. (Aff. of G. Riedesel, ¶ 20; Notice of Appeal, App. at 683). The concerns raised by Summit ultimately were resolved, and the appeal was ordered withdrawn on March 2, 2004. (Aff. of G. Riedesel, ¶ 20). The Pennsylvania enforcement scheme provides that a person may petition the Pennsylvania Environmental Hearing Board to intervene in any matter prior to the initial presentation of evidence. 25 Pa. Code § 1021.62(a). An individual must only have an interest greater than the public at large that will be affected by the Board's adjudication in order to establish a right to intervene. 25 Pa. Code § 1021.62(b). This is comparable to the opportunity to intervene provided in Section 1319(g)(4) of the Clean Water Act. Thus, Plaintiffs also had the opportunity to participate in an actual appeal of the 2003 COA by intervening in the appeal brought by Summit Township.

Third, the sewer system improvements to be performed by MTSA and Millcreek under the 2003 COA[19] were publicly noticed on two occasions in the Erie Times-News, providing a 30-day comment period during which interested persons could submit comments. (Aff. of G. Allender, ¶¶ 18, 20). The notices are required under Pennsylvania law. 25 Pa. Code § 71.31(c). These notices were published on May 26, 2004 and May 23, 2005. (Aff. of G. Allender, ¶¶ 18, 20; App. at 690 - 691). No public comments were received, nor did Plaintiffs submit any public comments. (Aff. of G. Allender, ¶¶ 18, 20). The Department approved each submission. (Aff. of R. Gilson, ¶¶ 11 – 12, 16 - 17; 9/30/04 letter, App at 418 - 419; 7/12/05 letter, App. at 600).

Fourth, each of the Department's approvals of the submissions publicly noticed was itself publicly noticed in Pennsylvania Bulletin notices on November 6, 2004 and July 30, 2005 (Aff.

---

[19]   The Special Study required by the Department under the 2003 COA ultimately constituted revisions to Millcreek Township's state-approved Act 537 Plan, as such had to be publicly noticed. (Aff. of G. Allender, ¶18).

of R. Gilson, ¶¶ 18 - 19; App. at 692 - 693).  Again, no action was taken by any member of the public in response to these notices, including any of the Plaintiffs.  (Aff. of R. Gilson, ¶ 18).

In comparing the Clean Streams Law to the CWA, the presence of a provision giving affected or potentially affected individuals 30 days after actual notice of an agency enforcement action to intervene as of right provides an opportunity for public participation that is roughly comparable to the public participation provided under Section 1319(g) of the Clean Water Act. This combined with the public availability of the Department's files, the ability to attend public meetings of MTSA and the Millcreek Township supervisors, the ability to intervene in an actual appeal of the 2003 COA, and the numerous publications which in fact provided actual notice to Plaintiffs is more than sufficient to "provide interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests."  Arkansas Wildlife Federation, 29 F.3d at 381.

In summary, Pennsylvania's Clean Streams Law enforcement scheme contains penalty assessment, public participation, and judicial review provisions sufficient to be "comparable" to the CWA enforcement scheme under either the overall comparability test or the factor-by-factor rough comparability test.  Because the Department already had commenced enforcement against the Defendants and was diligently prosecuting the Defendants under a comparable state law at the time the Plaintiffs filed the initial 60-day Notice of intent to file a citizen suit, the Plaintiffs civil penalty action is barred by Section 309(g)(6)(A)(ii).

> B.     THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES RELATING TO THE DISCHARGES FROM THE MANHOLES AT 51ST, AND 52ND STREETS AND ZIMMERLY ROAD BECAUSE THE MTSA AND MILLCREEK HAVE COMPLETED THE PROJECT REQUIRED BY THE 2003 COA THAT ENSURES THAT SUCH DISCHARGES CANNOT REASONABLY BE EXPECTED TO OCCUR AT THAT LOCATION IN THE FUTURE.

The Clean Water Act provides that

> any citizen may commence a civil action on his own behalf --
>
> (1)  against any person … who is alleged to be in violation of (A) and effluent standard or limitation.…

33 U.S.C. § 1365(a).  The seminal case of <u>Gwaltney of Smithfield, Ltd v. Chesapeake Bay Foundation, Inc.</u>, 484 U.S. 49. 108 S.Ct. 376 (1987) ("<u>Gwaltney I</u>") sets forth the proper scope of a citizen suit brought pursuant to Section 505 of the CWA.[20]

In interpreting Section 505 of the CWA, the United States Supreme Court ruled that the CWA does not permit citizen suits that are based on "wholly past violations."  <u>Gwaltney I,</u> 484 U.S. at 64, 108 S  Ct. at 385.  The Court explained that in order to state a claim under the CWA, citizen-plaintiffs must allege a "state of either continuous or intermittent violation -- that is, a

---

[20]    In <u>Gwaltney I,</u> plaintiffs instituted suit, claiming violations concerning the pollutants fecal coliform, chlorine and total Kjeldal nitrogen (TKN).  <u>Gwaltney I</u>, 484 U.S. at 54, 108 S.Ct. at 379-380.  The district court granted partial summary judgment to plaintiffs declaring that defendant Gwaltney violated the Act.    <u>Gwaltney I</u>, 484 U.S. at 54, 108 S.Ct. at 380. Thereafter, defendant Gwaltney moved to dismiss the action for lack of subject matter jurisdiction, asserting that the Act requires a defendant to be violating the Act at the time of lawsuit, and that Gwaltney was not violating the Act when the lawsuit was filed.  The district court rejected Gwaltney's argument and the Fourth Circuit affirmed.

reasonable likelihood that a past polluter will continue to pollute in the future." Gwaltney I, 484 U.S. at 56, 108 S.Ct. at 381.

Subsequent to Gwaltney I, a question arose as to whether a plaintiff in a CWA citizen suit case only had to prove any ongoing violation for the Court's jurisdiction to attach to all alleged violations (even those clearly wholly past) or whether a plaintiff had to prove that each violation was ongoing. After the remand of the Gwaltney I case, the Fourth Circuit Court of Appeals refused to hold that the ongoing violations conferred jurisdiction upon the Court to impose penalties for the wholly past violations, as these violations constituted a violation of a separate and distinct permit parameter:

> The entire structure of the Clean Water Act and regulations involves identifying specific pollutants and setting a permit limit for each pollutant of concern. It thus makes sense within this scheme to view each parameter separately for purposes both of determining ongoing violation and of assessing penalties.
>
> *   *   *
>
> [Plaintiff's] theory also runs against the reasoning of the Supreme Court in finding that there must be an ongoing violation to create subject-matter jurisdiction. If Congress wished to permit citizen suits only when a discharger fails to abate a problem and the government fails to take enforcement action, *see* 108 S.Ct. at 382-83, then it would make little sense to permit penalties for wholly past violations of one parameter simply because there are other ongoing violations of another parameter.

Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 696-697 (4th Cir. 1989) ("Gwaltney III").

The Third Circuit Court of Appeals, finding Gwaltney III instructive, adopted a modified by-parameter standard in Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc., 2 F.3d 493 (3d. Cir. 1993). A modified by-parameter standard expressly

accounts for the interrelationship between parameter violations and their underlying causes.  <u>Id.</u> at 499.

> Under the modified by-parameter approach, however, a plaintiff can establish at trial that violations are continuous or intermittent in either of two ways: first, by proving a likelihood of recurring violations of the same parameter; or second, by proving a likelihood that the same inadequately corrected source of trouble will cause recurring violations of one or more different parameters.

<u>Texaco</u>, 2d F.3d at 499.  Under a modified by-parameter approach, a court may have to consider evidence concerning the nature and causes of some violations in order to determine the likelihood that the same or related violations will continue to recur.  <u>Id.</u> at 501.

In <u>Texaco</u>, the Third Circuit affirmed the district court's finding that forty-nine violations were wholly pre-complaint violations.  The Third Circuit further found the district court's injunction which included wholly pre-complaint violations overbroad.  "In the context of a citizen suit, intended to be supplemental in nature, a district court may not grant any relief, monetary or injunctive, with respect to parameters over which it lacks Article III or subject matter jurisdiction." <u>Texaco</u>, 2 F.3d at 507.  *See also* <u>Pennsylvania Real Estate Investment Trust v. SPS Technologies</u>, 1995 WL 687003 (E.D. Pa. 1995) (dismissing plaintiff's claims pursuant to the CWA because plaintiff neither alleged nor could allege in good faith that defendant continuously or intermittently violated provisions of the Clean Water Act because any claimed violations must be "wholly past violations").  *cf* <u>Brossman Sales, Inc. v. Broderick</u>, 808 F.Supp. 1209 (E.D.Pa. 1992) (holding plaintiff failed to state a claim under the CWA as defendants relinquished ownership of the source of the alleged violation and no longer had the control to abate it).

Thus, in order for a plaintiff to withstand summary judgment, therefore, the plaintiff must establish a genuine issue of material fact that continuous or intermittent violations exist and produce evidence to support the following: (1) prove that violations continue on or after the date the complaint is filed, or (2) adduce evidence from which a reasonable trier of fact could find a continuing likelihood of a reoccurrence in intermittent or sporadic violations.  L.E.A.D. v. Exide Corp, 1999 WL 124473 (E.D. Pa. 1999), *citing* Natural Resources Defense Council v. Texaco Refining and Marketing, Inc., 2 F.3d 493 (3d Cir. 1993); see also, Allen County Citizens for the Environment, Inc. v. BP Oil Co., 762 F.Supp. 733 (N.D. Ohio 1991).  Jurisdiction will not lie where a plaintiff alleges claims for "wholly past" violations.  Gwaltney I, 484 U.S. at 57-58, 108 S.Ct. at 381-82.  Here, the violations relating to the Zimmerly Road manholes clearly were wholly past when the plaintiffs filed suit.  In addition, there are two violations alleged by Plaintiffs to be associated with the Kearsarge pump station that are wholly past.

Plaintiffs filed suit on February 14, 2005.  (App. at 1-2).  By September 20, 2004, MTSA and Millcreek had completed the Zimmerly Road relief sewer, which addressed the cause of the overflows at the 51st and 52nd Streets and Zimmerly Road - namely, the sewer line size was under capacity.  (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25).

Under the 2003 COA, MTSA and Millcreek were required to perform a Special Study to evaluate what had to be done by MTSA and Millcreek to eliminate the overflows at the Kearsarge pump station and the several manholes in that area.  (2003 COA, ¶ 3(a), App. at 167-168).  The Special Study concluded that the Zimmerly Road line was a 10" sewer line that had a capacity of 0.65 MGD, but was receiving flows of 0.4 to 1.5 MGD during storm events.  (App. at 251).  Further, the estimated future peak flow of that line was 1.72 MGD. (App. at 251).  Accordingly, the Zimmerly Road sewer line size was under capacity.  (Aff. of G. Allender, ¶ 25).

The proposed Zimmerly relief sewer, together with the existing Zimmerly Road sewer, provide a capacity of 2.07 MGD. (App. at 251). Based upon the analysis in the Special Study, the new capacity of the overall Zimmerly Road sewer is sufficient to handle both the existing and projected peak flows. (Aff. of G. Allender, ¶ 25).

The Zimmerly Road relief sewer has been operational since September 20, 2004. (Aff. of G. Riedesel, ¶ 23). Since that time, the Zimmerly Road sewer has, in fact, had adequate capacity to handle both normal flows and storm flows, and there have been no instances of overflows associated with the 51st and 52nd Streets and Zimmerly Road location since the relief line became operational. (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25). Based upon the work that has been completed, it is absolutely clear that MTSA and Millcreek, through their compliance with the 2003 COA, have completely eliminated the prospect of future overflows from that location.

Based upon this evidence, Plaintiffs cannot prove that as of February 14, 2005, there was evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence of the overflows at the 51st and 52nd Streets and Zimmerly Road locations. The project completed by MTSA and Millcreek fixed the capacity problem at that location. (Aff. of G. Riedesel, ¶ 23). Accordingly, the Zimmerly Road violations are wholly past, and this Court does not have subject matter jurisdiction over those violations. Therefore, summary judgment should be entered in favor of Defendants with respect to the Zimmerly Road violations alleged in Plaintiffs' Complaint.

In their Complaint, Plaintiffs allege that there were discharges at the Kearsarge pump station on November 7, 2000 and August 16, 2001. Both of these discharges are wholly past and this Court lacks subject matter jurisdiction over them. First, with respect to the November 7,

2000 discharge, this was caused by a malfunction in the seal on the overflow at the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 40; 12/5/00 letter, App. at 694). This problem was solved shortly after it was discovered and there have been no seal failures since November 7, 2000. (Aff. of G. Riedesel, ¶ 40). Thus, there has been no discharge due to a seal failure since the November 7, 2000 discharge, and there is no reasonable continuing likelihood of a reoccurrence of such a failure. As such, the discharge is wholly past.

Second, the discharge alleged to have occurred on August 16, 2001 likewise is wholly past. Contrary to Plaintiffs' allegation, the overflow that occurred on August 16, 2001 did not occur at the Kearsarge pump station and was not even associated with the area served by the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 41). Rather, the overflow was caused at a different pumping station by a power surge that caused the pumps to shut down and then not restart. (Aff. of G. Riedesel, ¶ 41; App. at 695 - 698). The suspected problem has been since repaired. (Aff. of G. Riedesel, ¶ 41). Thus, there has been no discharge due to a power surge malfunction since the August 16, 2001 overflow, and there is no reasonable continuing likelihood of a reoccurrence of such a malfunction. As such, the discharge is wholly past.

Since these two alleged violations are wholly past, this Court does not have subject matter jurisdiction over those violations. Therefore, summary judgment should be entered in favor of Defendants with respect to the November 7, 2000 and August 16, 2001 violations alleged in Plaintiffs' Complaint.

C.    PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES RELATING TO THE DISCHARGES FROM THE MANHOLES AT VARIOUS LOCATIONS ARE MOOT AS THE MTSA AND MILLCREEK HAVE COMPLETED PROJECTS REQUIRED BY THE 2003 COA THAT ENSURE THAT SUCH DISCHARGES CANNOT REASONABLY BE EXPECTED TO OCCUR AT THOSE LOCATIONS IN THE FUTURE.

Article III of the United State Constitution grants federal courts the power to adjudicate only "cases and controversies."  U.S. Const. Art. III, § 2, cl. 1; Whitmore v. Arkansas, 495 U.S. 149, 154-55, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); Khodara Environmental, Inc., ex rel. Eagle Environmental L.P. v. Beckman, 237 F.3d 186, 192-93 (3d  Cir. 2001).  The doctrine of mootness requires that the case or controversy must exist throughout all stages of the case, not just at the time the complaint is filed.  Brown v. Philadelphia Housing Authority, 350 F.3d 338, 343 (3d Cir. 2003); Khodara, 237 F.3d at 193.  Thus, it is appropriate to raise mootness at the summary judgment stage.  Nextel Partners Inc. v. Kingston Tp., 286 F.3d 687, 693 (3d Cir. 2002).

A case is considered moot "if the issues presented are no longer 'live' or the parties lack a cognizable interest in the outcome." In re Surrick, 338 F.3d 224, 229 (3d Cir. 2003), quoting In re Kulp Foundry, 691 F.2d 1125, 1128 (3d Cir. 1982)  "[T]he central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." In re Surrick, 338 F.3d at 230, quoting Jersey Cent. Power & Light Co. v. State of N.J., 772 F.2d 35, 39 (3d Cir. 1985).  Mootness can moot not only a plaintiff's request for injunctive and declaratory relief, but also their claim for

civil penalties. Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 120 S. Ct 693 (2000).

When events occur after the litigation is initiated, "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Laidlaw, 528 U.S. at 189, 120 S.Ct at 708. If the "event" that creates the asserted mootness is the voluntary cessation of the challenged activity, the "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Laidlaw, 528 U.S. at 189, 120 S.Ct. at 708, quoting U. S. v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968).

However, a plaintiff must produce evidence of more than speculation that the challenged activity will be resumed. Preiser v. Newkirk, 422 U.S. 395, 403, 95 S.Ct. 2330 (1975); Mississippi River Revival, Inc. v. City of Minneapolis, Minn., 319 F.3d 1013, 1017 (8th Cir. 2003) ("We refuse to speculate that these public bodies will allow the resumption of discharges without a permit."). Further, when the defendant is a governmental body, courts have treated the "cessation of the allegedly illegal conduct … with more solicitude … than similar action by private parties." Ammex, Inc. v. Cox, 351 F.3d 697, 705 (6th Cir. 2003); Ragsdale v. Turnock 841 F.2d 1358, 1365 (7th Cir. 1988); National Wildlife Federation v. U.S. Army Corps of Engineers, 404 F.Supp.2d 1015, 1018 (M.D. Tenn. 2005).

Lastly, where the defendant's actions are compelled by actions of other governmental bodies with the authority to require such action, the actions are not considered voluntary and there is not a genuine concern that the defendant is "free to return to its old ways." Ailor v. City of Maynardville, Tennessee, 368 F.3d 587, 600 (6th Cir. 2004) (case was moot where the City was already under an Order and Assessment from the Tennessee Department of Environment

and Conservation before suit was filed which required work that was performed during the pendency of the suit); <u>Tomaiolo v. Mallinoff</u>, 281 F.3d 1, 5 (1st Cir. 2002) (injunctive and declaratory relief claims were moot where municipality changed its law due to action by the state Attorney General and the state legislature).

Here, the relief sought by Plaintiffs relating to several alleged violations has become moot due to the MTSA's and Millcreek's compliance with the 2003 COA. According to Plaintiffs' Complaint there are 7 instances of discharges without a permit from the 51st and 52nd Streets and Zimmerly Road location; 3 instances of discharges without a permit from the Larchmont and Beaver Streets location and 3 instances of discharges without a permit from the Church and Patton and Pershing Streets location. (Complaint, ¶ 34). The work performed to date under the 2003 COA has made it absolutely clear that the discharges from the 51st and 52nd Streets and Zimmerly Road location, the Larchmont and Beaver Streets location and the Church and Patton and Pershing Streets location cannot reasonably be expected to recur. Therefore, the injunctive, declaratory and civil penalty relief sought by Plaintiffs for these alleged violations have been mooted.[21]

The 2003 COA was entered into by MTSA and Millcreek on October 31, 2003, approximately 16 months before the Plaintiffs filed their Complaint.[22] (Aff. of R. Gilson, ¶¶ 5-6;

---

[21]  Under Paragraph 9.b. of the 2003 COA, MTSA and Millcreek are subject to stipulated penalties in the amount of $2,500 for each overflow event at each point of overflow that occurs before March 30, 2007, including overflows resulting from pumping at these manholes; after March 30, 2007, the stipulated penalty is $5,000 for each overflow event at each point of overflow. (2003 COA, App. at 173).

[22]  Under Paragraph 22 of the COA, the MTSA's and Millcreek's obligations under the COA terminate only if the MTSA and Millcreek have completed all of the tasks set forth in the COA <u>and</u> MTSA and Millcreek have achieved compliance by having no overflows from any areas tributary from the Kearsarge pump station, including manual pumping, for a period of

2003 COA App. at 162). Paragraph 3 of the 2003 COA required that MTSA and Millcreek

submit a "complete and final Special Study" on or before July 1, 2004 that at a minimum was

required to include:

> i.   An evaluation of the following three alternatives to address the
>      removal of the Kearsarge Overflow and elimination of
>      overflow events tributary to the Kearsarge pump station: 1) the
>      construction of a retention facility at the Kearsarge pump
>      station; 2) the installation of an in-line booster on the
>      Kearsarge force main; 3) the replacement of the Kearsarge
>      pump station. Additional alternatives may be addressed in the
>      Special Study.
> ii.  Selection of the most feasible alternative of those identified in
>      the Special Study pursuant to Paragraph 3.a.i above, which will
>      result in the timely removal of the Kearsarge Overflow and
>      elimination of overflow events tributary to the Kearsarge pump
>      station.
>
> iii. An implementation schedule which includes a date when the
>      Kearsarge Overflow will be removed and overflow events from
>      other areas tributary to the Kearsarge pump station will be
>      eliminated. Said date shall be within 30 days of complete
>      installation of the alternative chosen pursuant to Paragraph 3.a.i
>      above.

(2003 COA, App. at 167-169).

In accordance with the 2003 COA, MTSA and Millcreek timely submitted the Special

Study, which was nearly eight months prior to the date Plaintiffs instituted this action. (Aff. of

G. Riedesel, ¶ 21; App. at 185). Of particular importance to the question whether some of

Plaintiffs' claims are moot, the Special Study found that the 10" sewer line along Zimmerly Road

("the Zimmerly Road line") and the 18" Beaver Run Interceptor were at or over capacity and

needed to be relieved. (App. at 208, 212, 248, 251). The capacity problem in the Zimmerly

---

24 months after March 30, 2007 and MTSA and Millcreek have paid all of the outstanding
penalties due under the COA. Further, the Department is the sole arbiter of whether MTSA
and Millcreek have complied with the COA, without any right of MTSA or Millcreek to
appeal. (2003 COA, App. at 177).

Road line caused the need to discharge from the 51st and 52nd Streets and Zimmerly Road location in order to protect nearby homes from having sewer backups in their basements. (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25). The capacity problem in the Beaver Run Interceptor caused the need to discharge from both the Larchmont and Beaver Streets and the Church, Patton and Pershing locations in order to protect nearby homes from having sewer backups in their basements. (Aff. of G. Riedesel, ¶ 24; Aff. of G. Allender, ¶ 26).

The Special Study recommended several projects that would enable MTSA and Millcreek to eliminate the overflow events from those three locations. (App. at 208, 212). MTSA and Millcreek recommended two capital projects to eliminate overflows in those three areas: First, construct a relief sewer on Zimmerly Road; and second, construct a diversion to the Beaver Run relief sewer. (Id.) In addition, Millcreek committed to continue its efforts to remove storm water in the system from illegal storm water connections and to install backflow preventors on the homes most at risk for basement sewer backups in the event a catastrophic event caused a surcharge at the Kearsarge pump station. (App. at 303-304). On September 30, 2004, the Department approved the Special Study submitted by MTSA and Millcreek. (Aff. of R. Gilson, ¶¶ 11 - 12; R. Gilson letter 9/30/04, App. at 418 - 419).

The MTSA and Millcreek have performed a number of actions since the inception of the 2003 COA, which moot the relief sought by Plaintiffs for the alleged violations associated with the three overflow locations.

First, MTSA and Millcreek have engaged in a significant program to detect and correct illegal storm water connections to its sewer system. As a necessary predicate to that effort, Millcreek and the MTSA passed and adopted a variety of ordinances, resolutions and rules and

regulations to enable them to more effectively enforce against properties that discharge storm water into the sanitary sewer system.

On March 30, 2004, Millcreek passed Ordinance 2004-4.  (Aff. of B. McGrath, ¶¶ 5-6, App. at 441 - 459).  Under Section 1.14.5 of Ordinance 2004-4, it is unlawful to discharge  "any storm water, surface drainage, ground drainage, roof runoff, subsurface drainage or unpolluted industrial process waters into any public sanitary sewer system."  (App. at 453).   Under Section 1.13.1 of Ordinance 2004-4, MTSA is authorized to establish rules and regulations governing the sanitary sewer system and to be used to implement the Ordinance.  (App. at 452).  In addition, under Section 1.13.5, the Manager of the MTSA is authorized to issue enforcement notices and commence enforcement actions.  (App. at 452).  Finally, Section 1.16 outlines the penalties that can be taken against anyone in violation of the Ordinance, which includes a $600.00 penalty per violation.  (App. at 456).  Section 1.17 outlines the enforcement actions that can be taken by Millcreek, including issuance of a cease and desist order.  (App. at 457-458).

In conjunction with Ordinance 2004-4, Millcreek also passed two resolutions:  Resolution 2004-R-13 and Resolution 2004-R-14.   (Aff. of B. McGrath, ¶¶ 7-9, App. at 460 – 468, 469 - 470).  Resolution 13 establishes a program to identify and terminate unlawful connections to the sanitary sewer system.  (Aff. of B. McGrath, ¶ 10; App. at 469-470).  The resolution sets forth the procedures to be followed for conducting inspections and for thereafter terminating any discovered illegal connections.  (Id.)  In Resolution 14, Millcreek formally adopted the Rules and Regulations Governing the Sanitary Sewer System ("Rules & Regulations").   (Aff. of B. McGrath, ¶ 10; App. at 469 – 470, App. at 471 - 525).

Section VIII of the Rules and Regulations deals with the inspections and terminations of unlawful connections.  (Aff. of B. McGrath, ¶ 10; App. at 490-495).  As with Resolution 13, the

Rules and Regulations lay out the process and procedures for inspecting for illegal connections and terminating any illegal connections that are discovered. (Id.) As part of the inspection program, MTSA and Millcreek were to determine areas of priority to initiate the program. (Id.).

Based on a comprehensive inflow and infiltration study conducted on the Kearsarge pump station area from 2000 to 2002 by the MTSA, MTSA and Millcreek identified a number of areas where it was suspected that large amounts of storm water were entering the sewer system and impacting the Kearsarge pump station area. (Aff. of G. Riedesel, ¶ 29; Project Study Area, App. at 699). As a result of that study, and armed with the new authority given to it by the Ordinance, Resolutions and Rules and Regulations, MTSA and Millcreek began to systematically inspect neighborhoods and individual homes for illegal connections. (Aff. of G. Riedesel, ¶ 29). To date, MTSA and Millcreek have inspected over 420 homes since the passage of the Ordinance, Resolutions and Rules and Regulations.[23] (Aff. of G. Riedesel, ¶ 29).

With respect to the areas that impact the Zimmerly Road sewer line (and hence the overflows at the 51st and 52nd Streets and Zimmerly Road location), MTSA and Millcreek have eliminated more than 31 illegal connections that were impacting that area during storm events. (Aff. of G. Riedesel, ¶ 30). It is estimated that on average, the removal of these illegal connections has reduced peak flows through the Zimmerly Road line by at least 0.22 MGD instantaneous peak flow. (Id.) With respect to the areas that impact the Beaver Run sewer (and hence the overflows at the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations), MTSA and Millcreek have eliminated 41 illegal storm water connections that

---

[23]    Under Paragraph 9.d of the 2003 COA, MSA and Millcreek are subject to stipulated penalties in the amount of $1,250 per calendar quarter for each quarter during which they fail to continue their program of identifying and securing termination of unlawful connections. (2003 COA, App. at 173-174).

were impacting that area during storm events.  (Id.)  It is estimated that on average, the removal of these illegal connections has reduced peak flows through the Beaver Run Interceptor by at least 0.295 MGD instantaneous peak flow.  (Id.)

The elimination of these illegal connections has removed a significant volume of storm water that was contributing to the overflows, which had to be pumped out of each of the three locations.  (Id.)  In fact, since September 9, 2004, there have been no overflows at any of these three locations, even though the Kearsarge pump station has had overflows on 6 occasions since that time due to storm events.  (Id.)

Second, in addition to the illegal connection work that MTSA and Millcreek have been performing, MTSA and Millcreek have installed backflow preventors in 6 homes in the area of the Zimmerly Road line at a cost of nearly $10,000.00.  (Aff. of G. Riedesel, ¶ 32).  It was discovered that the sewer pipes from these homes were at an elevation that was lower than the hydraulic grade line of the Kearsarge pump station.  (Id.)  Accordingly, these homes were especially susceptible to sewer backups in their basements.  (Id.)  This work was completed in early 2006.  (Id.)  This work provides further assurance that basements will not be flooded, thereby eliminating the need to have overflows in this area.  (Id.)

Third, with respect to the Zimmerly Road sewer line, MTSA and Millcreek completed the Zimmerly relief sewer on September 20, 2004.  (Aff. of G. Riedesel, ¶ 23).  Based upon the Special Study, the Zimmerly Road sewer line size was under capacity.  (Aff. of G. Allender, ¶ 25).  The Zimmerly relief sewer, together with the existing Zimmerly Road line, provide a capacity of 2.07 MGD. (Aff. of G. Allender, ¶ 25; Special Study, App at 251).  Based upon the analysis in the Special Study, the new capacity of the overall Zimmerly Road sewer is sufficient