to handle both the existing and projected peak flows into that sewer line. (Aff. of G. Allender, ¶ 25).

The Zimmerly Road relief sewer has been operational since September 20, 2004. (Aff. of G. Riedesel, ¶ 23). Since that time, the Zimmerly Road sewer has, in fact, had adequate capacity to handle both normal flows and peak flows, and there have been no instances of overflows associated with the 51st and 52nd Streets and Zimmerly Road location since the relief line became operational. (Id.) Based upon the work that has been completed, it is absolutely clear that MTSA and Millcreek, through their compliance with the 2003 COA, have completely eliminated the prospect of future overflows from that location. (Id.)

Accordingly, both the injunctive and declaratory relief and the civil penalties requested by Plaintiffs relating to the 51st and 52nd Streets and Zimmerly Road location are moot. There is nothing further for this court to order MTSA and Millcreek to do to stop the alleged violations (which in fact have stopped), and civil penalties will achieve no purpose as MTSA and Millcreek have completed the work and have already paid civil penalties, and continue to be threatened with future stipulated civil penalties, to ensure the deterrent effect.

Fourth, with respect to the 18" Beaver Run Interceptor, the MTSA and Millcreek have performed work that also moots Plaintiffs' claims associated with the overflows due to the overcapacity of that line. The Special Study concluded that the Beaver Run Interceptor has a capacity of 4.3 MGD; however, during storm events the peak flows could be 5.8 MGD. (Aff. of G. Allender, ¶ 26; Special Study, App. at 248). Thus, the line would be under capacity by 1.5 MGD during those events. (Aff. of G. Allender, ¶ 26). The Special Study proposed that the Peach Street Diversion be built to take flows of 1.2 MGD from the Beaver Run Interceptor to the Beaver Run relief sewer that has more than enough capacity to handle those flows. (Aff. of

G. Allender, ¶ 26; Special Study, App. at 285).  The Beaver Run Interceptor then would be able to accommodate the 0.3 MGD it would be under capacity (in essence, the line would act as storage until the flows subsided), and no overflows would be needed to protect any homes. (Special Study, App. at 285).  The inflow and infiltration investigation work performed by MTSA and Millcreek to date has already made up that 0.3 MGD shortfall of capacity for peak flows in the Beaver Run Interceptor.  (Aff. of G. Riedesel, ¶ 30).

On January 17, 2006, The Department issued to MTSA and Millcreek the permit to construct the Peach Street Diversion.  (Aff. of R. Gilson, ¶¶ 36 - 37; 1/17/06 Permit, App. at 420 - 424).  The Peach Street Diversion is expected to be operational by mid-late summer 2006. (Aff. of G. Riedesel, ¶ 28).

In the interim and to ensure that no further discharges will occur at the two locations impacted by the capacity limitation of the Beaver Run Interceptor, MTSA and Millcreek has developed a system to shift flows from the Peach Street Interceptor to the Beaver Run relief sewer.  (Aff. of G. Riedesel, ¶ 25; Aff. of G. Allender, ¶ 27).  MTSA found a location on the Peach Street Interceptor in the area of the Millcreek Mall that was only approximately 60 feet away from the Beaver Run relief sewer that could serve as a point to transfer flows over the surface via a pump and flexible hose.  (Id.)  This "over the surface" solution acts in the same fashion as the Peach Street Diversion.  (Id.)  Consequently, MTSA purchased a 6" pump, 60 feet of 6" flexible hose and made modifications to the Beaver Run line to accept the suction line of the pump.  (Id.)  The pump has the capacity to pump 2.0 MGD, which is more than what is needed to ensure that the Beaver Run Interceptor will not exceed its capacity and cause overflows at those two locations.  (Id.)  The cost of this equipment and work was in excess of $25,325.00.  (Aff. of G. Riedesel, ¶ 25).

The MTSA also has contracted with Chivers Construction Company ("Chivers") to operate the system when it is needed. (Aff. of G. Riedesel, ¶ 26). Once it is recognized that flows are backing up in the Beaver Run line during a storm event, Chivers is contacted and they immediately bring the pump system to the Millcreek Mall location and begin operating it. (Id.)

The cost to MTSA and Millcreek to have Chivers operate this pump station is approximately $136.00 per hour or $3,264.00 per 24-hour period. (Aff. of G. Riedesel, ¶ 26). Under the 2003 COA, MTSA and Millcreek must pay stipulated penalties in the amount of $5,000.00 to the Department for discharges from the two affected locations. (Aff. of G. Riedesel, ¶ 27). In addition, the PA Fish Commission has been fining MTSA $2,500.00 for each event. (Id.) Thus, a discharge from these locations would cost MTSA and Millcreek $7,500.00 in penalties. (Id.) Therefore, it costs MTSA and Millcreek significantly less to operate the "over the surface" pump system than it would be to have an overflow from these two locations. (Id.) Consequently, there is an economic incentive for MTSA and Millcreek to operate the "over the surface" pump system and prevent discharges from the two affected locations. (Id.) In most cases, the length of time for an overflow is much less than a full 24-hour period, and as such, in most cases the economic incentive for MTSA and Millcreek to use the "over the surface" pump system is significant. (Id.)

Since September 9, 2004, there have been no instances of overflows associated with the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations. (Aff. of G. Riedesel, ¶ 30). Based upon the illegal connection work that has been completed to date, as well as the "over the surface" pump system operated under the watchful eye of the 2003 COA stipulated penalties, it is absolutely clear that MTSA and Millcreek have completely eliminated the prospect of future overflows from those two locations.

Accordingly, both the injunctive and declaratory relief and the civil penalties requested by Plaintiffs relating to the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations are moot.  There is nothing further for this court to order MTSA and Millcreek to do to stop the alleged violations (which in fact have stopped), and civil penalties will achieve no purpose as MTSA and Millcreek have completed the work and have already paid civil penalties, and continue to be threatened with future stipulated civil penalties, to ensure deterrence.

In summary, the proof of the success of the efforts taken by MTSA and Millcreek to date is that there have been no discharges from any of these three locations since well before the complaint was filed.  In fact, the last discharge from these locations occurred during the remnants of the hurricane that hit the Millcreek area on September 9, 2004, which was determined to be the equivalent of an estimated 50-year storm.  (Aff. of A. Maas, ¶ 9, App. at 725; Aff. of G. Allender ¶ 19, App. at 738).  Thus, it has been nearly 19 months since there has been an overflow at these three locations.  This fact, combined with the work that MTSA and Millcreek have performed since September 9, 2004 and the 2003 COA, have mooted the Plaintiffs' claims for injunctive and declaratory relief and civil penalties relating to any alleged violations associated with discharges from the 51st and 52nd Streets and Zimmerly Road location, and the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations.

D.  PLAINTIFFS' CLAIM RELATING TO THE DECEMBER 14, 1999 DISCHARGE IS BARRED BY THE STATUTE OF LIMITATIONS.

In their Complaint, Plaintiffs assert that Defendants discharged from the bypass at the Kearsarge Pumping Station on December 14, 1999. (Complaint, ¶ 34.) Plaintiffs' claim relating to the alleged December 14, 1999 discharge is barred by the statute of limitations.

Although the CWA does not have a specific statute of limitations, Courts have determined that the five-year statute of limitations contained in 28 U.S.C. § 2462 applies to claims for civil penalties under the CWA. Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 75 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991). Furthermore, when a citizen suit is filed upon the CWA, the statute of limitations is tolled for the statutory 60-day notice period. Id. at 76. Lastly, the statute of limitations begins to accrue when the regulatory agency receives notice of the alleged violation. Id.; L.E.A.D, 1999 WL124473 at 3-4 (once violation is identified in a public record, statute begins to run under the discovery rule).

Here, the alleged violation occurred on December 14, 1999. (Aff. of G. Riedesel, ¶ 42.) On that same date, MTSA submitted a written notification to the Erie County Department of Health ("ECDH"). (Aff. of G. Riedesel, ¶ 42; App. at 700; Aff. of D. Range, ¶ 5). This notification was made pursuant to an arrangement worked out with the Department under which the ECDH would be notified when bypasses occurred. (Aff. of G. Riedesel, ¶ 42; 12/28/90 letter, App. at 701-703). Pursuant to an agreement between the Department and the ECDH, the ECDH acts as the agent of the Department in Erie County for, among other things, inspections and some permitting reviews. (Aff. of R. Gilson, ¶ 4; Aff. of D. Range, ¶ 4). The ECDH

immediately notified the Department of the use of the bypass.  (Aff. of D. Range, ¶ 7; App. at 704).  Thus, the statute of limitations began to run on December 14, 1999.

Plaintiffs filed their Complaint in this case on February 14, 2005.  (App. at 1-2).  Sixty (60) days prior to February 14, 2005 is December 16, 2004.  Based on the five-year statute of limitations then, any alleged violations that occurred prior to December 16, 1999 are barred by the statute of limitations.  Therefore, Plaintiffs' claim relating to the December 14, 1999 bypass is barred by the statute of limitations.  This Court should grant summary judgment in favor of the Defendants and against the Plaintiffs on Plaintiffs' claim that the December 14, 1999 discharge is a violation of the CWA.

> E.    PLAINTIFFS HAVE FAILED TO SHOW ANY HARM THAT WOULD BE IRREPARABLE TO SUPPORT THEIR THREE REQUESTS FOR MANDATORY INJUNCTIVE RELIEF.

In their Complaint, Plaintiffs ask this Court to enter an Order granting Plaintiffs a variety of mandatory injunctive relief.  Specifically, Plaintiffs request the following mandatory injunctive relief:

> 1.   Order the Defendants to assess and mitigate the environmental injuries caused by their illegal discharges;
>
> 2.   Order the Defendants to obtain a publicly available independent assessment of the facility by a qualified individual or organization, agreed upon by all parties, to determine how the Defendants can best comply with the requirements of the CWA; and

    3.  Order the Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance.

(Complaint, Request for Relief.)

Under the CWA, a court may order injunctive relief in a citizen suit. <u>Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.</u>, 906 F.2d 934 (3d Cir. 1990). This injunctive relief includes both the ability to forbid the continuance of a course of conduct or to compel the party to perform a particular act. <u>U. S. v. Malibu Beach, Inc.</u>, 711 F.Supp. 1301, 1310 (D.N.J. 1989). When the Court orders a party to perform a particular act, it is called a mandatory injunction. <u>U. S. v. Price</u>, 688 F.2d 204, 212 (3d Cir. 1982). Mandatory injunctive relief is extraordinary relief that should be granted only in extraordinary circumstances. <u>Id.</u> at 212-13; <u>Malibu Beach</u>, 711 F.Supp. at 1310.

Under the CWA, a court considering a request to issue an injunction must follow the traditional equitable standards for issuing injunctions. <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 311, 102 S.Ct. 1798, 1802 (1982). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." <u>Weinberger</u>, 456 U.S. at 312, *quoting* <u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 329 (1944). "In all cases, the question the court must decide is whether, considering all of the circumstances, it is appropriate to grant the specific relief requested." <u>Price</u>, 688 F.2d at 213.

A permanent injunction may be issued under the CWA "only after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest." <u>Texaco</u>, 906 F.2d at 941; <u>Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.</u>, 830 F.Supp. 1525, 1543 (D.N.J. 1993), *rev'd in part on other*

*grounds*, 50 F.3d 1239 (3d Cir. 1995). Here, plaintiffs' claims for mandatory injunctive relief fail because plaintiffs cannot prove that irreparable injury will occur if this Court does not grant each mandatory injunction requested by the plaintiffs.

This Court has succinctly described the standards followed in the Third Circuit for evaluating whether irreparable harm is established:

> "Irreparable injury is established by showing that the plaintiffs will suffer harm that 'cannot be redressed by a legal or equitable remedy following trial.'" Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989) ("The preliminary injunction must be the only way of protecting the plaintiff from harm."). The plaintiff bears this burden of making a "clear showing of immediate irreparable injury" Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989), cert. denied, 493 U.S. 848, 110 S.Ct. 144 (citation omitted), which is more than merely serious or substantial harm. ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987). The case law provides some assistance in determining that injury which is irreparable under this standard: "The word irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for …'." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (citation omitted). Additionally, "the claimed injury cannot merely be possible, speculative or remote." Dice v. Clinicorp. Inc., 887 F.Supp. 803, 809 (W.D. Pa. 1995). "Establishing a risk of irreparable harm is not enough." Id. (citing ECRI, 809 F.2d at 226).

Lines v. Wargo, 271 F.Supp. 2d 649, 665 (W.D. Pa. 2003). Thus, it is Plaintiffs' burden to show that they are entitled to the mandatory injunctive relief that they seek, and Plaintiffs have not, and cannot, meet that burden.

We will analyze each request for mandatory injunctive relief separately.

E.    PLAINTIFFS' REQUEST TO ORDER DEFENDANTS
TO ASSESS AND MITIGATE THE ENVIRONMENTAL
HARM CAUSED BY THE ALLEGED ILLEGAL
DISCHARGES MUST BE REJECTED BECAUSE
PLAINTIFFS HAVE FAILED TO MEET THE
STANDARDS REQUIRED FOR THE ISSUANCE OF A
MANDATORY INJUNCTION.

In their first requested mandatory injunction, Plaintiffs ask this Court to order Defendants to assess and mitigate the environmental harm that they have caused. This Court must reject Plaintiffs' request because Plaintiffs cannot prove that irreparable injury will occur if this Court does not grant each mandatory injunction requested by the plaintiffs.

In discovery, Plaintiffs have failed to identify with specificity any harm that Defendants' discharges have caused that would necessitate assessment and mitigation. Further, they have failed to even identify what mitigation they claim is necessary.

In Interrogatory No. 6 Defendants asked Plaintiffs to identify each adverse effect, environmental harm or degradation to Walnut Creek that Plaintiffs' claim were caused by Defendants' discharges. (App. at 706). Plaintiffs responded by objecting and stating that they did not need to make any showing of adverse effects, environmental harm or degradation.[1] (App. at 706-707). Plaintiffs also generally state that the negative impacts of raw sewage are obvious and refer to a general guidance document on combined sewer overflows published by USEPA. (App. at 707). Plaintiffs failed to identify any specific harm they claim the Defendants' discharges caused to Walnut Creek. (App. at 706-707).

---

[1]   This is the response provided despite the fact that Plaintiffs alleged such adverse effects, environmental harm and degradation in Paragraphs 1 and 9 of their Complaint. (Complaint, ¶¶ 1, 9).

In Interrogatory No. 9, Defendants asked Plaintiffs to identify all facts that supported their contention in Paragraph 14 of their complaint that "Without the issuance of injunctive relief …, Defendants will continue to degrade the quality of Walnut Creek …". (App. at 711-712). In response, Plaintiffs stated, "In regard to injunctive relief, such relief would prohibit Millcreek from continuing to violate the Clean Water Act; i.e., prohibit the unpermitted discharge of pollutants into Walnut Creek. It is obvious that the elimination of illegal discharge will stop the continuous degradation and prevent further aesthetic and recreational injury to Plaintiffs." (App. at 714). Again, Plaintiffs failed to identify any specific harm they claim the Defendants' discharges caused to Walnut Creek. (App. at 711-714).

Lastly, in Interrogatory No. 20, Defendants asked Plaintiffs to identify the specific mitigation Plaintiffs claim Defendants must perform. (App. at 715-716). In response, Plaintiffs stated, "Plaintiffs are currently formulating a proposal for a project that will help improve the water quality in Walnut Creek. Plaintiffs will supplement this response at such time as they have developed a specific project." (App. at 716). Discovery closed in this case on February 28, 2006, and as of that date, Plaintiffs had not supplemented their response. In the month since discovery closed, Plaintiffs have not supplemented their response. Thus, Plaintiffs failed to identify what mitigation was necessary. (Id.)

Under the Case Management Order, this Court Ordered that all expert disclosures be provided to the opposing party on or before January 31, 2006. Plaintiffs submitted no expert disclosures. Defendants, however, identified two outside experts and submitted their reports to this Court and Plaintiffs. Of particular importance to the issue now raised before this Court is the expert report of August E. Maas, P.E. (Aff. of A. Maas, ¶ 4; Expert Report, App. at 722 - 733).

Mr. Maas has a Bachelor of Science Degree in Civil Engineering from the University of Pittsburgh.  (Aff. of A. Maas, ¶ 2; App. at 732).  He holds a Professional Engineering ("P.E.") license in four states: Pennsylvania, Ohio, New York and Georgia.  (Id.)  He is a professional engineer who plans and designs municipal public works projects, specializing in wastewater treatment.  (Id.)  Mr. Maas has over 25 years of experience in this field, having worked for the Pennsylvania Department of Environmental Resources for five years before entering private practice for the balance of his career.  (Aff. of A. Maas, ¶ 3; App. at 732).  When he was with the Department, he was responsible for reviewing plans for permitting wastewater systems, performing stream modeling studies to determine effluent limits and performing value engineering cost recommendations.  (Id.)  As part of his stream modeling work, Mr. Maas conducted stream surveys to prepare the computer models to analyze the impacts of effluent discharges.  He also participated in aquatic surveys and studies.  (Aff. of A. Maas, ¶ 3; App. at 733).

In private practice, he has overseen a number of significant public sewer projects, including a $20 million project for the Borough of Ellwood City and a $16 million project at the Borough of North East.  (Aff. of A. Maas, ¶ 3; App. at 732-733).  Mr. Maas has developed stream monitoring programs and has reviewed numerous aquatic stream surveys which analyzed aquatic impact.  (Aff. of A. Maas, ¶ 3; App. at 733).  In addition, Mr. Maas has reviewed data from several dischargers to determine potential stream impacts in order to analyze required treatment facilities. (Id.)  Based on his education and experience, Mr. Maas is qualified to testify regarding the need for the type of mandatory injunctive relief that Plaintiffs seek.

Mr. Maas has reviewed whether the mandatory injunction requested by Plaintiffs to order Defendants to assess and mitigate the environmental injuries caused by the Defendants'

discharges is necessary.  (Aff. of A. Maas, ¶ 6).  Mr. Maas opined that such an assessment is not necessary because there is no evidence of any measurable harm that Defendants' discharges have caused to Walnut Creek.  (Aff. of A. Maas, ¶ 6; App. at 731).

Mr. Maas based his opinion on a number of factors.  (Aff. of A. Maas, ¶ 7; App. at 729 - 731).  First, the overflows are not frequent, both in number of overflows and in duration of overflows.  (Id.)  During the period of time covered by Plaintiffs' Complaint, the overflows at the Kearsarge pump station amount to 0.23% of the total time during that period -- time during which Walnut Creek continues to flow.  (Id.)  This indicates that the overflows are not frequent or chronic.  (Id.)  Second, the overflow events occur during significant wet weather events or conditions.  (Id.)  Thus, the overflow is significantly diluted by a factor of at least 5 to 1.  (Id.)  Third, during the overflow events, Walnut Creek has a high stream flow.  (Id.)  Both of these factors minimize the impact of any overflows.  (Id.)  Fourth, the overall volume of the discharges is insignificant in relation to the flow of Walnut Creek.  (Aff. of A. Maas, ¶ 7; App. at 729 - 730).  The volume of discharges is approximately 0.0004% of the total flow of Walnut Creek during the last 12+ years.  (Aff. of A. Maas, ¶ 7; App. at 730).  This large difference in flows indicates that there is no significant potential for long-term water quality impacts due to the overflows.  (Id.)  Fifth, sampling that has been performed of Walnut Creek does not indicate that there has been any water quality degradation due to the overflow.  (Aff. of A. Maas, ¶ 7; App. at 730-731).  Sampling performed on Walnut Creek downstream of the overflows during dry weather produced results that indicate the overflows have caused no continuing problem.  (Id.)  Lastly, Mr. Maas made personal observations of Walnut Creek, and based on his experience, did not see any visible signs of water quality degradation. (Aff. of A. Maas, ¶ 7; App. at 731).

Plaintiffs have produced no evidence in discovery that rebuts the expert opinion of Mr. Maas. Further, Plaintiffs have produced no evidence in discovery to support their claim that Walnut Creek has been degraded as a result of the Defendants' discharges. In addition, Plaintiffs have produced no evidence in discovery to establish that an assessment and mitigation of Walnut Creek is necessary to prevent any irreparable harm. In contrast, MTSA and Millcreek have introduced the opinion of Mr. Maas, a registered Professional Engineer, with over 25 years of experience in this exact field, dealing with these issues on a routine basis. It is Mr. Maas professional opinion that an assessment is not necessary because there is no evidence of any measurable harm that Defendants' discharges have caused to Walnut Creek. (Aff. of A. Maas, ¶ 6; App. at 731). Accordingly, this Court should grant Defendants' Motion for Summary Judgment as to Plaintiffs' request for a mandatory injunction requiring Defendants to assess and mitigate the alleged environmental harm caused to Walnut Creek.

> F.    PLAINTIFFS' REQUEST TO ORDER DEFENDANTS TO OBTAIN A PUBLICLY AVAILABLE INDEPENDENT ASSESSMENT OF THE FACILITY BY A QUALIFIED INDIVIDUAL OR ORGANIZATION, AGREED UPON BY ALL PARTIES, TO DETERMINE HOW THE DEFENDANTS CAN BEST COMPLY WITH THE REQUIREMENTS OF THE CWA MUST BE REJECTED BECAUSE PLAINTIFFS HAVE FAILED TO MEET THE STANDARDS REQUIRED FOR THE ISSUANCE OF A MANDATORY INJUNCTION.

In their second requested mandatory injunction, Plaintiffs request this Court to order the Defendants to obtain a publicly available independent assessment of the facility by a qualified individual or organization, agreed upon by all parties, to determine how the Defendants can best

comply with the requirements of the CWA.  This Court must reject Plaintiffs' request because Plaintiffs cannot prove that irreparable injury will occur if this Court does not grant each mandatory injunction requested by the plaintiffs.

In discovery, Plaintiffs have failed to identify what actions Plaintiffs believe the Defendants must take to best comply with the requirements of the CWA, or any facts that support the need for any action beyond what already is being done under the 2003 COA.

In Interrogatory No. 21, Defendants asked Plaintiffs to "Identify all actions Plaintiffs claim Defendants must take to best comply with the requirements of the Clean Water Act, explain how such actions will make Defendants comply with the Clean Water Act and identify any and all facts and documents, and all persons with knowledge of such facts and documents, that support such action."  (App. at 716).  In response, Plaintiffs simply recited some provisions of the CWA and objected asserting that the Interrogatory sought factual information for issues that were legal questions.  (App. at 715-716).

In stark contrast to Plaintiffs' lack of evidence are the actions taken by MTSA and Millcreek pursuant to the 2003 COA to address the alleged CWA violations.  As stated above, Paragraph 3 of the 2003 COA required MTSA and Millcreek to submit a Special Study to the Department on or before July 1, 2004 identifying the alternative to be implemented to remove the Kearsarge overflow and eliminate the overflow events tributary to the Kearsarge pump station, and setting a schedule for their completion.  (2003 COA, App. at 167-169).  Pursuant to the Pennsylvania Clean Streams Law and regulations, on May 26, 2004, MTSA and Millcreek published a public notice of the Special Study to enable interested persons to make public comments.  (Aff. of G. Allender, ¶ 18, App. at 690).  The Notice gave parties from May 26, 2004

to June 25, 2004 to submit comments. (Id.) No member of the public, including anyone from the three Plaintiffs, submitted any public comments. (Aff. of G.Allender, ¶ 18).

As required by the 2003 COA, by July 1, 2004, MTSA and Millcreek submitted the Special Study outlining its proposed solution and indicating that the work would be completed within 18 months after the Department issued the construction permit, and that the overflow would be eliminated within 30 days after construction was completed, all of which was consistent with the 2003 COA. (Aff. of G. Allender, ¶ 17; Special Study, App. at 186-413). The main component of the proposed solution was the construction of a tank with a capacity of at least 500,000 gallons. (Aff. of G. Allender, ¶ 17; Special Study, App. at 309).

The Department approved the Special Study on September 30, 2004. (Aff. of R. Gilson, ¶¶ 11 - 12; App. at 418-419). Under Paragraph 3.b. of the 2003 COA, once the Department approved the Special Study in writing, MTSA and Millcreek had to submit their permit for construction within nine months. (2003 COA, App. at 168).

Subsequent to the submission of the Special Study, the Millcreek Township area was hit with the remnant of a hurricane on September 9-10, 2004, which caused overflows at the Kearsarge pump station of volumes and duration that had never been experienced in the past. (Aff. of G. Allender, ¶ 19). As a result of those events, MTSA and Millcreek submitted an Act 537 Special Study Addendum to the Department on June 28, 2005. (Aff. of G. Allender, ¶ 19; Addendum, App. at 542-599). In this addendum, the size of the storage tank was increased to 2.3 million gallons. (Aff. of G. Allender, ¶ 19; Addendum, App. at 575).

As part of the Special Study Addendum, MTSA and Millcreek again published a public notice for comments on May 23, 2005. (Aff. of G. Allender, ¶ 20, App. at 691). The public had from May 23, 2005 to June 22, 2005 to comment on the proposed changes. (Id.) No member of

the public, including anyone from the three Plaintiffs, submitted a public comment. (Aff. of G. Allender, ¶ 20). On July 12, 2005, the Department approved the Special Study Addendum. (Aff. of R. Gilson, ¶¶ 16 - 17; App. at 600).

On June 28, 2005, in compliance with the schedule in the 2003 COA, MTSA and Millcreek submitted to the Department the permit application to construct the proposed storage tank and accompanying changes to the pump station. (Aff. of G. Allender, ¶ 22; App. at 603). On August 6, 2005, notice of this application appeared in the Pennsylvania Bulletin. (Aff. of R. Gilson, ¶¶ 21 - 22; App. at 734). On September 26, 2005, the Department issued the construction permit to MTSA and Millcreek. (Aff. of R. Gilson, ¶¶ 26 - 27; App. at 604- 608). On October 8, 2005, notice of the Department's issuance of the permit appeared in the Pennsylvania Bulletin. (Aff. of R. Gilson, ¶¶ 28 - 29; App. at 735). No one from the public, including anyone from the Plaintiffs, submitted any comments on the application or appealed the permit. (Aff. of R. Gilson, ¶¶ 23, 30).

Due to the change in the tank configuration from one tank to two tanks, MTSA and Millcreek submitted an application for an amended permit on December 28, 2005. (Aff. of G. Allender, ¶ 24). Also, on January 14, 2006, MTSA and Millcreek submitted an update to its Act 537 Plan to cover the new two-tank design. (Id.) On March 1, 2006, the Department approved the changes proposed by MTSA and Millcreek and issued an amended permit. (Aff. of R. Gilson, ¶¶ 32 - 35; App. at 614, 615-619).

Under Paragraph 3.c. of the 2003 COA, MTSA and Millcreek must complete construction of the permitted facilities within 18 months of receiving the permit. (2003 COA, App. at 168). Thus, the storage tanks and the accompanying improvements to the pump station must be completed on or before March 26, 2007, with the overflow removed by April 25, 2007.

(Aff. of G. Riedesel, ¶ 36).  The bids for the work were awarded on March 16, 2006, with construction expected to begin in Summer 2006.  (Id.)

Thus, MTSA and Millcreek have received all the necessary approvals from the Department to construct the storage tanks and accompanying improvements to the Kearsarge pump station, which are designed to remove the Kearsarge overflow and eliminate the overflow events tributary to the Kearsarge pump station.  (Aff. of R. Gilson, ¶ 35).  Accordingly, the Department has reviewed and approved the project proposed by MTSA and Millcreek.

Beyond the approval already received from the Department under the 2003 COA for the proposed project, MTSA and Millcreek have submitted the expert reports of two well-qualified Professional Engineers, who both have opined that the project proposed by MTSA and Millcreek will eliminate the overflow at the Kearsarge pump station.

The first expert is Gerald C. Allender, who also is the designer of the project.  (Aff. of G. Allender, ¶ 19).  Mr. Allender is a Registered Professional Engineer in the state of Pennsylvania.    (Aff. of G. Allender, ¶ 2; Expert Report, App. at 736). Mr. Allender has a Master's Degree in sanitary engineering from Penn State University.  (Id.)  Mr. Allender worked for the Department for approximately seven years as Chief of Planning, Operations and Facilities in three different regional offices of the Department.  (Id.)  Mr. Allender also worked as the Director of Sanitary Engineering for the Erie County Department of Health for five years.  (Id.)  For the last 30 years, Mr. Allender worked in private practice for Consoer Townsend Envirodyne Engineers/AECOM, which is now Metcalf & Eddy/AECOM.  (Aff. of G. Allender, ¶ 2; Expert Report, App. at 737).  In his years of private practice, Mr. Allender has worked on sewer collection and treatment projects for numerous municipal clients.  (Id.)

Mr. Allender is the author of the Special Study and the Addendum to Special Study submitted by MTSA and Millcreek and approved by the Department. (Aff. of G. Allender, ¶¶ 17, 19). The design of the proposed project has two main components. (Aff. of G. Allender, ¶ 23). First, the existing pumps at the Kearsarge pump station will be replaced with pumps of greater capacity to pump flows forward to the City of Erie sewer system. (Aff. of G. Allender, ¶ 23; Expert Report, App. at 738). These pumps will have a capacity of 4,500 gpm. (Id.) Second, MTSA and Millcreek will construct two overflow retention tanks that will have a combined capacity of 2.3 million gallons. (Aff. of G. Allender, ¶ 23; Expert Report, App. at 738-739). When the flows at the Kearsarge pump station reach 4,500 gpm, any flows above 4,500 gpm will be diverted to the storage tanks. (Aff. of G. Allender, ¶ 23; Expert Report, App. at 739). Once flows through the pump station fall below 4,500 gpm, the tanks will automatically begin to feed stored volumes back into the system to be transported forward to the City of Erie sewer system. (Id.) Based upon his expertise and experience, its is Mr. Allender's opinion that the proposed project will handle the overflows at the Kearsarge pump station and enable MTSA and Millcreek to remove the overflow. (Id.)

As discussed above, MTSA and Millcreek also retained the services of Mr. August E. Maas to review the proposed design. (Aff. of A. Maas, ¶ 8; Expert Report, App. at 725). As detailed earlier, Mr. Maas has expertise in municipal sewer treatment and conveyance systems. (Aff. of A. Maas, ¶¶ 2-3; Expert Report, App. at 732-733). Mr. Maas reviewed the situation confronting the MTSA and Millcreek and concluded that, in his professional opinion, the only alternative that MTSA and Millcreek could pursue to eliminate the overflow would be an overflow retention facility. (Aff. of A. Maas, ¶ 8; Expert Report, App. at 724).

Mr. Maas then reviewed the facility designed by Mr. Allender.  (Aff. of A. Maas, ¶ 9; Expert Report, App. at 725-727).  Mr. Maas first reviewed the design standards relied upon by Mr. Allender in sizing the overflow retention basin; namely, Mr. Allender's use of the September 8-9, 2004 storm event, which was approximately a 50-year storm event.  (Aff. of A. Maas, ¶ 9; Expert Report, App. at 725).  Mr. Maas opined that, based on his experience and guidelines followed by the Department and USEPA (which call for design for a 2-year, 24-hour storm event), the 2.3 million gallon size of the overflow retention facility far exceeds industry standards and will be sufficient to eliminate the overflows at the Kearsarge pump station.  (Aff. of A. Maas, ¶ 9; Expert Report, App. at 727).

Based on the lack of evidence that Plaintiffs possess, the progress made to date by MTSA and Millcreek on the project that has been approved by the Department, and the expert opinions of two registered Professional Engineers, Mr. Allender and Mr. Maas, there is no factual basis presented by the Plaintiffs upon which to grant the mandatory injunction that Plaintiffs seek.  Furthermore, Plaintiffs have presented no evidence to establish that they will be irreparably harmed if the mandatory injunction that they are seeking is not granted.  Accordingly, MTSA and Millcreek respectfully request that this Honorable Court grant their Motion for Summary Judgment as to the mandatory injunction sought by Plaintiffs, which would require MTSA and Millcreek to have the proposed project once again assessed to determine whether it will bring MTSA and Millcreek into compliance with the CWA.

G.    PLAINTIFFS' REQUEST TO ORDER THE
DEFENDANTS TO DEVELOP ADEQUATE
STANDARD OPERATING PROCEDURES AND AN
ENVIRONMENTAL MANAGEMENT SYSTEM TO
ENABLE DEFENDANTS TO ATTAIN AND
MAINTAIN COMPLIANCE MUST BE REJECTED
BECAUSE PLAINTIFFS HAVE FAILED TO MEET THE
STANDARDS REQUIRED FOR THE ISSUANCE OF A
MANDATORY INJUNCTION.

In their third requested mandatory injunction, Plaintiffs request this Court to order the Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance. This Court must reject Plaintiffs' request because Plaintiffs cannot prove that irreparable injury will occur if this Court does not grant each mandatory injunction requested by the plaintiffs.

In discovery, Plaintiffs have refused to identify any particular standard operating procedure or environmental management system that Plaintiffs believe Defendants should implement, and have also failed to identify any facts that support implementing such procedure or system.

In Interrogatory No. 22, Defendants asked Plaintiffs to identify each standard operating procedure that Plaintiffs claimed Defendants must implement to attain and maintain compliance and any facts supporting implementing such a procedure. (App. at 638). Plaintiffs objected to the request, but stated that it did not advocate one strategy over another. Plaintiffs simply assert that Defendants must put something in place to discontinue all discharges to Walnut Creek. Plaintiffs "encourage[d]" Defendants to implement the nine controls recommended by USEPA for Combined Sewer Systems. (App. at 638).

- 70 -

In Interrogatory No. 23, Defendants asked Plaintiffs to identify each environmental management system that Plaintiffs claimed Defendants must implement to attain and maintain compliance and any facts supporting implementing such a system. (App. at 639). Again, Plaintiffs objected, and stated that they did not advocate one management system over another. (App. at 639-640). Plaintiffs then simply cite Defendants to USEPA's website on ISO 14001. (Id.)

As with the first two requests for mandatory injunctive relief, Plaintiffs have identified no evidence that would support the relief that they are seeking. Plaintiffs have identified no standard operating procedure or environmental management system that they assert MTSA and Millcreek should implement. Instead, Plaintiffs offer oblique suggestions, without any factual support to justify their suggestions.

The combined sewer overflow ("CSO") guidance published by USEPA that Plaintiffs "encourage" Defendants to implement does not even apply to the Millcreek sewer system. The CSO guidance applies to sewer systems with "combined sewer overflows". (Aff. of G. Riedesel, ¶ 8). The Millcreek sewer system is not a combined sewer system. (Id.) Thus, because the Millcreek sewer system is not a combined sewer system, USEPA's CSO guidance does not apply to the Millcreek sewer system.

Plaintiffs simply point to the generic ISO 14001 system as the type of system they think should be implemented; however, Plaintiffs have offered no evidence that would support any claim that such a system would work to prevent overflows at the Kearsarge pump station or how such a system should be implemented. Plaintiffs have further failed to identify any evidence that would establish that they would suffer from irreparable harm if such a system were not implemented.

In contrast, MSA and Millcreek offer the opinion of August E. Maas, a well-qualified Professional Engineer in the field of sanitary sewer systems. Mr. Maas reviewed the operating procedures that will be in place for the updated Kearsarge pump station and overflow retention facilities, and concluded that they should provide reliable operation in order to maintain compliance with the CWA. (Aff. of A. Maas, ¶ 10; Expert Report, App. at 728).

In particular, Mr. Maas reviewed the following aspects of the project. First, when the flows into the pump station exceed the new pump capacity of 4,500 gpm, the water will automatically go to a wet well. (Aff. of A. Maas, ¶ 11; Expert Report, App. at 728). Once in the wet well, when the water hits a certain level, the water will then be automatically pumped to the overflow retention facilities. (Id.) Once the flows entering the station have decreased to below the 4,500 gpm maximum pumping rate, the water in the overflow retention facilities will automatically be returned to the station to be forwarded to the City of Erie system. (Id.) The system also will have automatic alarms monitored by a Supervisory Control and Data Acquisition ("SCADA") system. (Id.) A SCADA system is a computer system which monitors critical functions and alerts a dispatcher if a problem is detected. (Id.) The SCADA system operates 24 hours a day, 7 days a week. (Id.). The SCADA system will have alarms for wet well levels, flow set points, storage tank levels, pump faults and other parameters critical to the operation of the system. (Id.) Thus, if something goes wrong, someone from the MTSA or Millcreek will be contacted immediately so the problem can be addressed. (Id.) Equipped with these operating procedures and controls, MTSA and Millcreek will be able to attain and maintain compliance with the CWA. (Id.)

Based on the lack of evidence that Plaintiffs possess, the operating procedures that will be implemented with the upgraded Kearsarge pump station and the overflow retention facilities,

and the expert opinions of a registered Professional Engineer, Mr. Maas, there is no factual basis presented by the Plaintiffs upon which to grant the mandatory injunction that Plaintiffs seek. Furthermore, Plaintiffs have presented no evidence to establish that they will be irreparably harmed if the mandatory injunction that they are seeking is not granted. Accordingly, MTSA and Millcreek respectfully request that this Honorable Court grant their Motion for Summary Judgment as to the mandatory injunction sought by Plaintiffs, which would require MTSA and Millcreek to implement an undefined standard operating procedure and an undefined environmental management system.

VI.    Conclusion

In conclusion, Defendants Millcreek Township Sewer Authority and Millcreek Township respectfully ask this Court to grant their Motion for Summary Judgment against Plaintiffs Erie County Environmental Coalition, PennEnvironment, Inc. and the Gaia Defense League and bar in its entirety Plaintiffs' action under 33 U.S.C. 1365. Alternatively, Defendants Millcreek Township Sewer Authority and Millcreek Township respectfully ask this Court to grant them Partial Summary Judgment against Plaintiffs Erie County Environmental Coalition, PennEnvironment, Inc. and the Gaia Defense League with respect to the wholly past violations, the claims that have become moot, the claim barred by the statute of limitations and the mandatory injunctive relief sought by the Plaintiffs.

Respectfully submitted,


s / Mark J. Shaw
_____
Mark J. Shaw
PA50763
Robert E. Gandley
PA82524
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7607
(814) 454-4647 (Facsimile)
mshaw@mijb.com

Attorneys for Defendants
    Millcreek Township Sewer Authority
    and Millcreek Township


Dated:  March 31, 2006