IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIE COUNTY ENVIRONMENTAL COALITION, PENNENVIRONMENT, INC. and THE GAIA DEFENSE LEAGUE,<br>　　Plaintiffs<br><br>　　　v.<br><br>MILLCREEK TOWNSHIP SEWER AUTHORITY AND MILLCREEK TOWNSHIP,<br>　　Defendants | CIVIL ACTION NO. 05-59 ERIE<br>ELECTRONICALLY FILED<br><br>JUDGE COHILL |

**RESPONSIVE CONCISE STATEMENT OF DEFENDANTS
MILLCREEK TOWNSHIP SEWER AUTHORITY AND MILLCREEK TOWNSHIP**

Defendants MILLCREEK TOWNSHIP SEWER AUTHORITY and MILLCREEK TOWNSHIP, by and through their attorneys, MacDonald, Illig, Jones & Britton LLP, file this Responsive Concise Statement and state the following.

I.　Response to Plaintiffs' Concise Statement of Material Facts

In violation of Local Rule 56.1(B)(1) of the Local Rules of the United States District Court for the Western District of Pennsylvania, Plaintiffs failed to file a Concise Statement of Material Facts. Accordingly, there are no statements of facts to which Defendants Millcreek Township Sewer Authority or Millcreek Township must respond.

II.     Statement of Material Facts in Opposition to
        <u>Plaintiffs' Motion for Summary Judgment on All Claims</u>

1.      Plaintiffs did not file a concise statement of material fact in support of their Motion for Summary Judgment on All Claims. (Appendix to Responsive Concise Statement at p. 4) (hereinafter "Resp. App.").

2.      Plaintiffs sent their 60-day notice letter under the Clean Water Act ("CWA") to Defendants on December 9, 2004. (Complaint, ¶ 3; Resp. App. at pp. 6-13).

3.      Nowhere in Plaintiffs' December 9, 2004 60-day notice do Plaintiffs assert that Defendants are in violation of Section 1342(q) of the CWA.  (Resp. App. at pp. 6-13).

4.      Nowhere in Plaintiffs' December 9, 2004 60-day notice do Plaintiffs ever mention a combined sewer, a combined sewer overflow or United States Environmental Protection Agency's ("USEPA") Combined Sewer Overflow ("CSO") Policy that they now claim Defendants are violating.  (Resp. App. at pp. 6-13).

5.      The Millcreek sewer system is designed and operated as a sanitary sewer system. (Aff. of G. Riedesel, ¶ 7-8, attached to Defendants' Motion for Summary Judgment) (hereinafter "Aff. of G. Riedesel").

6.      To the extent any stormwater gets into the Millcreek sanitary sewer system, it is the result of either illegal connections or some other unintended manner.  (Aff. of G. Riedesel, ¶ 9).

7.      Plaintiff's assertion that the Millcreek sewer system "is an old sewer system that combined both sewage and stormwater in the same pipes" is not accurate.  (Aff. of G. Riedesel, ¶¶ 7-9).

8. Millcreek Township ("Millcreek") does not use the sanitary system to convey stormwater. (Supplemental Aff. of G. Riedesel, ¶ 3, attached hereto) (hereinafter "Supp. Aff. of G. Riedesel").

9. In support of their Motion for Summary Judgment, Millcreek Township Sewer Authority ("MTSA") and Millcreek have submitted the expert opinion and affidavit of an expert witness, August E. Maas, who opines that there is no evidence of any measurable harm caused by the discharge to Walnut Creek. (Aff. of A. Maas, ¶ 6-7; Appendix to Defendants' Motion for Summary Judgment at pp. 729-731) (hereinafter "App.").

10. MTSA and Millcreek currently are under a Consent Order and Agreement with the Pennsylvania Department of Environmental Protection ("PADEP"), which was entered on October 31, 2003 ("2003 COA"). (App. at 162-184).

11. Under the 2003 COA, MTSA and Millcreek are required to remove the Kearsarge Pump Station Overflow on or before April 25, 2007. (Aff. of G. Riedesel, ¶ 36; App. at p. 168, ¶ 3(a)(iii).

12. In order to accomplish the removal of the Kearsarge Pump Station Overflow, MTSA and Millcreek are constructing two overflow retention tanks that will hold a total of 2.3 million gallons and are implementing upgrades to the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 35).

13. The contract for the retention tanks and pump station upgrades have been awarded and contracts have been signed. (Supp. Aff. of G. Riedesel, ¶ 4).

14. MTSA and Millcreek are scheduled to meet the deadlines under the 2003 COA. (Supp. Aff. of G. Riedesel, ¶ 4).

15.  If the Kearsarge overflow is removed before the work performed under the 2003 COA is completed, MTSA would have no ability to manage the flows that would occur at the Kearsarge pump station if a significant storm event hit the Millcreek area.  (Supp. Aff. of G. Riedesel, ¶ 5).

16.  As a result, the sewer lines feeding the pump station will begin to back up and the pump station wet well will begin to fill.  (Supp. Aff. of G. Riedesel, ¶ 5).

17.  The backup in the sewer lines will lead to sewage backing up into people's homes.  (Supp. Aff. of G. Riedesel, ¶ 6).

18.  It is believed that dozens (or more) of homes could be impacted under such a scenario.  (Supp. Aff. of G. Riedesel, ¶ 6).

19.  This will cause property damage to these homes and present an increased health risk to the residents of those homes.  (Supp. Aff. of G. Riedesel, ¶ 6).

20.  The backup in the sewer lines eventually will cause manhole covers to "pop off."  (Supp. Aff. of G. Riedesel, ¶ 7).

21.  The manhole covers popping off create several problems.  (Supp. Aff. of G. Riedesel, ¶ 7).

22.  First, the flows out of the manholes will run across Township streets and possibly private property before ending up in Walnut Creek.  (Supp. Aff. of G. Riedesel, ¶ 7).

23.  Thus, flows will continue to enter Walnut Creek.  (Supp. Aff. of G. Riedesel, ¶ 7).

24.  Second, those flows also have the potential to cause property damage and an increased health risk.  (Supp. Aff. of G. Riedesel, ¶ 7).

25.  Third, the missing manhole covers present a safety risk to both vehicles and individuals.  (Supp. Aff. of G. Riedesel, ¶ 7).

26. The backup into the pump station wet well ultimately will overflow into the rest of the pump station and then outside of the pump station. (Supp. Aff. of G. Riedesel, ¶ 8).

27. Once the flows reach outside the pump station, those flows will quickly reach Walnut Creek. (Supp. Aff. of G. Riedesel, ¶ 8).

28. A backup at the pump station would create the risk of damaging both existing equipment at the pump station as well as the new construction required under the 2003 COA. (Supp. Aff. of G. Riedesel, ¶ 8).

29. Under the worst-case scenario, the pump station is knocked out of service, which would impair its ability to operate under normal conditions. (Supp. Aff. of G. Riedesel, ¶ 8).

30. The Millcreek sewer system is not a combined sewer system and does not have a CSO. (Aff. of G. Riedesel, ¶ 7-8).

31. Therefore, the CSO Policy does not apply to the Millcreek sewer system. (Aff. of G. Riedesel, ¶ 7-8).

32. If the Court were to issue an order requiring MTSA and Millcreek to install an electronic gauge on the overflow, it would take MTSA at least six to seven months to have an operating monitoring unit. (Supp. Aff. of G. Riedesel, ¶ 9).

33. It would take engineers about two months to come up with a design document, since the cost of an electronic gauge would trigger the requirement for public bidding. (Supp. Aff. of G. Riedesel, ¶ 9).

34. The required public bidding, together with the bonding and insurance requirements, would add another two months. (Supp. Aff. of G. Riedesel, ¶ 9).

35. The contractor would need about two months to order the equipment and complete the work. (Supp. Aff. of G. Riedesel, ¶ 9).

36.   Finally, it typically takes about a month to schedule the calibration of the unit. (Supp. Aff. of G. Riedesel, ¶ 9).

37.   An actual overflow would also be required to calibrate the equipment. (Supp. Aff. of G. Riedesel, ¶ 9).

38.   Thus, MTSA would either have to wait for the next overflow to naturally occur (which may be months or longer), or would have to purposely induce an overflow situation to properly calibrate the equipment. (Supp. Aff. of G. Riedesel, ¶ 9).

39.   One potential problem with installing an electronic gauge is that it is believed that the existing overflow line was an old storm sewer line. (Supp. Aff. of G. Riedesel, ¶ 10).

40.   It is suspected that the piping will not accommodate an electronic gauge. (Supp. Aff. of G. Riedesel, ¶ 10).

41.   Consequently, in order for the gauge to even work properly, the overflow piping would have to be replaced. (Supp. Aff. of G. Riedesel, ¶ 10).

42.   This could create permitting problems with PADEP, which would serve to further extend the schedule. (Supp. Aff. of G. Riedesel, ¶ 10).

43.   It is estimated that the electronic gauge alone would cost between $25,000.00 to $35,000.00, and that the pipe replacement could cost $40,000.00. (Supp. Aff. of G. Riedesel, ¶ 11).

44.   Thus, the estimated combined cost of the futile project would be $65,000.00 to $75,000.00. (Supp. Aff. of G. Riedesel, ¶ 11).

45.   With respect to economic benefit, MTSA and Millcreek have experienced no economic benefit out of this situation. (Supp. Aff. of G. Riedesel, ¶ 12).

46. Quite to the contrary, MTSA and Millcreek have spent millions of dollars attempting to resolve this situation, some of which have not produced successful results. (Aff. of G. Riedesel, ¶ 14, 16).

47. MTSA and Millcreek are a municipal authority and a municipality, respectively; therefore, unlike a private enterprise, there is no profit motive impacting their decisions. (Aff. of G. Riedesel, ¶ 5; Aff. of B. McGrath, ¶ 1).

48. Neither MTSA nor Millcreek has refused to implement a project based on it costing too much. (Supp. Aff. of G. Riedesel, ¶ 13).

49. MTSA and Millcreek have not delayed taking any action in an effort to save money. (Supp. Aff. of G. Riedesel, ¶ 14).

50. With respect to the seriousness of the violations, MTSA and Millcreek have presented unrebutted evidence that the discharges have not caused any measurable harm to Walnut Creek. (Aff. of A. Maas, ¶ 7-8).

51. With respect to the violation history and good faith efforts to comply, MTSA and Millcreek have undertaken numerous projects to address the problem, all of which will cost MTSA and Millcreek approximately $34 million. (Aff. of G. Riedesel, ¶¶ 14, 16, 23-26, 28-33, 36-37).

52. With respect to economic impact of the penalty on MTSA and Millcreek, any additional penalty will be borne by the users and taxpayers of Millcreek Township and that the cost of sewer usage in Millcreek Township has increased by 63% since 1999. (Supp. Aff. of G. Riedesel, ¶ 15).

53. Lastly, to date, MTSA and Millcreek already have paid $103,500.00 in penalties for the time period covered by Plaintiffs' Complaint to the present. (Supp. Aff. of G. Riedesel, ¶ 16).

54. The amount of penalties paid to date by MTSA and Millcreek would exceed the amount that would be paid under the USEPA's municipal penalty policy for noncompliance. (Resp. App. at 30-33).

55. MTSA and Millcreek have a service population just under 50,000. (Supp. Aff. of G. Riedesel, ¶ 3).

Respectfully submitted,

    s / Mark J. Shaw
Mark J. Shaw
PA50763
Robert E. Gandley
PA82524
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7607
(814) 454-4647 (Facsimile)
mshaw@mijb.com

Attorneys for Defendants
   Millcreek Township Sewer Authority
   and Millcreek Township

Dated: April 20, 2006

950184