# U.S. District Court
## Western District of Pennsylvania (Erie)
## CIVIL DOCKET FOR CASE #: 1:05-cv-00059-MBC

ERIE COUNTY ENVIRONM, et al v. MILLCREEK
TOWNSHIP S, et al
Assigned to: Judge Maurice B. Cohill, Jr
Demand: $0
Cause: 33:1365 Environmental Matters

Date Filed: 02/14/2005
Jury Demand: None
Nature of Suit: 893 Environmental
Matters
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2005 | 1 | COMPLAINT with summons issued Filing Fee $ 250.00 Receipt # 05-202 (nk) (Entered: 02/14/2005) |
| 04/13/2005 | 2 | NOTICE of Attorney Appearance for MILLCREEK TOWNSHIP S, MILLCREEK TOWNSHIP by Mark J. Shaw, Robert Ernest Gandley (nk) (Entered: 04/13/2005) |
| 04/13/2005 | 3 | Stipulation by ERIE COUNTY ENVIRONM, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEA, MILLCREEK TOWNSHIP S, MILLCREEK TOWNSHIP Extending Time with proposed order. (nk) (Entered: 04/13/2005) |
| 04/18/2005 | | ORDER upon motion granting [3-1] stipulation Extending Time, set Answer deadline to 5/13/05 for MILLCREEK TOWNSHIP, for MILLCREEK TOWNSHIP S ( signed by Judge Maurice B. Cohill Jr. on 4/18/05 ) CM all parties of record. (mad) (Entered: 04/19/2005) |
| 05/13/2005 | 4 | ANSWER to Complaint by MILLCREEK TOWNSHIP S, MILLCREEK TOWNSHIP (Attorney Mark Shaw) (nk) (Entered: 05/16/2005) |
| 05/27/2005 | 5 | ORDER, Reset Case Management Conference for 3:00 p.m. on 6/22/05 ( signed by Judge Maurice B. Cohill Jr. on 5/27/05 ) CM all parties of record. (nk) (Entered: 06/01/2005) |
| 06/16/2005 | 6 | UNOPPOSED MOTION by ERIE COUNTY ENVIRONM, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEA to participate in the initaial Case Management Conference via telephone with Proposed Order. (nk) (Entered: 06/16/2005) |
| 06/20/2005 | 7 | PROPOSED DISCOVERY PLAN pursuant to Rule 26(f) by ERIE COUNTY ENVIRONM, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEA (sealed) (Entered: 06/21/2005) |
| 06/23/2005 | 8 | CASE MANAGEMENT ORDER setting Discovery cutoff on 2/28/06 ; Pltf's pretrial narrative statement 3/21/06 Joining of parties amending of pleadings by 11/4/05 ; Motion Filing deadline due 3/31/06 ; Response to |

| | | |
|---|---|---|
| | | motions due 4/20/06 ; Disclosure statements shall be exchanged no later than 7/19/05; expert dosc;psires 1/31/06; depositions of experts 2/28/06; Concise Statement of Material Facts 4/27/06 ( signed by Judge Maurice B. Cohill Jr. on 6/23/05 ) CM all parties of record. (mad) (Entered: 06/23/2005) |
| 06/23/2005 | 9 | Case Management Conference held 6/22/05 before Judge Maurice B. Cohill Jr. [ Reporter: none ] CMO to be entered. (mad) (Entered: 06/23/2005) |
| 11/15/2005 | 10 | AMENDED COMPLAINT against all defendants. all defendants, filed by ALL PLAINTIFFS.(Murphy, Jennifer) (Entered: 11/15/2005) |
| 11/28/2005 | 11 | DECLARATION in Support of Standing filed by H.P. Lim. (dm) (Entered: 11/28/2005) |
| 11/28/2005 | 12 | NOTICE by ALL PLAINTIFFS re 10 Amended Complaint *Notice of Withdraw* (Murphy, Jennifer) Modified on 11/29/2005 removed from public view (dm, ). (Entered: 11/28/2005) |
| 11/29/2005 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE. re 12 Notice (Other) ERROR: Wrong Event Selected and No Proposed Order Attached CORRECTION: Refile using the Errata Event as Motion to Withdraw and Attach Proposed Order. This message is for informational purposes only. (dm) (Entered: 11/29/2005) |
| 11/30/2005 | 13 | Errata re 10 Amended Complaint *Motion to Withdraw* by ALL PLAINTIFFS Reason for Correction: Amended Complaint. (Attachments: # 1 Proposed Order for Motion to Withdraw)(Murphy, Jennifer) (Entered: 11/30/2005) |
| 11/30/2005 | 14 | MOTION to Withdraw 10 Amended Complaint by ERIE COUNTY ENVIRONMENTAL COALITITON, ALL PLAINTIFFS, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEAGUE. (Attachments: # 1 Proposed Order)(dm) (Entered: 11/30/2005) |
| 11/30/2005 | 15 | ORDER granting 14 Motion to Withdraw 10 Amended Complaint . Signed by Judge Maurice B. Cohill on 11/30/2005. (dm) (Entered: 11/30/2005) |
| 01/31/2006 | 16 | First MOTION for Protective Order *for Standing declarant depositions*, First MOTION to Quash Subpoenas by ERIE COUNTY ENVIRONMENTAL COALITITON, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEAGUE. (Attachments: # 1 Proposed Order)(Murphy, Jennifer) (Entered: 01/31/2006) |
| 01/31/2006 | 17 | BRIEF in Support re 16 First MOTION for Protective Order *for Standing declarant depositions*First MOTION to Quash SubpoenasFirst MOTION to Quash Subpoenas filed by ERIE COUNTY ENVIRONMENTAL COALITITON, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEAGUE. (Attachments: # 1 Exhibit 1- Skrypzak Affidavit# 2 Exhibit 2- Dallas Affidavit# 3 Exhibit 3- Gwinn Affidavit# 4 Exhibit 4 Pedler |

|  |  | Affidavit# 5 Exhibit 5 Visnosky Affidavit# 6 Exhibit 6 Davis Affidavit# 7 Exhibit 7 Burroughs Affidavit# 8 Exhibit 8 Lim Affidavit# 9 Exhibit 9 Weber Affidavit# 10 Exhibit 10 Shaw Letter 1/10/06# 11 Exhibit 11 Murphy Letter 1/17/06# 12 Exhibit 12 Shaw Letter 1/20/06# 13 Exhibit 13 Murphy Letter 1/24/06# 14 Exhibit 14 Shaw Letter 1/25/06)(Murphy, Jennifer) (Entered: 01/31/2006) |
|---|---|---|
| 01/31/2006 | 18 | Expert Report of August E. Maas, P.E., by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP.(Shaw, Mark) (Entered: 01/31/2006) |
| 01/31/2006 | 19 | Expert Report of Gerald C. Allender, P.E., by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP.(Shaw, Mark) (Entered: 01/31/2006) |
| 02/01/2006 | 20 | ORDER granting 16 Motion for Protective Order, granting 16 Motion to Quash; indicating that: 1) The subpoenas served upon the ten (10) standing witnesses are quashed; 2) Plaintiffs have already produced affidavits that demonstrate standing and further discovery on this issue is therefor inappropriate. Signed by Judge Maurice B. Cohill on 2/1/06.(jg) (Entered: 02/01/2006) |
| 02/10/2006 | 21 | MOTION for Reconsideration re 20 Order on Motion for Protective Order,, Order on Motion to Quash, by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP. (Attachments: # 1Proposed Order)(Shaw, Mark) Modified on 2/13/2006 to name attachment (dm). (Entered: 02/10/2006) |
| 02/10/2006 | 22 | BRIEF in Support re 21 MOTION for Reconsideration re 20 Order on Motion for Protective Order,, Order on Motion to Quash, filed by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP. (Shaw, Mark) (Entered: 02/10/2006) |
| 02/14/2006 | 23 | BRIEF in Opposition re 21 MOTION for Reconsideration re 20 Order on Motion for Protective Order,, Order on Motion to Quash, filed by ERIE COUNTY ENVIRONMENTAL COALITITON, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEAGUE. (Murphy, Jennifer) (Entered: 02/14/2006) |
| 02/22/2006 | 24 | ORDER denying 21 Motion for Reconsideration re 20 Order granting plaintiffs' Motion for Protective Order and Motion to Quash. Signed by Judge Maurice B. Cohill on 2/22/2006.(kmw) (Entered: 02/22/2006) |
| 03/08/2006 | 25 | Joint MOTION to Amend/Correct [8] Case Management Order, by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP. (Attachments: # 1 Proposed Order Amended Case Management Order)(Shaw, Mark) (Entered: 03/08/2006) |
| 03/14/2006 | 26 | ORDER granting 25 Joint Motion to Amend Case Management Order. Further ordered that first sentence of Paragraph 8 of 6/23/2005 Case |

| | | |
|---|---|---|
| | | Management Order is amended to the extent that if the parties do not file motions for judgment on the pleadings, for summary judgment, or to dismiss, plaintiffs' pretrial narrative statement shall comply with Local Rule 16.1.4A and be filed on or before 4/7/2006. Signed by Judge Maurice B. Cohill on 3/13/2006.(kmw) (Entered: 03/14/2006) |
| 03/31/2006 | 27 | First MOTION for Summary Judgment *on all claims* by ERIE COUNTY ENVIRONMENTAL COALITITON, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEAGUE. (Attachments: # 1 Proposed Order Granting Summary Judgment in Favor of Plaintiffs)(Murphy, Jennifer) (Entered: 03/31/2006) |
| 03/31/2006 | 28 | BRIEF in Support re 27 First MOTION for Summary Judgment *on all claims* filed by ERIE COUNTY ENVIRONMENTAL COALITITON, PENNEVIRONMENT, INC., THE GAIA DEFENSE LEAGUE. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9# 10 Exhibit 10# 11 Exhibit 11# 12 Exhibit 12# 13 Exhibit 13# 14 Exhibit 14)(Murphy, Jennifer) (Entered: 03/31/2006) |
| 03/31/2006 | 29 | MOTION for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP. (Attachments: # 1 Proposed Order)(Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 30 | AFFIDAVIT re 29 MOTION for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP Affiant: Ricardo F. Gilson. (Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 31 | AFFIDAVIT re 29 MOTION for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP Affiant: August E. Maas. (Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 32 | AFFIDAVIT re 29 MOTION for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP Affiant: Brian P. McGrath. (Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 33 | AFFIDAVIT re 29 MOTION for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP Affiant: Gerald C. Allender. (Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 34 | AFFIDAVIT re 29 MOTION for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP Affiant: Douglas D. Range. (Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 35 | AFFIDAVIT re 29 MOTION for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP Affiant: George W. Riedesel. (Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 36 | STATEMENT OF FACTS *in Support of* 29 Motion for Summary Judgment. by MILLCREEK TOWNSHIP SEWER AUTHORITY, |

| | | MILLCREEK TOWNSHIP.. (Shaw, Mark) (Entered: 03/31/2006) |
|---|---|---|
| 03/31/2006 | 37 | BRIEF in Support re 29 MOTION for Summary Judgment filed by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP. (Attachments: # 1 Brief pages 51-74)(Shaw, Mark) (Entered: 03/31/2006) |
| 03/31/2006 | 38 | Appendix to 29 Motion for Summary Judgment by MILLCREEK TOWNSHIP SEWER AUTHORITY, MILLCREEK TOWNSHIP. (Attachments: # 1 Appendix Pages 1-50# 2 Appendix Pages 51-100# 3 Appendix Pages 101-150# 4 Appendix Pages 151-200# 5 Appendix Pages 201-250# 6 Appendix Pages 251-300# 7 Appendix Pages 301-350# 8 Appendix Pages 351-400# 9 Appendix Pages 401-450# 10 Appendix Pages 451-500# 11 Appendix Pages 501-550# 12 Appendix Pages 551-600# 13 Appendix Pages 601-650# 14 Appendix Pages 651-700# 15 Appendix Pages 701-743)(Shaw, Mark) (Entered: 03/31/2006) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/20/2006 09:26:56 | | | |
| PACER Login: | mi0026 | Client Code: | 16198.0001/JLS |
| Description: | Docket Report | Search Criteria: | 1:05-cv-00059-MBC |
| Billable Pages: | 3 | Cost: | 0.24 |



Michael D. Fiorentino, Esq.
*Executive Director*

Kenneth T. Kristl, Esq.
*Of Counsel*
*Supervising Attorney*

James R. May, Esq.
*Of Counsel*

Jennifer A. Murphy, Esq.
*Staff Attorney*

Mary A. Spinelli
*Administrative Assistant*

## MID-ATLANTIC ENVIRONMENTAL LAW CENTER

*Defending the Mid-Atlantic*

At Widener University School of Law
4601 Concord Pike, P.O. Box 7474, Wilmington, DE 19803-0474
302-477-2167/Fax: 302-477-2032/www.maelc.org

December 9, 2004

<u>Certified Mail/ Return Receipt Requested</u>

Millcreek Township Sewer Authority
Millcreek Township Municipal Building
3608 West 26th Street
Erie, PA 16506

Millcreek Township
Millcreek Township Municipal Building
3608 West 26th Street
Erie, PA 16506



**RECEIVED**
12 - 13 - 04

Mike Leavitt, Administrator
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Donald S. Welsh, Regional Administrator, Region III
United States Environmental Protection Agency
1650 Arch Street
Philadelphia, PA 19103-2029

Governor Edward G. Rendell
225 Main Capitol Building
Harrisburg, Pennsylvania 17120

Kathleen McGinty
Secretary, Pennsylvania Department of Environmental Protection
Rachel Carson State Office Building
400 Market Street
Harrisburg, PA 17105

Cathleen C. Myers
Deputy Secretary of Water Management
Pennsylvania Department of Environmental Protection
Rachel Carson State Office Building
400 Market Street
Harrisburg, PA 17105

**RE:    Notice of Intent to File a Citizen Suit Under the Clean Water Act Concerning the Millcreek Township Sewer Authority**

This notice is provided pursuant to section 505(b) of the Federal Water Pollution Control Act (hereinafter referred to as the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(b), of PennEnvironment Inc.'s ("PennEnvironment"), Erie County Environmental Coalition's ("ECEC") and Gaia Defense League's ("GDL") intent to file suit against the Millcreek Township Sewer Authority, located at 3608 West 26th Street, Erie, Pennsylvania 16506, and Millcreek Township, located at located at 3608 West 26th Street, Erie, Pennsylvania 16506 (hereinafter "Millcreek") for illegal discharges and violations of the Clean Water Act. Specifically, these violations involve the Kearsarge Pumping Station, the 51st and Zimmerly bypass, the Larchmont and Beaver bypass, and the Church and Patton bypass, all of which are outfalls from Millcreek. Millcreek is part of the Erie Wastewater System that carries raw sewage as well as storm water to the Erie Wastewater Treatment Plant. The Mid-Atlantic Environmental Law Center (hereinafter "MAELC") represents PennEnvironment, the Erie County Environmental Coalition and the Gaia Defense League in this matter. PennEnvironment, Erie County Environmental Coalition and Gaia Defense League intend to bring this action to achieve long-term compliance with environmental laws and to improve the quality of Walnut Creek and Lake Erie.

As described in this letter, Millcreek is in violation of the Clean Water Act because of the Millcreek's continuing discharges of pollutants into Walnut Creek and its surrounding tributaries without a NPDES permit or a Pennsylvania water quality management permit. These violations are of special concern to PennEnvironment, Erie County Environmental Coalition and Gaia Defense League because Millcreek's discharges have severely impacted Walnut Creek, as well as other important waterbodies in the watershed.

## I.    IDENTIFICATION OF THE PARTIES AND COUNSEL

PennEnvironment is a statewide citizen-based research and advocacy group committed to improving water and air quality and preserving open spaces in Pennsylvania. PennEnvironment's state headquarters address is as follows:

PennEnvironment
c/o Mr. David Masur
1334 Walnut Street, 6th Floor
Philadelphia, PA 19107
(215) 732-5897

2

The Gaia Defense League (GDL) seeks to protect natural resources for citizens by utilizing the laws of the Commonwealth of Pennsylvania and the United States. The organization monitors the activities of the environmentally regulated community, and state and federal agencies. When necessary the GDL will bring enforcement actions in the courts. Additionally, the organization will undertake and promote the education of the citizenry in the protection of natural resources. The organization also promotes other civic interests such as assisting local governments on community building and sustainable development. The GDL's state headquarters address is as follows:

> The Gaia Defense League
> Cathy Pedler
> 912 West 2nd Street
> Erie, PA 16507
> (814) 454-7523

The Erie County Environmental Coalition (ECEC) has been in existence for 21 years. The purpose of the Coalition is to provide for member organizations and citizen members a united presence that will maintain and improve the quality of the environment and addresses related social justice concerns. ECEC consists of over 2,000 individuals in various local struggles to protect the environmental quality of the region. The ECEC's headquarters address is as follows:

> Erie County Environmental Coalition
> Martin Visnosky
> 501 E 38th Street
> Erie, PA 16546
> (814) 459-5201

MAELC represents PennEnvironment, the Erie County Environmental Coalition and the Gaia Defense League in this matter. MAELC is a not-for-profit environmental law firm that provides legal services to individuals and public interest organizations in environmental matters. MAELC works to ensure that environmental requirements are met, and that legislation and regulations are adequately implemented by responsible federal, state and local agencies. MAELC is located at Widener University School of Law and works in tandem with students in Widener's Environmental and Natural Resources Law Clinic. Please direct all correspondence to:

> Jennifer A. Murphy, Esq.
> Michael D. Fiorentino, Esq.
> Mid-Atlantic Environmental Law Center
> 4601 Concord Pike, P.O. Box 7474
> Wilmington, DE 19803-0474
> (302) 477-2182
> (302) 477-2032 (fax)

3

## II.    BACKGROUND

In 1972, Congress enacted the Clean Water Act ("CWA") to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §1251 (a). The CWA's purpose is to attain "water quality which provides for the protection and propagation of fish, shellfish and wildlife and provides for recreation in and on the water." 33 U.S.C. §1251(a)(2). Except as in compliance with a National Pollution Discharge Elimination System permit ("NPDES permit") "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The term "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The term pollutant means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water." 33 U.S.C. §1362(6). Millcreek has pumped raw or inadequately treated sewage into Walnut Creek and has therefore altered the chemical, physical and biological integrity of Walnut Creek. Additionally, Millcreek currently does not possess and at no time in the past has possessed a NPDES permit at any of its discharge points. Therefore, every discharge of pollutant by Millcreek from its pumping stations is a violation of the Clean Water Act.

Section 505(b) of the CWA, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the filing of a citizen suit in the appropriate federal or state court, under section 505(a) of the Clean Water Act, respectively, that notice of the alleged violations be given to the alleged violator, the Environmental Protection Agency, and the state in which the alleged violations occur.

Millcreek's violations of the CWA and the Pennsylvania Clean Streams Law have occurred and continue to occur. (Pennsylvania Clean Streams Law, 35 P.S. § 691.201, states that no "person or municipality shall place or permit to be placed, or discharge or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any sewage."). In 1992, following violations, Millcreek entered into a Consent Order and Agreement with the Commonwealth of Pennsylvania Department of Environmental Resources, pursuant to which Millcreek was required to install flow meters, implement various corrective measures, and submit written quarterly reports of their efforts to comply with the consent order. Following the establishment of the 1992 Consent Order and Agreement, Millcreek continued to violate the CWA and the Pennsylvania Clean Streams Law. In 2003, a second consent order was entered into by Millcreek and the Commonwealth of Pennsylvania Department of Environmental Protection, in regard to violations of the Pennsylvania Clean Streams Law. Quarterly reports and monthly notification letters submitted by Millcreek, pursuant to the aforementioned 2003 Consent Order and Agreement, demonstrate that Millcreek violated and continues to violate the CWA on a constant and/or intermittent basis.

PennEnvironment, Erie County Environmental Coalition and Gaia Defense League have summarized the legal counts they may include in any complaint filed against Millcreek. PennEnvironment, Erie County Environmental Coalition and Gaia Defense League retain the right to add new discharges to these allegations when a civil action is filed.

4

## III.   MILLCREEK TOWNSHIP SEWER AUTHORITY'S VIOLATIONS OF THE CLEAN WATER ACT

PennEnvironment, Erie County Environmental Coalition and Gaia Defense League hereby place you on notice, pursuant to section 505(b) of the CWA, 33 U.S.C. §1365(b), that they believe that Millcreek is discharging pollutants without a NPDES permit, and in doing so, is violating Section 301 of the CWA.

Permits under the CWA regulate discharges with the goals of 1) protecting public health and aquatic life, and 2) assuring that every facility treats wastewater.

Under federal law, each day that the facility discharges in violation of 33 U.S.C. §1311, the Clean Water Act authorizes the United States District Court to impose a civil penalty of up to thirty-two thousand five-hundred dollars ($32,500) per day, per pollutant discharged pursuant to 40 C.F.R. § 19.4.

## IV.   MILLCREEK TOWNSHIP SEWER AUTHORITY VIOLATIONS

Quarterly reports and monthly notification letters drafted by Millcreek, pursuant to the December 2003 Consent Order and Agreement, demonstrate that Millcreek has been discharging raw or inadequately treated sewage into Walnut Creek at several discharge points including: the Kearsarge Pumping Station, the 51st and Zimmerly Pumping Station, the Larchmont and Beaver Pumping Station and the Church and Patton Pumping Station. Raw or inadequately treated sewage contains regulated pollutants and/or parameters including biochemical oxygen demand, total suspended solids, oil and grease, fecal coliform, pH, volatiles (e.g. benzene), pesticides, and PCBs. Each of these individual pollutants multiplied by the number of discharges represents the total number of violations under the Clean Water Act. Below is a summary of the actual discharges without a permit with regard to each site maintained by Millcreek as of September 17th, 2004:

A.     The Kearsarge Pumping Station

|   | Date | Hours of discharge | Volume/Comment |
|---|------|--------------------|----------------|
| 1. | September 17, 2004 | 13 hours | 1,914,000 gallons |
| 2. | September 9, 2004 | 22 hours | 5,044,000 gallons |
| 3. | September 10, 2004 | 10 minutes | 156,000 gallons |
| 4. | August 1, 2004 | 2.5 hours | unknown number of gallons[1] |
| 5. | July 31, 2004 | 13 hours | 150,000-1,800,000 gallons[2] |
| 6. | July 16, 2004 | 7 minutes | 10,500 gallons |
| 7. | May 21, 2004 | 1 hour 25 minutes | 75,000 gallons |

---

[1] The August 1, 2004 notification letter for this discharge states that the flow meters during this time were broken and the exact amount of discharge from this station was therefore unknown at this time.
[2] The July 31, 2004 notification letter for this discharge states that the flow meters on this date were not registering the amount of discharge from this pumping station, the amount of discharge was therefore estimated on the report.

5

| | | | |
|---|---|---|---|
| 8. | March 20, 2004 | 3 hours 26 minutes | 231,000 gallons |
| 9. | November 28, 2003 | 7 minutes | 14,000 gallons |
| 10. | September 29, 2003 | 6 hours 55 minutes | 1,019,780 gallons |
| 11. | May 12, 2002 | 5 hours | unknown number of gallons[3] |
| 12. | April 14, 2002 | 3 hours 30 minutes | unknown number of gallons[4] |
| 13. | February 1, 2002 | 12 hours | 108,000 gallons |
| 14. | August 16, 2001 | 39 minutes | 10,000 gallons |
| 15. | November 7, 2000 | unknown time span | "minor discharge"[5] |
| 16. | December 14, 1999 | 7 hours | 300,000-1,000,000 gallons |

B.  The 51st, 52nd and Zimmerly Pumping Station

| | Date | Hours of discharge | Volume/Comment |
|---|---|---|---|
| 1. | September 9, 2004 | 15 hours | 378,000 gallons |
| 2. | July 31, 2004 | 2 hours 10 minutes | 58,500 gallons |
| 3. | September 29, 2003 | unknown time span | 108,000 gallons |
| 4. | April 14, 2002 | 1 hour | "did not exceed 24,999 gallons"[6] |
| 5. | February 1, 2002 | 6 hours | unknown number of gallons[7] |
| 6. | May 12, 2002 | 4 hours | unknown number of gallons[8] |
| 7. | August, 2000 | 3 hours 30 minutes | 25,000-74,999 gallons[9] |

C.  The Larchmont and Beaver Pumping Station

| | Date | Hours of discharge | Volume/Comment |
|---|---|---|---|
| 1. | September 9, 2004 | 1.5 hours | 306,000 gallons |
| 2. | April 14, 2002 | 1 hour | "did not exceed 24,999 gallons"[10] |
| 3. | February 1, 2002 | 6 hours | "intermittent ~ 40,000 gallons"[11] |

---

[3] The May 13, 2002 incident report for this discharge does not state the number of gallons discharged from this pumping station on this date.

[4] The May 15, 2002 notification letter for this discharge states that "the volume by-passed at this station was at such a low rate that it did not register in the bypass meter" therefore the exact amount of discharge is unknown.

[5] The December 5, 2000 notification letter for this discharge states that "there was a mechanical seal failure on the piping system of the Kearsarge Pump Station Bypass...the accidental discharge was very minor..."

[6] The May 15, 2002 notification letter for this discharge states that "the volume by-passed at this station was at such a low rate that it did not register in the bypass meter" therefore the exact amount of discharge is unknown.

[7] The March 11, 2002 notification letter for this discharge does not state the exact amount of discharge but rather states that pumps at this station were run "intermittently" therefore the exact amount of discharge is unknown.

[8] The May 13, 2002 incident report for this discharge does not state the number of gallons discharged from this pumping station on this date.

[9] The September 7, 2000 notification letter for this discharge states that "Based on the pumping equipment utilized and the duration period of 3.5 hours...our best estimate of volumes discharged would be between 25,000 to 74,000 gallons."

[10] The May 15, 2002 notification letter for this discharge states that "the volume by-passed at this station was at such a low rate that it did not register in the bypass meter" therefore the exact amount of discharge is unknown.

[11] The March 11, 2002 notification letter for this discharge does not state the exact amount of discharge but rather states that pumps at this station were run "intermittently" therefore the exact amount of discharge is unknown.

6

D.    The Church and Patton and Pershing Pumping Stations

| | Date | Hours of discharge | Volume/Comment |
|---|---|---|---|
| 1. | September 9, 2004 | 15 hours | 129,000 gallons |
| 2. | July 31, 2004 | 2 hours 10 minutes | 19,500 gallons |
| 3. | April 14, 2002 | 2 hours | "did not exceed 24,999 gallons"[12] |

## V.    CONCLUSION

If conditions causing the above violations are not corrected within 60 days, such that it is absolutely clear that there is no reasonable likelihood that the violations will recur, PennEnvironment, Erie County Environmental Coalition and Gaia Defense League intend to file suit, seeking civil penalties, injunctive relief, attorney's fees and litigation costs as provided in the Clean Water Act, on behalf of the organizations and their members.

PennEnvironment, Erie County Environmental Coalition and Gaia Defense League reserve the right to include in their complaint allegations of any additional violations not heretofore included in this 60 day notice letter. Furthermore, this letter does not preclude the intent of PennEnvironment, Erie County Environmental Coalition and Gaia Defense League either to sue for violations under any statutory law or to sue for new violations of the Clean Water Act other than those described above.

PennEnvironment, Erie County Environmental Coalition and Gaia Defense League believe this notice of intent to sue complies with the requirements of Section 505(b) of the Clean Water Act, 33 U.S.C. §1365(b), and accompanying regulations. If you would like to discuss this matter further, please contact us as soon as possible. Furthermore, we would like to be notified of any efforts to resolve these violations.

Respectfully,

Jennifer Murphy, Esquire
Michael D. Fiorentino, Esquire
Mid-Atlantic Environmental Law Center
4601 Concord Pike, P.O. Box 7474
Wilmington, DE 19803-0474
(302) 477-2182
(302) 477-2032 (fax)

---

[12] The May 15, 2002 notification letter for this discharge states that "the volume by-passed at this station was at such a low rate that it did not register in the bypass meter" therefore the exact amount of discharge is unknown.

7

**App. 12**

Tara E. Hafer
Student Intern
Widener University School of Law
Environmental and Natural Resources Law Clinic
4601 Concord Pike, P.O. Box 7474
Wilmington, DE 19803-0474

On behalf of PennEnvironment, Erie County Environmental Coalition and Gaia
Defense League

8

# INTERIM CLEAN WATER ACT SETTLEMENT PENALTY POLICY

March 1, 1995

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................... 2

II.     PURPOSE ......................................................... 2

III.    APPLICABILITY ................................................... 3

IV.     PENALTY CALCULATION METHODOLOGY ........................... 4
        A. Economic Benefit .......................................... 4
        B. Gravity Component ......................................... 6
        C.    Gravity Adjustment Factors .......................... 12
        D. Litigation Considerations ................................ 13
        E. Ability to Pay ............................................ 21

V.      SUPPLEMENTAL ENVIRONMENTAL PROJECTS (SEPs) ................. 22

VI.     OTHER TYPES OF PENALTIES ...................................... 22

VII.    DOCUMENTATION, APPROVALS, AND CONFIDENTIALITY. ............ 23

ATTACHMENT 1 -- Examples of How to Calculate Statutory Maximum Penalty

ATTACHMENT 2 -- Settlement Penalty Calculation Worksheet



## I.    INTRODUCTION

Section 309 of the Clean Water Act (CWA), (33 U.S.C. §1319) authorizes the Administrator of the U.S. Environmental Protection Agency ("EPA" or "Agency") to bring civil judicial and administrative actions against those who violate certain enumerated requirements of the CWA. In such actions the Administrator may seek civil penalties.

EPA brings enforcement actions to require alleged violators to promptly correct the violations and remedy any harm caused by the violations. As part of an enforcement action, EPA also seeks substantial monetary penalties which promote environmental compliance and help protect public health by deterring future violations by the same violator and deterring violations by other members of the regulated community. Penalties help ensure a national level playing field by ensuring that violators do not obtain an unfair economic advantage over competitors who have done whatever was necessary to comply on time. Penalties also encourage companies to adopt pollution prevention and recycling techniques, so that they minimize their pollutant discharges and reduce their potential liabilities.

This Policy implements the Agency's February 1984 general *Policy on Civil Penalties* (#GM-21) and the companion document, *A Framework for Statute Specific Approaches to Penalty Assessments* (#GM-22), both issued on February 16, 1984. This Policy revises and hereby supersedes the *Clean Water Act Penalty Policy for Civil Settlement Negotiations* issued on February 11, 1986.[1]

This document sets forth the policy of the EPA for establishing appropriate penalties in settlement of civil judicial and administrative actions. Subject to the circumstances of a particular case, this policy provides the lowest penalty figure which the Federal Government should accept in a settlement. This Policy is drafted so that violators whose actions, or inactions, resulted in a significant economic benefit and/or harmed or threatened public health or the environment will pay the highest penalties. Obviously, where settlement is not possible, the Government reserves the right to seek penalties up to the statutory maximum.

## II.    PURPOSE

---

[1] The guidances issued to interpret and supplement the 1986 Penalty Policy are also superseded. These documents are the: Addendum to the Clean Water Act Civil Penalty Policy for Administrative Penalties, issued August 28, 1987; Guidance on Penalty Calculations for POTW Failure to Implement an Approved Pretreatment Program, issued December 22, 1988; Bottomline Penalties for Cases Involving More Than Five Years of Non-Compliance, issued May 11, 1992; Gravity Penalty Pilot Policy for Clean Water Act Cases, issued November 12, 1992; and Final Interim Guidance on Use of Litigation Consideration Reductions in the Clean Water Act Penalty Policy, issued October 10, 1993 (which incorporated the November 1992 Gravity Penalty Pilot Policy).

The purpose of this Policy is to further four important environmental goals. First, penalties should be large enough to deter noncompliance. Second, penalties should help ensure a level playing field by ensuring that violators do not obtain an economic advantage over their competitors. These two goals generally require that penalties recover the economic benefit of noncompliance, plus an appropriate gravity amount. Third, CWA penalties should be generally consistent across the country. This is desirable as it not only prevents the creation of "pollution havens" in different parts of the nation, but also provides fair and equitable treatment to the regulated community wherever they may operate. Fourth, settlement penalties should be based on a logical calculation methodology to promote swift resolution of enforcement actions and the underlying violations.

## III.  APPLICABILITY

This Policy applies to all CWA civil judicial and administrative actions filed after the effective date of this Policy, and to all such pending cases in which the government has not yet transmitted to the defendant or respondent an oral or written proposed settlement penalty amount. This Policy also may be applied (instead of the 1986 version) in pending cases in which penalty negotiations have commenced if application of this Policy would not be disruptive to the negotiations. This Policy applies to civil judicial and administrative penalties sought under CWA §309, including: violations of NPDES permit limits and conditions; discharges without an NPDES permit; violations of pretreatment standards and requirements (including local limits and pretreatment programs); violations of §405 sludge use or disposal requirements; violations of §308 information requests; and violations of §309(a) compliance orders. This Policy does not apply to actions brought exclusively under CWA §311 (oil and hazardous substance spills) nor for violations of requirements in §404 ("wetlands" cases involving disposal of dredged or fill material). Separate penalty policies apply to these two types of cases.

This Policy sets forth how the Agency generally expects to exercise its enforcement discretion in deciding on an appropriate enforcement response and determining an appropriate settlement penalty. In some cases, the calculation methodology set forth here may not be appropriate, in whole or part; in such cases, with the advance approval of the Assistant Administrator, an alternative or modified approach may be used.

This Policy only establishes how the Agency expects to calculate the minimum penalty for which it would be willing to settle a case. The development of the penalty amount to plead in an administrative or judicial complaint is developed independent of this Policy, except that the Agency may not seek a settlement penalty in excess of the statutory maximum penalty for the violations alleged in the complaint. This Policy is not intended for use by EPA, violators, courts, or administrative judges in determining penalties at a hearing or trial. (Also see §VI below).

A settlement penalty calculation is generally required before the Agency files an administrative complaint or refers a civil action to the Department of Justice. The penalty

calculation should be revised as relevant new information is discovered during the course of the litigation. The penalty calculation should be reviewed periodically (e.g.,on the anniversary of when the complaint was filed) to determine if any revisions to the calculation are necessary.

## IV.   PENALTY CALCULATION METHODOLOGY

Before proceeding to calculate the settlement penalty, Agency staff should estimate the statutory maximum penalty in order to determine the potential maximum penalty liability of the discharger.[2] The penalty which the government seeks in settlement may not exceed this statutory maximum amount. Examples of how to calculate the statutory maximum are set forth in Attachment 1. In general, the statutory maximum penalty for violations of an effluent limit for a period longer than one day includes a separate penalty for each day in the time period (assuming there was a discharge on each day).

The settlement penalty  is calculated based on this formula:

**Penalty = Economic Benefit + Gravity +/- Gravity Adjustment Factors - Litigation Considerations - Ability to Pay - Supplemental Environmental Projects.**

Each component of the penalty calculation is discussed below.   A worksheet summarizing the penalty calculation is included as Attachment 2.

### A. Economic Benefit

Consistent with EPA's February 1984 *Policy on Civil Penalties,* every effort should be made to calculate and recover the economic benefit of noncompliance. The objective of the economic benefit calculation is to place violators in the same financial position as they would have been if they had complied on time. Persons that violate the CWA are likely to have obtained an economic benefit as a result of delayed or completely avoided pollution control expenditures during the period of noncompliance. Commonly delayed and avoided CWA pollution control expenditures, include, but are not limited to:

o   Monitoring and Reporting (including costs of the sampling and proper laboratory analysis);

o   Capital equipment improvements or repairs, including engineering design, purchase, installation, and replacement;

---

[2] This calculation of the statutory maximum penalty, done as part of the settlement penalty calculation, is a legal evaluation, subject to the attorney-work product privilege. This calculation is not intended for use in court.

o    Operation and maintenance expenses (e.g. labor, power, chemicals) and other annual expenses; and

o    One-time acquisitions (such as land purchase).

The standard method in settlement efforts for calculating the economic benefit from delayed and avoided pollution control expenditures is through the use of the Agency's BEN model. Refer to the "BEN User's Manual" (Office of Enforcement, December 1993, or any subsequent revision) for specific information on the operation and proper use of BEN. There is no minimum amount triggering the use of the BEN model. In estimating economic benefit using the BEN model, the benefit should be calculated from the first date of noncompliance, but EPA generally does not go back no more than five years prior to the date when the complaint should be filed.[3]

The BEN model will produce a valid estimate of the economic benefit from delayed and avoided compliance costs only if it is properly used.[4] Before using the BEN model you need a defensible theory of on-time compliance: that is, the pollution control system or measures the violator should have installed and operated earlier to have prevented the CWA violations at issue in the case.[5] As a general rule, the best evidence of what the violator should have done to prevent the violations, is what it eventually does (or will do) to achieve compliance.[6]

In some cases, the BEN model may not be an appropriate methodology for estimating economic benefit or will not capture the full scope of the economic benefit. For example, if the violator is a privately-owned regulated utility, the standard BEN model may not be appropriate. In this situation, the Agency should consider a wrongful profits analysis and seek to recover the profits and other competitive market benefits the violator obtained as a result of operating during the period of violation.[7]    In another type of case, if the violator decides that its "method of

---

[3] The five year guideline for when the BEN and gravity calculations starts is a policy decision. Legally, there is nothing that prevents EPA from calculating economic benefit or gravity from the first date of violation, even if that is more than five years before the complaint is filed, as long as the statutory maximum penalty (calculated pursuant to the five year statute of limitations) exceeds the settlement penalty amount.

[4] The BEN model does not calculate the "competitive advantage" benefits a firm may have obtained as a result of operating in violation of the law. Such benefits include profits and increases in market share from selling goods and services during the period of violation.

[5] The BEN model is comparing the compliance costs the violator would have paid if it had complied on-time, versus the usually smaller compliance costs it actually pays by complying late.

[6] See BEN User's Manual, December 1993, page 6-2.

[7] Regions should consult Headquarters for how to conduct this analysis; a financial consultant is likely to be needed.

compliance" is to cease operations at the facility, conducting a BEN analysis may be complicated.[8] In a few unusual cases, economic benefit may be negative: this means, e.g., operating the old inefficient treatment system was more expensive than purchasing and operating a new, more efficient treatment system. When economic benefit is negative, the settlement calculation enters zero as the economic benefit.


## B. Gravity Component

The gravity calculation methodology is based upon a logical scheme and criteria that quantifies the gravity of the violation based upon the CWA and its regulatory programs. Every reasonable effort must be made to calculate and recover a gravity component in addition to the economic benefit component. As EPA's February 1984 *Policy on Civil Penalties,* states on page 4:

> The removal of the economic benefit of noncompliance only places the violator in the same position as he would have been if compliance had been achieved on time. Both deterrence and fundamental fairness require that the penalty include an additional amount to ensure that the violator is economically worse off than if [he] had obeyed the law.

The gravity component of the penalty is calculated <u>for each month in which there was a violation</u>. The total gravity component for the penalty calculation equals the sum of each monthly gravity component. The monthly gravity formula is:

**Monthly gravity component = (1 + A + B + C + D)  x  $1,000.**

The four gravity factors -- A, B, C, and D -- are considered for each month in which there were one or more violations. Values are assigned to each of the four factors as described in the text and tables below. In performing the gravity calculation, the monthly gravity component is calculated from the first date of noncompliance up to when the violations ceased or the date the complaint is expected to be filed, but EPA has the option to start the gravity calculation no more than five years prior to the date when the complaint should be filed. (See footnote #4.) In cases with continuing violations, the gravity calculation should be revised periodically to include additional months of violations that have occurred since the previous calculation.

---

[8] In cases where a facility determines that it can only comply by ceasing operations, an appropriate BEN analysis would be to input the savings obtained from the delayed closure costs and the avoided costs of not treating the wastewater during the period of noncompliance. See Appendix B in BEN User's Manual. If it is not possible to estimate these avoided treatment costs, then a wrongful profit analysis is necessary.

"A" -- Significance of Violation (Monthly Range 0 to 20). This factor is based on the degree of exceedance of the most significant effluent limit violation in each month. Values for this factor are selected from within designated ranges; violations of toxic monthly effluent limits are weighted most heavily. Values are selected using the table below based on the effluent value which yields the highest factor A value. Regions select a particular value for factor A within the designated range. For purposes of this table conventional and nonconventional pollutants include biochemical oxygen demand, chemical oxygen demand, total oxygen demand, dissolved oxygen, total organic carbon, total suspended solids, total dissolved solids, inorganic phosphorous compounds, inorganic nitrogen compounds, oil and grease, calcium, chloride, fluoride, magnesium, sodium, potassium, sulfur, sulfate, total alkalinity, total hardness, aluminum, cobalt, iron, vanadium and temperature. Factor A values for fecal coliform and pH, which are calculated using logarithmic scales, are calculated using the special scales at the bottom of the table. All other pollutants are classified as toxic pollutants.

If there were no effluent limit violations in a particular month, but there were other violations, then factor A is assigned a value of zero in that month's gravity calculation. In pretreatment cases in which the industrial user was not required to provide monthly compliance reports, and provided less frequent effluent data (e.g., in a 40 CFR §403.12(e) periodic compliance report), any effluent violations reported in the report are assumed to represent identical violations in each month of the reporting period for purposes of calculating gravity if there is substantial evidence supporting this assumption. Examples of such evidence are: (1) no pretreatment equipment was in operation during the period and (2) the production and treatment operations remained consistent during the period. This means the monthly gravity calculation, with a factor A value, should be repeated for all of the months covered by the report.[9] If there was no evidence indicating continuing violations throughout the period covered by the periodic compliance report, then a value for Factor A should be assigned only for the month in which the sampling occurred. If the industrial user did not notify the control authority and repeat the sampling after finding the effluent violation as required by 40 CFR §403.12(g)(2), then an appropriate value for gravity Factor D should be assigned for this notification or monitoring violation(s).

---

[9] The pretreatment regulations, 40 CFR §403.12(g)(3), require the periodic compliance reports to contain data which "is representative of conditions occurring during the reporting period." For example, if an industrial user reports in its December (semi-annual) periodic compliance report that it violated the daily maximum cadmium limit by 150% in September, and this was the most significant effluent violation, using the Gravity Factor A Table, factor A will be assigned a value between 3 and 7 for each of the six months covered by the report (July - December) if, e.g., EPA had evidence that the facility lacked treatment equipment during that period and wastewater generating operations were consistent during the period.

## GRAVITY FACTOR A -- SIGNIFICANCE OF THE VIOLATION

Select a value for factor A based on the effluent limit violated in the month
which produces the highest range of values for factor A.

| Percent by which effluent limit was exceeded: | | | Factor A Value Ranges | |
| --- | --- | --- | --- | --- |
| Monthly Average | 7-day Average | Daily Maximum | Toxic Pollutants | Conventional & Nonconventional Pollutants |
| 1 - 20 | 1 - 30 | 1 - 50 | 1 - 3 | 0 - 2 |
| 21 - 40 | 31 - 60 | 51 - 100 | 1 - 4 | 1 - 3 |
| 41 - 100 | 61 - 150 | 101 - 200 | 3 - 7 | 2 - 5 |
| 101 - 300 | 151 - 450 | 201 - 600 | 5 - 15 | 3 - 6 |
| 301 - > | 451 - > | 601 - > | 10 - 20 | 5 - 15 |

| Percent Exceedance of Fecal Coliform Limit: | Standard Units above or below pH limit: | Factor A Value Ranges: |
| --- | --- | --- |
| 0 - 100 | 0 - .50 | 0 - 5 |
| 101 - 500 | .51 - 2.0 | 2 - 8 |
| 501 - 5,000 | 2.01 - 3.0 | 4 - 10 |
| 5,001 - > | 3.01 - 4.0 | 6 - 12 |
|  | 4.01 - > | 8 - 15 |

"B" -- Health and Environmental Harm  (Monthly Range 0 to 50 ).  A value for this factor is selected for each month in which one or more violations present actual or potential harm to human health or to the environment.  Values are selected using the table below based on the type of actual or potential harm that yields the highest factor value.

| GRAVITY FACTOR B -- HEALTH AND ENVIRONMENTAL HARM | |
|---|---|
| **Type of Actual or Potential Harm** | **Factor B Value Ranges** |
| Impact on Human Health (e.g., interference with drinking water supplies, harm or increased risks to subsistence fishing) | 10 - 50 |
| Impact on Aquatic Environment (or the POTW) | |
| Water quality-based effluent standard(s) or whole effluent toxicity limit violated | 1 - 10 |
| Fish kill, beach closing, restrictions on use of water body; or pass through or interference at the POTW caused by the IU discharge. | 4 - 50 |
| Other impact on aquatic environment | 2 - 25 |

"C" -- Number of Effluent Limit Violations  (Monthly Range 0 to 5). This factor is based on the total number of effluent limit violations each month. (Violations of interim limitations in administrative orders are not counted here, but included as part of recalcitrance.)   In order to properly quantify the gravity of the violations, all effluent limit violations  are considered and evaluated. Violations of different parameters at the same outfall are counted separately and violations of the same parameter at different outfalls are counted separately. The  guidelines in Attachment 1 for calculating the statutory maximum penalty are generally not applicable for selecting the value for gravity factor C  (e.g., violation of a weekly limit need not be calculated as 7 separate violations). A minimum factor C value of 1 is generally appropriate whenever there are violations of two or more different pollutants. Values for this factor may be selected by comparing the number of effluent limits exceeded with the number of effluent limits in the permit: e.g., if all of the limits in the permit were violated in a month, a value of 5 would be appropriate; if 50 percent of the limits in the permit were violated, a factor of 2 or 3 would be appropriate.

"D" -- Significance of Non-effluent Limit Violations. This factor has a value ranging from 0 (zero) to  70 and is based on the severity and number of the six different types of non-effluent limitation requirements violated each month. There are six types of non-effluent violations:  1) monitoring and reporting;  2) pretreatment program implementation;  3) sludge handling; 4) unauthorized discharges; 5) permit milestone schedules; and 7) other types of non-effluent violations. The value for factor D  for each month in which there is a non-effluent limit violation is selected pursuant to the table on the next page. The factor D value for a given month is the sum of the highest value for each type of non-effluent limit violation.

With regards to monitoring and reporting violations, the failure to submit a report in a timely manner should generally not be treated as a continuing violation past the month in which the report is due.  For example, if an industrial user fails to submit a baseline monitoring report as required by 40 CFR 403.12(b), this should be counted as a violation only in the month when the

report was due. Given the importance of such a report, if the violator fails to submit the report at all a factor D value of 5 or more may be appropriate for this violation.[10]

With regards to pretreatment program implementation violations, "key program activities" include: identifying all industrial users; issuing appropriate control mechanisms to all significant industrial users (SIUs); inspecting SIUs; enforcing industrial user self-monitoring; enforcing pretreatment standards (including local limits); submitting pretreatment reports to the approval authority; and failing to comply with other significant pretreatment program obligations. The 1989 *Guidance for Reporting and Evaluating POTW Noncompliance with Pretreatment Requirements* or subsequent revisions may be helpful in evaluating the seriousness of pretreatment program implementation violations.

As an example of calculating factor D for a given month, assume a discharger did not sample for 4 of the 8 parameters in its permit, the discharge monitoring report was submitted 20 days late, and there were several days of discharge of a process wastestream through an unauthorized outfall without any treatment. Using the factor D table, for Type 1, a value of 4 may be selected based on the failure to conduct sampling for half of the parameters; the delay in submitting sampling data is not considered since the other Type 1 violation produces a higher value. For the unauthorized discharge of the process wastestream, a value of 6 may be selected for Type 4. Since there are no Type 2, 3, 5, and 6 violations, a value of 0 is entered for each of these Types. Thus, the total value for factor D for this month is 10.

---

[10] The failure to provide the regulatory agency with required sampling data on the discharge is a very serious violation as this eliminates the government's ability to perform necessary oversight and allows the discharger to avoid the possible application of gravity factor A.

| GRAVITY FACTOR D -- NON-EFFLUENT LIMIT VIOLATIONS | |
|---|---|
| THE FACTOR D VALUE FOR A GIVEN MONTH IS THE SUM OF THE HIGHEST VALUE FOR EACH TYPE OF NON-EFFLUENT LIMIT VIOLATION. | |
| **Type and Extent of Violation** | **Factor D Value Ranges** |
| 1.  Effluent Monitoring and Reporting Violations: | |
| Failure to conduct or submit adequate pollutant sampling data for 1 or more pollutant parameters (but not all parameters) | 1 to 6 |
| Failure to conduct or submit any required pollutant sampling data in a given month but with a reasonable belief that the facility was in compliance with applicable limits. | 2 to 6 |
| Failure to conduct or submit any required pollutant sampling data in a given month without a reasonable basis to believe that facility was otherwise in compliance with applicable limits. | 6 to 10 |
| Failure to conduct or submit whole effluent toxicity sampling data | 4 to 10 |
| Delay in submitting sampling data | 0 to 5 |
| Failure to submit a pretreatment baseline report, 90-day compliance report, or periodic compliance report (40 CFR 403.12(b), (d), or (e,) or failure to sample again after finding a violation (40 CFR 403.12(g)(2)). | 2 to 8 |
| Any other monitoring or reporting violation | 0 to 10 |
| 2.  Pretreatment Program Implementation Violations : All key program activities implemented, with some minor violations. | 0 to 4 |
| One or two key program activities not implemented | 2 to 6 |
| Many key program activities not implemented | 4 to 8 |
| Few if any program activities implemented | 6 to 10 |
| 3.  Failure to properly control, treat, or dispose of sludge | 1 to 10 |
| 4.  Unauthorized discharge: e.g., discharge through an unpermitted outfall, discharge of a wastestream not identified in the permit, sewer overflows, or spill (other than oil or §311 hazardous substance) | 1 to 20 |
| 5.  Violation of permit milestone schedule | 1 to 10 |
| 6.  Any other type of noneffluent limit violation | 1 to 10 |

C.     Gravity Adjustment Factors

In certain circumstances as explained below, the total monthly gravity amount may be adjusted by three factors: flow reduction factor (to reduce gravity); history of recalcitrance (to increase gravity); and the quick settlement reduction factor (to reduce gravity). The resulting figure -- benefit + (gravity +/- gravity adjustments) -- is the preliminary penalty amount.

Flow Reduction Factor for Small Facilities.   The total monthly gravity amount may be reduced based on the flow of the facility. This factor is applicable to direct and indirect discharges, both municipal and non-municipals. Flow reduction percentages are selected using the table below. In order to ensure that these reductions are directed at small facilities (that are not otherwise part of large corporation), this gravity reduction does not apply to non-municipals if the facility or parent corporation employs more than 100 individuals.

| FLOW REDUCTION FACTOR | |
|---|---|
| AVERAGE DAILY WASTEWATER DISCHARGE FLOW (in gallons per day) | PERCENTAGE REDUCTION FACTOR OF TOTAL GRAVITY |
| Less than 5,000 | 50 |
| Between 5,000 and 9,999 | 40 |
| Between 10,000 and 19,999 | 30 |
| Between 20,000 and 29,999 | 20 |
| Between 30,000 and 49,999 | 10 |
| Between 50,000 and 99,999 | 5 |
| 100,000 and above | 0  (i.e., no reduction) |

History of Recalcitrance Adjustment Factor.  The "recalcitrance" factor is used to increase the penalty based on a violator's bad faith, or unjustified delay in preventing, mitigating, or remedying the violation. Recalcitrance is also present if a violator failed to comply with an EPA issued administrative compliance order or a §308 information request, or with a prior state or local enforcement order. This factor is applied by multiplying the total gravity component by a percentage between 0 and 150. In administrative penalty actions, violations of administrative compliance orders are not included in the recalcitrance calculation (because EPA lacks the authority to seek penalties in the administrative forum for violations of administrative compliance orders).

A minimum recalcitrance factor of 10 percent is generally appropriate for each instance in which a violator fails to substantially comply in a timely manner with an administrative compliance

order ("AO"), a §308 information request, or a state enforcement order. Thus, if a particular discharger violated 3 AOs, a minimum recalcitrance factor of 30 percent is generally appropriate. If a violator completely fails to comply with an AO or §308 request, a recalcitrance factor of 20 percent may be appropriate for that failure, while if there were only minor violations of the AO or request, a recalcitrance factor of 5 percent may be appropriate for that violation.

Quick Settlement Adjustment Factor. In order to provide an extra incentive for violators to negotiate quickly and reasonably, and in recognition of a violator's cooperativeness, EPA may reduce the gravity amount by 10 percent if EPA expects the violator to settle quickly. For purposes of this reduction factor, in Class I administrative enforcement actions, a quick settlement is when the violator signs an administrative consent order resolving the violations within four months of the date the complaint was issued or within four months of when the government first sent the violator a written offer to settle the case, whichever date is earlier. In Class II administrative enforcement actions and judicial cases, the controlling time period is 6 and 12 months, respectively. If the violator is not able to sign the consent order within this time period, this adjustment does not apply.

Environmental Auditing Adjustment Factor. This interim revision of the Penalty Policy contains no explicit gravity adjustment factor for violators that conduct, or fail to conduct, environmental audits, disclose the results to the government, promptly correct the violations and remedy any harm. This interim revision of the Policy (and the original 1986 version), however, automatically produces smaller penalty amounts for violators who promptly remedy violations. This is because violators who promptly remedy violations will have shorter histories of violations and this automatically reduces both the economic benefit and gravity amounts. After the Agency completes its review of its environmental auditing policy, this Policy may be reissued with an explicit adjustment factor for this factor. In the interim, Regions, may with the advance approval of Headquarters, appropriately adjust the gravity amount based on the presence, or absence, of an environmental auditing program.

D. Litigation Considerations (to decrease preliminary penalty amount)

1. Overview. The government should evaluate every penalty with a view toward litigation and attempt to ascertain the maximum civil penalty the court or administrative judge is likely to award if the case proceeds to trial or hearing. Many enforcement cases may have mitigating factors, weaknesses or equitable problems that could be expected to persuade a court to assess a penalty less than the statutory maximum amount. The simple existence of weaknesses in a case, however, should not automatically result in a litigation consideration reduction of the preliminary bottom-line settlement penalty amount (economic benefit + gravity ± gravity adjustment factors). The government may reduce the amount of the civil penalty it will accept at settlement to reflect weaknesses in its case where the facts demonstrate a substantial likelihood that the government will not achieve a higher penalty at trial.

2. <u>Legal Evaluation.</u> The mere existence of weaknesses or limitations in a case should not result in a reduction of the preliminary bottom-line settlement penalty amount, unless the Agency determines that the preliminary settlement amount is more than EPA is likely to obtain at trial.[11] In evaluating potential litigation consideration reductions, EPA legal staff should: (a) Determine the statutory maximum penalty; (b) Evaluate what penalty the court might assess at trial given the particular strengths and weaknesses of the case; and, (c) Compare this amount to the preliminary settlement amount (benefit + gravity + recalcitrance).

While Agency legal staff cannot predict the exact penalty amount a court might assess at trial, case law indicates that a court should use the statutory maximum as its preliminary penalty figure, and then reduce that amount, as appropriate, using only the penalty assessment factors in §309(d) of the Act. Fitting the facts of EPA's enforcement case to the method adopted by the courts in recent CWA penalty decisions provides the Agency with the clearest method to estimate penalty litigation outcomes.[12]

3. <u>Application.</u> Adjustments for litigation considerations are taken on a factual basis specific to the case. Before a complaint is filed, the application of certain litigation considerations is almost always premature, since the Agency generally does not have enough information to fully evaluate litigation risk regarding the assigned judge's previous ruling on similar matters, the court's informed opinion, or witness performance. Other litigation considerations, including evidentiary matters, witness availability, and equitable defenses often may not be reliably demonstrated until after case filing. Reductions for these litigation considerations are more likely to be appropriate after the Agency obtains an informed view, through discovery and settlement activities, of the strengths and weaknesses in its case and how the specific court views penalties in the case. Pre-filing settlement negotiations are often helpful in identifying and evaluating litigation considerations, especially regarding potential equitable defenses, and thus reductions based on such litigation considerations may be appropriately taken before the complaint is filed. As a general rule, the greater the disparity between the maximum statutory penalty and the preliminary penalty amount, the less litigation considerations should affect the Agency's settlement position.

---

[11] In many situations, weaknesses or limitations in a case are already accounted for in the preliminary penalty calculation. For example, the gravity calculation will be less in those circumstances in which the period of violation was brief, the exceedances of the limitations were small, the pollutants were not toxic, or there is no evidence of environmental harm. The economic benefit calculation also will be smaller when the violator has already returned to compliance since the period of violation will be shorter.

[12] The prevailing CWA case law on the assessment of penalties indicates that, in assessing a penalty, a court begins at the statutory maximum amount and reduces the penalty based on the specific factors set out in section 309(d) of the CWA. See <u>Atlantic States Legal Foundation v. Tyson Foods,</u> 897 F.2d 1128 (11th Cir. 1990). In contrast, settlement penalties calculated pursuant to this Policy build the Agency's bottom line negotiating position upward from zero, generally ending up with a figure orders of magnitude less than the statutory maximum penalty.

4. Possible Litigation Considerations.  While there is no universal list of litigation considerations,  the following factors may be appropriate in evaluating whether the preliminary settlement penalty exceeds the penalty the Agency would likely obtain at trial:

a. Known problems with the reliability or admissibility of the government's evidence proving liability or supporting a civil penalty;

b. The credibility, reliability, and availability of witnesses;[13]

c. The informed, expressed opinion of the judge assigned to the case (or person appointed by the judge to mediate the dispute), after evaluating the merits of the case.[14]

d. The record of the judge in any other environmental enforcement case presenting similar issues.  (In contrast, the reputation of the judge, or the judge's general demeanor, without a specific penalty or legal statement on a similar case, is rarely sufficient as a litigation consideration.)

e. Statements made by federal, State or local regulators that may allow the respondent or defendant to credibly argue that it believed it was complying with the federal law under which EPA is seeking penalties.

f. The payment by the defendant of civil penalties for the same violations in a case brought by another plaintiff.[15]

g. The development of new, relevant case law.

---

[13] The credibility and reliability of witnesses relates to their demeanor, reputation, truthfulness, and impeachability. For instance, if a government witness has made statements significantly contradictory to the position he is to support at trial, his credibility may be impeached by the respondent or defendant.  The availability of a witness will affect the settlement bottom-line if the witness cannot be produced at trial; it does not relate to the inconvenience or expense of producing the witness at trial.

[14] This factor, except as provided below with respect to the record of the judge or other trier of fact, may not be applied in anticipation, or at the stage of initial referral, and should not be distorted by taking at face value what a judge attempting to encourage a settlement might say.

[15] If the defendant has previously paid civil penalties for the same violations to another plaintiff, this factor may be used to reduce the amount of the settlement penalty by no more than the amount previously paid for the same violations. (If the previous plaintiff was a State qualified to preempt federal enforcement under EPA's interpretation of Section 309(g)(6), EPA's complaint should not include counts already addressed by a penalty. See "Supplemental Guidance on Section 309(g)(6) (A) of the Clean Water Act," memorandum from Frederick F. Stiehl, Enforcement Counsel for Water, to Regional Counsels, March 5, 1993, and "Guidance on State Action Preempting Civil Penalty Enforcement Actions Under the Federal Clean Water Act, OE/OW, August 28, 1987.)

h.  A blend of troublesome facts and weak legal arguments such that the Agency faces a significant risk of obtaining a nationally significant negative precedent at trial.

    5.  Not Litigation Considerations.  In contrast to the above list of possible litigation considerations, the following items are not litigation considerations:

a.  A generalized goal to avoid litigation or to avoid potential precedential areas of the law.[16]

b.  A duplicative use of elements included or assumed elsewhere in the Penalty Policy, such as inability to pay, "good faith"[17], "lack of recalcitrance", or a lack of demonstrated environmental harm[18].

c.  Off-the-record statements by the court, before it has had a chance to evaluate the specific merits of the case are, by themselves, not a reason to reduce the preliminary settlement penalty amount. (Compare with 4.c above.)

d.  The fact that the receiving water is already polluted or that the water can assimilate additional pollution is not a litigation consideration.[19]

e.  By itself, the failure of a regulatory agency to initiate a timely enforcement action is not a litigation consideration.[20]

---

[16]  A generalized desire to minimize litigation costs is not a litigation consideration.

[17]  The efforts of the violator to achieve compliance or minimize the violations after EPA, a State or pretreatment control authority has initiated an enforcement action (i.e., an administrative or judicial enforcement action) do not constitute "good faith" efforts.  If such efforts are undertaken before the regulatory agency initiates an enforcement response, the settlement penalty calculation already includes such efforts through a potentially smaller economic benefit amount, a shorter or less serious gravity component, or a lack of any recalcitrance.  The Penalty Policy assumes all members of the regulated community will make good faith efforts both to achieve compliance and remedy violations when they occur; consequently the settlement penalty calculation begins at zero and builds upward, with no reductions for good faith.  In contrast, the absence of good faith efforts provides the basis for increasing the penalty through use of the recalcitrance factor.

[18]  The gravity calculation will reflect the lack of environmental harm.  Courts have considered the extent of environmental harm associated with violations in determining the "seriousness of violations" pursuant to the factors in §309(d), and have used the absence of any demonstrated or discrete identified environmental harm to impose less than the statutory maximum penalty.  Proof of environmental harm, however, is neither necessary for liability nor for the assessment of penalties.

[19]  See, e.g., Natural Resources Defense Council v. Texaco Refining and Mktg., 800 F. Supp. 1, 24 (D. Del. 1992).

[20]  See PIRG v. Powell Duffryn, 913 F. 2d 64, 80-81 (3rd Cir. 1990).

6.  Approval of Litigation Considerations.  The Agency recognizes that the quantitative evaluation of litigation considerations often reflects subjective legal opinions.  Therefore, EPA Regions may reduce the preliminary penalty amount for litigation considerations for up to one-third of the net gravity amount (i.e., gravity as modified by the gravity adjustment factors) without Headquarters approval (where such approval would otherwise be required).  Of course, such a reduction must be fully explained and maintained in the case file.  This reduction is not applicable in municipal cases in which the tables in D.7 below are used.

7.  Municipal Cases.  In those cases against a municipality or other public entity (such as a sewer authority) in which the entity has failed to comply with the Clean Water Act but nevertheless did make good faith efforts to comply, the Agency may mitigate the preliminary penalty amount based on this national municipal litigation consideration.  The preliminary penalty amount (economic benefit + gravity $\pm$ gravity adjustments) may be mitigated to no less than the cash penalty determined by operation of the two tables set forth below.  In addition, the cash penalty amount established by the tables may be reduced based on compelling ability to pay considerations and by up to 40 percent for appropriate supplemental environmental projects. Reducing the cash penalty below the amount established by the national municipal litigation consideration (other than for ability to pay considerations or for 40 percent based on a SEP) requires compelling evidence of other considerations and the prior approval of Headquarters (even if Headquarters' approval of the settlement would otherwise not be required).

The national municipal litigation consideration is a discretionary factor and the Agency is under no obligation to use it in all municipal cases.[21]  It should only be used if there is some evidence that the municipality made a good faith effort to comply.  The national municipal litigation consideration is based on the economic benefit, environmental impact, duration and size of the facility, and is derived, in part, on the settlement penalties EPA has obtained from judicial municipal cases settled between October 1988 and December 1993.  There are three steps to calculate a penalty using the national municipal litigation consideration tables.

1. Using Table A determine the economic benefit environmental impact factor amount. This dollar amount is found by selecting an appropriate value from the range in the appropriate cell in Table A.  The economic benefit is the benefit previously calculated pursuant to section IV.A. above.  Impact of the violations is based on the actual or potential (risk) of harm caused, in whole or part, by the violations.

2. Using Table B determine the population months of violations factor amount.  This dollar amount is found by selecting an appropriate value from the range in the appropriate cell in Table B.  The service population is the total population served by the violating

---

[21]  The national municipal litigation consideration is primarily intended to apply in cases in which there has been a failure to timely construct treatment facilities or other capital projects; it may not be appropriate in pretreatment failure to implement cases.

POTW(s) during the period.  The months of violation are the total number of months calculated pursuant to section IV.B above.  (If the service population exceeds 3 million, the Table B value is found by combining values from multiple rows.  For example, if the service population was 4.5 million, the factor B penalty contribution would be the sum of a value selected from the appropriate cell in the 1,000,001 to 2,000,000 population row plus a value selected from the appropriate cell in the 2,000,001 to 3,000,000 population row.)

3. Sum the selected factor values from Tables A and B.  Note that the factor values in Tables A and B are in thousands of dollars.

## NATIONAL MUNICIPAL LITIGATION CONSIDERATION -- TABLE A

### ECONOMIC BENEFIT ENVIRONMENTAL IMPACT FACTOR IN THOUSANDS OF DOLLARS

| IMPACT OF VIOLATIONS ON HUMAN HEALTH OR THE ENVIRONMENT | ECONOMIC BENEFIT RANGES IN THOUSANDS OF DOLLARS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | .001 to 50 | 50 to 100 | 100 to 250 | 250 to 1,000 | 1,000 to 2,000 | 2,000 to 5,000 | 5,000 to 10,000 | 10,000 to 25,000 | greater than 25,000 |
| No actual or potential harm. | 6 to 9 | 11 to 15 | 17 to 23 | 32 to 43 | 49 to 67 | 75 to 103 | 110 to 151 | 167 to 230 | 283 to 389 |
| Minor actual or potential harm (e.g., water quality-based effluent or whole effluent toxicity limit violated). | 9 to 11 | 16 to 19 | 25 to 29 | 47 to 55 | 73 to 86 | 112 to 131 | 164 to 192 | 251 to 293 | 424 to 495 |
| Moderate actual or potential harm (e.g., fish kill, beach closing, restrictions on use of water body, raw sewage discharges). | 13 to 14 | 22 to 25 | 33 to 38 | 63 to 71 | 98 to 110 | 150 to 168 | 219 to 246 | 335 to 376 | 566 to 636 |
| Severe actual or potential harm (e.g., repeated beach closings, interference with drinking water supplies). | 17 to 32 | 30 to 55 | 46 to 84 | 87 to 158 | 135 to 245 | 206 to 374 | 301 to 548 | 460 to 837 | 778 to 1,414 |

## NATIONAL MUNICIPAL LITIGATION CONSIDERATION – TABLE B

### POPULATION MONTHS OF VIOLATION FACTOR IN THOUSANDS OF DOLLARS

| SERVICE POPULATION | MONTHS OF VIOLATION | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 to 6 | 7 to 12 | 13 to 18 | 19 to 24 | 25 to 30 | 31 to 36 | 37 to 42 | 43 to 48 | 49 to 54 | 55 to 60 | 61 to 66 | 66> |
| 100 to 5,000 | 0 to 0.6 | 0 to 1.8 | 0.1 to 3 | 0.1 to 4.2 | 0.1 to 5.4 | 0.1 to 6.6 | 0.2 to 7.8 | 0.2 to 9 | 0.2 to 10.2 | 0.2 to 11.4 | 0.3 to 12.6 | 0.3 to 14 |
| 5,001 to 25,000 | 0.6 to 3 | 1.8 to 9 | 3 to 15 | 4.2 to 21 | 5.4 to 27 | 6.6 to 33 | 7.8 to 39 | 9 to 45 | 10.2 to 51 | 11.4 to 57 | 12.6 to 63 | 14 to 70 |
| 25,001 to 50,000 | 3 to 6 | 9 to 18 | 15 to 30 | 21 to 42 | 27 to 54 | 33 to 66 | 39 to 78 | 45 to 90 | 51 to 102 | 57 to 114 | 63 to 126 | 70 to 140 |
| 50,001 to 100,000 | 6 to 12 | 18 to 36 | 30 to 60 | 42 to 84 | 54 to 108 | 66 to 132 | 78 to 156 | 90 to 180 | 102 to 204 | 114 to 228 | 126 to 252 | 140 to 280 |
| 100,001 to 250,000 | 12 to 30 | 36 to 90 | 60 to 150 | 84 to 210 | 108 to 270 | 132 to 330 | 156 to 390 | 180 to 450 | 204 to 510 | 228 to 570 | 252 to 630 | 280 to 700 |
| 250,001 to 500,000 | 30 to 60 | 90 to 180 | 150 to 300 | 210 to 420 | 270 to 540 | 330 to 660 | 390 to 780 | 450 to 900 | 510 to 1,020 | 570 to 1,140 | 630 to 1,260 | 700 to 1,400 |
| 500,001 to 1,000,000 | 60 to 120 | 180 to 360 | 300 to 600 | 420 to 840 | 540 to 1,080 | 660 to 1,320 | 780 to 1,560 | 900 to 1,800 | 1,020 to 2,040 | 1,140 to 2,280 | 1,260 to 2,520 | 1,400 to 2,800 |
| 1,000,001 to 2,000,000 | 120 to 240 | 360 to 720 | 600 to 1,200 | 840 to 1,680 | 1,080 to 2,160 | 1,320 to 2,640 | 1,560 to 3,120 | 1,800 to 3,600 | 2,040 to 4,080 | 2,280 to 4,560 | 2,520 to 5,040 | 2,800 to 5,600 |
| 2,000,001 to 3,000,000 | 240 to 360 | 720 to 1,080 | 1,200 to 1,800 | 1,680 to 2,520 | 2,160 to 3,240 | 2,640 to 3,960 | 3,120 to 4,680 | 3,600 to 5,400 | 4,080 to 6,120 | 4,560 to 6,840 | 5,040 to 7,560 | 5,600 to 8,400 |

E. Ability to Pay  (to decrease preliminary penalty amount)

The Agency typically does not request settlement penalties, which combined with the cost of the necessary injunctive relief, that are clearly beyond the financial capability of the violator. This means EPA should not seek a penalty that would seriously jeopardize the violator's ability to continue operations and achieve compliance, unless the violator's behavior has been exceptionally culpable, recalcitrant, threatening to human health or the environment, or the violator refuses to comply.

The adjustment for ability-to-pay may be used to reduce the settlement penalty to the highest amount that the violator can reasonably pay and still comply with the CWA.  The violator has the primary burden of establishing the claim of inability to pay.  The violator must submit the necessary information demonstrating actual inability to pay as opposed to unwillingness to pay. Further, the claim of inability to pay a penalty should not be confused with a violator's aversion to make certain adjustment in its operations in order to pay the penalty.[22]

If the violator is unwilling to cooperate in demonstrating its inability to pay the penalty, this adjustment should not be considered in the penalty calculation, because, without the cooperation of the violator, the Agency will generally not have adequate information to determine accurately the financial position of the violator.  In some cases, the Agency may need to consult a financial expert to properly evaluate a violator's claim of inability to pay.

If the violator demonstrates an inability to pay the entire negotiated penalty in one lump sum (usually within 30 days of consent decree entry), a payment schedule should be considered. The penalty could be paid in scheduled installments with appropriate interest accruing on the delayed payments.  The period allowed for such installment payments should generally not extend beyond three years.

If a payment schedule will not resolve the violator's ability-to-pay issue, as a last recourse, the Agency can reduce the amount it seeks in settlement to a more appropriate amount in situations in which inability-to-pay can be clearly documented and reasonably quantified.

In the case of municipalities, one quick way to evaluate whether there might be an ability to pay issue is to examine the most recent bond rating (within the past 5 years).  If the bond rating is below BBB (Standard & Poor's rating scale) or below Baa (Moody's rating scale), the community may be in poor financial condition and a detailed financial evaluation by an appropriate expert may be necessary to determine whether the financial condition affects the ability to pay a penalty.

---

[22] For example, a business may have to use funds that were previously designated to develop a new product line to pay a penalty and thus the new product line would be delayed.  Similarly, a penalty could be paid using company funds that otherwise would have gone to pay its executives bonuses.

# V.    SUPPLEMENTAL ENVIRONMENTAL PROJECTS (SEPs)

Supplemental Environmental Projects (SEPs) are defined by EPA as environmentally beneficial projects which a violator undertakes, but is not otherwise legally required to perform, in exchange for favorable penalty consideration in settlement of an enforcement action.  In order for a violator to receive a settlement penalty reduction in exchange for performing such a project, the project must conform with the  EPA's SEP Policy, or be approved in advance by the Assistant Administrator[23].   A SEP may be allowed in a municipal case, even if the cash penalty is less than economic benefit, provided the cash penalty is no less than 60 percent of the amount provided in section IV.D.7.  Use of SEPs in a particular case is entirely within the discretion of EPA, and the Department of Justice in judicial cases.

# VI.    OTHER TYPES OF PENALTIES

This Policy only establishes how the Agency expects to calculate the minimum penalty for which it would be willing to <u>settle</u> a case.  The development of the penalty amount to plead in an administrative or judicial complaint is developed independent of this Policy.   This Policy is not intended and should not be used as the basis for a penalty demand in a complaint, an administrative hearing or, a civil judicial trial.   The Agency will <u>not</u> use this Penalty Policy in arguing for a penalty at trial or in an administrative penalty hearing.[24]  In those cases which proceed to trial or an administrative hearing, the Agency should seek a penalty higher than that for which it is willing to settle.

If the "bottom-line" settlement penalty calculated pursuant to this Policy exceeds the maximum penalty that can be obtained in an administrative penalty action pursuant to §309(g) of the CWA, the Agency  should instead proceed judicially.[25]  In rare circumstances, the statutory maximum penalty may be less than the "bottom-line" settlement penalty in civil judicial cases; in such circumstances, the statutory maximum penalty should serve as the new "bottom-line" penalty.

---

[23]  See "EPA Policy on the Use of Supplemental Environmental Projects in Enforcement Settlements", transmitted on February 12, 1991 by the Assistant Administrator for Enforcement, or subsequent revisions.

[24]  If that were to occur, then the defendant would have no incentive to settle with EPA.  See *Guidance on the Distinctions Among Pleading, Negotiating, and Litigating Civil Penalties for Enforcement Cases Under the Clean Water Act,* OECM/OW, January 19, 1989.

[25]  For further guidance on choosing between administrative and judicial enforcement options, see "Guidance on Choosing Among Clean Water Act Administrative, Civil and Criminal Enforcement Actions", which was Attachment 2 to the August 28, 1987 "Guidance Documents and Delegations for Implementation of Administrative Penalty Authorities Contained in 1987 Clean Water Act Amendments".

## VII.   DOCUMENTATION, APPROVALS, AND CONFIDENTIALITY

Each component of the settlement penalty calculation (including all adjustments and subsequent recalculations) must be clearly documented with supporting materials and written explanations in the case file. In all cases in which a settlement penalty may not comply with the provisions of this Policy, or in a case in which application of this Policy appears inappropriate, the penalty must be approved in advance by the EPA Assistant Administrator for Enforcement and Compliance Assurance.

Documentation and explanations of a particular settlement penalty calculation constitute confidential information that is exempt from disclosure under the Freedom of Information Act, is outside the scope of discovery, and is protected by various privileges, including the attorney-client privilege and the attorney work-product privilege. While individual settlement penalty calculations are confidential documents, this Policy is a public document and may be released to anyone upon request. Further, as part of settlement negotiations between the parties, the Agency may choose to release parts of the case-specific settlement calculations. The release of such information may only be used for settlement negotiations in the case at hand and, of course, may not be admitted into evidence in a trial or hearing. See Rule 408 of Federal Rules of Evidence.

---

*This Policy is purely for the use of U.S. EPA enforcement personnel in settling cases. EPA reserves the right to change this Policy at any time, without prior notice, or to act at variance to this Policy. This Policy does not create any rights, implied or otherwise, in any third parties.*

---

## ATTACHMENT 1 TO INTERIM CWA SETTLEMENT PENALTY POLICY

## EXAMPLES OF HOW TO CALCULATE STATUTORY MAXIMUM PENALTY

| Violation scenario | Maximum statutory penalty* | Authority |
|---|---|---|
| Violation of daily maximum limit for pollutant A, on the 5th of January. | $25,000 | Plain reading of CWA, § 309(d): "$25,000 per day for each violation" |
| Violation of daily maximum limit for pollutant A, on the 5th, 10th, and 15th of January. | $75,000 | Plain reading of CWA, § 309(d): "$25,000 per day for each violation" |
| Violation of daily maximum limits for each of pollutants A and B, on the 5th of January. | $50,000 | Tyson Foods and Powell Duffryn, as well as plain reading of CWA, § 309(d): "$25,000 per day for each violation" |
| Violation in January of weekly average for pollutant A. | $25,000 per day, multiplied by 7 days $175,000. | Tyson Foods, 897 F.2d at 1139. Also see, Gwaltney, 897 F. 2d at 314. |
| Violation in January of monthly average limit for pollutant A. | $25,000 per day, multiplied by 31 days in January = $775,000 | Tyson Foods, 897 F.2d at 1139. Also see, Gwaltney, 897 F. 2d at 314. |
| Violation in January of monthly average limit for pollutant A, in which there is evidence that there were no discharges on 4 days (e.g. plant shut down on Sundays). | $25,000 per day, multiplied by 27 days in January = $675,000 | Natural Resources Defense Council v. Texaco, 2 F.3d 493, 507-508 (3rd Cir. 1993). |
| Violation in January of monthly average limits for both pollutants A and B. | $50,000 per day, multiplied by 31 days in January, = $1,550,000 | Tyson Foods, 897 F.2d at 1140, footnote 22 |
| Violation in January of monthly average limit for pollutant A, and of daily maximum limit for pollutant B on January 5th and 15th. | $775,000 for pollutant A, + $50,000 ($25,000 per day x 2) for pollutant B, = $825,000 | Tyson Foods, 897 F.2d at 1140, under "The interaction of daily and monthly violations" |
| Violation in January of monthly average limit for pollutant A, and of daily maximum limit for pollutant A on Jan. 5th and 15th. | 25,000 per day, multiplied by 31 days in January, = $775,000. | Tyson Foods, 897 F.2d at 1140, under "The interaction of daily and monthly violations" |
| Failure to properly monitor** for pollutant A on 4 required days in January. | $100,000. | Statutory language, CWA §309. |

*Attachment 1 to Interim CWA Settlement Penalty Policy*                                    *page 2*

| Violation scenario | Maximum statutory penalty* | Authority |
|---|---|---|
| Failure to properly monitor for pollutants A, B, and C on January 15. | $75,000. | Statutory language, CWA §309. |
| Failure to monitor for a monthly pollutant parameter. | $25,000 for each day in which the discharger was required to monitor for that pollutant. | Statutory language, CWA §309. |
| Failure to submit adequate discharge monitoring report on time ( each failure to monitor for a particular pollutant is subject to a separate penalty calculation). | $25,000. | Statutory language, CWA §309. |
| Failure to timely submit a report or other document (each failure to timely complete an activity covered by the report is subject to a separate penalty calculation). | $25,000 | Settlement policy discretion. |

**NOTES:**

\*  For administrative penalty cases the penalty per day for each violation is $10,000 and may not exceed the total penalty amount allowed in a Class I or Class II administrative proceeding.

\*\*  For purposes of calculating penalties, the act of monitoring for a particular pollutant includes the sequence of events starting with the collection of the wastewater sample through completion of the analytical testing of the sample.   The obligation to report the results of the monitoring is a separate act subject to a separate penalty calculation.

The guidelines set forth here reflect EPA's policy on how to calculate the statutory maximum penalty with regards to ensuring that all settlement penalties sought pursuant to the Penalty Policy do not exceed such statutory maximum.   At trial or in a hearing, EPA reserves the right to calculate the statutory maximum pursuant to more aggressive assumptions.

**ATTACHMENT 2 TO INTERIM CWA SETTLEMENT PENALTY POLICY**

Case Name_____          Date_____

Prepared by _____ and _____ [attorney name].

## SETTLEMENT PENALTY CALCULATION WORKSHEET

| | STEP | AMOUNT |
|---|---|---|
| 1. | Calculate Statutory Maximum Penalty (period of violations from ____ through ____) | |
| 2. | Economic Benefit (attach BEN printouts, with explanations for calculations) | |
| 3. | Total of Monthly Gravity Amounts | |
| 4. | Economic Benefit + Gravity (lines 2 + 3) | |
| 5. | Gravity Adjustments | |
| | a. Flow Reduction Factor ____ (0 to 50%) X line 3 | |
| | b. Recalcitrance Factor ____ (0 to 150%) X line 3 | |
| | c. Quick Settlement Reduction __ (0 or 10%) X line 3 | |
| | d. Total gravity adjustments (negative amount if net gravity reduction) (lines 5.b. − 5.c − 5.a ) | |
| 6. | Preliminary Penalty Amount (lines 4 + 5.d) | |
| 7. | Litigation Consideration Reduction (if any) | |
| 8. | Ability to pay reduction (if any) | |
| 9. | Reduction for Supplemental Environmental Projects (if any) | |
| 10. | **Bottom-line Cash Settlement Penalty** (Line 6 less lines 7, 8 and 9. Or, if applicable, amount calculated by national municipal litigation consideration in §IV.D.6, less no more than 40% of that amount for appropriate SEPs.) | |