**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ERIE COUNTY ENVIRONMENTAL | ) |
| COALITION, et. al., | ) |
|     Plaintiffs | ) |
| | ) |
|     v. | )CIVIL ACTION NO. 05-59 ERIE |
| | )ELECTRONICALLY FILED |
| MILLCREEK TOWNSHIP SEWER | ) |
| AUTHORITY, et. al., | ) |
|     Defendants | ) |

**RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

      Plaintiffs Erie County Environmental Coalition, PennEnvironment, and the Gaia Defense League (hereinafter collectively known as "Plaintiffs") submit this brief in opposition to Defendant Millcreek Township and Millcreek Township Sewer Authority's ("Millcreek") Motion for Summary Judgment. Millcreek does not contest or deny that its discharges violate the Clean Water Act ("CWA"). Instead, Millcreek contends that its agreement with the Pennsylvania Department of Environmental Protection ("DEP"), which does not require immediate compliance with the Clean Water Act, somehow precludes the Plaintiffs' action. Millcreek's argument is without legal merit. Therefore, this Court should deny Millcreek's Motion and grant summary judgment in favor of Plaintiffs.

**Summary Response to Plaintiffs Statement of Facts[1]**

      Millcreek, in its over 70 page Brief in Support of Summary Judgment, attempts to make this case much more complicated then it actually is. Plaintiffs have not overlooked the work that Millcreek has put into it sewage conveyance system. In fact, Plaintiffs appreciate the efforts. However, the simple fact is Millcreek discharges pollutants into Walnut Creek without a permit.

---

[1] Plaintiffs incorporate herein the facts and arguments presented in its own Brief in Support of Summary Judgment, as well as the exhibits attached thereto.

Discharges without a permit are a serious violation of § 301 of the Clean Water Act. 33 U.S.C. § 1311. Thus, Millcreek should be ordered to pay penalties for the effluent it discharges into Walnut Creek and be enjoined from further discharges by a date certain, and until that occurs should, at a minimum, follow the same requirements as the National Pollution Discharge Elimination System ("NPDES") permit holders are required to follow. The undisputed facts are that Millcreek illegally constructed a bypass into their sewage conveyance system, then failed to get a permit for the discharges from that bypass, and failed to remove the Kearsarge pump station bypass in accordance with the 1992 Consent Order and Agreement. Given these facts, Millcreek should not receive special privileges or exemptions from what is mandated under Clean Water Act.

Implicitly admitting its violations, Millcreek nevertheless tries to escape liability by relying on its October 31, 2003 Consent Order and Agreement with DEP under the Pennsylvania Clean Streams Law ("2003 COA") and advancing the legally erroneous position that Plaintiffs' claims are barred under § 309(g)(6) of the Clean Water Act, 33 U.S.C. § 1319(g)(6). Defendant's argument fails because the Clean Streams Law in general and the 2003 COA in particular do not satisfy the requirements of § 309(g)(6).

I.     **Defendants have failed to show that violations are barred under § 309(g).**

The discussion of the administrative penalties must be separated into three distinct groups of violations: 1) the violations that occurred prior to October 31, 2003 and were listed as past penalties for which a fine of $25,000 was paid;[2] 2) violations that occurred prior to October 31, 2003 and were not listed as past penalties for which a fine was paid;[3] and 3) violations that

---

[2] Kearsarge Pumping Station: September 29, 2003, April 14, 2002, February 1, 2002, November 7, 2000; Church and Patton and Pershing Street Pumping Stations: April 14, 2002.
[3] Kearsarge Pumping Station: May 12, 2002; Larchmont and Beaver Street Pumping Stations: April 14, 2002

occurred after the Consent Order and Agreement.[4] *See* Def. App. at 162-184, 2003 COA, ¶ 8 & Ex. A. In regard to the first set of violations, (those occurring prior to the 2003 COA), does not bar Plaintiffs' civil penalty action because the Clean Streams Law ("CSL") public participation provisions are not comparable to the CWA. As to the second group of violations, § 309(g0 cannot bar Plaintiffs civil penalty action because no penalty was ever assessed for these violations.

In regard to the third group of violations, (those violations that occurred post- 2003 COA), Plaintiffs argue §309(g)(6) does not bar their claims because: 1) the public participation provisions in the CSL for administrative penalties assessed are not comparable to the CWA and 2) DEP's action in regard to these violations was not taken pursuant to § 309(g) because DEP failed to tailor the penalties to the violations and there was inadequate public participation in regard to these violations.

Section 309(g) of the CWA can only bar citizen suit civil penalty actions in limited circumstances. Specifically, § 309(g)(6)(A) states:

> Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation –
>
> …
>
> (ii)    with respect to which a State has commenced and is diligently prosecuting an action under *a State law comparable to this subsection*, or
>
> (iii)    for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or *such comparable State law*, as the case may be,

---

[4] Kearsarge Pumping Station: Sept. 17, 2004, Sept. 9, 2004, Sept. 10, 2004, Aug. 1, 2004, July 31, 2004, July 16, 2004, May 21, 2004, March 20, 2004, Nov. 28, 2004; Larchmont and Beaver Street Pumping Stations: Sept. 9, 2004; Church and Patton and Pershing Street Pumping Stations: Sept. 9, 2004, July 31, 2004.

shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

33 U.S.C. § 1319(g)(6) (emphasis added). Thus, in order for § 309(g)(6) to have any role in barring a citizens' suit for civil penalties, the State law must be comparable to § 309(g) itself. Millcreek cannot make this showing in this case.

### A.    The Clean Streams Law is Not a Comparable State Law for § 309(g)(6) Purposes.

The legislative intent behind § 309 (added to the CWA in 1987) makes clear that "comparability" is a function of providing the same procedure as that outlined in § 309 itself. Senator John Chaffee, principal author and sponsor thereof, remarked "[i]n order to be comparable, a state law must provide for... public notice and participation procedures similar to those set forth in section 309(g); it must include... judicial review standards; and it must include provisions that are analogous to other elements of section 309(g)." *See* Atlantic States Legal Foundation v. Universal Tool & Stamping Co., 735 F. Supp 1404, 1415 (N.D. Ind. 1990) (quoting Senator Chafee's remarks from 133 Cong. Rec. S737 (daily ed. Jan. 14, 1987); Citizens For A Better Environment v. Union Oil Co., 861 F.Supp. 899, 905-908 (N.D. Cal. 1994) (quoting Senator Chafee's remarks); California Sportfishing v. City of W. Sacramento, 905 F.Supp. 792, 804 n 15 (E.D. Cal. 1995) (quoting Senator Chafee's remarks); The Old Timer, Inc., v. Blackhawk-Central Sanitation District, 51 F.Supp.2d 1109, 1114-15 (D. Colo. 1999) (quoting Senator Chafee's remarks). Therefore, Congress intended a comparable state law to have public participation procedures "comparable" to those listed in § 309(g).[5]

---

[5] EPA also supports this interpretation. In an EPA publication titled "EPA Guidance on State Action Preempting Civil Penalties Under the Federal Clean Water Act" (1987), EPA notes that comparable public participation procedures must "give the public notice of any proposed administrative penalty assessment." California Sportfishing v. City of W. Sacramento, 905 F.Supp.792, 804 n 16 (E.D. Cal. 1995). In 1993, EPA reaffirmed its view of "comparable state law" in a memorandum to regional counsel entitled "Supplemental Guidance on Section

Applying these principles to the CSL, it is clear that the public participation process proffered as part of the administrative penalty process does not compare with that in the CWA. Section 309(g)(4) of the CWA, 33 U.S.C. § 1319(g)(4) requires public participation in the administrative penalty assessment process. Specifically, §309(4)(A) requires the State to give "public notice of and a reasonable opportunity to comment" *on the proposed penalty order*. Paragraph (4)(B) of § 309(g) allows anyone who comments on a proposed penalty to participate in a hearing that is informal and non-adversarial and allows a participant to present evidence without having to adhere to formal rules of procedure. These paragraphs allow citizen participation in the administrative penalty process pre-order and without the burdens and hurdles that accompany formal appeals.

In contrast, the CSL does *not* require public notice; it only provides any *aggrieved party* with the right to appeal such an order with 30 days of receiving actual notice of it.  35 P.S. § 691.7 (emphasis added). Therefore, all of the public participation occurs *after the order assessing penalties*. This precise public participation scheme was addressed in McAbee v. Fort Wayne, 318 F.3d 1248 (11th Cir. 2003).

In McAbee, the 11th Circuit Court of Appeals reviewed the Alabama statute to determine whether it contained public participation provisions "comparable" to the requirements of § 309(g)(4). The Alabama public participation provision did not "ensure public notice *before* issuance of penalty orders, the AEMA requires only ex post facto notice of enforcement action." Id. at 1256 (emphasis provided). Based upon this disparity between the Alabama provision and the § 309(g)(4)'s allowance for public participation

---

309(g)(6)(A) of the Clean Water Act." Id.; Citizens For A Better Environment v. Union Oil, 861 F.Supp. at 907 n 12 (EPA's interpretation of § 1319(g) constitutes persuasive authority).

both before and then again after an order is issued, the 11th Circuit found that the public

participation provisions were not sufficiently comparable. The Court specifically noted,

> we agree with McAbee's contention that a right to pre-order participation
> is markedly different from the right to post-decision participation. In pre-
> order proceedings, an agency has not hardened its position, and interested
> persons are not subject to the same technical pleading requirements or
> burdens of proof that are imposed once the state has issued an order.

Id. at 1257. The difference between informal, non-adversarial participation at a pre-decision

stage to party status appeal that for all practical purposes requires a lawyer is incomparable.

Consequently, the public is much more likely to have a real impact on the penalty assessment by

participating in the pre-decisional stage of the process than by participating in a post-decisional

appeal.

Under Pennsylvania law, the party appealing the issuance of the permit bears the burden

of proof in showing the DEP's action was contrary to law or is unreasonable. Zlomsowitch v.

DEP, 2004 Pa. Envirn. LEXIS 56 at *42 (November 15, 2004).  Additionally, because a penalty

assessment is discretionary and not an exact science, it is virtually impossible to successfully

challenge the agency's original decision in an administrative appeal. See U.S. v. Smithfield

Foods, Inc., 191 F.3d 516 at 529 (4th Cir. 1999) (Supreme Court has emphasized that under the

Clean Water Act, penalty calculations are highly discretionary). A citizen wishing to participate

in the administrative enforcement process in Pennsylvania must be prepared to expend the time,

money, and energy required for a formal, adversarial process. On the other hand, during the pre-

decisional stage of the process a citizen merely has to submit comments and information to the

agency. In fact, it would be difficult for a person to participate in Pennsylvania's post-decisional,

adversarial hearings without hiring a lawyer to navigate through the formal procedural

requirements. Millcreek or other municipalities may not be overly concerned about legal fees,

technical pleading requirements, and burdens of proof, but to the average citizen they are usually insurmountable obstacles to the "meaningful" participation in the administrative enforcement process.

As in the case of <u>McAbee</u>, the Pennsylvania Clean Streams Law only allows for public participation after an enforcement action order has been issued. Therefore, the CSL is not comparable to § 309.

Additionally in <u>McAbee</u>, the 11th Circuit also criticized the fact that the public participation was only available to *aggrieved* parties. The court found that this was not comparable to the CWA because "[b]y comparison, the federal provisions allow members of the general public, even those who have not suffered a threatened or actual injury in fact, to participate in the enforcement process." <u>Id.</u> at 1257. This is also very similar to the public participation provisions at issue here. Specifically, 35 P.S. § 691.7 only allows an *aggrieved* person to file an appeal.

Several courts have held similar to <u>McAbee</u>.  <u>Jones v. City of Lakeland</u>, 244 F.3d 518, 523-24 (6th Cir. 2000). (holding that Tennessee law was not comparable to § 1319(g) because it provided no public notice of hearings and no opportunity for the public to participate in ongoing enforcement actions); <u>Citizens For A Better Environment v. Union Oil Co.</u>, 83 F.3d 1111, 1116-18 (9th Cir. 1996) (holding that the California statute was not comparable to § 1319(g) because unless state law had public notice and participation provisions comparable to § 1319(g), nominal penalties imposed by the state would insulate polluters from citizen action); <u>U.S. v. Smithfield Foods, Inc.</u>, 191 F.3d 516 (4th Cir. 1999)(holding that Virginia law was not comparable to § 1319(g) because, among other things, it failed to provide adequate procedures for notice and public participation.); <u>Idaho Rural Council v. Bosma</u>, 143 F.Supp. 2d 1169, 1182

(D. Idaho 2001) (holding that Idaho statute was not comparable to § 1319(g) because the statute lacked provisions for public notice and comment and provided no opportunity for a pre-decisional hearing); L.E.A.D. v. Exide Corp., 1999 U.S. Dist. LEXIS 2672 (E.D. Pa. 1999) (holding that, because Pennsylvania law does not provide for notice of or comment on proposed penalties, it is not comparable to § 1319(g)); California Sportfishing, 905 F. Supp. at 803-05 (E.D. Cal. 1995)(holding that California law is comparable to § 1319(g) because it provides for notice of and opportunity to comment on proposed penalty orders and opportunity to participate in pre-decisional hearing); PIRG v. New Jersey Expressway Authority, 822 F. Supp. 174, 184 n 14 (D.N.J. 1992) (holding that New Jersey law is not comparable to § 1319(g) because it provides for no public notice and no opportunity to comment on proposed penalty orders and no opportunity to participate in a pre-decisional hearing); Natural Resources Defense Council, Inc. v. Vygen Corp., 803 F. Supp. 97, 101 (N.D. Ohio 1992) (holding that Ohio law not comparable to § 1319(g) because pre-decisional notice of and opportunity to comment on proposed penalties and opportunity to participate in pre-decisional hearings were completely discretionary, unlike § 1319(g)); PIRG v. GAF, 770 F.Supp.943, 950- 51(D.N.J.1991) (holding that New Jersey law is not comparable to § 1319(g) because it provides for no public notice and no opportunity to comment on proposed penalty orders and no opportunity to participate in a pre-decisional hearing); Atlantic States Legal Foundation, Inc. v. Universal Tool & Stamping Co., 735 F. Supp. 1404, 1415-16 (N.D. Ind. 1990)(holding that Indiana law is not comparable to § 309(g) because it provides no notice of or opportunity to comment on proposed penalties).

   To demonstrate that the public participation afforded in the CSL is comparable to § 309(g), Defendant proffers: 1) the holdings in Paper, Allied-Industrial, Chemical and Energy Workers International Union v. Continental Carbon Co., 428 F.3d 1285, 1296 (10th Cir. 2005)

and Ark. Wildlife Fed'n v. ICI Americas, Inc., 29 F.3d 376, 381 (8th Cir. 1994), *cert. denied*, 513 U.S. 1147, (1995); 2) the Pennsylvania right to access public records; and 3) public notice for sewer system improvements. Def. Br. at 32-36. Not one of these arguments demonstrates that the CSL is comparable to § 309(g).

Paper, Allied and ICI Americas are distinguishable from the present case. In Paper, Allied, the 10th Circuit reviewed an Oklahoma Statute to determine whether it was comparable to § 309(g). The 10th Circuit held that the public participation provisions were comparable. However, it is not clear how the Court came to such a result because the Court concedes that the public participation provisions do not include a public comment period prior to the issuance of a penalty. Id. at 1294-1296. Therefore, the Court relies upon the Open Meetings Act. Id. It is not clear from the facts of the case or the opinion how such notice of a meeting satisfies pre-issuance participation. Therefore, this case is unpersuasive.

Additionally, ICI Americas is not persuasive because it found comparable to the pre-issuance public participation requirements of § 309(g), provisions in the statute that allowed for public comment during the NPDES permit issuance process, which is not related to an enforcement action. This argument is illogical and has already been rejected by a Pennsylvania district court in the L.E.A.D. case. *See* L.E.A.D., 1999 U.S. Dist. LEXIS 2672.

Second, access to public records is not evidence of CSL's comparability to § 309(g) because it does not allow for public notice or comment as required by § 309(g). The only function that public access to records may provide is notice of action or an order after the fact. Any public participation in the process would still be ex post facto. The fact that Ms. Pedler was able to find out information about the 1992 & 2003 COA after both were approved does not change the ability to provide public comment prior to the issuance of the order. *See* Def. Br. At

33-34. Even when Ms. Pedler found out about the order there was no affirmative obligation to exhaust her administrative remedies and there was no way for the average person to know about the 30 day actual notice deadline. Public Interest Research Group of New Jersey v. Yates Industries, Inc., 757 F.Supp. 438 (D.N.J. 1991); Hanson v. U.S., 710 F.Supp. 1105 (E.D. Tex. 1989). Also, the ability of Plaintiffs to intervene in the Summit Township appeal is of no consequence because it is still post order participation that has been established as available under CSL.

Third, any public notice regarding Millcreek's sewer improvements by the Township or by the State are still post-order and do not provide proposed penalty assessment notice. *See* Def. Br. At 34-35. Moreover, these notices were about sewer improvements and not about civil penalties assessed by the State. Additionally, any meetings that occurred in Millcreek Township to approve of the 2003 Consent Order and Agreement were not held as a requirement of the Clean Streams Law. To assert that Pennsylvania Sunshine Law meets the requirements for § 309(g) is too attenuated. Additionally, Defendants have provided no evidence that there was a public comment at such a meeting. *See* Def. App. at 743).

Therefore, based upon the caselaw and the lack of public participation provisions in the CSL, the Clean Stream Law is not comparable to the requirements of §309(g).

The Defendants try to make the distinction between the overall comparability approach and the rough comparability approach. This distinction does not, in fact, exist. The courts since North and South Rivers Watershed Ass'n., Inc. v. Town of Scituate, 949 F.2d 552 (1st Cir. 1991) and ICI Americas have overwhelmingly adopted the rough comparability approach. As demonstrated above, there is no debate regarding the clear language, the Congressional intent,

EPA's interpretation, and caselaw regarding § 309(g). Moreover, the distinction between the two in regard to the requirements of public participation is slight, at most.

Defendants' arguments for comparability, Def. Br. at 26, do not overcome this body of legal precedent. Defendants offer: 1) the dictionary definition of "comparable"; 2) the ability of certain areas to overcome weaknesses of other areas; and 3) the similarities to the public participation requirements under the NPDES program, mainly 33 U.S.C. §1342(b)(7) and 40 C.F.R. §123.27 Def. Br. at 26-7,  31-2. Not one these arguments are persuasive.

The overall comparability approach still places special emphasis on the comparability of the state's penalty-assessment and public-participation provisions at every stage of the process by stating a comparable State provision must provide "interested citizens a meaningful opportunity to participate at significant stages of the decision-making process." Id. at 1257, *citing* ICI Americas at 381; *see also* Scituate, 949 F.2d at 555.

The dictionary definition of "comparable," although helpful, is not definitive in supporting either the overall comparability or rough comparability approaches. The definition of "comparable" includes things like "features in common" and "similar," however, it is not sufficient to determine whether the standard is an overarching comparison or whether the comparison needs to be made for each requirement under §309(g).

Defendants also argue that the rough comparability test cannot be the correct test because it does not allow strengths in, for example, the state's administrative penalty amounts to overcome deficiencies in its public participation provisions. This argument was specifically addressed in McAbee, "Under an 'overall' balancing test for compatibility, judges would be forced to weigh incommensurable values, for example, the positive value of identical penalty-assessment provisions against the negative value of starkly dissimilar public-participation

provisions." <u>McAbee</u>, 318 F.3d at 1255. Therefore, the weighing of importance is more of a burden that causes greater disconnect among the courts.

Lastly, Defendants argument in support of the overall approach based upon NPDES provisions and regulation is not persuasive because both § 402(b) of the CWA and 40 C.F.R. § 123.27 were enacted prior to the 1987 Amendment that added § 309(g) to the CWA. Therefore, the state enforcement process contemplated by § 123.27 did not include administrative penalties under § 309(g). Additionally, the disjunctive language of 40 C.F.R. § 123.27, which allows for public participation in one of two ways either intervention as of right in an appeal <u>or</u> reasonable assurance of public participation such as 30 day public comment is in direct contradiction with the requirements of § 309(g), which requires three layers of public participation.

Based upon the requirements of § 309(g) of the CWA, the Clean Streams Law is not a comparable state law. Therefore, § 309(g) does not preclude Plaintiffs' present suit.

> **B.    The violations that occurred after the 2003 Consent Order and Agreement with DEP are not barred under § 309(g)**

Even if the Court finds Pennsylvania Clean Streams Law comparable to the requirements of § 309(g) in some general sense, Plaintiffs' claims based on Millcreek's violations after October 31, 2003 are still not barred by that provision for two reasons. First, § 309(g)(6)(A) requires that the penalties assessed were in an action filed by the State under this subsection. Here, the penalties assessed after October 31, 2003 were pursuant to the 2003 COA, not the result of an action filed under § 309(g). Second, the post October 31, 2003 penalties do not satisfy the basic requirements of § 309(g)(2)-(5), 33 U.S.C. §§ 1319(g)(2)-(5), especially, § 309(g)(3)'s requirement that the penalty issued for a violation be tailored to that specific violation, and § 309(g)(4)'s requirement that there be public participation for penalties assessed.

Section 309(g)(3)'s tailoring requirement is clear. The penalty amount under the CWA is determined by taking into account "the nature, circumstances, extent and gravity of the violation, or violations, and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation, and such other matters as justice may require."  33 U.S.C. § 1319(g)(3).  Similarly, in determining the amount of the civil penalty under the Clean Streams Law, factors that are considered include "the willfulness of the violation, damage or injury to the waters of the Commonwealth or their uses, cost of restoration, and other relevant factors."  35 P.S. § 691.605.  The purpose for having such guidelines for issuing penalties is to provide some continuity in penalties and to have the penalty assess match the violation. The 2003 COA, by contrast, simply sets an arbitrary amount ($2,500 before March 30, 2007 and $5,000 after) for all future discharges without knowing the frequency, duration, extent, or damage of such future discharges. Thus, as the undisputed facts show, Millcreek paid a $2,500 penalty for a discharge of 14,000 gallons of effluent on November 28, 2003 and paid the same $2,500 penalty for an effluent discharge of over 5 million gallons into Walnut Creek on September 9, 2004. *See* Plaintiff. Exs. 1 & 5. Clearly, the penalties assessed after October 31, 2003 do not meet the requirements of § 309(g)(3) or 35 P.S. § 691.605 because DEP did not tailor each penalty in accordance with the requirements.  Thus, the penalties paid after October 31, 2003 are not sufficient as to bar Plaintiffs' citizen suit for administrative penalties under 309(g)(6).

Additionally, § 309(g)(4) requires public participation for a penalty assessed and contains specific procedures therein. Millcreek proffers no evidence that such public participation took place for any of the post October 31, 2003 administrative penalties. Therefore, the stipulation of penalties for future discharges does not meet the public participation requirements of § 309(g).

It may have been convenient for DEP and Millcreek to simply set a flat amount for stipulated penalties in the 2003 COA. In doing so, however, DEP and Millcreek forfeited any claim under § 309. Thus, there is no compliance with § 309 and thus no bar to Plaintiff's suit.

II.    **Plaintiffs Request to Enjoin Millcreek from Continuing to Violate the Act is Not Barred by Any of Defendants' Affirmative Defenses.**

Millcreek has gone to great lengths to bar Plaintiffs' action for civil penalties. However, Millcreek does not seem to challenge Plaintiffs' action for injunctive relief to enjoin Defendants from further discharge and to order the removal of the overflows. Millcreek admits to discharging sewage from pumping stations through bypasses into Walnut Creek without a permit.  Discharges of pollutants are illegal unless the discharger has a Federal or State issued permit allowing for such discharges. Therefore, Millcreek is discharging illegally into Walnut Creek in violation of the CWA.

To the extent Millcreeks' arguments regarding a bar to citizen suits based upon § 309(g)(6) are intended to bar Plaintiffs' citizen suit as a whole, including declaratory and injunctive relief, the language of § 309(g)(6) precludes such a conclusion.

Specifically, subsection 309(g)(6)(A) states that the violations covered by an administrative penalty action that has been commenced and is being diligently prosecuted "shall not be the subject of a *civil penalty action* under . . . section 1365 of this title." 33 U.S.C. § 1319(g)(6)(A)(emphasis added.) Section 1365 contains the CWA's citizen suit provisions. *See* id. § 1365. If Congress had intended administrative penalty assessments under subsection 309(g) to preclude all actions that arise under the CWA's citizen suit provision, including those seeking equitable relief, then it would not have prohibited "civil penalty actions", but rather "civil actions." Congressional intent to limit the preclusiveness of subsection 309(g) to civil penalty

actions is also evident in the conference committee report on the 1987 CWA amendments, which

reads:

> No one may bring an action to recover civil penalties under section . . . 505 of this Act for any violation with respect to which the Administrator has commenced and is diligently prosecuting an administrative civil penalty action, or for which the Administrator has issued a final order not subject to further judicial review (and for which the violator has paid the penalty). This limitation applies only to an action for civil penalties for the same violations which are the subject of the administrative civil penalties proceeding. [T]his limitation would not apply to: 1) an action seeking relief other than civil penalties (e.g., an injunction or declaratory judgment) . . .

Arne R. Leonard, *When Should an Administrative Enforcement Action Preclude a Citizen Suit Under the Clean Water Act*, 35 NAT. RESOURCES J. 555, 612-613 (1995) *quoting* H.R. CONF. REP. NO. 1004, 99th Cong., 2d Sess. 133 (1986), reprinted in 1987 Legislative History, at 822 (emphasis added). Additionally, Congress intended administrative penalty assessments "to address past, rather than continuing violations [that] are clearly documented and easily corrected and will likely be uncontested by the violator." Id. at 609, *quoting* S. REP. NO. 50, 99th Cong., 1st Sess. 26-27 (1985), reprinted in 1987 Legislative History, at 1447-48.

The ability to bring a CWA citizen suit can be limited by § 505(b) or § 309(g). Section 505(b) acts as a complete bar to citizen suits where an agency is diligently prosecuting violations in a court action. 33 U.S.C. 1365(b). Specifically, 505(b) states:

> No action may be commenced- … if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance…

Distinguishable from language in 505(b) that "requires compliance" with the Act, § 309(g) only requires the agency to diligently prosecute or assess administrative penalties to bar a "civil penalty action." The difference between the language in 505(b) and 309(g) is important in determining which citizen suits are barred. The language in 309(g) clearly leaves out the phrase

"requires compliance" which makes sense only to bar "civil penalty" actions but not civil actions

on the whole. *See* 33 U.S.C. §§ 1365(b) & 1319(6)(6). This is especially pertinent in a case such

as this where the administrative action although --assessing penalties for violations-- does not

require immediate compliance with the Act, even though possible. As the Supreme Court has

noted, the governmental enforcement provisions in section 309 of the CWA and the citizen suit

provisions in section 505 are structured differently. *See* Gwaltney of Smithfield v. Chesapeake

Bay Found., 484 U.S. 49, 58 (1987) (quoting Tull v. United States, 481 U.S. 412, 425 (1987)).

     While courts should leave some room for prosecutorial discretion in their analysis of

whether an agency is diligently prosecuting an administrative penalty action, such deference

need not extend to the issue of remedies.

     The Courts split on whether the bar set forth in 309(g)(6) extends to injunctive and

declaratory relief. However, Plaintiffs urge this Court to adopt the clear language of the statute

that the limitations on citizen suits set forth in § 309(g) do not apply to requests for injunctive

relief. This position is supported by the Congressional intent behind § 309(g), the clear statutory

construction, as argued above, as well as case law. For example, in Orange Environment, Inc. v.

County of Orange, the district court granted great deference to the State agency in its analysis of

the § 309(g), but held that a citizen suit for injunctive relief was not precluded. 860 F. Supp. at

1003, 1017, 1018 (S.D.N.Y. 1994). In reaching this holding, the Orange Environment court

analyzed the clear language of § 309(g) and the "equities of the situation." Id. at 1018.  The

equities favored the citizen plaintiffs because, despite potential diligent prosecution of an

administrative penalty action to address past violations, New York failed to stop the defendant

from violating the CWA again in the future. This failure "spurred the citizen plaintiffs' suit for

declaratory and injunctive relief," and "arguably a good deal of progress that had been made . . .

may have resulted from the plaintiffs' suit." Id. at 1018-19.  This approach taken by the majority of courts does not unnecessarily duplicate or unduly interfere with governmental prosecution of an administrative penalty action for one simple reason: administrative penalty actions are supposed to only address past violations, while citizen suits for injunctive relief seek to enjoin a defendant from continuing to violate the CWA. See 33 U.S.C. § 1365(a).

Other District Courts have found similarly. Public Interest Research Group of New Jersey, Inc. v. Witco Chemical Corp.,1990 WL 66178 (D.N.J. May 17, 1990) (Section 505 is more preclusive than § 309. The Court determined that only civil penalty proceedings are barred under § 309); North Carolina Shellfish Growers Assoc. v. Holly Ridge LLC, 200 F.Supp. 2d 551, 557 (E.D.N.C. 2001) (Section 309(g)(6)(A) only applies to civil penalty actions, so that Plaintiffs' claim for injunctive relief would not be barred.) California Sportsfishing Protection Alliance v. City of West Sacramento, 905 S. Supp. 792 (E.D. CA. 1995) (The language of § 1319(g) is unambiguous that only civil penalty actions are barred, not injunctive relief, specifically declining to follow the contrary holding in Scituate);  Coalition for a Liveable West Side, Inc. v. New York City Department of Environmental Protection, 830 F. Supp. 194 (S.D.N.Y. 1993) (Section 309(g) does not bar citizen suits for injunctive relief); New York Coastal Fisherman's Ass'n v. New York City Department of Sanitation, 772 F. Supp. 162, 169 (S.D.N.Y. 1991) ("we note that the limitation on citizen suits . . . relates only to actions for civil penalties, not injunctive or declaratory relief."); U.S. v. Smithfield Foods, Inc., 965 F. Supp. 769, 791 (E.D. Va. 1997) ("Since Section 309 (g)(6)(A) only applies to civil penalty actions, the Court finds that the United States' claim for injunctive relief is not barred by this section"); see also Save Our Bays & Beaches v. City and County of Honolulu, 904 F. Supp. 1098, 1126 (D.

Haw. 1994) and <u>Molakai Chamber of Commerce v. Kikui, Inc.</u>, 891 F. Supp. 1389, 1403 (D.

Haw. 1995).

However, the First and Eighth Circuit Courts have held the opposite. *See* <u>North & South</u>

<u>Watershed Ass'n v. Town of Scituate</u>, 949 F. 2d 552, 557 (1st Cir. 1991); <u>Arkansas Wildlife</u>

<u>Federation v. ICI Americas, Inc.</u>, 29 F. 3d 376 (8th Cir. 1994). The conclusions of the First and

Eighth Circuit in <u>Scituate</u> and <u>ICI</u>, respectively, is based upon <u>Gwaltney of Smithfield v.</u>

<u>Chesapeake Bay Found.</u>, 484 U.S. 49 (1987). However, such reliance upon <u>Gwaltney</u> is

unfounded. <u>Gwaltney</u> was limited to whether citizens could maintain a suit for wholly past

violations; moreover, the citizen suit at issue was brought before the enactment of § 309(g).

Additionally, in <u>Scituate</u>, the First Circuit held that an administrative order precluded a citizen

suit for injunctive relief because the plain language of the statute would lead to an absurd result.

949 F.2d at 558. In order to find that an administrative penalty action precludes a citizen suit for

injunctive relief, courts must ignore the clear Congressional intent and plain language of §

309(6)(A) and, in effect, redraft the statutory language so that it conforms to their conclusion. In

<u>Coalition for a Livable West Side,</u> a district court in New York accused the First Circuit Court in

<u>Scituate</u> of redrafting § 309 in order to reach its holding and instead held that an administrative

order did not preclude a citizen's group from seeking injunctive relief. 830 F. Supp. at 197.

Therefore, <u>Gwaltney</u>, <u>Scituate</u>, and <u>ICI Americas</u> are unpersuasive.

Finally, allowing citizen suits for injunctive relief to proceed in the face of administrative

enforcement actions does not undermine the goals of the CWA but rather supports them. In

1972, Congress set an ambitious national goal "that the discharge of pollutants into the navigable

waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1). To achieve this goal, Congress

authorized CWA prosecutors to combat future violations with administrative compliance orders

as well as citizen suits. 33 U.S.C. § 1365. The main remedy contemplated by the citizen suit provisions was abatement of pollution through court-ordered injunctive relief. *See* Gwaltney, 484 U.S. at 59, 61 (inferring from legislative history and the statute's use of the present tense that "the interest of the citizen-plaintiff is primarily forward-looking"). Given the success of citizen suits and the failure of administrative compliance orders in achieving compliance with the CWA's abatement goals, Congress had good reason to decline to give any preclusive effect to administrative compliance orders when it amended the CWA in 1987.

Here, the 2003 Consent Order and Agreement does not require Millcreek to come into immediate compliance with the Act. Since 1992, the Pennsylvania Department of Environmental Protection has attempted to eliminate the overflow at Kearsarge that was illegally constructed by Millcreek, yet despite two administrative orders, the discharges continue. The 2003 Consent Order and Agreement gives the appearance that there will be an end to the violations of the Clean Water Act. Unfortunately, the 1992 Consent Order and Agreement was also supposed to accomplish that goal. Additionally, in the 2003 COA Millcreek is allegedly required to discontinue discharging at the end of construction but the only means of enforcing that in the COA is that Millcreek will be required to pay a higher penalty for discharges. Therefore, a judicial order is necessary to stop the continued discharges immediately and permanently. Thus, Plaintiffs' request to enjoin Millcreek from further violations of the Act is not precluded. Plaintiffs respectfully request this Court to immediately enjoin Millcreek from discharging into Walnut Creek. If this Court finds that immediate compliance with the Act is not possible, Plaintiffs request that the Court require Millcreek to satisfy certain requirements.

Until Millcreek stops discharging into Walnut Creek they should be required to meet the same requirements as National Pollution Discharge Eliminations System ("NPDES")

permitholders.[6] *See* 40 C.F.R. §§ 122.21 & 122.41. In general, a NPDES permitholder is required to sample the effluent discharged and test it for pollutants and pollutant quantities. At the very least, NPDES permit holders are required to sample and analyze the following pollutants: Biochemical Oxygen Demand (BOD5); Fecal coliform; Design Flow Rate; Total Suspended Solids; Temperature (both winter and summer); and pH. 40 C.F.R. § 122, Appendix J. The monitoring of several additional pollutants may also be required. *See* 40 C.F.R. § 122, Appendix J. The results of this monitoring should be reported. Therefore, Plaintiffs request this Court to enjoin Millcreek from further discharges and in the event the Court finds that it is not immediately possible, to requires Millcreek to come into compliance with the NPDES permit regulations until the discharges are eliminated.

III.    **The Discharge from the Kearsarge Pump Station on November 7, 2000 is not wholly past.**

Plaintiffs withdraw as a violation of the Clean Water Act the overflows that occurred at the 51st and 52nd Streets and Zimmerly Road bypass. Additionally, Plaintiffs withdraw as a violation the discharge on August 16, 2001. However, Plaintiffs still claim as a violation to the Act the discharge on November 7, 2000 from the Kearsarge pump station.

Plaintiffs agree with Defendants that Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49 (1987) ("Gwaltney I") stands for the proposition that citizens are barred from bringing suit for "wholly past violations." Def. Br. at 37-39. Plaintiffs also agree that "citizen-plaintiffs must allege a 'state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future." Def. Br. at 37-38, *quoting* Gwaltney I, at 56. Plaintiffs recognize that the Third Circuit Court of Appeals has

---

[6] The claim that Millcreek is a sanitary sewer overflow (SSO) instead of a CSO does not get them off the hook. Millcreek should still be required to meet the NPDES permit requirements of the Act if there is no immediate compliance.

modified that approach in <u>Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.,</u> 2 F.3d 493 (3d Cir. 1993), holding that plaintiffs can establish in one of two ways that violations are continuous or intermittent "by proving the likelihood of recurring violations of the same parameter;" or "by proving a likelihood that the same inadequately corrected source of trouble will cause recurring violations of one or more different parameters." <u>Texaco</u>, 2 F.3d at 499. Where Plaintiffs differ from Defendants is the application of <u>Gwaltney</u> and <u>Texaco</u> to this case.

Defendants claim that the discharge on November 7, 2000 is wholly past because it "was caused by a malfunction in the seal on the overflow at the Kearsarge pump station." Def. Br. at 42. Therefore, Defendants concluded that this violation is not continuing, and is instead wholly past and not within the jurisdiction of this Court. However, in <u>Gwaltney</u> the alleged violator had a permit and the citizen-plaintiffs alleging that the permittee "had violated and would continue to violate" conditions of its permit by exceeding effluent limitations for certain pollutants. In <u>Gwaltney</u>, the discharges had ceased due to the installation of new equipment. Therefore, the Court deemed the violations "wholly past." Here, Millcreek illegally installed the Kearsarge bypasses and does not have a permit for its discharges. Therefore, until Millcreek removes the bypass or obtains a NPDES permit, the violations will recur. As in the language of <u>Texaco</u>, the Kearsarge bypass is the same inadequately corrected source of trouble and until it is removed or Millcreek gets a permit, it is likely to continue. Other courts have only recognized a discharge without a permit to be wholly past only when the violator applies for and/or received a permit to discharge. *See* <u>Parker v. Scrap Metal processors, inc.</u>, 386 F.3d 993 (11th Cir. 2004); <u>Mississippi River Revival, Inc. v. City of Minneapolis</u>, 319 F.3d 1013 (8th Cir. 2003).

**IV.**     **The Violations Relating to Discharges from the Larchmont and Beaver Streets Location and the Church and Patton and Pershing Streets Location Are Not Moot.**

The discharges from the Larchmont and Beaver Streets location and the Church and Patton and Pershing Streets location are not moot because Defendants have not carried their heavy burden of demonstrating that the wrongs will not be repeated.[7]

In seeking to have a case dismissed as moot, the Defendants' burden is a heavy one. Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189 (2000) ("The 'heavy burden of persuading' … lies with the party asserting mootness.")(internal citation omitted); Gwaltney of Smithfield v. Chesapeake Bay Found., 484 U.S. 49, 66 (1987) (same).  To show mootness, Millcreek must demonstrate that it is "absolutely clear" that "there is no reasonable expectation that the wrong will be repeated." Gwaltney of Smithfield v. Chesapeake Bay Found., 484 U.S. 49, 66 (1987) (internal citations omitted). Therefore, Millcreek's actions must have "completely eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)(emphasis added).

The Friends of the Earth case, in particular, illustrates the stringency of the mootness test. In Friends of the Earth, a citizen suit was brought under the Clean Water Act against a hazardous waste company for violations of their discharge permit. 528 U.S. at 189. Defendant company argued that its subsequent compliance with its discharge permit requirements and the closure of its facility rendered the case against it moot.  Id.  Despite these measures taken, the company retained its discharge permit and, with it, the potential for future permit violations.  Id. at 194. This fact did not make it absolutely clear that future violations could not reasonably be expected to recur and the case against it was, therefore, not moot.  Id.

---

[7] In regard to the discharges from the 51st and 52nd Streets and Zimmerly Road location, Plaintiffs withdraw their claims for relief for the discharges. However, this should not be construed to mean that Plaintiffs concede the issue of mootness at this location.

The courts have specifically found that where there is a discharge without a permit only subsequent acquisition of a discharge permit rendered the case against it moot. *See* <u>Mississippi River Revival, Inc. v. City of Minneapolis, Minn.</u>, 319 F.3d 1013, 1015 (8th Cir. 2003) (Defendant obtaining a permit made it absolutely clear that future *discharges without a permit* would not recur and the case against it was only then mooted).

Millcreek admits that there is a capacity problem with the Beaver Dam interceptor, which affects both the Larchmont and Beaver Streets and the Church and Patton and Pershing Streets locations. Def. Br. at 46-47. Millcreek asserts that it conducted a Special Study to determine how to eliminate the discharge at these locations and determined that it would need to construct a diversion at the Beaver Run relief sewer and remove illegal connections from the pipes in order to eliminate the discharge. Def. Br. at 47. In furtherance of the the the elimination of illegal connections, Millcreek passed an ordinance in March 2004 "to detect and correct illegal storm water connections to its sewer system."  Def. Br. at 47, 48. Since March of 2004, there has been at least one discharge from each of the locations. *See* Plaintiff Exs. 1 & 2. Millcreek has also engaged in some enforcement actions that have potentially reduced the inflow and infiltration to the system by .3 million gallons per day, well short of the 1.5 million gallons per day ("MGD") potential overcapacity Millcreek has at Beaver Run. Def. Br. at 51. By virtue of the fact that there have been discharges resulting in overflows since the inception of the ordinance and the subsequent enforcement actions have only resulted in a reduction of .3 MGD, it is clear that the ordinance has not in fact "completely eliminated the prospect of future overflows." Def. Br. at 50, 53.

In regard to the main project to eliminate the overflow at these locations, Millcreek claims that the diversion would take 1.2 MGD from the interceptor to a relief sewer, that project

has yet to be completed. Until the completion of the construction and the sealing of the manholes at these two locations, this case is not moot.

Like the cessation in <u>Friends of the Earth</u>, Defendants here do not satisfy their burden of illustrating that it is absolutely clear that they have completely eliminated the prospect of future overflows.  Unlike the discharge permit issued in <u>Mississippi River Revival, Inc.</u>, Defendants here do not offer a reliable vehicle through which to ensure future discharge will not occur.

Defendants have mistakenly relied on the enactment of an ordinance, which has only reduced a portion of the over capacity and the construction of a diversion that has not yet been completed in an attempt to render Plaintiff's case moot.  Defendants have clearly not satisfied the stringent requirements of the mootness test.

Defendants have not offered case law or otherwise legally binding authority that actually support s their argument that the claims against them are to be rendered moot.  Def. Br. at 43-54. For example, in <u>Ailor v. City of Maynardville, Tennessee</u>, 368 F.3d 587(6th Cir. 2004), a city's treatment plant was violating its discharge permit and, in response to Tennessee Department of Environment and Conservation, it constructed a new treatment plant and fully complied with its permit. <u>Id.</u> at 600. Citizens subsequently brought a suit under CWA.  <u>Id.</u>  The court held that the city had "met its 'heavy burden' of demonstrating that the alleged violations were not likely to recur, since they were largely caused by an outdated wastewater treatment plant, which had been replaced by the time Plaintiffs filed their federal action."  <u>Id.</u>  Two things in <u>Ailor</u> are distinguishable from the case at hand: (1) there was no discharge after defendant had taken corrective measures and (2) construction of the new treatment plant was already complete.  In this case, there has been discharge after Defendants' attempted corrective measures and construction of the diversion is not complete; therefore, the case against them is not moot.

V.    __The December 14, 1999 discharge from Kearsarge__

      Plaintiffs withdraw their claim related to the discharge from the Kearsarge pumping station on December 14, 1999. However, Plaintiffs want to make it clear that this withdrawal is not a concession that this violation is barred by the statute of limitations.

VI.    __Plaintiffs withdraw their requests for certain injunctive relief but continue to seek an Order requiring Millcreek to assess harm and mitigate damages__.

      Plaintiffs withdraw their request that this Court enter an Order granting the following relief: 1) Order the Defendants to obtain a publicly available independent assessment of the facility by a qualified individual or organization, agreed upon by all parties, to determine how the Defendants can best comply with the requirements of the CWA; and 2) Order the Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance. Plaintiffs have not sought any of this relief in its Motion for Summary Judgment and herein formally withdraw such requests.

      However, Plaintiffs are seeking an order requiring Defendants to assess and mitigate the environmental injuries caused by their illegal discharges. Defendants claim that such a request constitutes mandatory injunctive relief and allows the Court discretion to balance the equities including whether there has been or will be irreparable harm. Def. Br. at 56-8; *see* Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

      Plaintiffs easily demonstrate irreparable harm to Walnut Creek. Millcreek has discharged over 16 million gallons of pollutants into the Creek. These discharges are uncontrolled under CWA NPDES permit requirements. EPA issued guidance on the impacts regarding such Sanitary Sewer Overflow ("SSO") discharges.

> The Environmental Protection Agency lists specific pollutants of concern found in CSOs and Sanitary Sewer Overflows (SSOs), which are likely to cause or contribute to water quality impairment. *See* EPA's Report to Congress on the Impacts and Control of CSOs and SSOs, August 2004, EPA Document 833-R-04-001. These pollutants are certain oxygen-demanding substances, sediment or total suspended solids, pathogens, toxics, nutrients and floatables. The adverse effects and environmental degradation these pollutants are likely to cause include impairment and degradation of aquatic life support, drinking water supplies, fish consumption, shellfish harvesting and recreational uses. These pollutants and commensurate environmental harms are likely to result from the Defendants' numerous discharges of raw and inadequately treated sewage, which contain several of these pollutants.

Def. App. at 710[8]. The EPA accepts as a given that millions of gallons of uncontrolled sewage being dumped into Walnut Creek causes irreparable harm to water quality and aquatic life. Plaintiffs have no specific information regarding the contents and amount of pollutants in Millcreek's sewage discharges because Millcreek has not sampled its own effluent. Therefore, there is no way for Plaintiffs, or Defendants for that matter, to know the exact type of pollutants and how those pollutants impact water quality and aquatic life.

The expert report of August Maas of Hill Engineering, Inc. provided by Defendants is unpersuasive as to the impacts to Walnut Creek for several reasons. *See* Def. App. at 729-731. As a preliminary matter, Mr. Maas is an engineer and his Curriculum Vitae does not state any education or background that would qualify him as an expert regarding biology, ecology, chemistry or anything about water quality or aquatic life. Mr. Maas limited experience with stream modeling does not qualify him as an expert on issues water quality and aquatic impact. Therefore, Plaintiffs request the Court to not take into account any statements Mr. Maas made regarding water quality impact.

---

[8] The Defendants claim that Plaintiffs have not offered any evidence in support of irreparable harm. This is simply untrue. In response to an Interrogatory served by Defendants, Plaintiffs responded with the information provided by EPA. *See* Def. Br. at 59-60; Def. App. at 710.

If the Court accepts Mr. Maas as an expert in water quality, his analysis is still unpersuasive to rebut the basic fact that millions of gallons of sewage being dumped into the Creek is harmful. First, Mr. Maas' investigation into water quality is limited to fecal coliform and does not take into account many of the other pollutant parameters that are most likely in Millcreek's discharge and may have an impact on water quality, including dissolved oxygen, total suspended solids, pH, nutrients, and potentially toxics. Second, Mr. Maas only took a limited look at water quality and did not analyze the impact to aquatic life. Third, Mr. Maas did not calculate the potential impact that one large discharge, such as 5 million gallons may have on the aquatic life that have to live in polluted water and ingest it. Fourth, Mr. Maas makes an estimation as to how much of the effluent discharged is sewage as opposed to stormwater but does not calculate other pollutants that would be in the stormwater mixed in with the sewage, pollutants which are harmful to the environment and attributable to Millcreek because they are entering Walnut Creek through Defendant's pipe or manhole. Fifth, Mr. Maas failed to compare his wet weather findings where there was no discharge from Millcreek with samples from wet weather events where Millcreek did discharge. Sixth, EPA's recognition of water quality and aquatic impacts is based on high flow events because that is the type of flow that occurs when there is a discharge from a Combined Sewer Overflow ("CSO") or a Sanitary Sewer Overflow ("SSO"), so Mr. Maas' conclusion regarding high flow and dilution is unfounded. Seventh, Mr. Maas' actual visit to Millcreek was to simply look at the Creek and haphazardly conclude there were "no visible signs of water quality degradation." Def. App. at 731. Therefore, Millcreek's supposed expert as to water quality is not sufficient to rebut the basic presumption that million of gallons of sewage and polluted stormwater is harmful, as affirmed by EPA. Thus, Plaintiffs are entitled to injunctive relief requiring Millcreek to assess Walnut Creek and mitigate damages.

## Conclusion

The undisputed evidence demonstrates that Millcreek acted contrary to the CWA in discharging raw and untreated sewage into Walnut Creek without a permit and Millcreek has not denied this. Additionally, Defendants' affirmative defenses do not preclude these violations. Because there are no genuine issues of material fact, Plaintiffs are entitled to summary judgment. The appropriate remedy is for the Court to grant injunctive, declaratory, and civil penalties relief as outlined in Plaintiffs' Brief in Support of Summary Judgment.

Respectfully submitted,

s/ Jennifer A. Murphy
Jennifer A. Murphy, Esquire
PA90851
Mid-Atlantic Environmental Law Center
4601 Concord Pike, P.O. Box 7474
Wilmington, DE 19803-0474
(302) 477-2182
(302) 477-2032 (fax)
jennifer.a.murphy@law.widener.edu
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document by electronic means utilizing the

Court's CM/ECF system that will serve notice of electronic filing to Mark J. Shaw, Esq.,

McDonald, Illig, Jones & Britton, LLP, Attorney for Defendants on this 20th day of April, 2006.


         /s/ Jennifer A. Murphy
         Jennifer A. Murphy
         PA90851
         Mid-Atlantic Environmental Law Center
         c/o Widener University School of Law
         4601 Concord Pike
         P.O. Box 7474
         Wilmington, DE  19803