IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIE COUNTY ENVIRONMENTAL COALITION, PENNENVIRONMENT, INC. and THE GAIA DEFENSE LEAGUE,<br>    Plaintiffs | ) ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-59 ERIE<br>ELECTRONICALLY FILED |
| MILLCREEK TOWNSHIP SEWER AUTHORITY AND MILLCREEK TOWNSHIP,<br>    Defendants | ) ) ) ) | JUDGE COHILL |

## JOINT CONCISE STATEMENT OF MATERIAL FACTS
## REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants MILLCREEK TOWNSHIP SEWER AUTHORITY AND MILLCREEK

TOWNSHIP, by and through their attorneys, MacDonald, Illig, Jones & Britton LLP, and

Plaintiffs ERIE COUNTY ENVIRONMENTAL COALITION, PENNENVIRONMENT, INC.,

and THE GAIA DEFENSE LEAGUE, by and through their attorneys, the Mid-Atlantic Law

Center, file this Joint Concise Statement of Material Facts Regarding Defendants' Motion for

Summary Judgment, pursuant to Rule 26(f) of the Federal Rules of Civil Rules of Civil

Procedure, LR 16.1.A of the Local Civil Rules of the United States District Court for the

Western District of Pennsylvania and the Court's Order dated June 23, 2005:

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE TO MATERIAL FACTS |
|---|---|

1.      Plaintiffs sent a notice of intent to sue to Defendants on December 9, 2004. (Complaint ¶ 3).

1.      Admitted.

2.      Plaintiffs filed this suit on February 14, 2005, 67 days after the notice of intent to sue was sent.  (See Summons, App. 1-2).

2.      Admitted.

3.      In their Complaint, Plaintiffs allege 16 discharges from the Kearsarge Pump Station between December 14, 1999 and September 17, 2004; Plaintiffs allege seven discharges from the 51st and 52nd Streets and Zimmerly Road Pumping Station between August 2000 and September 9, 2004; Plaintiffs allege 3 discharges from the Larchmont and Beaver Street Pumping Station between February 1, 2002 and September 9, 2004; and Plaintiffs allege three discharges from the Church and Patton and Pershing Street Pumping Stations between April 14, 2002 and September 9, 2004.  (Complaint ¶ 34).

3.      Admitted.

4.      In their Complaint, Plaintiffs seek the following relief:  First, Plaintiffs ask this Court to declare that Defendants are in violation of the CWA; second, Plaintiffs ask this Court to enjoin Defendants from further violating the CWA; third, Plaintiffs ask this Court to order Defendants to assess and mitigate any environmental injuries caused by Defendants' discharges; fourth, Plaintiffs ask this Court to order Defendants to hire an independent expert to determine how Defendants can best comply with the requirements of the CWA; fifth, Plaintiffs ask the Court to order Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance.  Sixth, Plaintiffs seek "significant" civil penalties; and lastly, Plaintiffs seek an amount of the costs of litigation, including attorneys' fees and expert witness expenses. (Complaint, Prayer for Relief).

4.      Admitted.

5.    Brian P. McGrath is Supervisor of Millcreek Township ("Millcreek") and was first elected a Supervisor of Millcreek Township Supervisor in 1994. There are three Supervisors in Millcreek. (Aff. of B. McGrath, ¶ 1).

5.    Admitted.

6.    George Riedesel is the current Executive Director of the Millcreek Township Sewer Authority ("MTSA") and the Millcreek Water Authority. (Aff. of G. Riedesel, ¶ 1).

6.    Admitted.

7.    Mr. Riedesel has been Executive Director/Manager since June 8, 1998. (Aff. of G. Riedesel, ¶ 1).

7.    Admitted.

8.    Mr. Riedesel is a Registered Professional Engineer in the states of Pennsylvania, New York and Ohio. (Aff. of G. Riedesel, ¶ 2).

8.    Admitted.

9.    Mr. Riedesel received a B.S. Degree in Civil Engineering from the University of Cincinnati in 1972. (Aff. of G. Riedesel, ¶ 2).

9.    Admitted.

10.    Since receiving his degree in civil engineering, Mr. Riedesel has spent much of his professional life working on the operation, planning and construction of sanitary sewer systems. (Aff. of G. Riedesel, ¶ 2).

10.    Admitted.

11.    Upon graduation from college, Mr. Riedesel was employed with a private consulting firm in Columbus, Ohio, where he was assigned to be the City Engineer for Worthington, Ohio. (Aff. of G. Riedesel, ¶ 3).

11.    Admitted.

12.    In that capacity, Mr. Riedesel began his work related to sewer systems. (Id.)

12.    Admitted.

13.    From 1974 to 1977, Mr. Riedesel was the Planning and Department Head for Portage County, Ohio. (Id.)

13.    Admitted.

14.    From 1977 to 1982, as an engineer employed by Consoer Townsend & Associates, Mr. Riedesel was involved in all aspects of sanitary sewer work for the New Castle Sanitation Authority, Shenango Township Sewer Authority and the Union Township Sewer Authority. (Id.)

14.    Admitted.

15.    From 1982 to 1998, Mr. Riedesel    15.    Admitted.
was the Director of Public Works and County
Engineer for Chautauqua County, New York.
(Aff. of G. Riedesel, ¶ 4).

16.    As Director of Public Works and    16.    Admitted.
County Engineer, Mr. Riedesel was responsible
for the direct operation of two existing sewer
systems in Chautauqua County. (Id.)

17.    Mr. Riedesel's work also included    17.    Admitted.
planning and feasibility studies, consolidation,
pretreatment,    industrial    development    and
expansion for various sewer systems. (Id.)

18.    Prior    to    Mr. Riedesel,    David    18.    Admitted.
Wright served as Acting Manager of MSTA
from January 1998 -- June 1998.    (Aff. of
G. Allender, ¶ 3).

19.    Prior to Mr. Wright, Bruce Yount    19.    Admitted.
served as Manager of the MTSA. (Id.)

20.    Mr. Yount served in that capacity    20.    Admitted.
from September 1996 until his untimely death in
January 1998. (Id.)

21.    Mr. Yount was previously the Chief of the Bureau of Sewers of the City of Erie. (Id.)

21.    Admitted.

22.    Prior to Mr. Yount, Max Gill was the Manager of the MTSA. (Id.)

22.    Admitted.

23.    Mr. Gill was manager for over 18 years, and was the manager of MTSA at the time the Kearsarge force main overflow was installed. (Id.)

23.    Admitted.

24.    The MTSA is a municipal authority organized and existing under the Pennsylvania Municipality Authorities Act since June 4, 1956. (Aff. of G. Riedesel, ¶ 5).

24.    Admitted.

25.    Millcreek is a political subdivision of the Commonwealth of Pennsylvania. (Aff. of B. McGrath, ¶ 1).

25.    Admitted.

26.    The MTSA owns the Millcreek sanitary sewer system ("Millcreek sewer system"). (Aff. of G. Riedesel, ¶ 5).

26.    Admitted.

27.    Pursuant to an agreement with Millcreek, the MTSA leases the Millcreek sewer system to Millcreek. (Aff. of G. Riedesel, ¶ 5).

27.    Admitted.

28.    Under the agreement between the
MTSA and Millcreek, Millcreek is responsible
for operating and managing the Millcreek sewer
system. (Aff. of G. Riedesel, ¶ 5).

28.    Admitted.

29.    The Millcreek sewer system
serves most of the residents and businesses
located within Millcreek Township. (Aff. of
G. Riedesel, ¶ 6).

29.    Admitted.

30.    There remain areas of Millcreek
Township that are not served by the Millcreek
sewer system, but instead rely upon on-site
septic or other types of on-site sanitary disposal
systems. (Aff. of G. Riedesel, ¶ 6).

30.    Admitted.

31.    The Millcreek sewer system is
comprised of 374 miles of sewer lines serving
Millcreek Township. (Aff. of G. Riedesel, ¶ 7).

31.    Admitted.

32.    The Millcreek sewer system is
designed to accept only sanitary and certain
approved industrial wastewater. (Id.)

32.    Admitted.

33.    The Millcreek sewer system is
not a "combined sewer system." (Aff. of
G. Riedesel, ¶ 8).

33.    Admitted.

34.    A combined sewer system is a sewer system intentionally designed to transport both wastewater <u>and</u> storm water. (Aff. of G. Riedesel, ¶ 8)        .

34.    Admitted.

35.    A combined sewer system is designed with overflows that allow the system to discharge, into a nearby body of water, when storm water flows in the system exceed the capacity of the system; these are known as "combined sewer overflows" or "CSOs". (Aff. of G. Riedesel, ¶ 8).

35.    Admitted.

36.    The City of Erie, for example, has several combined sewer overflows that are allowed under its NPDES Permit. (Aff. of G. Allender, ¶ 9; Aff. of D. Range, ¶ 9; City of Erie NPDES Permit, App. at 7- 66).

36.    Admitted, but immaterial. The City of Erie is not at issue here and has no bearing on whether Millcreek is in violation of the Clean Water Act.

37.    Douglas D. Range is the Director of Environmental Health Services for the Erie County Department of Health ("ECDH"). (Aff. of D. Range, ¶ 1).

37.    Admitted, but immaterial. The City of Erie is not at issue here and has no bearing on whether Millcreek is in violation of the Clean Water Act.

38.    As Director of Environmental Health Services, Mr. Range is responsible for all aspects of the ECDH's Environmental Program, including water quality monitoring, inspections, enforcement and other activities relating to NPDES permits and un-permitted discharges within Erie County. (Aff. of D. Range, ¶ 2).

38.    Admitted, but immaterial. The City of Erie is not at issue here and has no bearing on whether Millcreek is in violation of the Clean Water Act.

39.    Millcreek Township is located in Erie County and falls under the scope of Mr. Range's responsibilities. (Aff. of D. Range, ¶ 3).

39.    Admitted, but immaterial. The City of Erie is not at issue here and has no bearing on whether Millcreek is in violation of the Clean Water Act.

40.    In Mr. Range's role as Director of the Environmental Program, he is responsible for overseeing the compliance of the City of Erie with its NPDES permits. (Aff. of D. Range, ¶ 8).

40.    Admitted, but immaterial. The City of Erie is not at issue here and has no bearing on whether Millcreek is in violation of the Clean Water Act.

41.    A true and correct copy of the City of Erie NPDES permit is included in the Appendix to the Motion for Summary Judgment at App. 7 – 66. (Aff. of D. Range, ¶ 9).

41.    Admitted, but immaterial. The City of Erie is not at issue here and has no bearing on whether Millcreek is in violation of the Clean Water Act.

42.    Although the Millcreek sewer system is not a "combined sewer system," storm water finds its way into the system through inflow and infiltration.    (Aff. of G. Riedesel, ¶ 9).

43.    Inflow is surface storm water that enters a sewer system through direct connections, such as illegal hookups from roof drains, basement sumps, damaged manholes or accidental connections with the storm sewer. (Aff. of G. Riedesel, ¶ 9).

44.    Millcreek's ordinances have historically prohibited discharges of storm water and other non-wastewater into the Millcreek sewer system.    (See Millcreek Township Ordinance 89-29, App. at 69– 86; Aff. of B. McGrath, ¶ 11; Millcreek Township Ordinance 2002-23, App. at 425– 440; Aff. of B. McGrath, ¶ 13).

45.    A true and correct copy of Ordinance 89-29 is included in the Appendix to Motion for Summary Judgment at App. 69 - 86. (Aff. of B. McGrath, ¶ 12).

42.    Admitted.

43.    Admitted.

44.    Admitted.

45.    Admitted.

46.    A true and correct copy of Ordinance 2002-23 is included in the Appendix to Motion for Summary Judgment at App. 425 - 440. (Aff. of B. McGrath, ¶ 13).

46.    Admitted.

47.    Infiltration is groundwater that enters through cracks in the sewer system piping. (Aff. of G. Riedesel, ¶ 9).

47.    Admitted.

48.    The drawing attached at App. 67 illustrates how inflow and infiltration penetrate a sanitary sewer system. (Aff. of G. Riedesel, ¶ 9; App. at 67).

48.    Admitted.

49.    The portion of the Millcreek sewer system that feeds into the Kearsarge pump station has a high amount of inflow and infiltration. (Aff. of G. Riedesel, ¶ 9).

49.    Admitted.

50.    The Millcreek sewer system is part of a regional sewer system that is comprised of sewer systems from the City of Erie, Lawrence Park, Wesleyville, Harborcreek Township, Fairview Township, Fairview Borough and Summit Township, as well as Millcreek Township.    (Aff. of G. Riedesel, ¶ 10).

50.    Admitted.

51.    All of the wastewater from these locations is sent to the wastewater treatment plant owned by the Erie Sewer Authority, and operated by the City of Erie. (Id.)

51.    Admitted.

52.    The Millcreek sewer system feeds into the City of Erie sewer system at several locations. (Aff. of G. Allender, ¶ 4; Erie Regional Interceptor Map, App. at 68).

52.    Admitted.

53.    A true and correct copy of a drawing that shows the major locations where the Millcreek sewer system feeds into the Erie system is included in the Appendix to Motion for Summary Judgment at App. 68. (Aff. of G. Allender, ¶ 3).

53.    Admitted.

54.    Of relevance to the claims raised by the Plaintiffs in this action, the wastewater from areas of Millcreek Township served by the Kearsarge pump station is now transported to the City of Erie's system through the Pittsburgh Avenue/Manor sewer (and previously the Ellsworth sewer) and then is transported to the City's wastewater treatment plant by the Westside Interceptor. (Aff. of G. Allender, ¶ 4).

54.    Admitted.

55.    Attached at App. 87 is a drawing showing the sewer lines fed by the Kearsarge pump station. (Aff. of G. Allender, ¶ 4; App. at 87).

55.    Admitted.

56.    A true and correct copy of a drawing that shows the sewer lines fed by the Kearsarge pump station is included in the Appendix to Motion for Summary Judgment at App. 87. (Aff. of G. Allender, ¶ 4).

56.    Admitted.

57.    The sewer line immediately leaving the pump station (and marked FM) and connecting to the Pittsburgh Avenue sewer line at 38th Street is what is called a force main. (Id.).

57.    Admitted.

58.    A force main uses pressure created by pumps to transport wastewater through a pipe. (Aff. of G. Allender, ¶ 4).

58.    Admitted.

59.    The force main feeds into what is called a gravity main on Pittsburgh Avenue. (Id.).

59.    Admitted.

60.    A gravity main relies on the forces of gravity to transport wastewater though a pipe. (Id.).

60.    Admitted.

61.    The remainder of the sewer lines that transport the wastewater from the Kearsarge pump station are gravity mains. (Id.).

61.    Admitted.

62.    In addition to areas of Millcreek Township, the Kearsarge pump station is fed by sewer lines that serve areas of Summit Township. (Aff. of G. Allender, ¶ 5).

62.    Admitted.

63.    The Millcreek sewer lines that directly feed the Kearsarge pump station are all gravity sewer lines. (Id.)

63.    Admitted.

64.    With respect to Summit Township, the Kearsarge pump station serves the upper Peach Street area of Summit Township, primarily populated by shopping areas with residential and business areas south of that shopping district. (Id.)

64.    Admitted.

65.    The Summit Township sewer lines are a mix of gravity fed and force mains. (Id.)

65.    Admitted.

66.    Attached at App. 88-89 are two drawings showing the sewer lines that feed into the Kearsarge pump station from both Millcreek Township (Figure VII-b) and Summit Township (Figure VII-a).  (Aff. of G. Allender, ¶ 5; App. at 88-89).

66.    Admitted.

67.    True and correct copies of two drawings showing the sewer lines that feed into the Kearsarge pump station from both Millcreek Township (Figure VII-b) and Summit Township (Figure VII-a) are included in the Appendix to Motion for Summary Judgment at App. 88 and 89.  (Aff. of G. Allender, ¶ 5).

67.    Admitted.

68.    The Millcreek sewer system, therefore, is in the middle of the regional sewer system that ultimately is served by the City of Erie wastewater treatment plant.   (Aff. of G. Allender, ¶ 6).

68.    Admitted.

69.    To the north, which is downstream, the Kearsarge pump station is subject to the capacity limitations imposed by the City of Erie sewer system.  (Id.)

69.    Admitted.

70.     To the south, which is upstream, the Kearsarge pump station is subject to the future flow possibilities of Summit Township. (Id.)

70.     Admitted.

71.     The Kearsarge pump station itself was constructed in the mid-1950s.   (Aff. of G. Allender, ¶ 7).

71.     Admitted.

72.     At that time, there was a gravity fed overflow built into the Kearsarge pump station to handle overflow situations during severe storm events, which was standard practice to protect against damage to the system and its customers under severe operating conditions.  (Id.)

72.     Admitted.

73.     The pump station was then upgraded in the mid-1980s due to increasing development in the areas of Millcreek Township and Summit Township it served.  (Id.)

73.     Admitted.

74.     The gravity overflow was plugged with concrete.  (Id.)

74.     Admitted.

75.     In the late 1980s, due to a significant storm event that caused widespread sewage backups in numerous homes and businesses in the area of the Kearsarge pump station (including a hospital and a senior citizen home), an overflow was installed on the force main sewer line that transports the wastewater from the Kearsarge pump station toward the City of Erie sewer system. (Aff. of G. Riedesel, ¶ 12; M. Gill 6/21/91 letter, App. at 90-91).

75.     Admitted.

76.     A true and correct copy of the June 21, 1991 letter to the Department is included in the Appendix to Motion for Summary Judgment at App. 90 - 91. (Aff. of G. Riedesel, ¶ 12).

76.     Admitted.

77.     The overflow is operated manually during severe storm events when the water levels at the Kearsarge pump station rise high enough to cause sewage backups in customers' residences and businesses. (App. at 90-91).

77.     Admitted.

78.     The overflow, when used, discharges into Walnut Creek. (Id.)

78.     Admitted.

79.    Investigations conducted in the early 1990s into the causes of the overflows at the Kearsarge pump station concluded that the pump station had sufficient pumping capacity during storm events, if its pump head was reduced. (Aff. of G. Allender, ¶ 8).

79.    Admitted.

80.    However, there was not enough transport capacity in both the Millcreek sewer system and the City of Erie sewer system downstream of the Kearsarge pump station. (Id.)

80.    Admitted.

81.    During dry weather, the Kearsarge pump station has more than enough capacity to handle the normal sewage flows that enter it. (Aff. of G. Riedesel, ¶ 11).

81.    Admitted.

82.    The current capacity of the pump station is 3750 gpm and the normal dry weather flows are between 700 gpm and 1200 gpm. (Aff. of G. Riedesel, ¶ 11).

82.    Admitted.

83.    Accordingly, MTSA and Millcreek began to explore in 1991 how they could solve this capacity problem and, in March 1991, MTSA submitted to the Pennsylvania

83.    Admitted.

Department of Environmental Resources, now known as the Pennsylvania Department of Environmental Protection ("Department"), a Task Activity Report for a proposed Special Study. (Aff. of G. Allender, ¶ 8; M. Gill 3/27/91 letter, App. 92-98).

84.     A copy of the MTSA's letter and the Report, which the Erie office of CTE completed, is included in the Appendix to Motion for Summary Judgment at App. 92 - 98. (Aff. of G. Allender, ¶ 8).

85.     At this same time, the City of Erie was having capacity problems within its sewer system, in terms of both conveyance capacity and treatment capacity, and was investigating what it should do. (Aff. of G. Allender, ¶ 9).

86.     At the time, the City of Erie also had entered into a Consent Order and Agreement with the Department. (Aff. of G. Allender ¶ 9).

84.     Admitted.

85.     Admitted.

86.     Admitted.

87.    In 1992, MTSA and Millcreek entered into a Consent Order and Agreement ("1992 COA") with the Department to address the overflow problem at the Kearsarge pump station as well as address capacity issues in other areas of the Millcreek sewer system. (Aff. of G. Allender, ¶ 10; 1992 COA, App. at 99-120; Aff. of G. Riedesel, ¶ 13).

87.    Admitted.

88.    A true and correct copy of the 1992 COA is included in the Appendix to Motion for Summary Judgment at App. 99 - 120. (Aff. of G. Riedesel, ¶ 13)

88.    Admitted.

89.    Under the 1992 COA, MTSA and Millcreek proposed two basic alternative solutions to the Kearsarge problem. (Aff. of G. Allender, ¶ 10).

89.    Admitted.

90.    First, MTSA and Millcreek proposed to construct a new sewer line directly from the Millcreek sewer system to the wastewater treatment plant, thereby bypassing most of the conveyance portion of the City of Erie sewer system. (Aff. of G. Allender, ¶ 10; Alternative Selection Report, App. 121-159).

90.    Admitted.

91.     Under the second alternative, MTSA and Millcreek proposed to expand the capacity of its sewer lines downstream of the Kearsarge pump station, and work with the City of Erie to expand the capacity of the City's sewer lines downstream of the Kearsarge pump station, and increase the capacity of the wastewater treatment plant to handle high wet weather flows.     (Aff. of G. Allender, ¶ 11; Alternative Selection Report, App. 121-159).

91.     Admitted.

92.     The Kearsarge pump station capacity was then to be increased.     (Aff. of G. Allender, ¶ 11).

92.     Admitted.

93.     Under either scenario, it was recognized that it would take a substantial amount of time to solve the overflow problem and remove the Kearsarge overflow.  (Id.)

93.     Admitted.

94.     A true and correct copy of MTSA's Alternative Selection and Implementation Schedule, Sewage Facilities Plan is included in the Appendix to Motion for Summary Judgment at App. 121 -159.  (Aff. of G. Allender, ¶ 10).

94.     Admitted.

95.    The Department approved the alternative under which the MTSA, Millcreek and the City of Erie worked together on the regional solution. (Aff. of G. Allender, ¶ 12; Department letter 3/11/93, App. 160-161).

95.    Admitted.

96.    A true and correct copy of the Department's 3/11/93 letter, on which Mr. Allender is copied, is included in the Appendix to Motion for Summary Judgment at App. 160 - 161. (Aff. of G. Allender, ¶ 12).

96.    Admitted.

97.    Pursuant to the 1992 COA, MTSA, Millcreek and the City engaged in an eight-year period of sewer investigation, construction and repair, ranging from cleaning existing sewer lines, to constructing new sewer lines, to performing studies and abatement of inflow and infiltration, to constructing a significant upgrade of the City's wastewater treatment plant. (Aff. of G. Allender, ¶ 13).

97.    Admitted.

98.    MTSA and Millcreek performed 22 projects during this period. (Id.)

98.    Admitted.

99.     On those 22 projects, MTSA and Millcreek spent approximately $8.9 million. (Aff. of G. Riedesel, ¶ 14).

99.     Admitted.

100.    In    addition,    MTSA's    and Millcreek's share of the work performed by the City of Erie during that time period is approximately $20.8 million, of which, MTSA and Millcreek already have paid $6.2 million. (Aff. of G. Riedesel, ¶ 14).

100.    Admitted.

101.    MTSA and Millcreek also paid a civil penalty to the Department in the amount of $15,000.    The 1992 COA also imposed stipulated penalties for each overflow.  (Aff. of G. Riedesel, ¶ 15).

101.    Admitted.

102.    Under the life of the 1992 COA, MTSA and Millcreek paid $20,100.00 in stipulated penalties to the Department for overflows, and paid $500.00 to the Pennsylvania Fish and Boat Commission ("PA Fish Commission") for those same overflows. (Aff. of G. Riedesel, ¶ 15).

102.    Admitted.

103.    Thus, the total amount of civil penalties paid under the 1992 COA to the Department and to the PA Fish Commission was $35,600.00.  (Aff. of G. Riedesel, ¶ 15).

103.    Admitted.

104.    Despite having spent and being committed to spend nearly $30 million, by the end of 2000, the capacity problem at the Kearsarge pump station was not solved.  (Aff. of G. Riedesel, ¶ 16; Aff. of G. Allender ¶ 14).

104.    Admitted.

105.    Thus, the removal of the Kearsarge overflow, which was the only project remaining to be completed under the 1992 COA, could not be completed.  (Id.)

105.    Admitted.

106.    It was discovered that although the millions of dollars spent increased the capacity of the sewer system downstream of the Kearsarge pump station, there still was insufficient available capacity downstream of the Kearsarge pump station to accommodate the overflows at the pump station.  (Id.)

106.    Admitted.

107.    Essentially, the projects that were completed did not work.  (Id.)

107.    Admitted.

108.   The wet weather flows that the Millcreek sewer system was receiving from other areas that fed into the same sewer line as the Kearsarge pump station proved to be much higher than the monitoring performed in the early-mid 1990s established, and upon which many of the projects were based.   (Aff. of G. Allender ¶ 14).

108.   Admitted.

109.   When the projects completed under the 1992 COA still did not enable MTSA and Millcreek to remove the overflow, MTSA and Millcreek began to examine whether they could eliminate enough inflow and infiltration from the areas served by the Kearsarge pump station to reduce the flows into the Kearsarge pump station and eliminate the overflows. (Aff. of G. Riedesel, ¶ 17).

109.   Admitted.

110.   Shortly after that effort began, the Department approached MTSA and Millcreek inquiring why the Kearsarge overflow had not been removed. (Id.)

110.   Admitted.

111.    At that time, the Department informed MTSA and Millcreek that inflow and infiltration work alone would not be acceptable to the Department to eliminate the overflow. (Id.)

111.    Admitted.

112.    As a result, MTSA, Millcreek and the Department entered into a new Consent Order and Agreement dated October 31, 2003 ("2003 COA"). (Aff. of G. Riedesel, ¶ 17; 2003 COA, App. at 162-184).

112.    Admitted.

113.    On    October 31,    2003, Mr. Ricardo F. Gilson executed, on behalf of the Department, a Consent Order and Agreement between the Department and the Millcreek Township Sewer Authority ("MTSA") and Millcreek Township ("2003 COA"). (Aff. of R. Gilson, ¶ 5).

113.    Admitted.

114.    Mr. Gilson is the Program Manager for the Water Quality Section of the Northwest Regional Office of the Pennsylvania Department of Environmental Protection ("Department"). (Aff. of R. Gilson, ¶ 1).

114.    Admitted.

115.    As Program Manager, Mr. Gilson is responsible for all aspects of the Department's Water Quality Program, ranging from approving NPDES permits and sewer construction permits to enforcement and approving Consent Orders and Agreements in the Department's Northwest Region. (Aff. of R. Gilson, ¶ 2).

115.    Admitted.

116.    Millcreek Township is located in the Department's Northwest Region and falls under the scope of Mr. Gilson's responsibilities. (Aff. of R. Gilson, ¶ 3).

116.    Admitted.

117.    A true and correct copy of the 2003 COA is included in the Appendix to Motion for Summary Judgment at App. 162 - 184. (Aff. of G. Riedesel, ¶ 17; Aff. of R. Gilson, ¶ 6).

117.    Admitted.

118.    The 2003 COA was entered into by MTSA and Millcreek on October 31, 2003, approximately 16 months before the Plaintiffs filed their Complaint. (Aff. of R. Gilson, ¶¶ 5 - 6; 2003 COA App. at 162).

118.    Admitted.

119.   On October 23, 2003, MTSA approved the execution of the 2003 COA at a public meeting. (Aff. of G. Riedesel, ¶ 18).

119.   Admitted.

120.   A true and correct copy of the October 23, 2003 meeting minutes and Resolution 2003-08 of the MTSA approving execution of the 2003 COA is included in the Appendix to Motion for Summary Judgment at App. 741 - 743. (Aff. of G. Riedesel, ¶ 18).

120.   Admitted.

121.   On October 28, 2003, at a publicly noticed Supervisors' meeting, Millcreek approved the execution of the Consent Order and Agreement entered into between MTSA, Millcreek and the Pennsylvania Department of Environmental Protection ("Department") dated October 31, 2003 ("2003 COA"). (Aff. of B. McGrath, ¶ 2).

121.   Admitted.

122.   The execution of the 2003 COA was the subject of a newspaper article in the Erie Times-News, the City of Erie's only daily newspaper. (Aff. of B. McGrath, ¶ 3; 10/29/03 News Article App. at 681 - 682).

122.   Admitted.

123.  A true and correct copy of the October 29, 2003 newspaper article is included in the Appendix to Motion for Summary Judgment at App. 681 - 682.  (Aff. of B. McGrath, ¶ 3).

123.  Admitted.

124.  The 2003 COA actually was appealed to the Environmental Hearing Board by Summit Township, which has a sewer system that feeds into the Millcreek sewer system. (Aff. of G. Riedesel, ¶ 20; Notice of Appeal, App. at 683 - 689).

124.  Admitted.

125.  A true and correct copy of the Notice of Appeal filed by Summit Township is included in the Appendix to Motion for Summary Judgment at App. 683 - 689.  (Aff. of G. Riedesel, ¶ 20).

125.  Admitted.

126.  This appeal was filed on December 1, 2003.  (Aff. of G. Riedesel, ¶ 20; Notice of Appeal, App. at 683).

126.  Admitted.

127.  The concerns raised by Summit ultimately were resolved, and the appeal was ordered withdrawn on March 2, 2004.  (Aff. of G. Riedesel, ¶ 20).

127.  Admitted.

128.    Under the 2003 COA, MTSA and Millcreek were to conduct a "Special Study" to evaluate the Kearsarge pump station and present a plan for improving the capacity of the pump station and sewer system served by the pump station and for eliminating the overflows at the Kearsarge pump station and overflows associated with the pump station. (App. at 167-168, ¶ 3(a)).

128.    Admitted.

129.    Paragraph 3 of the 2003 COA required that MTSA and Millcreek submit a "complete and final Special Study" on or before July 1, 2004 that at a minimum was required to include:

129.    Admitted.

i.    An evaluation of the following three alternatives to address the removal of the Kearsarge Overflow and elimination of overflow events tributary to the Kearsarge pump station: 1) the construction of a retention facility at the Kearsarge pump station; 2) the installation of an in-line booster on the Kearsarge force main; 3) the replacement of the Kearsarge pump station. Additional alternatives may be addressed in the Special Study.

ii.    Selection of the most feasible alternative of those identified in the Special Study pursuant to Paragraph 3.a.i above, which will result in the timely removal of the Kearsarge Overflow and elimination of overflow events tributary to the Kearsarge pump station.

     iii.   An implementation schedule which includes a date when the Kearsarge Overflow will be removed and overflow events from other areas tributary to the Kearsarge pump station will be eliminated. Said date shall be within 30 days of complete installation of the alternative chosen pursuant to Paragraph 3.a.i above.

(2003 COA, App. at 167-169).

130.    The Special Study performed by MTSA and Millcreek in this case was performed pursuant to Act 537. (Aff. of G. Allender, ¶ 18).

130.    Admitted.

131.    The 2003 COA presented three alternatives for MTSA and Millcreek to consider in the Special Study: (1) the construction of a retention facility at the Kearsarge pump station; (2) the installation of an in-line booster on the Kearsarge force main; or (3) the replacement of the Kearsarge pump station. (App. at 167-168, ¶ 3(a)).

131.    Admitted.

132.    Under the 2003 COA, the Special Study was due on or before July 1, 2004. (Id.)

132.    Admitted.

133.    The 2003 COA also provides that MTSA and Millcreek were to apply for any necessary permits for work recommended in the Special Study within nine months of receiving approval by the Department of the Special Study. (App. at 168, ¶ 3(b)).

133.    Admitted.

134.    The 2003 COA then requires MTSA and Millcreek to complete construction of the work within 18 months after receiving the permits from the Department.    (App. at 168, ¶ 3(c)).

134.    Admitted.

135.    The 2003 COA requires MTSA and Millcreek to remove the Kearsarge overflow within 30 days after construction of the work is complete. (App. at 169, ¶ 3(d)).

135.    Admitted.

136.    The 2003 COA also requires MTSA and Millcreek to continue their efforts to reduce inflow and infiltration in the Millcreek Sewer system. (App. at 169, ¶ 3(f)).

136.    Admitted.

137.    It also places limits on the number of sewer connections that can be made each year in areas that feed into the Kearsarge pump station. (App. at 169-172, ¶ 4).

137.    Admitted.

138.    Under Paragraph 22 of the COA, the MTSA's and Millcreek's obligations under the COA terminate only if the MTSA and Millcreek have completed all of the tasks set forth in the COA <u>and</u> MTSA and Millcreek have achieved compliance by having no overflows from any areas tributary from the Kearsarge pump station, including manual pumping, for a period of 24 months after March 30, 2007 <u>and</u> MTSA and Millcreek have paid all of the outstanding penalties due under the COA. (2003 COA, App. at 177).

138.    Admitted.

139.    Under Paragraph 22 of the COA, the Department is the sole arbiter of whether MTSA and Millcreek have complied with the COA, without any right of MTSA or Millcreek to appeal. (2003 COA, App. at 177).

139.    Admitted.

140.    The 2003 COA imposed a civil penalty of $25,000.00 upon MTSA and Millcreek, which they paid. (Aff. of G. Riedesel, ¶ 19; App. at 173, ¶ 8).

140.    Admitted.

141.    In addition, the 2003 COA imposes stipulated penalties for each future overflow. (App. at 173-174; ¶ 9).

141.    Admitted.

142.    To date, MTSA and Millcreek have paid $42,500.00 in additional civil penalties under the stipulated penalty provisions of the 2003 COA. (Aff. of G. Riedesel, ¶ 19).

142.    Admitted.

143.    Thus, the total civil penalties under the 2003 COA paid to date are $67,500.00. (Id.)

143.    Admitted.

144.    In addition, the PA Fish Commission has imposed fines totaling $21,250.00 since the execution of the 2003 COA, which have been paid. (Id.)

144.    Admitted.

145.    Pursuant to the Pennsylvania Clean Streams Law and regulations, on May 26, 2004, MTSA and Millcreek published a public notice of the Special Study to enable interested persons to make public comments. (Aff. of G. Allender, ¶ 18; App. at 690).

145.    Admitted.

146.    A true and correct copy of the May 26, 2004 public notice is included in the Appendix to Motion for Summary Judgment at App. 690. (Aff. of G. Allender, ¶ 18).

146.    Admitted.

147.    The Notice stated, "The purpose of this Special Study is to define the facilities necessary to provide capacity to eliminate existing and future station overflows." (Id.)

147.    Admitted.

148.    The Notice gave parties from May 26, 2004 to June 25, 2004 to submit comments. (Id.)

148.    Admitted.

149.    No member of the public, including anyone from the three Plaintiffs, submitted any public comments.    (Aff. of G. Allender, ¶ 18).

149.    Admitted.

150.    In accordance with the 2003 COA, MTSA and Millcreek timely submitted the Special Study, which was nearly eight months prior to the date Plaintiffs instituted this action. (Aff. of G. Riedesel, ¶ 21; App. at 185).

150.    Admitted.

151.    On June 29, 2004, the MTSA and Millcreek submitted the Special Study to the Department for its review and approval. (Aff. of G. Riedesel, ¶ 21; Riedesel letter 6/29/04, App. at 185; Act 537 Special Study, Vol. I, App. at 186-413).

151.    Admitted.

152.    A true and correct copy of Volume I of the Special Study is included in the Appendix to Motion for Summary Judgment at App. 186 - 413. (Aff. of G. Riedesel, ¶ 21; Aff. of G. Allender, ¶ 17).

152.    Admitted.

153.    As required by the 2003 COA, by July 1, 2004, MTSA and Millcreek submitted the Special Study outlining its proposed solution and indicating that the work would be completed within 18 months after the Department issued the construction permit, and that the overflow would be eliminated within 30 days after construction was completed, all of which was consistent with the 2003 COA.    (Aff. of G. Allender, ¶ 17; Special Study, App. at 186-413).

153.    Admitted.

154.    The Special Study recommended several projects to address the overflows at the Kearsarge pump station and the area served by the Kearsarge pump station. (App. at 213).

155.    The main project proposed was an upgrade to the electronics and pumping capacity of the Kearsarge pump station together with an overflow retention tank. (App. at 278, 285, 293-295, 308-309).

156.    The pump station upgrade would increase the capacity of the pump station to send flows to the City of Erie system to 4,500 gpm from the existing 3,750 gpm. (App. at 285, 293).

157.    Any flows above the new 4,500 gpm capacity that would enter the Kearsarge pump station would be redirected to an overflow retention tank. (App. at 285, 309).

154.    Admitted.

155.    Admitted.

156.    Admitted.

157.    Admitted.

158.    At the time of the Special Study, Millcreek was still evaluating the size of the tank, but it was expected to be at least 500,000 gallons. (Aff. of G. Allender, ¶ 17; App. at 309; Aff. of R. Gilson, ¶ 10; Department Internal Review Memo, App. at 414-417).

158.    Admitted.

159.    In addition to the pump station upgrade and overflow retention tank, the Special Study found that the 10" sewer line along Zimmerly Road ("the Zimmerly Road line") and the 18" Beaver Run Interceptor were at or over capacity and needed to be relieved. (App. at 208, 212, 248, 251).

159.    Admitted.

160.    A capacity problem in the Zimmerly Road line caused the need to discharge from the 51st and 52nd Streets and Zimmerly Road location in order to protect nearby homes from having sewer backups in their basements. (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25).

160.    Admitted.

161.    A capacity problem in the Beaver Run Interceptor caused the need to discharge from both the Larchmont and Beaver Streets and the Church, Patton and Pershing locations in order to protect nearby homes from having sewer backups in their basements.  (Aff. of G. Riedesel, ¶ 24; Aff. of G. Allender, ¶ 26).

161.    Admitted.

162.    The Special Study recommended several projects that would enable MTSA and Millcreek to eliminate the overflow events from those three locations.  (App. at 208, 212).

162.    Admitted.

163.    The    Study    recommended diverting  flows  from  the  Peach  Street Interceptor (which is tributary to the 18" Beaver Run Interceptor) to resolve capacity issues in the Beaver Run Interceptor.  (Aff. of G. Allender, ¶ 17).

163.    Admitted.

164.    This relief sewer is known as the Peach Street Diversion.  (Id.)

164.    Admitted.

165.    In addition, Millcreek committed to continue its efforts to remove storm water in the system from illegal storm water connections and to install backflow preventors on the homes

165.    Admitted.

most at risk for basement sewer backups in the event a catastrophic event caused a surcharge at the Kearsarge pump station. (App. at 303-304).

166. The Special Study also recommended back flow preventors in homes that would be flooded if the pump station surcharged due to a catastrophic event. (App. at 212).

166. Admitted.

167. On September 30, 2004, the Department approved the Special Study submitted by MTSA and Millcreek. (Aff. of R. Gilson, ¶¶ 11 - 12; R. Gilson letter 9/30/04, App. at 418-419).

167. Admitted.

168. A true and correct copy of the Department's 9/30/04 letter approving the Special Study is included in the Appendix to the Motion for Summary Judgment at App. 418 - 419. (Aff. of R. Gilson, ¶ 12).

168. Admitted.

169. In the Department's internal review memo on the Special Study, the Department concluded that the plan was consistent with the requirements of Pennsylvania law and approval was

169. Admitted.

recommended. (Aff. of R. Gilson, ¶ 10; App. at 414-417).

170.    A true and correct copy of the Department's September 28, 2004 internal review memo on the Special Study is included in the Appendix to the Motion for Summary Judgment at App. 414 - 417. (Aff. of R. Gilson, ¶ 10).

170.    Admitted.

171.    Under Paragraph 3.b. of the 2003 COA, once the Department approved the Special Study in writing, MTSA and Millcreek had to submit their permit for construction within nine months. (2003 COA, App. at 168).

171.    Admitted.

172.    To date, MTSA and Millcreek have accomplished significant portions of their obligations under the 2003 COA. (Aff. of G. Riedesel, ¶ 22; Aff. of G. Allender ¶ 15).

172.    Admitted.

173.    First, even before the Department approved the Special Study, MTSA and Millcreek completed the Zimmerly Road relief sewer and it was operational by September 20, 2004. (Aff. of G. Riedesel, ¶ 23).

173.    Admitted.

174.  By September 20, 2004, MTSA and Millcreek had completed the Zimmerly Road relief sewer, which addressed the cause of the overflows at the 51st and 52nd Streets and Zimmerly Road location - namely, the sewer line size was under capacity.  (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25).

174.  Admitted.

175.  The Special Study concluded that the Zimmerly Road line was a 10" sewer line that had a capacity of 0.65 MGD, but was receiving flows of 0.4 to 1.5 MGD during storm events.  (App. at 251).

175.  Admitted.

176.  Further, the estimated future peak flow of that line was 1.72 MGD. (App. at 251).

176.  Admitted.

177.  Accordingly, the Zimmerly Road sewer line size was under capacity.  (Aff. of G. Allender, ¶ 25).

177.  Admitted.

178.  The proposed Zimmerly relief sewer, together with the existing Zimmerly Road sewer, provide a capacity of 2.07 MGD. (Aff. of G. Allender, ¶ 25; App. at 251).

178.  Admitted.

179.    Based upon the analysis in the Special Study, the new capacity of the overall Zimmerly Road sewer is sufficient to handle both the existing and projected peak flows. (Aff. of G. Allender, ¶ 25).

179.    Admitted.

180.    The Zimmerly Road relief sewer has been operational since September 20, 2004. (Aff. of G. Riedesel, ¶ 23).

180.    Admitted.

181.    Since that time, the Zimmerly Road sewer has, in fact, had adequate capacity to handle both normal flows and storm flows, and there have been no instances of overflows associated with the 51st and 52nd Streets and Zimmerly Road location since the relief line became operational. (Aff. of G. Riedesel, ¶ 23; Aff. of G. Allender, ¶ 25).

181.    Admitted.

182.    The project completed by MTSA and Millcreek fixed the capacity problem at that location. (Aff. of G. Riedesel, ¶ 23).

182.    Admitted.

183.    This work was completed at a cost of $125,995.04. (Id.)

183.    Admitted.

184. Second, with respect to the Beaver Run Interceptor, the Special Study concluded that the Beaver Run Interceptor has a capacity of 4.3 MGD; however, during storm events the peak flows could be 5.8 MGD. (Aff. of G. Allender, ¶ 26; Special Study, App. at 248).

184. Admitted.

185. Thus, the line would be under capacity by 1.5 MGD during those events. (Aff. of G. Allender, ¶ 26).

185. Admitted.

186. The Special Study proposed that the Peach Street Diversion be built to take flows of 1.2 MGD from the Beaver Run Interceptor to the Beaver Run relief sewer that has more than enough capacity to handle those flows. (Aff. of G. Allender, ¶ 26; Special Study, App. at 285).

186. Admitted.

187. The Beaver Run Interceptor then would be able to accommodate the 0.3 MGD it would be under capacity (in essence, the line would act as storage until the flows subsided), and no overflows would be needed to protect any homes. (Special Study, App. at 285).

187. Admitted.

188.    The    inflow    and    infiltration investigation work performed by MTSA and Millcreek to date has already made up that 0.3 MGD shortfall of capacity for peak flows in the Beaver Run Interceptor.  (Aff. of G. Riedesel, ¶ 30).

188.    Admitted.

189.    Until the Diversion can be built, in the interim and to ensure that no further discharges will occur at the two locations impacted by the lack of capacity of the Beaver Run Interceptor, MTSA and Millcreek has developed a system to shift flows from the Peach Street Interceptor to the Beaver Run relief sewer.    (Aff. of G. Riedesel, ¶ 25; Aff. of G. Allender, ¶ 27).

189.    Admitted.

190.    MTSA    and    Millcreek    have created a temporary relief sewer for the 18" Beaver Run Interceptor until the Peach Street Diversion is constructed.  (Aff. of G. Riedesel, ¶ 24; Aff. of G. Allender ¶ 27).

190.    Admitted.

191.   MTSA   and   Millcreek accomplished this by acquiring a pump and hose system to pump from the Peach Street Interceptor during significant storm events to the Beaver Run relief sewer that has enough capacity to carry those flows.   (Aff. of G. Riedesel, ¶ 25; Aff. of G. Allender ¶ 27).

191.   Admitted.

192.   MTSA found a location on the Peach Street Interceptor in the area of the Millcreek Mall that was only approximately 60 feet away from the Beaver Run relief sewer that could serve as a point to transfer flows over the surface via a pump and flexible hose.  (Aff. of G. Riedesel, ¶ 25).

192.   Admitted.

193.   This "over the surface" solution acts in the same fashion as the Peach Street Diversion.  (Aff. of G. Allender, ¶ 27).

193.   Admitted.

194.   Consequently MTSA purchased a 6" pump, 60 feet of 6" flexible hose and made modifications to the Beaver Run line to accept the suction line of the pump.  (Id.)

194.   Admitted.

195.    The pump has the capacity to pump 2.0 MGD, which is more than what is needed to ensure that the Beaver Run Interceptor will not exceed its capacity and cause overflows at those two locations.  (Id.)

195.    Admitted.

196.    The cost of this equipment and work was in excess of $25,325.00.  (Aff. of G. Riedesel, ¶ 25).

196.    Admitted.

197.    The MTSA also has contracted with Chivers Construction Company ("Chivers") to operate the system when it is needed.  (Aff. of G. Riedesel, ¶ 26).

197.    Admitted.

198.    Once it is recognized that flows are backing up in the Beaver Run line during a storm event, Chivers is contacted and they immediately bring the pump system to the Millcreek Mall location and begin operating it. (Id.)

198.    Admitted.

199.    The cost to MTSA and Millcreek to have Chivers operate this pump station is approximately $136.00 per hour or $3,264.00 per 24-hour period. (Aff. of G. Riedesel, ¶ 26).

199.    Admitted.

200.    Under the 2003 COA, MTSA and Millcreek must pay stipulated penalties in the amount of $5,000.00 to the Department for discharges from the two affected locations. (Aff. of G. Riedesel, ¶ 27).

200.    Admitted.

201.    In addition, the PA Fish Commission has been fining MTSA $2,500.00 for each event. (Id.)

201.    Admitted.

202.    Thus, a discharge from these locations would cost MTSA and Millcreek $7,500.00 in penalties. (Id.)

202.    Admitted.

203.    Therefore, it costs MTSA and Millcreek significantly less to operate the "over the surface" pump system than it would be to have an overflow from these two locations. (Id.)

203.    Admitted.

204.    Consequently, there is an economic incentive for MTSA and Millcreek to operate the "over the surface" pump system and prevent discharges from the two affected locations. (Id.)

204.    Admitted.

205.    In most cases, the length of time for an overflow is much less than a full 24-hour period, and as such, in most cases the economic incentive for MTSA and Millcreek to use the "over the surface" pump system is significant. (Id.)

206.    Since September 9, 2004, there have been no instances of overflows associated with the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations. (Aff. of G. Riedesel, ¶ 30).

207.    The proof of the success of the efforts taken by MTSA and Millcreek to date is that there have been no discharges from any of these three locations since well before the complaint was filed. (Aff. of G. Riedesel, ¶ 30).

208.    In fact, the last discharge from these locations occurred during the remnants of the hurricane that hit the Millcreek area on September 9, 2004, which was determined to be the equivalent of an estimated 50-year storm. (Aff. of A. Maas, ¶ 9, App. at 725; Aff. of G. Allender ¶ 19, App. at 738).

205.    Admitted.

206.    Admitted.

207.    Admitted.

208.    Admitted.

209.   Thus, it has been nearly 19 months since there has been an overflow at these three locations. (Aff. of G. Riedesel, ¶ 30).

209.   Admitted.

210.   On January 17, 2006, The Department issued to MTSA and Millcreek the permit to construct the Peach Street Diversion. (Aff. of R. Gilson, ¶¶ 36 - 37; 1/17/06 Permit, App. at 420 - 424).

210.   Admitted.

211.   A true and correct copy of the 1/17/06 Peach Street Diversion construction permit is included in the Appendix to the Motion for Summary Judgment at App. 420 - 424. (Aff. of R. Gilson, ¶ 37).

211.   Admitted.

212.   The work for the Diversion has been put out to bid and bids are to be received on April 18, 2006. (Aff. of G. Riedesel, ¶ 28; Aff. of G. Allender ¶ 28).

212.   Admitted.

213.   The Peach Street Diversion is expected to be operational by mid-late summer 2006. (Aff. of G. Riedesel, ¶ 28).

213.   Admitted.

214.   This Diversion is expected to cost approximately $129,000.00. (Id.)

214.   Admitted.

215.    Third, MTSA and Millcreek have made significant strides in their efforts to investigate and eliminate inflow and infiltration in the sewer system that is served by the Kearsarge pump station.  (Aff. of G. Riedesel, ¶ 29; Aff. of B. McGrath, ¶ 4).

215.    Admitted as an opinion George Riedesel and Brian McGrath.

216.    MTSA and Millcreek have engaged in a significant program to detect and correct illegal storm water connections to its sewer system. (Aff. of G. Riedesel, ¶ 29).

216.    Admitted as an opinion George Riedesel.

217.    As a necessary predicate to that effort, Millcreek and the MTSA passed and adopted a variety of ordinances, resolutions and rules and regulations to enable them to more effectively enforce against properties that discharged storm water into the sanitary sewer system. (Id.).

217.    Admitted.

218.    In March 2004, MTSA and Millcreek passed new ordinances, resolutions and rules and regulations to enable them to better enforce against illegal connection to their sanitary sewer system.  (Aff. of G. Riedesel, ¶ 29; Aff. of B. McGrath, ¶ 4; Ordinance 2004-

218.    Admitted.

4, App. at 441-459; Resolution 2004-R-13, App.
at 460-468; Resolution 2004-R-14, App. at 469-
470; Rules and Regulations, App. at 471-525).

219.   A true and correct copy of                219.   Admitted.
Ordinance 2004-4 is included in the Appendix to
Motion for Summary Judgment at App. 441 -
459.  (Aff. of B. McGrath, ¶ 6).

220.   A true and correct copy of                220.   Admitted.
Resolution 2004-R-13 is included in the
Appendix to Motion for Summary Judgment at
App. 460 - 468.  (Aff. of B. McGrath, ¶ 8).

221.   A true and correct copy of                221.   Admitted.
Resolution 2004-R-14 is included in the
Appendix to Motion for Summary Judgment at
App. 469 - 470.  (Aff. of B. McGrath, ¶ 9).

222.   A true and correct copy of the            222.   Admitted.
Rules and Regulations is included in the
Appendix to Motion for Summary Judgment at
App. 471 - 525.  (Aff. of B. McGrath, ¶ 11).

223.   On March 30, 2004, Millcreek             223.   Admitted.
passed Ordinance 2004-4.  (Aff. of B. McGrath,
¶¶ 5-6; App. at 441 - 459).

224.    Under    Section    1.14.5    of          224.    Admitted.
Ordinance 2004-4, it is unlawful to discharge
"any storm water, surface drainage, ground
drainage, roof runoff, subsurface drainage or
unpolluted industrial process waters into any
public sanitary sewer system." (App. at 453).

225.    Under    Section 1.13.1    of          225.    Admitted.
Ordinance 2004-4, MTSA is authorized to
establish rules and regulations governing the
sanitary sewer system and to be used to
implement the Ordinance. (App. at 452).

226.    In addition, under Section 1.13.5,          226.    Admitted.
the Manager of the MTSA is authorized to issue
enforcement notices and commence enforcement
actions. (App. at 452).

227.    Finally, Section 1.16 outlines the          227.    Admitted.
penalties that can be taken against anyone in
violation of the Ordinance, which includes a
$600.00 penalty per violation. (App. at 456).

228.    Section 1.17    outlines    the          228.    Admitted.
enforcement actions that can be taken by
Millcreek, including issuance of a cease and
desist order. (App. at 457-458).

229.   In conjunction with Ordinance 2004-4, Millcreek also passed two resolutions: Resolution 2004-R-13 and Resolution 2004-R-14.  (Aff. of B. McGrath, ¶¶ 7-9; App. at 460 - 468, 469 - 470).

229.   Admitted.

230.   Resolution 13 establishes a program to identify and terminate unlawful connections to the sanitary sewer system.  (Aff. of B. McGrath, ¶ 10; App. at 469-470).

230.   Admitted.

231.   The resolution sets forth the procedures to be followed for conducting inspections and for thereafter terminating any discovered illegal connections.  (Id.)

231.   Admitted.

232.   In Resolution 14, Millcreek formally adopted the Rules and Regulations Governing the Sanitary Sewer System ("Rules & Regulations").  (Aff. of B. McGrath, ¶ 10; App. at 469 – 470, App. at 471 - 525).

232.   Admitted.

233.   Section VIII of the Rules and Regulations deals with the inspections and terminations of unlawful connections.  (Aff. of B. McGrath, ¶ 10; App. at 490-495).

233.   Admitted.

234.    As with Resolution 13, the Rules and Regulations lay out the process and procedures for inspecting for illegal connections and terminating any illegal connections that are discovered. (Id.)

234.    Admitted.

235.    As part of the inspection program, MTSA and Millcreek were to determine areas of priority to initiate the program. (Id.).

235.    Admitted.

236.    Based on a comprehensive inflow and infiltration study conducted on the Kearsarge pump station area from 2000 to 2002 by the MTSA, MTSA and Millcreek identified a number of areas where it was suspected that large amounts of storm water were entering the sewer system and impacting the Kearsarge pump station area. (Aff. of G. Riedesel, ¶ 29; Project Study Area, App. at 699).

236.    Admitted.

237.    As a result of that study, and armed with the new authority given to it by the Ordinance, Resolutions and Rules and Regulations, MTSA and Millcreek began to systematically inspect neighborhoods and

237.    Admitted.