individual homes for illegal connections. (Aff. of G. Riedesel, ¶ 29).

238. Pursuant to those new ordinances, resolutions and rules and regulations, MTSA and Millcreek have conducted inspections at 420 residences and businesses in the area served by the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 29; I&I Summary, App. at 526-541).

238. Admitted.

239. A true and correct copy of a summary of the inspections and enforcement taken to date by MTSA and Millcreek is included in the Appendix to Motion for Summary Judgment at App. 526 - 541. (Aff. of G. Riedesel, ¶ 29).

239. Admitted.

240. Under Paragraph 9.d of the 2003 COA, MSA and Millcreek are subject to stipulated penalties in the amount of $1,250 per calendar quarter for each quarter during which they fail to continue their program of identifying and securing termination of unlawful connections. (2003 COA, App. at 173-174).

240. Admitted.

241.    As a result of those inspections and subsequent enforcement actions, 72 illegal connections have been removed to date, with more expected to come. (Id.)

241.    Admitted.

242.    It is estimated that the removal of these 72 illegal connections removed a minimum of 104,000 gpd and an estimated peak flow of 0.5 million gallons per day ("MGD") during a normal storm event. (Aff. of G. Riedesel, ¶ 29).

242.    Admitted.

243.    With respect to the areas that impact the Zimmerly Road sewer line (and hence the overflows at the 51st and 52nd Streets and Zimmerly Road location), MTSA and Millcreek have eliminated more than 31 illegal peak connections that were impacting that area during storm events. (Aff. of G. Riedesel, ¶ 30).

243.    Admitted.

244.    It is estimated that on average, the removal of these illegal connections has reduced peak flows through the Zimmerly Road line by at least 0.22 MGD instantaneous peak flow. (Id.)

244.    Admitted.

245.  With respect to the areas that impact the Beaver Run sewer (and hence the overflows at the Larchmont and Beaver Streets and Church and Patton and Pershing Streets locations), MTSA and Millcreek have eliminated 41 illegal storm water connections that were impacting that area during storm events. (Id.)

245.  Admitted.

246.  It is estimated that on average, the removal of these illegal connections has reduced peak flows through the Beaver Run Interceptor by at least 0.295 MGD instantaneous peak flow. (Id.)

246.  Admitted.

247.  The elimination of these illegal connections has removed a significant volume of storm water that was contributing to the overflows, which had to be pumped out of each of the three locations. (Id.)

247.  Admitted, but a legal conclusion as to the meaning of "significant."

248.  In fact, since September 9, 2004, there have been no overflows at any of these three locations, even though the Kearsarge pump station has had overflows on six occasions since that time due to storm events. (Id.)

248.  Admitted.

249.   Since 2000, the investigation and abatement work related to the Kearsarge area have cost $381,176.85. (Id.)

250.   Fourth, MTSA and Millcreek completed the first phase of electrical renovations needed at the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 31).

251.   These renovations included new variable frequency drives, controls and wiring. (Id.)

252.   The cost of these renovations was $222,843.15. (Id.)

253.   Fifth, MTSA and Millcreek have completed their investigation of the homes that need backflow preventors. (Aff. of G. Riedesel, ¶ 32).

254.   Ultimately, it was determined that only six homes needed backflow preventors. (Id.)

255.   It was discovered that the sewer pipes from these homes were at an elevation that was lower than the hydraulic grade line of the Kearsarge pump station. (Id.)

249.   Admitted.

250.   Admitted.

251.   Admitted.

252.   Admitted.

253.   Admitted.

254.   Admitted.

255.   Admitted.

256.    Accordingly, these homes were especially susceptible to sewer backups in their basements. (Id.)

257.    This work provides further assurance that basements will not be flooded, thereby eliminating the need to have overflows in this area. (Id.)

258.    MTSA completed installation of those backflow preventors in February 2006. (Id.)

259.    The cost of the investigation and installation of the backflow preventors was $14,539.70. (Id.)

260.    Sixth, MTSA and Millcreek have made significant progress on the major project of the Special Study. (Aff. of G. Riedesel, ¶ 33; Aff. of G. Allender ¶ 21).

256.    Admitted.

257.    Admitted.

258.    Admitted.

259.    Admitted, but a legal conclusion as to the meaning of "significant."

260.    Admitted    as    an    opinion    of G. Riedesel and G. Allender.

261.    Subsequent to the submission of the Special Study, the Millcreek Township area was hit with the remnant of a hurricane on September 9-10, 2004, which caused overflows at the Kearsarge pump station of volumes and duration that had never been experienced in the past.  (Aff. of G. Allender, ¶ 19).

261.    Admitted.

262.    As a result of those events, MTSA and Millcreek submitted an Act 537 Special Study Addendum to the Department on June 28, 2005.    (Aff. of G. Allender, ¶ 19; Addendum, App. at 542-599).

262.    Admitted.

263.    Subsequent to the approval of the Special Study, MTSA and Millcreek submitted an Act 537 Special Study Addendum to the Department on June 28, 2005.    (Aff. of G. Allender, ¶ 19, Special Study Addendum, App. at 542-599).

263.    Admitted.

264.    A true and correct copy of the Special Study Addendum is included in the Appendix to Motion for Summary Judgment at App. 542 - 599.  (Aff. of G. Riedesel, ¶ 33; Aff. of G. Allender, ¶ 18).

264.    Admitted.

265.   In this addendum, the size of the storage tank was increase to 2.3 million gallons. (Aff. of G. Allender, ¶ 19; App. at 575).

265.   Admitted.

266.   The increase in the size of the storage tank was made necessary by an overflow event that occurred at the Kearsarge pump station on September 9-10, 2004, as well as other overflow events that occurred after the Special Study was submitted to the Department. (Aff. of G. Allender, ¶ 19; App. at 547).

266.   Admitted.

267.   In September, 2004, the Millcreek Township area was hit with the remnants of a hurricane, which caused flooding throughout the region.  (Aff. of G. Allender; ¶ 19).

267.   Admitted.

268.   The storm was estimated to be the equivalent of an approximate 50-year storm event.  (Aff. of A. Maas, ¶ 9; App. at 725; Aff. of G. Allender, ¶ 19; App. at 572, 574, 738).

268.   Admitted.

269.   The size of the storage tank was determined using that storm event.  (Aff. of G. Allender, ¶ 19; App. at 572, 574).

269.   Admitted.

270.    It is believed that the 2.3 million gallon design for the overflow retention tank is quite conservative and contains a significant safety factor. (Aff. of G. Allender, ¶19).

270.    Admitted.

271.    As part of the Special Study Addendum, MTSA and Millcreek again published a public notice for comments on May 23, 2005. (Aff. of G. Allender, ¶ 20; App. at 691).

271.    Admitted.

272.    A true and correct copy of the May 23, 2005 public notice is included in the Appendix to Motion for Summary Judgment at App. 691. (Aff. of G. Allender, ¶ 20).

272.    Admitted.

273.    The public notice stated, in pertinent part,

273.    Admitted.

The purpose of this update is to advise the public of changes in the facilities necessary to provide capacity to eliminate existing and future station overloads.
…
The original study called for continuing review of facility sizing during the design and review processes. Overflow events observed during that period revealed that facility sizing was not sufficient to protect against extreme future events. The update describes the increase in storage sizing and forward flow capabilities to be necessary to protect against those events.

(App. at 691).

274.    The public had from May 23, 2005 to June 22, 2005 to comment on the proposed changes. (Id.)

274.    Admitted.

275.    No member of the public, including anyone from the three Plaintiffs, submitted a public comment.    (Aff. of G. Allender, ¶ 20).

275.    Admitted.

276.    The Special Study, its addendum and associated work cost approximately $270,000.00.  (Aff. of G. Riedesel, ¶ 33).

276.    Admitted.

277.    The Department approved the Special Study Addendum on July 12, 2005. (Aff. of R. Gilson, ¶¶ 16-17; R. Gilson letter 7/12/05, App. at 600).

277.    Admitted.

278.    A true and correct copy of the Department's July 12, 2005 letter approving the Special Study Addendum is included in the Appendix to Motion for Summary Judgment at App. 600.  (Aff. of R. Gilson, ¶ 17).

278.    Admitted.

279.    In the Department's internal review memo on the Special Study Addendum, the Department concluded that the Addendum was consistent with the requirements of

279.    Admitted.

Pennsylvania law and approval was recommended. (Aff. of R. Gilson, ¶¶ 14 - 15; App. at 601-602).

280.    A true and correct copy of the Department's July 7, 2005 internal review memo on the Special Study Addendum is included in the Appendix to Motion for Summary Judgment at App. 601 - 602. (Aff. of R. Gilson, ¶ 15).

280.    Admitted.

281.    The sewer system improvements to be performed by MTSA and Millcreek under the 2003 COA were publicly noticed on two occasions in the Erie Times-News, providing a 30-day comment period during which interested persons could submit comments. (Aff. of G. Allender, ¶¶ 18, 20).

281.    Admitted.

282.    The Special Study required by the Department under the 2003 COA ultimately constituted revisions to Millcreek Township's state-approved Act 537 Plan and, as such, had to be publicly noticed. (Aff. of G. Allender, ¶ 18).

282.    Admitted.

283.    These notices were published on May 26, 2004 and May 23, 2005. (Aff. of G. Allender, ¶¶ 18, 20; App. at 690 - 691).

283.    Admitted.

284.  No public comments were received, nor did Plaintiffs submit any public comments. (Aff. of G. Allender, ¶¶ 18, 20).

284.  Admitted.

285.  The Department approved each submission. (Aff. of R. Gilson, ¶¶ 11–12, 16-17; R. Gilson letter 9/30/04, App. at 418 - 419; R. Gilson letter 7/12/05, App. at 600).

285.  Admitted.

286.  Each of the Department's approvals of the submissions publicly noticed was itself publicly noticed in Pennsylvania Bulletin notices on November 6, 2004 and July 30, 2005 (Aff. of R. Gilson, ¶¶ 18 - 19; App. at 692 - 693).

286.  Admitted.

287.  A true and correct copy of the Pennsylvania Bulletin notices dated November 6, 2004 and July 30, 2005 regarding the Department's approvals of the Special Study and Special Study Addendum are included in the Appendix to Motion for Summary Judgment at App. 692 - 693. (Aff. of R. Gilson, ¶ 19).

287.  Admitted.

288.  No action was taken by any member of the public in response to these notices, including any of the Plaintiffs.  (Aff. of R. Gilson, ¶ 18).

288.  Admitted.

289.  On June 28, 2005, in compliance with the deadline in the 2003 COA, MTSA and Millcreek submitted a permit application for the Kearsarge pump station upgrades and overflow retention tank.  (Aff. of G. Allender, ¶ 22; App. at 603).

289.  Admitted.

290.  A true and correct copy of the cover letter accompanying the permit application is included in the Appendix to Motion for Summary Judgment at App. 603. (Aff. of G. Allender, ¶ 22).

290.  Admitted.

291.  On August 6, 2005, notice of this application appeared in the Pennsylvania Bulletin.  (Aff. of R. Gilson, ¶¶ 21 - 22; App. at 734).

291.  Admitted.

292.    A true and correct copy of the August 6, 2005 Pennsylvania Bulletin notice is included in the Appendix to Motion for Summary Judgment at App. 734.    (Aff. of R. Gilson, ¶ 22).

292.    Admitted.

293.    The Department issued the construction permit on September 26, 2005. (Aff. of R. Gilson, ¶¶ 26 - 27; Part II Permit, App. at 604-608).

293.    Admitted.

294.    A true and correct copy of the Department's September 26, 2005 construction permit for the Kearsarge pump station upgrades and overflow retention facility is included in the Appendix to Motion for Summary Judgment at App. 604 - 608.    (Aff. of R. Gilson, ¶ 27).

294.    Admitted.

295.    Thus, the storage tanks and the accompanying improvements to the pump station must be completed on or before March 26, 2007, with the overflow removed by April 25, 2007. (Aff. of G. Riedesel, ¶ 36).

295.    Admitted.

296. In the Department's internal review and recommendation document, the Department recommended approval of the permit and stated, "The proposed work will provide flow equalization during heavy storm water events, eliminate an overflow and reduce the potential of sewage contamination of Walnut Creek." (Aff. of R. Gilson, ¶ 25; App. at 609–611, 611).

296. Admitted.

297. A true and correct copy of the Department's September 26, 2005 internal review and recommendation document is included in the Appendix to Motion for Summary Judgment at App. 609 - 611. (Aff. of R. Gilson, ¶ 25).

297. Admitted.

298. On October 8, 2005, notice of the Department's issuance of the permit appeared in the Pennsylvania Bulletin. (Aff. of R. Gilson, ¶¶ 28 - 29; App. at 735).

298. Admitted.

299.    A true and correct copy of the October 8, 2005 Pennsylvania Bulletin notice is included in the Appendix to Motion for Summary Judgment at App. 735.  (Aff. of R. Gilson, ¶ 29).

299.    Admitted.

300.    No one from the public, including anyone from the Plaintiffs, submitted any comments on the application or appealed the permit.  (Aff. of R. Gilson, ¶¶ 23, 30).

300.    Admitted.

301.    In late 2005, MTSA and Millcreek encountered a problem with the site location for the 2.3 million gallon tank.  (Aff. of G. Riedesel, ¶ 34).

301.    Admitted.

302.    The property on which the tank was to be located is owned by Millcreek Township, but it contains use restrictions that would prohibit the placement of the tank on that property.  (Aff. of G. Riedesel, ¶ 34; Aff. of B. McGrath, ¶ 13).

302.    Admitted.

303.    The property had been donated to Millcreek many years ago, subject to these restrictions. (Id.)

303.    Admitted.

304.    MTSA and Millcreek sought to obtain court approval to lift the restrictions, but neighbors living across from the Kearsarge pump station objected.  (Aff. of G. Riedesel, ¶ 34).

304.    Admitted.

305.    As a result of the delays caused by the neighbors' intervention, MTSA and Millcreek acquired property adjacent to the restricted property and to the Kearsarge pump station that does not have any use restrictions. (Aff. of G. Riedesel, ¶ 35).

305.    Admitted.

306.    Due to the configuration of this new property, MTSA and Millcreek had to modify the retention tank system from one 2.3 million gallon tank to two tanks that equal 2.3 million gallons. (Id.)

306.    Admitted.

307.    MTSA notified the Department of the problem in writing on December 8, 2005. (Aff. of G. Riedesel, ¶ 35; G. Riedesel letter 12/8/05, App. at 612-613).

307.    Admitted.

308.    A true and correct copy of the
December 8, 2005 letter to the Department is
included in the Appendix to Motion for
Summary Judgment at App. 612 - 613. (Aff. of
G. Riedesel, ¶ 35).

308.    Admitted.

309.    Due to the change in the tank
configuration from one tank to two tanks,
MTSA and Millcreek submitted an amended
permit application to the Department on
December 28, 2005. (Aff. of G. Allender, ¶ 24).

309.    Admitted.

310.    Also, on January 14, 2006,
MTSA and Millcreek submitted an update to its
Act 537 Plan to cover the new two-tank design.
(Id.).

310.    Admitted.

311.    On March 1, 2006, the
Department approved the changes proposed by
MTSA and Millcreek and issued an amended
permit. (Aff. of R. Gilson, ¶¶ 32 - 35; R. Gilson
3/1/06 letter, App. at 614; 3/1/06 Part II Permit,
App. at 615-619).

311.    Admitted.

312.   A true and correct copy of the Department's March 1, 2006 letter approving the change from one tank to two tanks is included in the Appendix to Motion for Summary Judgment at App. 614. (Aff. of R. Gilson, ¶ 33).

312.   Admitted.

313.   A true and correct copy of the March 1, 2006 amended construction permit is included in the Appendix to Motion for Summary Judgment at App. 615 - 619. (Aff. of R. Gilson, ¶ 37).

313.   Admitted.

314.   Thus, MTSA and Millcreek have received all the necessary approvals from the Department to construct the storage tanks and accompanying improvements to the Kearsarge pump station, which are designed to remove the Kearsarge overflow and eliminate the overflow events tributary to the Kearsarge pump station. (Aff. of R. Gilson, ¶ 35).

314.   Admitted.

315.   On March 16, 2006, MTSA and Millcreek awarded the bids for the work to be completed under the permit.     (Aff. of G. Riedesel, ¶ 36).

315.   Admitted.

316.    The estimated cost of that work, based on the awarded bids is $3,194,165.80. (Id.)

316.    Admitted.

317.    The work is expected to begin this summer and be completed no later than the deadline under the 2003 COA.    (Aff. of G. Riedesel, ¶ 36; Aff. of G. Allender, ¶ 24).

317.    Admitted.

318.    In summary, the total cost to MTSA and Millcreek under the 2003 COA, including civil penalties, is $4,451,795.54. (Aff. of G. Riedesel, ¶ 37).

318.    Admitted.

319.    MTSA and Millcreek have paid a total of $67,500.00 in civil penalties. (Id.)

319.    Admitted.

320.    In addition, MTSA and Millcreek have paid fines totaling $21,250.00 to the PA Fish Commission. (Id.)

320.    Admitted.

321.    Lastly, the work required under the 2003 COA has and will cost MTSA and Millcreek approximately $4,363,045.54. (Id.)

321.    Admitted.

322.    The 2003 COA was fully executed and in effect by October 31, 2003, more than one year prior to the Plaintiffs sending their required 60-day notice letter on

322.    Admitted.

December 9, 2004. (Aff. of R. Gilson, ¶¶ 5 - 6;
2003 COA, App. at 162 -184).

323.    Pursuant to the 2003 COA,
MTSA has already spent or committed in excess
of $4.36 million on corrective measures to
address the violations alleged by the Plaintiffs in
their Complaint. (Aff. of G. Riedesel, ¶ 37).

323.    Admitted.

324.    MTSA also has paid $67,500.00
in civil penalties to date, plus another
$21,250.00 to the PA Fish Commission. (Aff.
of G. Riedesel, ¶ 19).

324.    Admitted.

325.    These penalties include penalties
for violations that occurred before the execution
of the 2003 COA and stipulated civil penalties
that the Defendants agreed to pay to the
Department for any overflows that occurred
subsequent to the execution of the 2003 COA.
(Aff. of G. Riedesel, ¶ 19; 2003 COA, ¶¶ Q, S,
V and 8, App. at 165, 166, 173).

325.    Admitted.

326.    To date, MTSA and Millcreek
have met all of the deadlines imposed by the
2003 COA for the work that is to be performed
under the 2003 COA and have paid all of the

326.    Admitted.

civil penalties and stipulated civil penalties imposed under the 2003 COA. (Aff. of R. Gilson, ¶ 7).

327. With respect to the final order requirement under Section 1319(g)(6)(A)(iii), both the 1992 COA and the 2003 COA are final orders under which MTSA and Millcreek have paid civil penalties to the Department under the Pennsylvania Clean Streams Law. First, the 30-day appeal period under either order has long expired. (1992 COA, App. at 99; 2003 COA, App. at 162).

327. Denied as a conclusion of law as to whether the Consent Order and Agreement constitutes a final order and whether the appeal period has long since passed.

328. Second, under the 1992 COA, MTSA and Millcreek paid civil penalties amounting to $35,100.00; in the 2003 COA, MTSA and Millcreek have paid civil penalties amounting to $67,500.00. (Aff. of G. Riedesel, ¶¶ 15, 19).

328. Admitted.

329. The state law requiring public access to the records appears to be effective, as at least one member of the Plaintiff organizations, Catherine Pedler, has reviewed the MTSA and Millcreek file at the

329. Admitted in part. Denied as to the characterization of Ms. Pedler and other members of the groups.

Department's offices on several occasions beginning on July 2, 2004. (Depo. of C. Pedler, App. at 621-637).

330.    Ms. Pedler also reviewed public files regarding the 2003 COA in June of 2004 at the Erie County Health Department. (Depo. of C. Pedler, App. at 621, 638-640).

330.    Admitted.

331.    With respect to the November 7, 2000 discharge, this was caused by a malfunction in the seal on the overflow at the Kearsarge pump station. (Aff. of G. Riedesel, ¶ 40; 12/5/00 letter, App. at 694).

331.    Admitted.

332.    This problem was solved shortly after it was discovered and there have been no seal failures since November 7, 2000. (Aff. of G. Riedesel, ¶ 40).

332.    Admitted but whether the overall problem is solved is conclusion of law.

333.    A true and correct copy of the December 5, 2000 letter sent to the Department by MTSA at the time explaining the problem is included in the Appendix to Motion for Summary Judgment at App. 694. (Aff. of G. Riedesel, ¶ 40).

333.    Admitted.

334.    Contrary to Plaintiffs' allegation, the overflow that occurred on August 16, 2001 did not occur at the Kearsarge pump station and was not even associated with the area served by the Kearsarge pump station.    (Aff. of G. Riedesel, ¶ 41).

334.    Admitted.

335.    Rather, the overflow was caused at a different pumping station by a power surge that caused the pumps to shut down and then not restart.  (Aff. of G. Riedesel, ¶ 41; App. at 695 - 698).

335.    Admitted.

336.    The suspected problem has been since repaired.  (Aff. of G. Riedesel, ¶ 41).

336.    Admitted.

337.    A true and correct copy of the August 23, 2001 letter sent to the Department by MTSA at the time explaining the problem is included in the Appendix to Motion for Summary Judgment at App. 695 - 698. (G. Riedesel, ¶ 41).

337.    Admitted.

338.    In their Complaint, Plaintiffs assert that Defendants discharged from the bypass at the Kearsarge Pumping Station on December 14, 1999. (Complaint, ¶ 34).

338.    Admitted.

339. Here, the alleged violation occurred on December 14, 1999. (Aff. of G. Riedesel, ¶ 42).

339. Cannot admit or deny; this statement is incomprehensible as to its meaning.

340. On that same date, MTSA submitted a written notification to the Erie County Department of Health ("ECDH"). (Aff. of G. Riedesel, ¶ 42; App. at 700; Aff. of D. Range, ¶ 5).

340. Admitted.

341. A true and correct copy of the December 14, 1999 written notification to ECDH is included in the Appendix to Motion for Summary Judgment at App. 700. (Aff. of G. Riedesel, ¶ 42).

341. Admitted.

342. This notification was made pursuant to an arrangement worked out with the Department under which the ECDH would be notified when bypasses occurred. (Aff. of G. Riedesel, ¶ 42; 12/28/90 letter, App. at 701-703).

342. Admitted.

343. A true and correct copy of the December 28, 1990 letter from MTSA to the Department outlining the notification procedure is included in the Appendix to Motion for Summary Judgment at App. 701 - 703. (Aff. of G. Riedesel, ¶ 42).

343. Admitted.

344. Pursuant to an agreement between the Department and the ECDH, the ECDH acts as the agent of the Department in Erie County for, among other things, inspections and some permitting reviews. (Aff. of R. Gilson, ¶ 4; Aff. of D. Range, ¶ 4).

344. Admitted.

345. Millcreek Township is located in Erie County and falls under the scope of Mr. Range's responsibilities. (Aff. of D. Range, ¶ 3).

345. Repeat of Statement No. 39.

346. A true and correct copy of the December 14, 1999 notice is included in the Appendix to the Motion for Summary Judgment at App. 704. (Aff. of D. Range, ¶ 6).

346. Admitted.

347. The ECDH immediately notified the Department of the use of the bypass. (Aff. of D. Range, ¶ 7; App. at 704).

347. Admitted.

348.    On    December    14,    1999,
Mr. Range   reviewed   the   notice   from   the
Millcreek   Township   Sewer   Authority   and   that
same   day   Mr. Range   notified   Walt   Sarsfield   at
the   Department   of   the   overflow   event.   (Aff. of
D. Range, ¶ 7).

349.    Sixty    (60)    days    prior    to
February 14,   2005   is   December 16,   2004.
(Summons, App. 1 - 2).

350.    Plaintiffs   request   the   following
mandatory injunctive relief:

    1.    Order the Defendants to assess
and mitigate the environmental injuries caused
by their illegal discharges;

    2.    Order the Defendants to obtain a
publicly available independent assessment of the
facility by a qualified individual or organization,
agreed upon by all parties, to determine how the
Defendants    can    best    comply    with    the
requirements of the CWA; and

    3.    Order the Defendants to develop
adequate standard operating procedures and an
environmental management system to enable
Defendants to attain and maintain compliance.

(Complaint, Request for Relief).

348.    Admitted.

349.    Admitted.

350.    Admitted.

351. In Interrogatory No. 6 Defendants asked Plaintiffs to identify each adverse effect, environmental harm or degradation to Walnut Creek that Plaintiffs' claim were caused by Defendants' discharges. (App. at 706).

351. Admitted.

352. Plaintiffs responded to Interrogatory No. 6 by objecting and stating that they did not need to make any showing of adverse effects, environmental harm or degradation. (App. at 706-707).

352. Denied. Plaintiffs responded to Interrogatory No. 6 by stating, "No showing of adverse effects, environmental harm or degradation must be made by Plaintiffs to support a contention of discharge violations. It is a well-known principle and simple fact what the obvious negative impacts of raw sewage are on any waterbody." (Def. App. at 706).

353. Plaintiffs provided this response despite the fact that they alleged such adverse effects, environmental harm and degradation in Paragraphs 1 and 9 of their Complaint. (Complaint, ¶¶ 1, 9).

353. Admitted, however, Plaintiffs object to the characterization made.

354.   Plaintiffs also generally state that the negative impacts of raw sewage are obvious and refer to a general guidance document on combined sewer overflows published by USEPA. (App. at 707).

354.   Denied. Please refer to the response provided for No. 352.

355.   Plaintiffs failed to identify any specific harm they claim the Defendants' discharges caused to Walnut Creek. (App. at 706-707).

355.   Denied as a legal conclusion of law and failure to include all of Plaintiffs response. Plaintiffs cite to Environmental Protection Agency guidance that states: The Environmental Protection Agency lists specific pollutants of concern found in CSOs and Sanitary Sewer Overflows (SSOs), which are likely to cause or contribute to water quality impairment. *See* EPA's Report to Congress on the Impacts and Control of CSOs and SSOs, August 2004, EPA Document 833-R-04-001. These pollutants are certain oxygen-demanding substances, sediment or total suspended solids, pathogens, toxics, nutrients and floatables. The adverse effects and environmental degradation these pollutants are likely to cause include impairment and degradation of aquatic life support, drinking water supplies, fish consumption, shellfish harvesting and recreational uses. These pollutants

and commensurate environmental harms are likely to result from the Defendants' numerous discharges of raw and inadequately treated sewage, which contain several of these pollutants" (Def. App. at 710) and list the specific discharges of pollutants (Def. App. at 707-708)

356.    In    Interrogatory    No. 9, Defendants asked Plaintiffs to identify all facts that supported their contention in Paragraph 14 of their complaint that "Without the issuance of injunctive relief …, Defendants will continue to degrade the quality of Walnut Creek …". (App. at 711-712).

356.    Admitted

357.    In    response    to    Interrogatory No. 9, Plaintiffs stated, "In regard to injunctive relief, such relief would prohibit Millcreek from continuing to violate the Clean Water Act; i.e., prohibit the unpermitted discharge of pollutants into Walnut Creek.    It is obvious that the elimination of illegal discharge will stop the continuous degradation and prevent further aesthetic and recreational injury to Plaintiffs." (App. at 714).

357.    Denied.    Plaintiffs    responded    to Interrogatory No. 9 by stating, Based on the number of past overflow violations, it is evident that the quality of the Walnut Creek and its surrounding tributaries will continue to be degraded by the defendant if injunctive relief is not issued and civil penalties assessed. See Charts for the names of pumping stations that discharged, when they discharged, the total hours and amount of gallons of sewage discharged. Complaint ¶ 34. Also, more

recent violations are as follows:

| WHERE | WHEN | HOURS OF DISCHARGE | AMOUNT OF DISCHARGE |
|---|---|---|---|
| Kearsarge Pumping Station | 04/05/05 | 2 Hours and 40 Minutes | 207,000 Gallons |
| Kearsarge Pumping Station | 01/12/05 | 6 Hours | 455,605 Gallons |
| Kearsarge Pumping Station | 12/31/04 | 11 Hours and 15 Minutes | 2,156,100 Gallons |
| Kearsarge Pumping Station | 12/23/04 | 4 Hours and 15 Minutes | 618,000 Gallons |

In addition to these documented violations, plaintiffs also refer to two separate consent order and agreements that were entered into by the defendants and the Pennsylvania Department of Environmental Protection. The first consent order agreement was entered into the Commonwealth of Pennsylvania, Department of Environmental Protection, Millcreek Township and the Millcreek Township Sewer Authority on January 7, 1992. The second consent order and agreement was entered into by the above parties on October 31, 2003.

In the consent order and agreement entered into in 2003, Paragraph Q states: "Despite the system improvements in Paragraph O, above [discussing the Township and Sewer Authorities' expanding

termination of unlawful connections in the Kearsarge pump station], the Township and Authority continue to allow untreated sewage to be periodically discharged to Walnut Creek via the Kearsarge Overflow and from other areas tributary to the Kearsarge pump station. The Township and the Authority have reported the overflow events…and have paid penalties for the reported overflows at the Kearsarge pump station in accordance with the 1992 COA." *See* Consent Order and Agreement, October 31, 2003.

This paragraph indicates that the finding of the DEP at the time the consent order and agreement were entered in to was that the Township and the Sewer Authority continued to allow discharges of sewage to occur in Walnut Creek. It also indicates that between the time of the signing and implementation of the 1992 COA and the 2003 COA, the Township and the Authority have reported violations and have paid fines for those violations. Therefore, the discharges that were to be stopped by the 1992 COA continued past the signing of the order and agreement, thus necessitating a subsequent COA in

agreement, thus necessitating a subsequent COA in 2003.

In addition, it is indicated in Paragraph V of the 2003 COA that the violations described above were unlawful. Paragraph V states in part: "The violations described in Paragraphs Q and S, above, constitute unlawful conduct pursuant to Section 611 of the Clean Streams Law, 35 P.S. §691.611; are statutory nuisances pursuant to Section 601 of the Clean Streams Law, 35 P.S. §691.601; and subject the Township and the Authority to civil penalty liability pursuant to 605 of the Clean Streams Law, 35 P.S. §691.605." The Township and the Authority were made aware that this conduct was in violation of the law. The Township and the Authority continue to discharge sewage into the Walnut Creek despite the 2003 COA. Though they have paid fine for these discharge violations, the discharge of sewage into the Walnut Creek and its surrounding tributaries continued to occur.

The COAs and the minimal fines that the Township and the Sewer Authority have received thus far are not acting as a deterrent from

discharging into the Walnut Creek. In order for the deterrent effect to be achieved the defendants will need to be placed in a worse position than they would have been in had they complied in the first place. Environmental Protection Agency, "Policy on Civil Penalties," February 16, 1984. The Clean Water Act and its corresponding regulations set up a system of enforcement for noncompliance. One aspect of such enforcement is the imposition of civil penalties. Civil penalties are often imposed to deter a violator to continue to violate. In regard to injunctive relief, such relief would prohibit Millcreek from continuing to violate the Clean Water Act, i.e. prohibit the unpermitted discharge of pollutants into Walnut Creek. It is obvious that the elimination of illegal discharge will stop the continuous degradation and prevent further aesthetic and recreational injury to Plaintiffs. (Def. App. 712-714)

358.    Again, Plaintiffs failed to identify any specific harm they claim the Defendants' discharges caused to Walnut Creek. (App. at 711-714).

358.    Denied as a legal conclusion of law.

359.    Lastly, in Interrogatory No. 20, Defendants asked Plaintiffs to identify the specific mitigation Plaintiffs claim Defendants must perform. (App. at 715-716).

359.    Admitted.

360.    In response to Interrogatory No. 20, Plaintiffs stated, "Plaintiffs are currently formulating a proposal for a project that will help improve the water quality in Walnut Creek. Plaintiffs will supplement this response at such time as they have developed a specific project." (App. at 716).

360.    Admitted.

361.    Discovery closed in this case on February 28, 2006, and as of that date, Plaintiffs had not supplemented their response. (Case Management Order).

361.    Admitted.

362.    In the month since discovery closed, Plaintiffs have not supplemented their response. Thus, Plaintiffs failed to identify what mitigation was necessary.

362.    Admitted.

363.    Under the Case Management Order, this Court Ordered that all expert disclosures be provided to the opposing party on or before January 31, 2006. (Case Management Order).

363.    Admitted.

364.    Plaintiffs submitted no expert disclosures. (Docket).

364.    Admitted.

365.    Defendants, however, identified two outside experts and submitted their reports to this Court and Plaintiffs. (Docket; A. Maas Expert Report, App. at 722 - 733; G. Allender Expert Report, App. at 736 - 740).

365.    Admitted.

366.    Of particular importance to the issue now raised before this Court is the expert report of August E. Maas, P.E.    (Aff. of A. Maas, ¶ 4; Expert Report, App. at 722 - 733).

366.    Denied as a legal conclusion as to the importance of Mr. Maas' expert report and whether Mr. Maas' report is actually an "expert" report.

367.    A true and correct copy of the Expert Report I submitted in this case is included in the Appendix to Motion for Summary Judgment at App. 722 - 733. (Aff. of A. Maas, ¶ 4).

367.    Admitted.

368.    Mr. Maas is currently President of Hill Engineering, Inc., and has been in that position for approximately one year.  Prior to that, he was Vice-President of Hill Engineering.  (Aff. of A. Maas, ¶ 1).

368.    Admitted.

369.    Mr. Maas has a Bachelor of Science Degree in Civil Engineering from the University of Pittsburgh.  (Aff. of A. Maas, ¶ 2; App. at 732).

369.    Admitted.

370.    Mr. Maas holds a Professional Engineering ("P.E.") license in four states: Pennsylvania, Ohio, New York and Georgia.  (Id.)

370.    Admitted.

371.    Mr. Maas is a professional engineer who plans and designs municipal public works projects, specializing in wastewater treatment.  (Id.)

371.    Admitted.

372.    Mr. Maas has over 25 years of experience in this field, having worked for the Pennsylvania Department of Environmental Resources for five years before entering private practice for the balance of his career.  (Aff. of A. Maas, ¶ 3; App. at 732).

372.    Admitted.

373. When he was with the Department, Mr. Maas was responsible for reviewing plans for permitting wastewater systems, performing stream modeling studies to determine effluent limits and performing value engineering cost recommendations. (Id.)

373. Admitted.

374. As part of his stream modeling work, Mr. Maas conducted stream surveys to prepare the computer models to analyze the impacts of effluent discharges. (Aff. of A. Maas, ¶ 3, App. at 733).

374. Admitted.

375. Mr. Maas also participated in aquatic surveys and studies. (Aff. of A. Maas, ¶ 3; App. at 733).

375. Denied. Mr. Maas reviewed aquatic surveys (Aff. of A. Maas, App. at 733). It is not clear as to what Defendant means by "participated."

376. In private practice, Mr. Maas has overseen a number of significant public sewer projects, including a $20 million project for the Borough of Ellwood City and a $16 million project at the Borough of North East. (Aff. of A. Maas, ¶ 3; App. at 732-733).

376. Admitted.

377.   Mr. Maas has developed stream monitoring programs and has reviewed numerous aquatic stream surveys which analyzed aquatic impact. (Aff. of A. Maas, ¶ 3; App. at 733).

377.   Admitted.

378.   In addition, Mr. Maas has reviewed data from several dischargers to determine potential stream impacts in order to analyze required treatment facilities. (Id.)

378.   Admitted.

379.   Based on his education and experience, Mr. Maas is qualified to testify regarding the need for the type of mandatory injunctive relief that Plaintiffs seek. (Aff. of A. Maas, ¶ 5).

379.   Denied as a conclusion of law.

380.   Mr. Maas has reviewed whether the mandatory injunction requested by Plaintiffs to order Defendants to assess and mitigate the environmental injuries caused by the Defendants' discharges is necessary. (Aff. of A. Maas, ¶ 6).

380.   Denied. It is not clear from the Affidavit whether that was the precise review Mr. Maas was making (*See* Aff. of Maas, Def. App. at 722-731).

381.    Mr. Maas opined that such an assessment is not necessary because there is no evidence of any measurable harm that Defendants' discharges have caused to Walnut Creek. (Aff. of A. Maas, ¶ 6; App. at 731).

381.    Denied. Mr. Maas refers to any measurable "water quality degradation" and does not use the word "harm." (Aff. of Maas, Def. App. at 731).

382.    Mr. Maas based his opinion on a number of factors. (Aff. of A. Maas, ¶ 7; App. at 729- 731).

382.    Admitted as an opinion of Mr. Maas.

383.    First, the overflows are not frequent, both in number of overflows and in duration of overflows. (Id.)

383.    Admitted as an opinion of Mr. Maas.

384.    During the period of time covered by Plaintiffs' Complaint, the overflows at the Kearsarge pump station amount to 0.23% of the total time during that period -- time during which Walnut Creek continues to flow. (Id.)

384.    Admitted as an opinion of Mr. Maas.

385.    This indicates that the overflows are not frequent or chronic. (Id.)

385.    Admitted as an opinion of Mr. Maas.

386.    Second, the overflow events occur during significant wet weather events or conditions. (Id.)

386.    Admitted as an opinion of Mr. Maas.

387. Thus, the overflow is significantly diluted by a factor of at least 5 to 1. (Id.)

387. Admitted as an opinion of Mr. Maas.

388. Third, during the overflow events, Walnut Creek has a high stream flow. (Id.)

388. Admitted as an opinion of Mr. Maas.

389. Both of these factors minimize the impact of any overflows. (Id.)

389. Admitted as an opinion of Mr. Maas.

390. Fourth, the overall volume of the discharges is insignificant in relation to the flow of Walnut Creek. (Aff. of A. Maas, ¶ 7; App. at 729 - 730).

390. Admitted as an opinion of Mr. Maas.

391. The volume of discharges is approximately 0.0004% of the total flow of Walnut Creek during the last 12+ years. (Aff. of A. Maas, ¶ 7; App. at 730).

391. Admitted as an opinion of Mr. Maas.

392. This large difference in flows indicates that there is no significant potential for long-term water quality impacts due to the overflows. (Id.)

392. Admitted as an opinion of Mr. Maas.

393.   Fifth, sampling that has been performed of Walnut Creek does not indicate that there has been any water quality degradation due to the overflow.   (Aff. of A. Maas, ¶ 7; App. at 730-731).

393.   Admitted as an opinion of Mr. Maas.

394.   Sampling performed on Walnut Creek downstream of the overflows during dry weather produced results that indicate the overflows have caused no continuing problem. (Id.)

394.   Admitted as an opinion of Mr. Maas.

395.   Lastly, Mr. Maas made personal observations of Walnut Creek, and based on his experience, did not see any visible signs of water quality degradation. (Aff. of A. Maas, ¶ 7; App. at 731).

395.   Admitted as an opinion of Mr. Maas.

396.   It is Mr. Maas professional opinion that an assessment is not necessary because there is no evidence of any measurable harm that Defendants' discharges have caused to Walnut Creek.  (Aff. of A. Maas, ¶ 6; App. at 731).

396.   Denied. It is a legal conclusion as to whether Mr. Maas is an expert and can make such a "professional opinion."

397. In discovery, Plaintiffs have failed to identify what actions Plaintiffs believe the Defendants must take to best comply with the requirements of the CWA, or any facts that support the need for any action beyond what already is being done under the 2003 COA.

397. Denied. Plaintiffs, throughout their responses to Interrogatories discuss the requirement of National Pollution Discharge Permits and advocate compliance with it. (Def. App. at 705-719).

398. In Interrogatory No. 21, Defendants asked Plaintiffs to "Identify all actions Plaintiffs claim Defendants must take to best comply with the requirements of the Clean Water Act, explain how such actions will make Defendants comply with the Clean Water Act and identify any and all facts and documents, and all persons with knowledge of such facts and documents, that support such action." (App. at 716).

398. Admitted.

399. In response to Interrogatory No. 21, Plaintiffs simply recited some provisions of the CWA and objected asserting that the Interrogatory sought factual information for issues that were legal questions. (App. at 715-716).

399. Denied. First, Plaintiffs' response appears on Def. App. 716. Second, Plaintiffs response states: "Under the Clean Water Act, a permit is required for the discharge of any pollutant into the navigable waters of the United States. 33 U.S.C. § 1342(a)(1). The discharge of any pollutant, by any person without a permit is

unlawful. 33 U.S.C. § 1311(a). The terms "discharge of a pollutant" and "discharge of pollutants" mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

Plaintiffs object to this interrogatory to the extent that it demands factual information to be provided when the definition of a "discharge" under Section 502(12) of the Clean Water Act, 33 U.S.C. § 1362(6), and the definition of "point source" under Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14) are in fact a legal arguments." (Def. App. 716)

400. Expert Gerald C. Allender is the designer of the project. (Aff. of G. Allender, ¶ 19).

400. Denied, it is a legal conclusion as to whether Mr. Allender is an expert.

401.    Gerald C. Allender is the Business Unit Leader of the Erie office for Metcalf & Eddy/AECOM, which formerly was Consoer Townsend Envirodyne Engineers/AECOM. (Aff. of G. Allender, ¶ 1).

401.    Admitted.

402.    Mr. Allender has worked for the last 40-plus years on issues involving sanitary sewers. (Aff. of G. Allender, ¶ 2).

402.    Admitted.

403.    Mr. Allender is a Registered Professional Engineer in the state of Pennsylvania.  (Aff. of G. Allender, ¶ 2; Expert Report, App. at 736).

403.    Admitted.

404.    Mr. Allender has a Master's Degree in sanitary engineering from Penn State University. (Id.)

404.    Admitted.

405.    Mr. Allender worked for the Department for approximately seven years as Chief of Planning, Operations and Facilities in three different regional offices of the Department. (Id.)

405.    Admitted.

406.    Mr. Allender also worked as the Director of Sanitary Engineering for the Erie County Department of Health for five years. (Id.)

406.    Admitted.

407.    For the last 30 years, Mr. Allender worked in private practice for Consoer Townsend Envirodyne Engineers/AECOM, which is now Metcalf & Eddy/AECOM. (Aff. of G. Allender, ¶ 2; Expert Report, App. at 737).

407.    Admitted.

408.    In his years of private practice, Mr. Allender has worked on sewer collection and treatment for numerous municipal clients, including the Millcreek Township Sewer Authority ("MTSA") and the City of Erie Sewer Authority. (Aff. of G. Allender, ¶ 2).

408.    Admitted.

409.    Mr. Allender has performed work on behalf of MTSA since the mid-1980s, and is familiar with both the operation of the Millcreek sewer system and the operators of the Millcreek sewer system from the mid-1980s to the present. (Aff. of G. Allender, ¶ 2).

409.    Admitted.

410.    Mr. Allender is the author of the Special Study and the Addendum to Special Study submitted by MTSA and Millcreek and approved by the Department.    (Aff. of G. Allender, ¶¶ 17, 19).

411.    The design of the proposed project has two main components.    (Aff. of G. Allender, ¶ 23).

412.    First, the existing pumps at the Kearsarge pump station will be replaced with pumps of greater capacity to pump flows forward to the City of Erie sewer system.  (Aff. of G. Allender, ¶ 23; Expert Report, App. at 738).

413.    These pumps will have a capacity of 4,500 gpm.  (Id.)

414.    Second, MTSA and Millcreek will construct two overflow retention tanks that will have a combined capacity of 2.3 million gallons.    (Aff. of G. Allender, ¶ 23; Expert Report, App. at 738-739).

410.    Admitted.

411.    Admitted.

412.    Admitted.

413.    Admitted.

414.    Admitted.

- 102 -

415.    When the flows at the Kearsarge pump station reach 4,500 gpm, any flows above 4,500 gpm will be diverted to the storage tanks. (Aff. of G. Allender, ¶ 23; Expert Report, App. at 739).

416.    Once flows through the pump station fall below 4,500 gpm, the tanks will automatically begin to feed stored volumes back into the system to be transported forward to the City of Erie sewer system.  (Id.)

417.    Based upon his expertise and experience, it is Mr. Allender's opinion that the proposed project will handle the overflows at the Kearsarge pump station and enable MTSA and Millcreek to remove the overflow.  (Id.)

418.    A true and correct copy of the Expert Report that Mr. Allender submitted in this case is included in the Appendix to Motion for Summary Judgment at App. 736-740.  (Aff. of G. Allender, ¶ 29).

415.    Admitted.

416.    Admitted.

417.    Admitted as the opinion of Mr. Allender.

418.    Admitted.

419. MTSA and Millcreek also retained the services of Mr. August E. Maas to review the proposed design. (Aff. of A. Maas, ¶ 8; Expert Report, App. at 725).

419. Admitted.

420. As detailed earlier, Mr. Maas has expertise in municipal sewer treatment and conveyance systems. (Aff. of A. Maas, ¶¶ 2-3; Expert Report, App. at 732-733).

420. Denied, it is a legal conclusion regarding whether Mr. Maas is an expert or not.

421. Mr. Maas reviewed the situation confronting the MTSA and Millcreek and concluded that, in his professional opinion, the only alternative that MTSA and Millcreek could pursue to eliminate the overflow would be an overflow retention facility. (Aff. of A. Maas, ¶ 8; Expert Report, App. at 724).

421. Admitted as the opinion of Mr. Maas.

422. Mr. Maas then reviewed the facility designed by Mr. Allender. (Aff. of A. Maas, ¶ 9; Expert Report, App. at 725-727).

422. Admitted.

423. Mr. Maas first reviewed the design standards relied upon by Mr. Allender in sizing the overflow retention basin; namely, Mr. Allender's use of the September 8-9, 2004 storm event, which was approximately a 50-year

423. Admitted.

storm event. (Aff. of A. Maas, ¶ 9; Expert Report, App. at 725).

424. Mr. Maas opined that, based on his experience and guidelines followed by the Department and USEPA (which call for design for a 2-year, 24-hour storm event), the 2.3 million gallon size of the overflow retention facility far exceeds industry standards and will be sufficient to eliminate overflows at the Kearsarge pump station. (Aff. of A. Maas, ¶ 9; Expert Report, App. at 727).

424. Admitted as the opinion of Mr. Maas.

425. In addition, it is Mr. Maas professional opinion that the design of the project will allow MTSA and Millcreek to remove the overflow at the Kearsarge pump station. (Aff. of A. Maas, ¶ 9; Expert Report, App. at 727).

425. Admitted as the opinion of Mr. Maas.

426. In discovery, Plaintiffs have refused to identify any particular standard operating procedure or environmental management system that Plaintiffs believe Defendants should implement, and have also failed to identify any facts that support

426. Denied. Plaintiffs responded as follows: "Plaintiffs object to this interrogatory subject to the general objections set forth above .

Plaintiffs recognize that there are different strategies available to attain and maintain compliance. Plaintiffs do not advocate any one

implementing such procedure or system. (App. at 717 - 718).

strategy over another but do assert that Defendants must however implement some affirmative standard operating procedure. Such procedures are usually controlled by a NPDES permit.

Primarily, Defendants must discontinue all discharges into Walnut Creek. Defendants must build facilities to accommodate the entire sewage system and expand their capacity to handle all overflows. Defendants must have a proper plan and procedures in place to meet effluent limitations required by law.

Also, Defendants are encouraged to implement the nine minimum controls established by the EPA, which are: proper operation and regular maintenance programs for the sewer system and the CSOs; maximum use of the collection system for storage; review and modification of pretreatment requirements to assure CSO impacts are minimized; maximization of flow to the POTW for treatment; prohibition of CSOs during dry weather; control of solid and floatable materials in CSOs; pollution prevention; public notification to ensure that the public

receives adequate notification of CSO occurrences and CSO impacts; and monitoring to effectively characterize CSO impacts and the efficacy of CSO controls. Combined Sewer Overflows: Guidance for Monitoring and Modeling, EPA 832-B-99-002 (January 1999).

Additionally, CSO operators are responsible for developing and implementing long-term control plans that will eventually lead to compliance with the Clean Water Act. The major objectives of a long-term plan outlined by the EPA are: characterization, monitoring and modeling of the combined sewer system; public participation; consideration of sensitive areas; evaluation of alternatives; cost/performance consideration; operational plan; maximizing treatment at the existing POTW plant treatment plant; implementation schedule; and post-construction compliance monitoring program. Combined Sewer Overflows: Guidance for Monitoring and Modeling, EPA 832-B-99-002 (January 1999). (Def. App. at 717-718).

427. In Interrogatory No. 22, Defendants asked Plaintiffs to identify each standard operating procedure that Plaintiffs claimed Defendants must implement to attain and maintain compliance and any facts supporting implementing such a procedure. (App. at 717).

427. Admitted.

428. Plaintiffs objected to Interrogatory No. 22, but stated that it did not advocate one strategy over another. (App. at 718).

428. Admitted.

429. Plaintiffs simply assert that Defendants must put something in place to discontinue all discharges to Walnut Creek. (App. at 717-718).

429. Admitted.

430. Plaintiffs "encourage[d]" Defendants to implement the nine controls recommended by USEPA for Combined Sewer Systems. (App. at 717).

430. Admitted.

431.    In    Interrogatory    No. 23,
Defendants asked Plaintiffs to identify each
environmental    management    system    that
Plaintiffs claimed Defendants must implement
to attain and maintain compliance and any facts
supporting implementing such a system.  (App.
at 718).

431.    Admitted.

432.    Plaintiffs    objected    to
Interrogatory No. 23, and stated that they did not
advocate one management system over another.
(App. at 719).

432.    Admitted.

433.    Plaintiffs    then    simply    cite
Defendants to USEPA's website on ISO 14001.
(Id.)

433.    Admitted.

434.    The combined sewer overflow
("CSO") guidance published by USEPA that
Plaintiffs "encourage" Defendants to implement
does not even apply to the Millcreek sewer
system.  (Aff. of G. Riedesel, ¶ 18).

434.    Admitted.

435.    The CSO guidance applies to
sewer    systems    with    "combined    sewer
overflows".  (Aff. of G. Riedesel, ¶ 8).

435.    Admitted.

436.   The Millcreek sewer system is not a combined sewer system. (Id.)

436.   Admitted.

437.   Thus, because the Millcreek sewer system is not a combined sewer system, USEPA's CSO guidance does not apply to the Millcreek sewer system. (Id.)

437.   Admitted.

438.   Mr. Maas reviewed the operating procedures that will be in place for the updated Kearsarge pump station and overflow retention facilities, and concluded that they should provide reliable operation in order to maintain compliance with the CWA. (Aff. of A. Maas, ¶ 10; Expert Report, App. at 728).

438.   Admitted as a conclusion of Mr. Maas.

439.   In particular, Mr. Maas reviewed the following aspects of the project. First, when the flows into the pump station exceed the new pump capacity of 4,500 gpm, the water will automatically go to a wet well. (Aff. of A. Maas, ¶ 11; Expert Report, App. at 728).

439.   Admitted.

440.   Once in the wet well, when the water hits a certain level, the water will then be automatically pumped to the overflow retention facilities. (Id.)

440.   Admitted.

441. Once the flows entering the station have decreased to below the 4,500 gpm maximum pumping rate, the water in the overflow retention facilities will automatically be returned to the station to be forwarded to the City of Erie system. (Id.)

441. Admitted.

442. The system also will have automatic alarms monitored by a Supervisory Control and Data Acquisition ("SCADA") system. (Id.)

442. Admitted.

443. A SCADA system is a computer system which monitors critical functions and alerts a dispatcher if a problem is detected. (Id.)

443. Admitted.

444. The SCADA system operates 24 hours a day, 7 days a week. (Id.).

444. Admitted.

445. The SCADA system will have alarms for wet well levels, flow set points, storage tank levels, pump faults and other parameters critical to the operation of the system. (Id.)

445. Admitted.

446.    Thus, if something goes wrong, someone from the MTSA or Millcreek will be contacted immediately so the problem can be addressed. (Id.)

447.    Equipped with these operating procedures and controls, MTSA and Millcreek will be able to attain and maintain compliance with the CWA. (Id.)

446.    Admitted as the procedure that is set to take place. Denied as to the extent the statement means to assert that protocol will actually be followed on every occasion in the future.

447.    Denied as a legal conclusion.

_____s / Mark J. Shaw_____
Mark J. Shaw
PA Bar ID No. 50763
Robert E. Gandley
PA Bar ID No. 82524
MacDONALD, ILLIG, JONES &
    BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7600

Attorneys for Defendants
    Millcreek Township Sewer Authority
    and Millcreek Township

_____s / Jennifer A. Murphy_____
Jennifer A. Murphy
PA Bar ID No. 90851
Michael D. Fiorentino
PA Bar ID No. 73576
MID-ATLANTIC ENVIRONMENTAL
    LAW CENTER
4601 Concord Pike, P.O. Box 7474
Wilmington, DE 19803-0474
(302) 477-2182

Attorneys for Plaintiffs
    Erie County Environmental Coalition,
    PennEnvironment, Inc. and The Gaia
    Defense League

Dated:  April 28, 2006