IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE COUNTY ENVIRONMENTAL )
COALITION, PENNENVIRONMENT, )
INC. and THE GAIA DEFENSE LEAGUE, )
    Plaintiffs )
     )
     )
           v. )   CIVIL ACTION NO. 05-59 ERIE
     )   ELECTRONICALLY FILED
MILLCREEK TOWNSHIP SEWER )
AUTHORITY AND MILLCREEK )   JUDGE COHILL
TOWNSHIP, )
    Defendants )

**REPLY BRIEF OF DEFENDANTS MILLCREEK TOWNSHIP SEWER
AUTHORITY AND MILLCREEK TOWNSHIP TO THE RESPONSE IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants MILLCREEK TOWNSHIP SEWER AUTHORITY and MILLCREEK

TOWNSHIP, by and through their attorneys, MacDonald, Illig, Jones & Britton LLP, file this

Reply Brief to the Response in Opposition to Defendants' Motion for Summary Judgment and

state the following in support thereof.

I.    Introduction

At the outset, Plaintiffs have withdrawn several claims raised in their Complaint. First,

Plaintiffs have withdrawn their claim of Clean Water Act ("CWA") violations associated with

the 51st and 52nd Streets and Zimmerly Road overflows. Second, Plaintiffs have withdrawn

their claim of CWA violations associated with the August 16, 2001 discharge. Third, Plaintiffs

have withdrawn their claim of the CWA violation associated with the December 14, 1999 discharge. Fourth, Plaintiffs have withdrawn their request for relief that the Court order Defendants to obtain a publicly available independent assessment of the facility by a qualified individual or organization, agreed upon by all parties, to determine how the Defendants can best comply with the requirements of the CWA. Fifth, Plaintiffs have withdrawn their request for relief that the Court order Defendants to develop adequate standard operating procedures and an environmental management system to enable Defendants to attain and maintain compliance. In light of the evidence presented by Millcreek Township Sewer Authority ("MTSA") and Millcreek Township ("Millcreek") on these five issues and Plaintiffs' subsequent withdrawal of these claims, MTSA and Millcreek respectfully request that this Court enter an order granting judgment in favor of MTSA and Millcreek on these five issues.[1]

With respect to the remainder of the claims that Plaintiffs have not withdrawn, Plaintiffs have failed to establish any genuine issues of material fact that would preclude this Court from granting summary judgment in favor of MTSA and Millcreek.

II.     Argument

A.     SECTION 1319(g) OF THE CLEAN WATER ACT BARS PLAINTIFFS' CLAIMS FOR ALL ALLEGED VIOLATIONS BECAUSE DEFENDANTS WERE BEING PROSECUTED UNDER COMPARABLE STATE LAW.

---

[1]     In total, Plaintiffs have withdrawn nine (9) of the discharges for which they sought civil penalties in their Motion for Summary Judgment on All Claims. On this basis alone, the Court should deny Plaintiffs' Motion for Summary Judgment regarding the amount of civil penalties.

1.   Contrary to Plaintiffs' Argument, the 2003 COA
     Includes All of the Discharges That Occurred Prior to
     its Execution.

In evaluating whether Plaintiffs' claims are barred under Section 1319(g), Plaintiffs argue that three distinct groups of violations must be separately evaluated: "1) the violations that occurred prior to October 31, 2003 and were listed as past penalties for which a fine of $25,000 was paid; 2) violations that occurred prior to October 31, 2003 and were not listed as past penalties for which a fine was paid; and 3) violations that occurred after the Consent Order and Agreement."

Plaintiffs' claim that the second group of violations, which were not specifically listed as past penalties for which the $25,000 fine was paid, are not barred under Section 1319(g). These violations include a May 12, 2002 overflow at Kearsarge and an April 14, 2002 overflow at the Larchmont and Beaver pumping stations. Plaintiffs fail to recognize that the 2003 Consent Order and Agreement includes these two violations within the scope of violations for which the Defendants paid the $25,000 civil penalty. Paragraph 8 of PADEP's 2003 COA required the Township and the Authority to pay a $25,000 civil penalty for the violations in Paragraphs U and V of the findings, covering the period from the signing of the 1992 COA to the signing of the 2003 COA. Paragraph V subsequently references the violations described in Paragraphs Q and S of the findings. Paragraph S broadly describes the following category of violations:

> The discharge of untreated sewage into Walnut Creek from the Kearsarge Overflow and other areas tributary to the Kearsarge pump station violates Sections 201, 202, and 401 of the Clean Streams Law, 35 P.S. §§ 691.201, 691.202, and 691.401.

2003 COA, ¶ S. Thus, the 2003 COA broadly addresses all violations that occurred during the period covered by the 1992 COA, which includes the April 14, 2002 and May 12, 2002

violations. For this reason, there is no distinction between the Plaintiffs' first and second categories of violations, as both categories were addressed by the $25,000 civil penalty paid by the Defendants.

> 2. Plaintiffs' Argument That Pennsylvania Law is not Comparable to Section 1319(g) Ignores the Plain Unambiguous Language of Section 1319(g).

As explained in Defendants' Brief in Support of Motion for Summary Judgment, to examine comparability, the Court must first determine whether to apply a test analogous to the rough comparability test that examines comparability factor by factor, or the overall comparability test that examines the comparability of the state and federal enforcement schemes as a whole. In arguing that the rough comparability test is the proper test to apply when determining whether violations have been prosecuted under a comparable state law, Plaintiffs have acknowledged that "[t]he definition of 'comparable' includes things like 'features in common' and 'similar'. Pl. Resp. at p. 11. However, Plaintiffs argue that the definition does not guide the Court in which test to apply because the definition "is not sufficient to determine whether the standard is an overarching comparison or whether the comparison needs to be made for each requirement under [§ 1319(g).]" Pl. Resp. at p. 11. This argument ignores the plain language of Section 1319(g)(6).

Section 1319(g)(6) plainly refers to "an action under a state law comparable to this subsection" or an order issued and penalty assessed "under this subsection, or such comparable state law" in defining the cases where a citizen suit is precluded. The "subsection" referred to is subsection 1319(g), which provides for the imposition of administrative penalties. Thus, the Act

clearly states that the state law must only be comparable to subsection 1319(g) and it does not require that the state law be comparable to each individual provision, specifically including 1319(g)(4). Where the language of the Act is clear, the Court need not look beyond the plain language in interpreting it. *See* Szehinskyj v. Atty. Gen. of U. S., 432 F.3d 253, 256 (3d Cir. 2005) ("The law is what Congress enacts, not what its members say on the floor.")

> 3.  Senator Chaffee's Remarks Do Not Support Plaintiffs'
>     Argument that Pennsylvania Law in Not Comparable
>     to Section 1319(g).

Plaintiffs argue that the remarks made by Senator John Chaffee during Senate consideration of the Water Quality Act of 1987 support their interpretation that a "comparable state law" must be comparable with each individual provision found in Section 1319(g). Plaintiffs, however, take Senator Chaffee's remarks regarding Section 1319(g)(6) out of context. The entire remarks of Senator Chaffee regarding Section 1319(g) are as follows:

> New paragraph 309(g)(6) sets out limitations that preclude citizen suits where the Federal Government or a State has commenced and is diligently prosecuting an administrative civil penalty action or has already issued a final administrative civil penalty order not subject to further review and the violator has paid the penalty. The same provision limits Federal civil penalty actions under subsections 309(d) and 311(b) for any violation of the Federal Water Pollution Control Act. While redundant enforcement activity is to be avoided and State action to remedy a violation of Federal law is to be encouraged, the limitation on Federal civil penalty actions clearly applies only in cases where the State in question has been authorized under section 402 to implement the relevant permit program.

> A single discharge may be a violation of both State and Federal law and a State is entitled to enforce its own law. However, only if a State has received authorization under section 402 to implement a particular permitting program can it prosecute a violation of Federal law. Thus, even if a nonauthorized State takes action under State law against a person who is responsible for a discharge which also constitutes a violation of the Federal permit, the State action cannot be addressed to the Federal violation, for the State has no authority over the Federal

permit limitation or condition in question. In such case, the authority to seek civil penalties for violation of the Federal law under subsections 309(d) or 311(b) or section 505 would be unaffected by the State action, notwithstanding paragraph 309(g)(6).

In addition, the limitation of 309(g)(6) applies only where a State is proceeding under a State law that is comparable to section 309(g). For example, in order to be comparable, a State law must provide for a right to a hearing and for public notice and participation procedures similar to those set forth in section 309(g); it must include analogous penalty assessment factors and judicial review standards; and it must include provisions that are analogous to the other elements of section 309 (g).

Finally, section 309 (g) (6) (A) provides that violations with respect to which a Federal or State administrative penalty action is being diligently prosecuted or previously concluded "shall not be the subject of" civil penalty actions under sections 309 (d), 311 (b), or 505. This language is not intended to lead to the disruption of any Federal judicial penalty action then underway, but merely indicates that a Federal judicial civil penalty action or a citizen suit is not to be commenced if an administrative penalty proceeding is already underway.

133 Cong. Rec. S733-02, 1987 WL 928615, *12-13 (Cong. Rec.).

First, it is important to note that Senator Chaffee states that "redundant enforcement activity is to be avoided and state action to remedy a violation of Federal law is to be encouraged." Thus, Senator Chaffee recognized that the role of citizen suits should be interstitial and not intrusive in the overall enforcement scheme.

Second, it is important to note that Senator Chaffee's statements about making sure that there is an approved program recognizes that the NPDES permitting scheme is federally-based. If the state program is not approved, then the NPDES permit is issued by USEPA, and is a federal permit. Thus, it is logical to conclude that without federal approval, a state, even if it has a comparable state law, cannot undermine the ability of either USEPA or a citizen's group to enforce that federal permit. This further supports Defendants' argument that it is appropriate for the Court to rely upon 40 C.F.R. § 123.27 to evaluate whether Pennsylvania law is comparable.

Third, it is important to note that Senator Chaffee began his remarks regarding the requirements for a comparable state law with the modifier "[f]or example" which Plaintiffs failed to include in the language they quoted. Thus, Senator Chaffee's statement cannot be read to mean that the only way a state law can be comparable is to satisfy his example. Again, this is consistent with Defendants' argument that the Court should rely on 40 C.F.R. § 123.27 to determine comparability. Senator Chaffee's remarks can be read to represent the one alternative presented in 40 C.F.R. § 123.27(d)(2), but cannot be read to preclude the other alternative presented in 40 C.F.R. § 123.27(d)(1), which Pennsylvania's law satisfies. "Even the most ardent academic defenders of the use of legislative history in statutory interpretation are quick to disavow cherry-picking from floor speeches." Szehinskyj; 432 F.3d at 256, fn. 2 (3d Cir. 2005). The cited language is thus only an example of a state law scheme that would be comparable, and contemplates that there also would be other scenarios where a state law scheme is deemed comparable.

Finally, a literal reading of Senator Chaffee's comments, as proffered by Plaintiffs, would imply that a comparable state law "must provide for a right to a hearing"; however, as noted by the District Court for the Eastern District of California in the California Sportfishing opinion relied upon by Plaintiffs, "even [§ 1319] does not expressly guarantee citizens the right to participate in public hearings on administrative penalty actions." California Sportfishing Protection Alliance v. City of West Sacramento, 905 F.Supp. 792, 804 (E.D.Cal. 1995). The Plaintiffs place great importance on "[§ 1319(g)] allow[ing] anyone who comments on a proposed penalty to participate in a hearing that is informal and non-adversarial and allows a participant to present evidence without having to adhere to formal rules of procedure." Pl. Resp. at p. 5. As pointed out in California Sportfishing, subsection 1319(g) only allows citizen

participation in the event USEPA chooses to hold a hearing, there is no right to a pre-decisional

hearing under the federal rules. Thus, Plaintiffs' interpretation of Senator Chaffee's comments is

inconsistent with Section 1319(g) itself.

> 4.  The Cases String-Cited by Plaintiffs Do Not Hold That a State Law Which Provides an Aggrieved Party with the Absolute Right to Challenge a Civil Penalty Issued Under State Law Is Not Comparable to Section 1319(g)

In support of their argument, Plaintiffs string-cite several cases, suggesting that each have

held that appeal provisions similar to those provided under Pennsylvania law have been held to

be not comparable to 1319(g). Plaintiffs' suggestion is not accurate.

In Jones v. City of Lakeland, TN, 224 F.3d 518, 524 (6th Cir. 2000), the Sixth Circuit

Court of Appeals found that a Tennessee statute was not comparable where the statute left the

appealability of a Consent Order and Assessment up to the sole discretion of the state. Under the

Tennessee statute, affected parties could intervene only if the state filed a consent judgment with

the chancery court, and the decision to file a consent judgment was solely within the state's

discretion. Id. Here, an aggrieved party's right to challenge a COA in Pennsylvania does not

depend upon any discretionary act of the PADEP.

In U.S. v. Smithfield Foods, Inc., 191 F.3d 516, 525 n.3 (4th Cir. 1999), the Fourth

Circuit Court of Appeals expressly refused to decide whether the right to appeal made Virginia's

law comparable because such right to appeal was added subsequent to the state action at issue in

that case.

In <u>California Sportfishing Protection Alliance v. West Sacramento</u>, 905 F.Supp. 792 (E.D.Cal. 1995), the court was faced with the California law that is nearly identical to Section 1319(g). Thus, the court did not even decide the issue presented in this case.

In <u>Citizens for a Better Environment - California v. Union Oil Co. of Calif.</u>, 83 F.3d 1111 (9th Cir. 1996), the Ninth Circuit Court of Appeals held that a state law under which the penalty was issued, and which clearly was not comparable, could not be made comparable simply by being related to a state law that was comparable. <u>Id</u>. at 1116-1118. Again, the court did not address the issues presented in this case.

In <u>Natural Resources Defense Council, Inc. v. Vygen Corp.</u>, 803 F.Supp. 97, 101 (N.D.Ohio 1992), the court concluded that Ohio law did not provide citizens with any opportunity to participate in the process. There is no decision in this case regarding any party's ability to challenge a civil penalty; rather, the court focused on the lack of <u>prior</u> notice. As argued in Defendants' main Brief, Pennsylvania's law provides the same protection as prior notice by giving an aggrieved party the right to challenge the civil penalty within 30 days of <u>actual</u> notice, which provides participation that is comparable to Section 1319(g).

In <u>Idaho Rural Council v. Bosma</u>, 143 F.Supp.2d 1169, 1182 (D.Idaho 2001), the court held that plaintiff's citizen suit was not barred where there was no provision for public participation. Again, the court was not confronted with a state law like here in Pennsylvania that gives an unfettered right to challenge the state's action. In <u>L.E.A.D. (Lead Environmental Awareness Development) v. Exide Corp.</u>, 1999 WL 124473 (E.D.Pa. Feb. 19, 1999), as pointed out in Defendants' main Brief, the court's decision was based on Pennsylvania law that existed prior to when it was amended to add the right to appeal. Thus, this case is wholly inapplicable.

In <u>Atlantic States Legal Foundation, Inc. v. Universal Tool & Stamping Co., Inc.</u>, 735 F.Supp. 1404, 1416-1417 (N.D.Ind. 1990), the court found that Indiana's law was not comparable where there were no public participation requirements, no judicial review requirements, and no comparable provision discussing the factors to be considered in assessing a civil penalty. Thus, the court was faced with what it viewed as multiple problems with the Indiana law. Here, however, the only question is whether Pennsylvania's public participation requirements are comparable.

In both <u>Public Interest Research Group of New Jersey, Inc. v. GAF Corp.</u>, 770 F.Supp. 943, 951 (D.N.J. 1991) and <u>Public Interest Research Group of New Jersey, Inc. v. New Jersey Expressway Authority</u>, 822 F.Supp. 174, 184 (D.N.J. 1992), the court concluded that New Jersey's law contained no provisions for public involvement. Again, neither case was confronted with a system identical to that provided under Pennsylvania law.

Lastly, despite being the focal point of Plaintiffs' argument, in <u>McAbee v. City of Fort Payne</u>, 318 F.3d 1248, 1256-57 (11th Cir. 2003), the Eleventh Circuit Court of Appeals was not confronted with a statute that provided the same public participation provided under Pennsylvania law. Like the Pennsylvania law, Alabama law allows an aggrieved person to challenge the state's action; however, unlike the Pennsylvania law that allows the right to appeal based on <u>actual</u> notice, Alabama law requires the appeal be filed within 15 days of a newspaper publication notice.[2]  While Alabama law may not effectively give citizens the ability to

---

[2]  There is a split of authority as to whether a right for any aggrieved person to challenge a state's actions which is not based on actual notice is sufficient. The United States District Courts in Colorado and Oregon have held that state law enforcement with a right of appeal (without a requirement of actual notice) is comparable to Section 1319(g) even in the absence of predecisional notice and participation. *See* <u>Sierra Club v. Colorado Refining Co.</u>, 838

participate in the civil penalty process, in sharp contrast, Pennsylvania clearly gives all aggrieved citizens the ability to participate by triggering any action a citizen must take on <u>actual</u> notice. It is the actual notice aspect of the Pennsylvania law that makes it comparable to the public participation requirements of Section 1319(g).

Plaintiffs suggest that Pennsylvania's law is not comparable because a "post decision" appeal effectively precludes a citizen from participation. This unsupported assertion is not correct. First, an appeal to the Pennsylvania Environmental Hearing Board, challenging a Department COA can be initiated by simply filling out a single form provided by the EHB. (See form attached as Exhibit A). Instructions on filing the form (totaling two pages), as well as the form and a two-page list of commonly-asked questions, can be found on the EHB website at www.ehb.courtapps.com. (See Exhibit B). Under the EHB Practices and Procedures Rules, individuals do not need legal counsel to appear before the EHB. 25 Pa. Code § 1021.21. Further, the Board will refer individuals who appear pro se and cannot afford a lawyer to pro bono counsel. 25 Pa. Code § 1021.24. Contrary to Plaintiffs' assertions, the EHB is not a procedurally difficult venue to appear before:

> As we have repeatedly stated, our Rules of Practice and Procedures should be followed. However, we have also stated just as often that appeals should be decided on their merits. Litigation before the Environmental Hearing Board is not a legal minefield where a procedural misstep can blow your case out of the water. Such a system turns the practice of law into a game rather than a search for justice.
> . . .
> Section 1021.4 of our Rules provides the Board with great latitude to exercise our sound discretion in deciding such questions where procedural missteps have occurred.
>
> The rules in this chapter shall be liberally construed to secure the just, speedy and inexpensive determination of every appeal or proceeding in

F.Supp. 1428, 1435 (D.Colo. 1993); <u>Saboe v. State of Oregon</u>, 819 F.Supp. 914, 917-918 (D.Or. 1993).

> which they are applicable. The Board at every stage of an appeal or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.

25 Pa. Code Section 1021.4.

White Township v. DEP and Glendale Yearound Sewer Co., EHB Docket No. 2005-097-R (July 18, 2005).

In addition, Plaintiffs' assertion that citizens who submit public comments are "much more likely to have a real impact on the penalty assessment" fails to recognize the realities of the "notice" presented under Section 1319(g). First, the "public notice" that Plaintiffs assert is so sacred has no specific requirements in the CWA and it can be satisfied with a notice in the Federal Register or any other "method reasonably calculated to provide notice." 33 U.S.C. § 1319(g)(4)(A); 40 C.F.R. § 22.45(b)(2). (See attached example of a notice in the Federal Register, Exhibit C). Some USEPA Regions now post notices only on their website to satisfy public notice. (See attached notice of Region 5 switch to web-based notice, Exhibit D). If the ordinary citizen happens to read the Federal Register (or stumble across it on the internet in some regions) on the day that the notice appears, they then have a "reasonable opportunity" to comment. In the public notice, this time period typically is 30 days. 40 C.F.R. § 22.45(b) and (c)(3). The process of commenting is further complicated by the fact that the Administrative Record, containing the information upon which the penalty assessment is based, is available for review at the USEPA Regional Offices. (See Exhibit C). Thus, for a commenter from Millcreek Township, Pennsylvania, reviewing the file would require a trip to Philadelphia. Once an order is actually issued, only a citizen who has commented may then petition USEPA for review within 30 days or file an appeal in either U.S. District Court and the U.S. Court of Appeals, depending on the type of penalty. 33 U.S.C. § 1319(g)(8); 40 C.F.R. § 22.45(c)(4). We

respectfully suggest that an ordinary citizen would have a much greater opportunity to participate after receiving actual notice, and a much easier time navigating Pennsylvania's law than the specifics contained in Section 1319(g).

Second, plaintiffs' assumption fails to recognize that even under the Section 1319(g) system, when the USEPA and the alleged violator have settled the USEPA's claim, by the time the public can participate and provide comments, USEPA and the alleged violator already have agreed upon a proposed order. Thus, in many respects, the agency's position already has hardened by the time the citizens are allowed to be involved under Section 1319(g). Thus, plaintiffs' assumption that citizens would much more likely have an impact on the penalty is not correct.

5.    Plaintiffs' Argument That 40 C.F.R. § 123.27 is not Persuasive Because Section 1319(g) was Passed as Law Subsequent to the Promulgation of 40 C.F.R. § 123.27 Ignores the Scope of the Subsequent Amendments.

Plaintiffs argue that this Court should reject Defendants' argument that Pennsylvania law is comparable under Section 402 and the corresponding regulation at 40 C.F.R. § 123.27 because that Section and those regulations were enacted prior to the Water Quality Act of 1987, which added subsection 309(g). Pl. Resp. at p. 12. Plaintiffs, however, fail to recognize that the Water Quality Act of 1987 was not a wholly separate law, but rather a revision of the Clean Water Act. In fact, additional provisions were added to Section 402 of the Clean Water Act as part of the 1987 amendments; however, Congress elected not to modify subsection 402(b) related to the requirements for state program authorizations. Pub.L. 100-4, §§ 402-405, Feb. 4, 1987. Given

Senator Chaffee's specific reference to state approval under Section 402 as a requirement for comparability, it is only logical that he would have suggested clarifying language to eliminate any inconsistency between subsection 402(b) and subsection 1319(g) as part of the Water Quality Act of 1987 if he had viewed those two sections as being in conflict.

Further, USEPA also revised 40 C.F.R. § 123.27 on two occasions subsequent to the 1987 amendments for the specific purpose of incorporating changes resulting from the 1987 amendments. *See* 54 Fed. Reg. 258 (January 4, 1989) and 58 Fed. Reg. 67981 (December 22, 1993).

> On February 4, 1987, Congress enacted the Water Quality Act of 1987 (WQA), which revised the Clean Water Act (CWA). This new statute makes a number of changes to EPA's existing National Pollutant Discharge Elimination System (NPDES) permit and pretreatment programs under section 402 of the CWA, and includes modifications to other CWA provisions as well. Today's rules revise EPA's existing NPDES, pretreatment, and water quality regulations to reflect statutory changes which supplement or supercede existing regulatory requirements.

54 Fed. Reg. 246 (January 4, 1989). Thus, if USEPA believed that the addition of subsection 1319(g) changed the requirements for an approvable state program, it would have modified 40 C.F.R. § 123.27(d) in one of the subsequent amendments to reflect additional state program requirements.

> 6. The Comparability Test Under Section 1319(g) is not Limited Solely to Consideration of the Provisions of the Pennsylvania Clean Streams Law.

Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment spends several pages discussing case law holding that various state enforcement schemes providing only post-decisional participation are not comparable to Section 1319(g). Pl. Resp. at pp. 5-9. As

explained above, none of the cases cited by Plaintiffs examine a state law scheme equivalent to the current Pennsylvania enforcement scheme. Plaintiffs then state without any authority that:

> [A]ny meetings that occurred in Millcreek Township to approve of the 2003 Consent Order and Agreement were not held as a requirement of the Clean Streams Law. To assert that Pennsylvania Sunshine Law meets the requirements for § 309(g) is too attenuated.

Pl. Resp. at p. 10. Plaintiffs have cited no authority for the proposition that the comparability of Pennsylvania law should be limited solely to the law contained within the Clean Streams Law, to the exclusion of considering the participation provided via the Pennsylvania Sunshine Act (65 Pa.C.S.A. § 710.1(a)). Adopting Plaintiffs' argument would force the courts to evaluate the Clean Streams Law in a vacuum; however, 35 P.S. § 691.7 of the Clean Streams Law directly incorporates the current administrative procedure and judicial review provisions of the Environmental Hearing Board (EHB) which were not promulgated in a vacuum; rather, they were promulgated in the context of existing Pennsylvania law, including the Pennsylvania Sunshine Act. In fact, the Eleventh Circuit's recent opinion in Paper, Allied-Industrial, Chemical and Energy Workers International Union v. Continental Carbon Co., 428 F.3d 1285 (10th Cir. 2005), which Plaintiffs claim is "distinguishable" on the basis that "[i]t is not clear from the facts of the case or the opinion how such notice of a meeting satisfies pre-issuance participation," is exactly on point. Pl. Resp. at p. 9.

Plaintiffs do not deny that the Pennsylvania Sunshine Act provides prior notice of the meeting schedule and an opportunity for pre-decisional public participation; rather, they point out that "Defendants have provided no evidence that there was a public comment at such a meeting." Pl. Resp. at p. 10. Unfortunately for Plaintiffs, the comparability test does not look at actual public participation, but rather "a meaningful opportunity to participate at significant stages of the decision-making process." Paper, 428 F.3d at 1295. Under the Plaintiffs'

- 15 -

interpretation, a Plaintiff such as Ms. Pedler could simply choose not to participate at the pre-decisional stage and then sue without limitation under the citizen suit provision where the additional remedies of reasonable costs and attorney fees are available. This surely was not the intent of the drafters of the diligent prosecution bar.

        B.      STIPULATED PENALTIES IMPOSED UNDER THE 2003 COA ARE INCLUDED IN THE PRECLUSIVE BAR OF SECTION 1319(g).

Plaintiffs argue that penalties assessed under the 2003 COA are somehow not the result of an enforcement action under Section 1319(g) and, therefore, cannot be barred by Section 1319(g). This argument is meritless as the entire 2003 COA, including the stipulated penalty provisions, clearly constitute a state enforcement action pursuant to § 1319(g)(6)(A). Further, to the extent Plaintiffs are attempting to argue that stipulated penalties are somehow something less than an administrative enforcement action, as noted in Defendants' Brief in Support of Motion for Summary Judgment, the fact that the Department has chosen in part to penalize the Defendants through stipulated civil penalties rather than separate civil enforcement actions does not make their prosecution any less diligent. *See* Hudson River Sloop Clearwater, Inc. v. Consolidated Rail Corp., 591 F.Supp. 345, 351, n. 5 (N.D.N.Y. 1984), *rev'd on other grounds sub nom.*, Friends of the Earth v. Consolidated Rail Corp., 768 F.2d 57 (2d Cir. 1985).

Given that stipulated penalties generally constitute diligent enforcement, Plaintiffs are essentially limited to arguing that the specific stipulated penalties imposed under the 2003 COA do not meet the § 1319(g)(3) requirement, which provides in pertinent part:

> In determining the amount of any penalty assessed under this subsection, the Administrator or the Secretary, as the case may be, shall take into account the nature, circumstances, extent and gravity of the violation, or violations, and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation, and such other matters as justice may require.

Plaintiffs argue that each penalty must be specifically tailored to the violation; however, this would entirely eliminate the possibility of using stipulated penalties. Rather, § 1319(g)(3) merely requires that the relevant factors be taken into account, which PADEP does at the time it sets the amount of the stipulated penalty. Plaintiffs challenge the methodology (apparently on the basis of the "nature, circumstances, extent and gravity" of the discharges) because the 2003 COA penalized Defendants the same amount for the November 28, 2003 discharge of 14,000 gallons as it did for the September 9, 2004 discharge of over 5 million gallons.

Plaintiffs do not state which penalty they believe is inappropriately large or small, or why. There are many relevant factors to consider that reasonably could lead to the conclusion that a uniform stipulated penalty, regardless of volume, is most reasonable. For example, as would be expected, larger overflows (such as the Defendants' larger September 9, 2004 overflow) typically occur during larger storm events when Walnut Creek is flowing at much higher volumes such that there is tremendous dilution occurring. The largest overflows would also be expected to occur at times when the downstream City of Erie collection system also is overflowing from its permitted combined sewer overflows, such that conveying the additional flows downstream merely would result in a larger overflow downstream. The PADEP methodology also is consistent with the expert opinion of Mr. August E. Maas who opined that there is no evidence of any measurable harm that Defendants' discharges have caused to Walnut Creek. (Aff. of A. Maas, ¶ 6; App. at 731). Plaintiffs have presented no evidence indicating that

the stipulated penalties imposed by PADEP do not take into account the nature, circumstance, extent and gravity of the violations. Beyond their misplaced implication that the penalties should be proportionate to the volume of the overflow (as explained above), Plaintiffs have not even identified which "nature, circumstance, extent and gravity" issues should be considered.

Plaintiffs further challenge, that there was inadequate public participation in the setting of the stipulated penalties, is merely a reiteration of their general challenge that there was inadequate opportunity for public participation in the 2003 COA to trigger the diligent prosecution bar of Section 1319(g).

C.    SECTION 1319(g) OF THE CLEAN WATER ACT ALSO BARS PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF FOR ALL ALLEGED VIOLATIONS BECAUSE DEFENDANTS WERE BEING PROSECUTED UNDER COMPARABLE STATE LAW.

Plaintiffs argue that even if their claims for civil penalties are barred by § 1319(g)(6), their claims for injunctive and declaratory relief should not be.[3]  However, an order granting

---

[3]  Plaintiffs argue that the only way to achieve immediate compliance with the Act is through the issuance of an injunction, and suggest that Defendants have conceded that issue. As an initial matter, Defendants dispute that they have conceded the issue, as more fully explained in their Brief in Opposition to Plaintiffs' Motion for Summary Judgment on All Claims. As the record shows and as Defendants' experts have testified, the overflows that have occurred in the Kearsarge area were generally unavoidable given the capacity limitations in the system. Thus, at present, an injunction that orders Defendants to seal the overflow would not eliminate overflows in the system. Such an injunction would only result in overflows from other relief points in the system, including overflows into residents' homes as well as onto the ground and ultimately into Walnut Creek. Thus, even if Section 1319(g)(6) allowed the Court to grant the requested injunctive relief, an injunction ordering no more overflows into Walnut Creek would be akin to an injunction ordering less severe rainfall events. PADEP recognized that overflows cannot be eliminated without capital improvements to the system and, as such, forced the Defendants to enter a Consent Order and Agreement that is centered

additional injunctive relief likely would be either duplicative or inconsistent with the requirements of the 2003 COA. As acknowledged by Plaintiffs, the two federal Circuit Courts of Appeal that have addressed this issue have found, for this very reason, that injunctive and declaratory relief are barred along with civil penalties under Section 1319(g)(6). North and South Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d 552, 557-58 (1st Cir. 1991); Arkansas Wildlife Federation v. ICI Americas, Inc., 29 F.3d 376, 383 (8th Cir. 1994), cert. denied 513 U.S. 1147, 115 S.Ct. 1094 (1995). In Arkansas Wildlife, the Eighth Circuit Court of Appeals held that:

> Allowing suits for declaratory and injunctive relief in federal court, despite a state's diligent efforts at administrative enforcement, could result in undue interference with, or unnecessary duplication of, the legitimate efforts of the state agency. We believe that such a result would undermine, rather than promote, the goals of the CWA, and is not the intent of Congress.

Arkansas Wildlife, 29 F.3d at 383.

In North and South, the First Circuit Court of Appeals dealt with facts very similar to this case. The defendant in North and South was a municipality operating under an administrative order with the state agency to perform capital improvements on their wastewater system, to limit new connections, and to submit periodic reports to the state. North and South, 949 F.2d at 553-54. The plaintiff was a citizen group who filed suit seeking civil penalties and declaratory and injunctive relief several years after the order was entered. Id. at 554. The North and South court held that language of Section 1319(g) barring a civil penalty action under Section 505 of the CWA should be read as barring citizen suit claims for both civil penalties and injunctive relief because Section 505, which authorizes citizen suits generally, does not distinguish between

---

on a compliance schedule to have the needed capital improvements implemented as quickly as possible.

suits seeking civil penalties and suits seeking declaratory or injunctive relief. Id. at 557-58. The

First Circuit, noting that primary enforcement responsibility lies with the government, affirmed

the grant of defendant's motion for summary judgment because:

> The State is already acting with diligence to remedy the violations Appellants seek to enjoin. Appellants argue their claim for injunctive relief should stand because the violations have been ongoing since the Order issued. Yet violations may continue despite everything reasonably possible being done by the State and Appellee to correct them. At oral arguments, Appellants conceded their suit was brought primarily to "spur action" on the part of the State and Appellee. As explained above, action is already being taken by those parties. Merely because the State may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires does not entitle Appellant to injunctive relief.

Id. at 558.[4]

Coalition for a Liveable West Side, Inc. v. New York City Department of Environmental

Protection, 830 F.Supp. 194 (S.D.N.Y. 1993), which Plaintiffs cite for its holding that Section

1319(g)(6) does not bar injunctive relief, also recognized the threat that an inconsistent parallel

citizen action posed, but it offered a different solution:

> A court which entertains a citizen's action for injunctive relief can manage the action so as to ensure that the diligently pursued State enforcement action will dominate and that the city will not be whipsawed

---

[4] The legislative history supports the Circuits' determination that a citizen suit in its entirety is barred. In reference to Section 1319(g), Senator Chaffee stated, "This language is not intended to lead to the disruption of any Federal judicial penalty action then underway, but merely indicates that a Federal judicial civil penalty action or a citizen suit is not to be commenced if an administrative penalty proceeding is already underway." 133 Cong. Rec. S733-02, 1987 WL 928615, *12-13 (Cong. Rec.)(Emphasis added). Further, the Conference Report prepared by the House regarding S. 1128 and submitted by Representative Robert Roe contained a similar broad description of the diligent prosecution bar:

> The citizen suits provision in section 505(b)(1) of the Federal Water Pollution Control Act is amended to provide that no action can be commenced by a citizen if the Administrator or state has commenced and is diligently pursuing the assessment of a civil penalty.

132 Cong.Rec. H10532-02 (October 15, 1986). Thus, both recognize that a citizen suit is entirely barred if a comparable state action is being diligently pursued.

by multiple actions. it may even be appropriate to stay the citizen action while the city can demonstrate that the State is indeed diligently prosecuting its action and seeking adequate relief. Of course, the federal court must manage the citizen suit seeking injunctive relief with deference to the injunctive relief already applied by the state prosecution.

Id. at 197.

The reasoning of the First and Eighth Circuit Courts is more persuasive than the district courts cited by Plaintiffs. Further, the discussions of the Courts of Appeals are supported by the legislative history. Lastly, even the district courts that have concluded that Section 1319(g)(6) does not bar injunctive relief recognize the potential conflicts such a remedy presents. The recognition of this dilemma provides further support to conclude that Section 1319(g)(6) bars citizen suits as a whole, not just the civil penalty aspect of the citizen suit.

      D.      PLAINTIFFS HAVE FAILED TO DISPUTE THAT THE CAUSE OF THE NOVEMBER 7, 2000 DISCHARGE WAS A MALFUNCTION WHICH HAS BEEN CORRECTED AND, THEREFORE, AS A MATTER OF LAW, THE NOVEMBER 7, 2000 DISCHARGE IS WHOLLY PAST.

With respect to the November 7, 2000 discharge, Plaintiffs do not contest that the discharge was caused by a malfunction or that the malfunction was repaired. Rather, Plaintiffs argue that such a discharge is not wholly past because it was a discharge without a permit associated with the Kearsarge overflow.

Plaintiffs' argument fails to comprehend the causation test laid out by the Third Circuit Court of Appeals in Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc., 2 F.3d 493 (3d Cir. 1993). In Texaco, the Third Circuit Court of Appeals rejected plaintiffs' argument that jurisdiction is attached to entire cases, rather than individual violations alleged

within a case.  Id. at 498.  Consequently, the Third Circuit Court of Appeals adopted a modified-by-parameter approach that examines the interrelationship between the violations and their underlying causes. Id. at 499.

Here, the cause of the November 7, 2000 discharge was an equipment malfunction, not a capacity problem during a wet weather event.  As such, given that the malfunction was corrected back in 2000, and that there have been no discharges caused by equipment malfunction since that time, there is not a reasonable likelihood that this discharge will continue in the future.

Plaintiffs' Complaint only alleges that MTSA and Millcreek have violated the CWA by discharging without a permit.  Thus, contrary to Plaintiffs' argument, the source of trouble that is the focus of the allegations in Plaintiffs' Complaint is the lack of capacity of the Kearsarge pump station during extreme wet weather events, which would cause the use of the overflow (i.e., the discharge), not the presence of the overflow.[5]  As pointed out in the Supplemental Affidavit of George Riedesel, with the overflow removed and no upgrade to the capacity of the Kearsarge Pump Station, there would continue to be discharges to Walnut Creek. (Supp. Aff. of G. Riedesel, ¶¶ 5-8).  Thus, the focus of the Court's inquiry should be whether the November 7, 2000 discharge was due to the wet weather capacity issue at the Kearsarge Pump Station.  The clear, unrebutted answer to that question is that the November 7, 2000 discharge was not related to the wet weather capacity problem, but instead was due to equipment malfunction that has since been repaired.  Accordingly, the November 7, 2000 discharge is wholly past.[6]

---

[5]   In fact, under Section 1365(a), Plaintiffs would not be able to pursue a citizen suit against the MTSA and Millcreek for the mere presence of an overflow at the Kearsarge Pump Station.

[6]   Neither case cited by Plaintiffs support their position.  In Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1009-1010 (11th Cir. 2004), the defendants appealed a jury verdict under several common law theories and federal environmental law statutes, including the Clean

E.    PLAINTIFFS HAVE FAILED TO PRESENT ANY
EVIDENCE TO DEMONSTRATE A REASONABLE
LIKELIHOOD OF RECURRENCE OF THE
DISCHARGES AT THE LARCHMONT AND BEAVER
STREETS AND CHURCH AND PATTON AND
PERSHING STREETS LOCATIONS IN LIGHT OF
THE ACTIONS TAKEN BY MTSA AND MILLCREEK
PURSUANT TO THE 2003 COA.

Although Plaintiffs do not dispute any of the facts presented by MTSA and Millcreek,

Plaintiffs argue that Defendants have failed to meet their "heavy" burden with respect to the

discharges from the Larchmont and Beaver Streets and Church and Patton and Pershing Streets

locations.  To the contrary, it is Plaintiffs who have failed to meet their burden in light of the

evidence presented by MTSA and Millcreek.

First, Plaintiffs' argument fails to recognize that MTSA's and Millcreek's actions are

pursuant to the 2003 COA and that such actions began long before Plaintiffs' served their 60-day

notice letter or filed this lawsuit.  Therefore, those actions are not "voluntary" as that term is used

by the Supreme Court in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC),

Inc., 528 U.S. 167, 120 S.Ct. 693 (2000).  See e.g., Ailor v. City of Maynardville, TN., 368 F.3d

---

Water Act ("CWA").  With respect to the CWA claims, plaintiffs claimed that storm water
runoff generated on defendants' contaminated property would cross their property before
discharging into a stream.   Plaintiffs alleged that defendants violated the CWA by
discharging without a permit.  The Court held that there was sufficient evidence for a jury to
conclude that the CWA violations were ongoing where, despite now having a storm water
permit, defendants were in violation of that permit.  In contrast, in Mississippi River Revival,
Inc. v. City of Minneapolis, MN, 319 F.3d 1013, 1016 (8th Cir. 2003), the Court held that
plaintiffs' CWA claims of discharge without a permit were moot where the defendants were
issued a permit, despite plaintiffs' claims that defendants were in violation of their permit.
Thus, the two cases seem to have conflicting holdings.  In any event, neither case focuses on
the issue relevant here, namely, whether a discharge due to one cause that is wholly past can
be resurrected by discharges due to another cause that is not wholly past.

587, 600 (6th Cir. 2004). In Laidlaw, the defendant's actions only began after plaintiffs issued

their 60-day notice letter and filed suit. Accordingly, the court naturally imposed a heavier

burden under the circumstances. Here, there is no connection between the actions taken by

MTSA and Millcreek under the 2003 COA and Plaintiffs' initiation of these proceedings. Thus,

there is not a genuine concern that MTSA and Millcreek would continue discharging from these

locations. See, e.g., Ailor, 368 F.3d at 600.

Second, Plaintiffs' assertion that Laidlaw held that the subsequent compliance and closure

of the facility did not moot the case is incorrect. The Supreme Court never reached that issue in

its Opinion. Rather, the Court stated,

> Laidlaw also asserts, in a supplemental suggestion of mootness, that the
> closure of its Roebuck facility, which took place after the Court of
> Appeals issued its decision, mooted the case. The facility closure, like
> Laidlaw's earlier achievement of substantial compliance with its permit
> requirements, might moot the case, but--we once more reiterate--only if
> one or the other of these events made it absolutely clear that Laidlaw's
> permit violations could not reasonably be expected to recur.
> Concentrated Phosphate Export Assn., 393 U.S., at 203, 89 S.Ct. 361.
> The effect of both Laidlaw's compliance and the facility closure on the
> prospect of future violations is a disputed factual matter. FOE points out,
> for example--and Laidlaw does not appear to contest--that Laidlaw
> retains its NPDES permit. These issues have not been aired in the lower
> courts; they remain open for consideration on remand.

Laidlaw, 528 U.S. at 193-94, 920 S.Ct. at 711. Thus, the issue was remanded to the lower court

for consideration.

Third, Plaintiffs' argument attempts to isolate and/or ignore the actions taken by MTSA

and Millcreek. The Court, however, must look at the actions taken by MTSA and Millcreek as a

whole to properly determine whether those actions moot Plaintiffs' claims. Plaintiffs' assertion

that there have been discharges after Defendants took action is not correct. As indicated by the

I&I Summary contained in the Appendix to Defendants' Motion for Summary Judgment at

App. 526-541, eighty percent (80%) of the illegal connection removals that occurred in the area of the Millcreek sewer system that impacts the overflow locations occurred subsequent to the last discharge from those locations, which was September 9, 2004. (App. at 526-541) (Charles Street, Clinton Street, Crowell Street, Patton Street, Pershing Avenue, Roslindale Avenue, Ruth Avenue, Schwartz Drive, Southview Drive, Spring View Drive, St. Ann Drive, St. Mary Drive, Winslow Drive, Larchmont Drive). Thus, Plaintiffs' claim that there has been a discharge since MTSA and Millcreek have taken their actions is not accurate.

Plaintiffs also suggest that the actions of MTSA and Millcreek have left them 1.2 MGD short of what is needed to eliminate the capacity problems that caused these overflows. Again, Plaintiffs fail to cite all of the facts, which they have admitted. (See Plaintiffs' Response to Defendants' Concise Statement of Facts, ¶¶ 189-208). Currently in place is a system that pumps up to 2.0 MGD from the capacity-stressed area to an area of the Millcreek system that can handle the additional flows. (Aff. of G. Riedesel, ¶¶ 25-27, 30; Aff. of G. Allender, ¶ 27). The fact that a long-term solution that would make such a diversion beneath the surface is in the process of being completed does not take away the fact that the current system eliminated the problem. Given the threat and cost of stipulated penalties, the current system offers a reliable vehicle through which to ensure that future discharge will not occur. (Aff. of G. Riedesel, ¶ 27). In fact, since September 9, 2004, nearly twenty (20) months ago, a discharge has not occurred. (Aff. of G. Allender, ¶ 19; Aff. of G. Riedesel, ¶ 30). Plaintiffs have admitted these facts. (See Plaintiffs' Response to Defendants' Concise Statement of Facts, ¶¶ 200-206).

Contrary to Plaintiffs' argument, Ailor v. City of Maynardville, TN, 368 F.3d 587 (6th Cir. 2004), supports Defendants' arguments here. As with the plaintiffs in Ailor, Plaintiffs "have not met their burden as the non-moving party on summary judgment of establishing a realistic

- 25 -

prospect that the violations alleged in the complaint would continue, having presented no evidence to demonstrate recurrence." <u>Ailor</u>, 368 F.3d at 600. Here, the discharges from Larchmont and Beaver Streets and Church and Patton and Pershing Streets are the subject of the 2003 COA, which was executed fourteen (14) months before Plaintiffs' 60-day notice and sixteen (16) before Plaintiffs filed suit. (Complaint, ¶ 3; Summons, App. at 1-2; Aff. of R. Gilson, ¶ 5). The last discharge for those locations occurred on September 9, 2004, three (3) months before Plaintiffs' 60-day notice and five (5) months before suit was filed. (Complaint, ¶ 3; Summons, App. at 1-2; Aff. of G. Allender, ¶ 19). Pursuant to the 2003 COA, MTSA and Millcreek began taking actions to ensure that a discharge from these locations to Walnut Creek would not happen again. First, MTSA and Millcreek have undertaken an extensive program to remove illegal connections. (Aff. of G. Riedesel, ¶ 29; Aff. of B. McGrath, ¶¶ 4-11). Second, MTSA and Millcreek have implemented an above-ground solution to the capacity problems in those locations. (Aff. of G. Riedesel, ¶¶ 25-27, 30; Aff. of G. Allender, ¶ 27). Third, MTSA and Millcreek have initiated a below-ground method to address the capacity problems. (Aff. of G. Allender, ¶¶ 26, 28; Aff. of G. Riedesel, ¶ 28; Aff. of R. Gilson, ¶¶ 36-37; App. at 420-424). Plaintiffs have admitted to all of these facts. (See Plaintiffs' Response to Defendants' Concise Statement of Facts, ¶¶ 186-198, 210-247). Further, Plaintiffs have not presented any evidence to rebut this evidence presented by MTSA and Millcreek. Plaintiffs' mere speculation, without evidentiary support, that there is a reasonable likelihood that the discharges from these locations will recur is not sufficient to defeat Defendants' Motion for Summary Judgment. See, <u>e.g.</u>, <u>Potomac Riverkeeper, Inc. v. National Capital Skeet and Trap Club, Inc.</u>, 388 F.Supp.2d 582, 586 (D.Md. 2005). Thus, Plaintiffs have failed to demonstrate that these discharges will recur in light of the actions taken by MTSA and Millcreek.

F.    THE UNREBUTTED EXPERT OPINION OF AUGUST E. MAAS, P.E. ESTABLISHES THAT PLAINTIFFS ARE NOT ENTITLED TO AN INJUNCTION REQUIRING MTSA AND MILLCREEK TO ASSESS AND MITIGATE WALNUT CREEK.

Although Plaintiffs have withdrawn two of their three mandatory injunctive relief claims, Plaintiffs assert that they continue to seek an order from this Court requiring MTSA and Millcreek to assess and mitigate environmental injuries caused by the discharges. MTSA and Millcreek first point out that in Plaintiffs' Motion for Summary Judgment on All Claims, Plaintiffs have not asked for this relief. Second, Plaintiffs have failed to present any evidence regarding Walnut Creek that would establish irreparable harm absent the injunctive relief. Plaintiffs, without citation to any portion of the record, assert that they have "easily" demonstrated irreparable harm to Walnut Creek. Quite to the contrary, the evidence of record in this case demonstrates that there has been no measurable harm from the discharge that would necessitate the assessment and mitigation they request.

The only "facts" identified by Plaintiffs in response to Defendants' Motion for Summary Judgment on this issue is Plaintiffs' Answer to an Interrogatory served by Defendants, which is quoted in Plaintiffs' Response at Page 26. First, the Answer was verified by Cathy Pedler, a member of two of the Plaintiffs' groups. (App. at 721; Pedler Depo. at pp. 11-12, Exhibit F). Ms. Pedler has no education or expertise that would enable her to render an opinion regarding the impact of the discharges on Walnut Creek based upon a USEPA report to Congress. (See Pedler Depo. at pp. 8-11, Exhibit F).

Second, the USEPA report, which is not included as an exhibit to either Plaintiffs' Response or their Motion for Summary Judgment on All Claims, is not specific to Walnut Creek, and does not offer any particular findings with respect to the discharges that have occurred in Walnut Creek. Thus, Plaintiffs have presented no evidence specific to the condition of Walnut Creek that would support their claim for injunctive relief. Contrary to Plaintiffs' unsupported statement, nowhere does the report state that the discharges have caused "irreparable harm to water quality and aquatic life" in Walnut Creek. Further, Plaintiffs admit that they have conducted no particularized evaluation of Walnut Creek. Plaintiffs' "evidence" does not establish that there would be irreparable harm to Walnut Creek if the Court did not grant the mandatory injunctive relief they seek.

In addition, USEPA's CSO Policy undermines Plaintiffs' unsupported assertion that USEPA accepts as a given that the discharges to Walnut Creek have caused irreparable harm. Under the CSO Policy, USEPA has established a "presumption" approach under which a municipality with a CSO is deemed to be providing an adequate measure of control to meet the water quality based requirements of the CWA. Under this "presumption" approach, a municipality is allowed to average four to six overflow events per year or discharge less than 15% by volume of the combined flows collected on an annual basis. Thus, USEPA allows up to four to six combined sewer overflows a year or overflows that constitute less than 15% by volume of the annual average flow. Under either scenario, USEPA deems that the water quality based requirements of the CWA are being met, even though there are actual combined sewer discharges. This completely undermines Plaintiffs' assertion that the USEPA Report, by simply identifying possible water quality impairments, is sufficient to establish that there has been and will be irreparable harm to Walnut Creek.

In an effort to prop up their claims, Plaintiffs request that this Court disregard the statements of Defendants' expert, August E. Maas. Plaintiffs make this request without submitting any evidence that brings into doubt Mr. Maas' expertise to opine on whether an assessment and mitigation of Walnut Creek would be necessary. Plaintiffs confuse the issue of who would actually perform the assessment and mitigation with the issue of who can evaluate whether such an assessment and mitigation is even needed. Certainly, given his twenty-five (25) years of PADEP and private practice experience with municipal wastewater treatment plants and the numerous studies that he personally has been involved with in those twenty-five (25) years analyzing the impact of discharges on a stream, Mr. Maas has the expertise to evaluate whether a stream needs to be assessed and mitigated due to a municipal wastewater discharge. Plaintiffs have failed to present any evidence that would undermine this conclusion.

With respect to Plaintiffs' attack on Mr. Maas' opinion that there has been no measurable harm to Walnut Creek, again, Plaintiffs have presented no evidence to rebut that opinion. Instead, Plaintiffs assert that Mr. Maas has failed to look at a variety of items, but have submitted no evidence to establish that Mr. Maas in fact failed to consider these items, and have submitted no evidence to indicate a failure to examine any of these items would establish that Mr. Maas' opinion that there has been no measurable harm is incorrect. Thus, Plaintiffs have failed in their attack on the expertise of Mr. Maas and the opinion he has rendered. Accordingly, this Court should grant Defendants' Motion for Summary Judgment regarding Plaintiffs' request that this Court order Defendants to assess and mitigate Walnut Creek.

III.    Conclusion

In conclusion, Plaintiffs have failed to create any genuine issues of material fact, and based upon the undisputed facts, Defendants Millcreek Township Sewer Authority and Millcreek Township are entitled to judgment as a matter of law. Accordingly, Defendants Millcreek Township Sewer Authority and Millcreek Township respectfully request that this Honorable Court grant Defendants' Motion for Summary Judgment.

Respectfully submitted,

s / Mark J. Shaw

Mark J. Shaw
PA50763
Robert E. Gandley
PA82524
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7607
(814) 454-4647 (Facsimile)
mshaw@mijb.com

Attorneys for Defendants
   Millcreek Township Sewer Authority
   and Millcreek Township

Dated:   May 5, 2006

951001

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2006, the foregoing Reply Brief of Defendants Millcreek Township Sewer Authority and Millcreek Township to Response in Opposition to Defendants' Motion for Summary Judgment was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

s/Mark J. Shaw
Mark J. Shaw
PA 50763
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7607
(814) 454-4647 (facsimile)
mshaw@mijb.com (e-mail)

Rev. 02-2006



COMMONWEALTH OF PENNSYLVANIA
**ENVIRONMENTAL HEARING BOARD**
2nd Floor – Rachel Carson State Office Building
400 Market Street, P.O. Box 8457
Harrisburg, PA 17105-8457

(717) 787-3483
Telecopier: (717) 783-4738
http://ehb.courtapps.com

William T. Phillipy, IV
Secretary to the Board

# NOTICE OF APPEAL

**1. Name, address and telephone number of Appellant:**

**2. Subject of your appeal:**
    **(a) Action of the Department for which review is sought (*a copy must be attached*):**

    **(b) The Department's official who took the action:**

    **(c) The location of the operation or activity which is the subject of the Department's action (municipality, county):**

    **(d) On what date and how you received notice of the Department's action:**

**3. *Objections to the Department's action in separate, numbered paragraphs.*** **The objections may be factual or legal and must be specific. If you fail to state an objection here, you may be barred from raising it later in your appeal. Attach additional sheets, if necessary.**

**4. Specify any related appeal(s) now pending before the Board. If you are aware of any such appeal(s) provide that information.**

Exhibit A

The information submitted is true and correct to the best of my information and belief.

_____
**Signature of Appellant or Appellant's Counsel**

**Telephone No.:**_____

If you have authorized counsel to represent you, please supply the following information (<u>**CORPORATIONS MUST BE REPRESENTED BY COUNSEL**</u>):

_____
**Name (Type or Print)**

_____
**Address**

_____

_____

_____
**(Area Code)    Telephone Number**

---

**THIS FORM AND THE PROOF OF SERVICE MUST BE RECEIVED BY THE ENVIRONMENTAL HEARING BOARD WITHIN 30 DAYS AFTER YOUR RECEIPT OF NOTICE OF THE ACTION OF THE DEPARTMENT THAT YOU ARE APPEALING.    MAIL OR HAND-DELIVER YOUR APPEAL AND PROOF OF SERVICE TO:**

**ENVIRONMENTAL HEARING BOARD**
**2nd Floor, Rachel Carson State Office Building**
**400 Market Street, P.O. Box 8457**
**Harrisburg, PA  17105-8457**

**You may wish to send your appeal to the Environmental Hearing Board by certified mail, return receipt, so that you know your appeal was received by it within the required time.**

---

**TDD users please contact the Pennsylvania Relay Service at 1-800-654-5984.  If you require an accommodation or this information in an alternative form, please contact the Secretary to the Board at 717-787-3483.**

2

**PROOF OF SERVICE**

_____ (Appellant or Appellant's Counsel, if appellant is represented by an attorney) hereby certifies that a copy of the notice of appeal, was on _____, served upon
(date)

☐ **The Office of Chief Counsel of the Department or agency taking the action appealed.**

via

☐ **first class mail, postage pre-paid**
☐ **overnight delivery**
☐ **personal delivery**

**AND**

☐ **The officer of the Department who took the action being appealed.**

via

☐ **first class mail, postage pre-paid**
☐ **overnight delivery**
☐ **personal delivery**

**AND**

If your appeal is from the Department's issuance of a permit, license, approval, or certification to another person,

☐ **The recipient of the permit, license, approval, or certification.**

via

☐ **first class mail, postage pre-paid**
☐ **overnight delivery**
☐ **personal delivery**

**AND**

Where applicable, the following:
- ☐ Any affected municipality, its municipal authority, and the proponent of the decision, where applicable, in appeals involving a decision under Sections 5 or 7 of the Sewage Facilities Act, 35 P.S. §§ 750.5, 750.7;
- ☐ The mining company in appeals involving a claim of subsidence damage or water loss under the Bituminous Mine Subsidence and Land Conservation Act, 52 P.S. § 1406.1 et seq.;
- ☐ The well operator in appeals involving a claim of pollution or diminution of a water supply under Section 208 of the Oil and Gas Act, 58 P.S. § 601.208;
- ☐ The owner or operator of a storage tank in appeals involving a claim of an affected water supply under Section 1303 of the Storage Tank and Spill Prevention Act, 35 P.S. § 6021.1303.

_____

_____

_____
**Signature (Appellant or Appellant's Counsel, if appellant is represented by an attorney)**

3

COMMONWEALTH OF PENNSYLVANIA

## ENVIRONMENTAL HEARING BOARD

(717) 787-3483
Telecopier: (717) 783-4738
http://ehb.courtapps.com

2nd Floor – Rachel Carson State Office Building
400 Market Street, P.O. Box 8457
Harrisburg, PA  17105-8457

William T.Phillipy, IV
Secretary to the Board

## FILING INSTRUCTIONS

Except in the case of electronically filed documents, the following number of copies shall be filed with the Board:

| | |
|---|---|
| Notices of Appeal, Complaints, Answers | One original and 2 copies |
| Dispositive motions; post-hearing briefs | One original and 2 copies |
| Pre-hearing memoranda; petitions for supersedeas; nondispositive motions or petitions | One original and 1 copy |
| All other documents | One original |

Copies of a Notice of Appeal shall be served on, *i.e.* delivered to, the appropriate persons and the agencies taking the action from which the appeal is filed, in accordance with the proof of service page in the Notice of Appeal form.  If an appellant does not know the correct address for the agency involved in the appeal, he should contact that agency directly, or may contact the Board Secretary to obtain the appropriate address.   For the Department of Environmental Protection, the address of the Office of Chief Counsel is:

Department of Environmental Protection
Office of Chief Counsel
16th Floor, Rachel Carson State Office Building
400 Market Street,  P.O. Box 2063
Harrisburg, PA  17105-2063

In appeals involving the Department of Environmental Protection, an appellant should also serve a copy of the Notice of Appeal at the following address:

Department of Environmental Protection
Office of Chief Counsel, Bureau of Litigation
Attention:  Diane Houtz,
Third Floor, 909 Elmerton Avenue
Harrisburg, PA  17110-8200.

In third party appeals, it is also necessary to serve the recipient of the action in

Exhibit B

**ENVIRONMENTAL HEARING BOARD**
**FILING INSTRUCTIONS**
**Page 2**

accordance with the Board's rules at 25 Pa. Code § 1021.51(g)-(h).

When filing a new appeal, an appellant should specify any related appeal already pending before the Board, in accordance with the Notice of Appeal form.

In the case of a penalty assessment, many environmental statutes require that the amount of the penalty or a bond in that amount be submitted within the 30-day period required for the filing of the appeal. Where the statute requires that the prepayment be made to the Board, the appellant shall submit to the Board with the appeal a check in the amount of the penalty or an appropriate bond securing payment of the penalty as required by statute. A check shall be made payable to the Commonwealth of Pennsylvania; a bond shall be in favor of the Board. If the appellant seeks to avoid such a requirement by a claim of inability to pay, that claim must also be submitted within the 30-day period by a verified statement either in the notice of appeal or in a supplementary document.

All documents must be filed with the Secretary to the Board in Harrisburg. A document filed by mail, hand or other delivery service which is received after the close of the business day at 4:30 PM Eastern Time shall be deemed to be filed on the following business day. Documents filed electronically (by facsimile or electronic mail) shall be deemed filed on the day they are received by the Board.

While the Board has a fax machine available for the convenience of parties faced with time constraints, fax transmission should not be used as a substitute for routine filing by mail or delivery services. With respect to motions, petitions, memoranda of law, post-hearing briefs and similar filings, the fax transmission should not exceed 10 pages in length. The 10-page facsimile shall consist of the first 5 pages and the last 5 pages of the document and the certificate of service. Multiple copies of filings should not be transmitted via fax.

Revised: February 2006

## FREQUENTLY ASKED QUESTIONS AND ANSWERS

The following information is provided to assist users in gaining an understanding to some of the most commonly asked questions about the legal system and process at the Environmental Hearing Board. It is not meant to serve as legal guidance or advice. The Environmental Hearing Board strongly advises use of professional legal counsel for determining definitive answers and obtaining guidance in pursuing an appeal through the Board.

1. **Q:**    How do I obtain a subpoena for Board proceedings?

   **A:**    Blank subpoena forms may be requested by contacting the Board Secretary, or by downloading the form from the Board's Web page at ehb.courtapps.com. The parties are responsible for filling in the appropriate information, serving it and properly compensating the individual upon whom it is served. While it is a good idea to include your own proof of service form, such proof of service need not be filed with the Board. You should also review Rules 234.1-234.4 of the Pennsylvania Rules of Civil Procedure for specific requirements. Board Rule 114, 25 Pa. Code § 1021.114.

2. **Q:**    May an attorney who is not admitted to the Pennsylvania Bar represent a party before the Board?

   **A:**    Yes, in some instances. Out-of-state attorneys who seek to represent a party before the Board must file a petition to be admitted pro hac vice. The petition should indicate that the petitioning attorney is a member in good standing of another state's bar and show that the other state allows Pennsylvania attorneys to appear before tribunals analogous to the EHB in that state.

3. **Q:**    Do I need an attorney to appeal my case to the Board?

   **A:**    Corporations, organizations and groups of individuals are required to have a licensed attorney represent them before the Board. Individuals may represent themselves as pro se litigants before the Board, but legal advice and/or representation is encouraged for all parties in order to present the best case possible for the record. Environmental law and legal procedure can prove to be very difficult for the non-lawyer.

4. **Q:**    Does it cost anything to file an appeal?

   **A:**    There is no cost for the filing of an appeal to the Environmental Hearing Board. Of course, there may be legal fees and other costs associated with processing a case, but at no time will the Board charge parties for services provided.

5. **Q:**    Are records, files and hearings public?

   **A:**    Most of the materials associated with processing a case through the Environmental Hearing Board are public information. There are some provisions for excluding certain information when it is of a sensitive nature. Attorney work product is always confidential. Hearings are open to the public but recording and/or video taping proceedings are not allowed.

   The Board endeavors to promptly comply with requests for information and/or copies of documents. If the information requested is a lengthy document, or perhaps multiple documents, the requestor may come to the office and copy the documents at a fee of 25 cents per page. If the requestor cannot do this, the Board, at its convenience, will copy the documents at a fee of 25

cents per page for uncertified copies. The requestor will also be charged a search fee of $5 per half hour (or any portion thereof) for the time Board staff spend in retrieving and copying uncertified documents. If the documents must be certified, a charge of $1 per page will be imposed. A search fee will not be charged for certified documents. Copies of all EHB hearing transcripts must be obtained from the court reporting service which was used for the hearing in question.

6.  **Q:**    How long does it take until my appeal may be scheduled for a hearing?

**A:**    It is impossible to establish an exact time frame as each case may vary greatly in complexity and duration. It usually takes at least 6 months from the date when an initial Notice of Appeal is filed until a case is scheduled for a hearing. Absent unusual circumstances, the Board will dispose of all appeals within two years.

7.  **Q:**    To whom do I have to serve copies of my filings?

**A:**    Copies of the Notice of Appeal and all subsequent filings to the Board should be served on the DEP program area from which actions originated; to the DEP office of Chief Counsel; to all listed parties that DEP addresses formally in correspondence; to other appellants, permittees or intervenors in the case, and to any other parties in the case. *See* Rule 32, 25 Pa. Code § 1021.32, Rule 51(g), 25 Pa. Code § 1021.51(g).

8.  **Q:**    Explain how to calculate the 30 day period beyond which no appeal may be filed on an action?

**A:**    The appeal must be filed within 30 days of the date on which a party receives written notice of the Department's action. If the party has not received such a written notice, but notice of the action is published in the Pennsylvania Bulletin in a manner to inform him that he may be affected by the action, the appeal must be filed within 30 days of that notice. Otherwise, the action must be filed within 30 days of the time the affected party learns of the action. Rule 52, 25 Pa. Code § 1021.52.

Westlaw.

55 FR 38848-02

55 FR 38848-02, 1990 WL 327326 (F.R.)

**(Cite as: 55 FR 38848)**

NOTICES

ENVIRONMENTAL PROTECTION AGENCY

[FRL-3833-1]

Section 309(g) of the Clean Water Act;  Class I and II Administrative Penalty
Assessments

Friday, September 21, 1990

AGENCY: Environmental Protection Agency.

ACTION: Notice of proposed administrative penalty assessment under section 309(g)
of the Clean Water Act and opportunity to comment.

SUMMARY: Notice is hereby given of the United States Environmental Protection
Agency's [U.S. EPA] proposed decision to assess a civil penalty under section
309(g) of the Clear Water Act in the amount of $36,500 against T.B. Wood's Sons
Company, Chambersburg, Pennsylvania facility ("Respondent") for allegedly
violating the zinc standards contained in the Pretreatment Standards for the Metal
Finishing Point Source Category.  Persons are invited to submit comments
concerning this decision, but to be considered the comments must be received on or
before October 22, 1990.

DATES: Comments are due on or before October 22, 1990.

ADDRESSES: Information relevant to the proposed penalty assessment, including any
comments received and other nonconfidential information submitted by the
Respondent, is on file and may be inspected, and arrangements made for copying, at
the U.S. EPA **Region III** office between the hours of 9 a.m. and 4 p.m., Monday
through Friday except holidays.  To make arrangements to examine the
administrative record contact the person named below:

  Lorraine Hanlon (3WM52), Permits Enforcement Branch, U.S. EPA, **Region III**, 841
Chestnut Building, Philadelphia, PA 19107, telephone (215) 597-8821, [FTS]
597-8221.

SUPPLEMENTARY INFORMATION: EPA is providing notice of proposed administrative
penalty assessments for alleged violations of the Clear Water Act ("CWA").  EPA is
also providing notice of opportunity to comment on the proposed assessments.

  Under section 309(g) of CWA, 33 U.S.C. 1319(g), EPA is authorized to issue orders

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit C**

55 FR 38848-02, 1990 WL 327326 (F.R.)

**(Cite as: 55 FR 38848)**

assessing civil penalties for various violations of CWA. EPA may issue such orders after commencing a Class II penalty proceeding. EPA provides public notice of the proposed assessments pursuant to 309(g)(4)(a) of CWA, 33 U.S.C. 1310(g)(4)(a).
  Class II proceedings are conducted under EPA's Consolidated Rules of Practice Governing the Administrative Assessment of Civil Penalties, 40 CFR part 22.

  Pursuant to section 309(g) of the Clear Water Act, (CWA), 33 U.S.C. 1319(g), in the matter of T.B. Wood's Sons Company ("Respondent"), EPA Docket No. CWA-III-045, EPA commenced on September 11, 1990, Class II proceedings for the assessment of penalties in the amount of $36,500. The Respondent's facility is located at 440 North Fifth Avenue, Chambersburg, PA 17201. Respondent is engaged in the following activities or operations: The manufacturing of industrial power transmission equipment including "V" belt drives, variable speed drives, timing belt drives, flexible and rigid couplings, and electric motor controls. The Respondent is an indirect discharger of sanitary and process wastewater to the Borough of Chambersburg's publicly owned treatment works. The company is alleged to have violated the zinc standard, monitoring and reporting requirements of the Pretreatment Standards for the Metal Finishing Point Source Category.

  Persons wishing to comment on the amount or basis for the proposed assessment are invited to submit a statement to the EPA Regional Administrator, addressed to the attention of the Regional Hearing Clerk (address below), within thirty (30) days from October 22, 1990. All comments received within this thirty (30) day period will be considered in the **38849** formulation of the final penalty assessment order. All comments must include the name, address, and telephone number of the writer and a concise statement of the basis for any comment and any relevant facts on which it is based. All comments should be addressed to: Regional Hearing Clerk (3RC00), U.S. EPA **Region III**, 841 Chestnut Building, Philadelphia, PA 19107.

  The Respondent against whom the penalty is proposed to be assessed may request a hearing before the Agency on the proposed penalty assessment within twenty (20) days. If such a hearing is held, members of the public who submitted timely comments on the proposed assessment will be notified in writing of the hearing and may request an opportunity to be heard and to submit evidence at the hearing. Should the Respondent not request a hearing, persons who submitted timely comments on the proposed penalty assessment will be given an additional thirty (30) days after issuance of the Final Penalty Assessment Order to petition the Agency to set aside the Final Penalty Assessment Order, and to hold a hearing on the penalty assessment. Such petitions will be granted if the evidence presented by the petitioner is material, and was not considered by the Agency in formulation of the Final Penalty Assessment Order.

  Any person interested in a particular case or group of cases may leave his/her name, address, and telephone number on a registry of interested persons which will be maintained in each file. The list of names will be maintained as a means for persons with an interest in the case to contact others with the same interest.

 Dated: September 11, 1990.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 FR 38848-02                                                            **Page 3**

55 FR 38848-02, 1990 WL 327326 (F.R.)

**(Cite as: 55 FR 38848)**

Victoria P. Benett,

Acting Director, Water Management Division.

[FR Doc. 90-22439 Filed 9-20-90;  8:45 am]

BILLING CODE 6560-50-M

 55 FR 38848-02, 1990 WL 327326 (F.R.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

70 FR 21410-01                                                        Page 1

70 FR 21410-01, 2005 WL 943359 (F.R.)

(Cite as: 70 FR 21410)

NOTICES

ENVIRONMENTAL PROTECTION AGENCY

[FRL-7901-8]

Proposed Penalty Order Issued Under the Clean Water Act and Safe Drinking Water
Act; Notice of Intent To Provide Internet Notice

Tuesday, April 26, 2005

AGENCY: **Environmental Protection Agency** (EPA).

*21410 ACTION: Notice.

SUMMARY: Notice is hereby given that the **Environmental Protection Agency** (EPA),
Region 5, will issue notices of proposed penalty orders issued under the Clean
Water Act and the Safe Drinking Water Act via the Internet.

DATES: U.S. EPA Region 5 will commence use of Internet notice on May 26, 2005.

ADDRESSES: The address of the Internet notice site is: http://
www.epa.gov/region5/publicnotices.

FOR FURTHER INFORMATION CONTACT: Richard R. Wagner, Senior Attorney Office of
Regional Counsel, U.S. **Environmental Protection Agency**, Region 5, 77 West Jackson
Boulevard, Chicago, Illinois 60604, or telephone him at (312) 886-7947.

SUPPLEMENTARY INFORMATION: By statute the Administrator of EPA is required to
provide notice of many of its actions, and his officers and staff commonly do so
through notification in newspapers of general circulation. However, given the
current state of technology, Internet notice may provide a more effective and
efficient means to provide such notice. The benefits of such notice include the
speed with which such notices can be delivered as well as the relatively low cost
to the public treasury of providing such notices. In addition, in practice,
newspaper notices may not always reach the broadest audience. This is for two
reasons. First, newspaper notices are nearly always published on one day only,
irrespective of the length of any associated comment period. Secondly, in an
attempt to provide notice to those most likely to be affected by an action, notice
is often published in local newspapers. However, these newspapers often have very
finite distribution areas, and, as a consequence, interested individuals outside
those distribution areas may have difficulty in obtaining the notices. Internet
notice would provide more robust review of its proposed actions by allowing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit D**

70 FR 21410-01                                                                                      Page 2

70 FR 21410-01, 2005 WL 943359 (F.R.)

**(Cite as: 70 FR 21410)**

notice to remain available to the public during the entirety of the comment
period, and by providing access to a far greater audience than is possible under
current practices. Benefits to the public include the relative ease of access, and
low cost of access resulting from the opportunity to access a larger number of
notices, in one place, for a longer period of time. We recognize that not all
members of the public may have ready access to the Internet, however due to the
considerations listed above, as well as the general availability of the Internet
through schools, work and libraries, we believe that Internet notice will likely
reach a larger audience than has the past practice of publishing a notice in a
newspaper. Nonetheless, in particular instances where we believe additional notice
may be helpful, we may supplement the Internet notice with newspaper notice, press
release or other forms of communication.

 Under the authority of the Administrator, Region 5 intends to commence Internet
notice only for a subset of notices relating to proposed penalty orders issued
under Sections 309(g) and 311(b)(6) of the Clean Water Act, 33 U.S.C **1319(g)** and
33 U.S.C 1321(b)(6), respectively, as well as Section 1423(c)(3) of the Safe
Drinking Water Act, 42 U.S.C. 300h-2(c)(3)(B). Under these provisions, the
Administrator is authorized to assess civil penalties for violations of the Clean
Water Act and the Safe Drinking Water Act, after providing the alleged violator
notice of the proposed penalty and an opportunity for a hearing. Notice of the
proposed penalty, and opportunity to provide comment must also be provided to
interested members of the public. The Administrator by rule at 40 CFR Part 22
provides that notice to the public may be made "by a method reasonably calculated
to provide notice.* * *" 40 CFR 22.45(b)(2). Given the wide use of the Internet
among the public and the relatively greater accessibility provided by the Internet
when compared to traditional means of notice, Region 5 believes that Internet
notice of these orders meets the regulatory requirements of 40 CFR 22.45(b)(2).

 The Region notes that public notice of certain proposed permitting actions under
the National Pollutant Discharge **\*21411** Elimination System has been provided
through the Internet for several years. The Region intends to continue this
practice, as well as to explore options for expanding use of Internet notice to
other types of Agency actions. If EPA Region 5 decides to commence use of the
Internet to provide notice of additional classes of Agency actions, notice of that
decision will be provided first in the Federal Register.

Norman Niedergang,

Acting Regional Administrator, Region V.

[FR Doc. 05-8319 Filed 4-25-05; 8:45 am]

BILLING CODE 6560-50-P

 70 FR 21410-01, 2005 WL 943359 (F.R.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2                    - - - - -
   ERIE COUNTY                )
 3 ENVIRONMENTAL COALITION,)
   ET AL.,                    )
 4                           )
             Plaintiffs,     )
 5                           )
            -v-              )  Case No.
 6                           )   05-59ERIE
   MILLCREEK TOWNSHIP SEWER)  Judge Cohill
 7 AUTHORITY, ET AL.,        )
                            )
 8        Defendants.        )

 9                  - - - - -
        DEPOSITION OF CATHERINE L. PEDLER
10           Tuesday February 28, 2006
                    - - - - -
11
```

Deposition of CATHERINE L. PEDLER, called by

the Defendants for examination under the

Federal Rules of Civil Procedure, taken

before me, Carla A. Virgili, a Stenographer-

Commissioner appointed in the State of

Pennsylvania at the offices of MacDonald

Illig Jones & Britton, LLP, 100 State Street,

Suite 700, Erie, Pennsylvania 16507,

commencing at 1:35 p.m., the day and date

above set forth.

---

COMPUTER-AIDED TRANSCRIPTION BY

MORSE, GANTVERG & HODGE, INC.

PITTSBURGH, PENNSYLVANIA

---

ORIGINAL

Exhibit E

1          What type of notes did you review?

2    A     I had files that I've been compiling

3    over the last couple of years that mostly are

4    documents from file reviews from --

5    Q     Okay.

6          From DEP?

7    A     Yes.  From DEP.

8    Q     I'd like to cover a little bit of your

9    background.

10         Where are you currently employed?

11   A     At Mercyhurst College.

12   Q     What is your title?

13   A     Sustainability coordinator.

14   Q     How long have you held that position?

15   A     I've had that specific position since

16   July 2004.

17   Q     What does the sustainability

18   coordinator do?

19   A     It's environmental sustainability and

20   so I work within the school to try to lessen

21   the economical footprint of the school,

22   encourage the school to use more alternative

23   energy, recycle paper, local organic foods,

24   that type of thing.

25   Q     Okay.

1          Prior to your position as -- let me
2   back up.  In your position as sustainability
3   coordinator, do you teach any classes?
4   A       No.
5   Q       So it's an administrative position
6   within the college?
7   A       Yes.
8   Q       Prior to your position as
9   sustainability coordinator, what position did
10  you have?
11  A       I was an archaeological researcher at
12  Mercyhurst College.
13  Q       How long did you have that position?
14  A       Since 1991.
15  Q       What did that position entail?
16  A       My specialty is lithic technology,
17  which is looking at Native American, for the
18  most part, prehistoric stone tools, and I
19  also was a club advisor and I -- at that time
20  I did teach some anthropology labs.
21  Q       Prior to '91 what was your work
22  history?
23  A       I was an archaeological researcher at
24  the University of Pittsburgh.
25  Q       For how long?

1  A      Since 1985.

2  Q      Same type of job responsibilities as at

3  Mercyhurst?

4  A      Yes, except I also did more field work

5  so I was working on grants and contracts

6  doing excavations, which I also occasionally

7  did at Mercyhurst.

8  Q      How about prior to 1985?

9  A      I was a student at the University of

10 Pittsburgh in anthropology.

11 Q      That was your major, I take it?

12 A      Yes.

13 Q      As part of your college -- what degree

14 do you have?  I'm sorry.

15 A      A BA in anthropology from the

16 University of Pittsburgh.

17 Q      Any other formal education beyond your

18 bachelor's of arts?

19 A      I was in the graduate program at

20 Slippery Rock University part-time for a

21 couple of years in the sustainable systems

22 MS-3 program but I did not complete that

23 degree.

24 Q      What's that program about?

25 A      That teaches alternative energy.  I was

1  focusing on permaculture, which is organic

2  agriculture and sustainable systems in terms

3  of communities.

4  Q      As part of the time you were in school

5  at the University of Pittsburgh, did you take

6  any science classes?

7  A      I took biology classes, anthropology.

8  I believe at least the professors that I was

9  taking them from consider it science.

10  Q      What type of biology classes?

11  A      Well, I don't think I can remember

12  exactly.

13  Q      That's fine.

14  A      Okay.

15  Q      Am I correct, you're a member of the --

16  is it GAIA Defense League?

17  A      Yes.

18  Q      And a member of the Erie County

19  Environmental Coalition, correct?

20  A      Correct.

21  Q      Do you hold any officer positions of

22  either of those groups?

23  A      Yes.  I'm the administrator, otherwise

24  known as president of the GAIA Defense

25  League, and I'm the -- I guess at the moment

1  I am not -- I am not a board member of the

2  coalition at this point, currently.

3  Q       Were you a board member in the past?

4  A       Yes.

5  Q       When was that?

6  A       I was the chairperson from -- I believe

7  the chair position started in 2002.  I'm not

8  absolutely certain, but I believe that's when

9  that started, and it ended in, I believe --

10 this is 2006 now, right?

11 Q       The last time I checked, yes.

12 A       It ended in 2004, I believe.  I'm not

13 absolutely certain but I believe that's the

14 time period.

15 Q       Estimates are fine.  I won't hold you

16 to specific dates.

17         Any type of other environmental

18 organizations that you're a member of?

19 A       Yes.

20 Q       What are they?

21 A       The Lake Erie Regional Conservancy, the

22 Sierra Club, the Allegheny Defense Project.

23 I believe that's it.

24 Q       Are you a member of Penn Environment?

25 A       I believe -- I'm not certain but I