## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIE COUNTY ENVIRONMENTAL COALITION, et. al.,<br>    Plaintiffs | )<br>)<br>)<br>) |
| v. | )CIVIL ACTION NO. 05-59 ERIE<br>)ELECTRONICALLY FILED |
| MILLCREEK TOWNSHIP SEWER AUTHORITY, et. al.,<br>    Defendants | )<br>)JUDGE COHILL<br>) |

## PLAINTIFFS' REPLY TO DEFENDANTS' BRIEF IN OPPOSITION TO PLAINITFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Erie County Environmental Coalition, PennEnvironment, and Gaia Defense League, submit this Brief in Reply to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and LR 56.1 of the Local Civil Rules of the United States District Court for the Western District of Pennsylvania.

## I.  MILLCREEK IS IN SERIOUS VIOLATION OF THE CWA

Defendants are in violation of the Clean Water Act ("CWA", "the Act") §301, 40 U.S.C. § 1311. On the following occasions at the following locations Defendants discharged sewage into Millcreek without a National Pollution Discharge Elimination System ("NPDES") permit[1]: Kearsarge Pump Station discharges[2], including September 17, 2004 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 1, 5-6 ), September 9, 2004 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 1, 5-6 ), September 10, 2004 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 1-4), August 1, 2004 (Comp. at

---

[1] Plaintiffs are not suing Defendants under 33 U.S.C. § 1342(q)(1) but rather Plaintiffs are using the provision to demonstrate the requirements Millcreek must meet in order to comply with the CWA. However, Plaintiffs withdraw any request for relief associated with 1342(q) based upon G. Riesdel's affidavit stating that Millcreek is a Sanitary Sewer Overflow not a Combined Sewer Overflow ("CSO").

[2] Plaintiffs are no longer challenging the discharges in December 1999 and August 2000.

5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 7, 9-11), July 31, 2004 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 7, 9-11), July 16, 2004(Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 7,8), May 21, 2004(Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 15-18), March 20, 2004 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 19-25), November 28, 2004 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 26-28), September 29, 2003(Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 29-33), May 12, 2002(Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 34), April 14, 2002 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 35)., February 1, 2002 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 36), November 7, 2000(Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 37); the Larchmont Beaver Pumping Station, September 9, 2004(Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 1, 5-6 ), April 14, 2002 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 35); and the Church and Patton Pumping Station September 9, 2004 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 1, 5-6 ), July 31, 2004(Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 7, 9-11), April 14, 2002 (Comp. at 5-7, ¶ 6; Ans. at 6, ¶ 34; App. at 35). [3]

The evidence in this case- especially Millcreek's own admission- proves violations by Millcreek's discharge of pollutants into a waterbody without a permit. *See* 40 U.S.C. §1311. Millcreek submitted signed letters to the Pennsylvania Department of Environmental Protection ("DEP") admitting to the alleged discharges.[4] *See* Comp. ¶ 6; Ans. ¶ 6; and App. at 1-39. Millcreek admits that clear it discharged pollutants (Comp. ¶ 12; Ans. ¶ 12); indeed, the CWA definition of pollutants includes sewage. 33 U.S.C. §1362(6). These pollutants are discharged into a water of the United States, Walnut Creek. *See* Comp. ¶ 12; Ans. ¶ 12; Comp. ¶ 36; Ans. ¶ 36**;** App. at 65, 73; Def. Resp. Fact Nos. 23 & 24. All of these discharges occurred without

---

[3] Plaintiffs are no longer challenging the discharges from 51st and Zimmerly Pumping Station.
[4] Defendants' claim that such documents are unverified is disingenuous. These documents were provided by Defendants during discovery, which is clear from Millcreek's stamp on the bottom right-hand corner. If Defendant is now claiming some problem with these documents, it is clearly in violation of Rule 26(g), which requires an attorney to sign initial disclosure and discovery requests in order to demonstrate the disclosure is complete and correct.

Millcreek having a NPDES permit. (Comp. at 3, ¶ 12; Ans. at 3, ¶ 12).   These violations of the

Act are unrebutted. The only issue is whether Plaintiffs' claims are barred by Defendants'

affirmative defenses. The record clearly show those defense have no merit.[5]

## II.    PLAINTIFFS HAVE ESTABLISHED ORGANIZATIONAL STANDING

Plaintiffs have established organizational standing. *See* Pl. Br. at 8-13 ; App. at  40-63.

Defendants' argument that Plaintiffs are required to produce evidence of environmental harm to

Walnut Creek in order to demonstrate standing is unfounded, citing Public Interest Research

Group of New Jersey, Inc. v. Magnesium Elektron, 123 F.3d 111 (3rd Cir. 1997). The

Magnesium Elektron holding was in effect overruled by Friends of the Earth v. Laidlaw, 528

U.S. 167, 181-183 (2000). In 2000, approximately two years after the decision in Magnesium

Elektron, the Supreme Court addressed the issue of whether citizens, in order to demonstrate

standing, needed to show harm to the environment. Specifically, the Court noted:

> The relevant showing for purposes of Article III standing, however, is not injury
> to the environment but injury to the plaintiff. To insist upon the former rather than
> the latter as part of the standing inquiry is to raise the standing hurdle higher than
> the necessary showing for success on the merits in an action alleging
> noncompliance with an NPDES permit.

Id. at 181. Subsequently, the Court ruled that environmental plaintiffs allege injury in fact

sufficient for standing when they assert when "they use the affected area and are persons for

whom 'the aesthetic and recreational values of the area will be lessened' by the challenged

activity." Id at 183, *citing* Sierra Club v. Morton, 405 U.S. 727, 735 (1972).  Therefore, Plaintiffs

are not required to demonstrate actual harm to Walnut Creek in order to establish standing

because such a burden would be greater than the burden Plaintiff has in demonstrating a

violation to the Act. Instead, Plaintiffs need only demonstrate some injury to themselves, which

---

[5] Plaintiffs incorporate herein by reference its Response to Defendants' Motion for Summary Judgment, filed April 21, 2006.

is clearly demonstrated by the nine affidavits submitted by Plaintiffs' standing declarants. App.

at 40-63.

### III.  PLAINTIFFS ARE ENTITLED TO THE RELIEF REQUESTED

Under the Clean Water Act,

> The district courts shall have jurisdiction . . . to enforce such an effluent standard
> or limitation, or such an order … and to apply the appropriate civil penalties
> under section 1319(d) of this title.

33 U.S.C. §1365. For the above violations to the Clean Water Act, Plaintiffs request the Court to

declare Millcreek in violation of the Act and require Millcreek to cease all discharges as soon as

practicably possible. If the Court finds it is not practicably possible for Millcreek to immediately

cease discharging, then Plaintiffs request the court to set a date certain for cessation and the

removal of the Kearsarge bypass. Additionally, Plaintiffs request this Court to require

Defendants to comply with the National Pollution Discharge Elimination System ("NPDES")

permit requirements until that date certain. Plaintiffs also request the Court to assess civil

penalties commensurate with the criteria in 33 U.S.C. § 1319(d). Additionally, Plaintiffs seek the

award of a Supplemental Environmental Project as well as an order to assess and mitigate

environmental harm and damage.

> A.  Plaintiffs are entitled to Injunctive Relief enjoining Millcreek from Further
> Discharging Sewage into Walnut Creek.

Plaintiffs need only demonstrate a relaxed form of "irreparable harm" in order to obtain

injunctive relief that violates the Act. This relaxed form of irreparable harm balanced against the

inadequacy of legal remedies can be demonstrated in several ways in accordance with case law.

Here, Plaintiffs are requesting the Court to cease all discharges and in the case that the Court

finds Millcreek unable to comply immediately, Plaintiffs request the Court to order Defendants

to comply with NPDES permit requirements.  Plaintiffs are not suggesting that Millcreek remove the overflow prior to construction but seek a date certain that is enforceable by this Court.[6]

Defendants assert Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) and Natural Resources Defenses Council(NRDC), Inc. v. Texaco Refining and Marketing, Inc., 906 F.2d 934, 939 (3d Cir. 1990) as dispositive cases as to the necessity of a demonstration of irreparable injury in order to attain injunctive relief in environmental statute case. However, these cases do not end the issue. In the subsequent Third Circuit Court Appeals case, Temple University v. White, 941 F.2d 201 (3d Cir.1991), the Court declined to resolve the issue of "whether a permanent injunction requires the showing of irreparable injury" in cases that involve statutory violations. Therefore, the Temple University case has led some of Pennsylvania federal district courts to adopt a relaxed standard for irreparable injury. SEPTA v. Pa. PUC, 210 F.Supp.2d 689, 726 (E.D. Pa. 2002) (the district court expressed its opinion that it found "convincing the logic of those cases applying a relaxed standard for issuing injunctions upon a showing of a statutory violation."). Therefore, even though there may be a requirement to demonstrate irreparable harm, it is a relaxed standard that can be demonstrated in a number of ways.

The Court has "repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." Weinberger, 456 U.S. at 312. Courts must in each case balance the competing claims of the parties and also consider the consequences of granting or not granting the requested relief on each party and the public. Id. This involves a balancing of harms test to see if such an injury is "sufficiently likely." Amoco Prod. Co. v. Village of Gambell (Amoco), 480 U.S. 531 (1987)

Even in Weinberger, the Supreme Court did not contemplate expert testimony regarding whether there was irreparable injury. Rather the Court was trying to avoid usurping the Court's

_____

[6] Plaintiffs withdraw their claims regarding all CSOs

discretion so a judge is "not mechanically obligated to grant an injunction for every violation of law." Weinberger, 456 U.S. at 313, citing TVA v. Hill, 437 U.S., at 193, 98 S. Ct., at 2301; Hecht Co. v. Bowles, 321 U.S., at 329, 64 S. Ct., at 591. This standard is not contrary to the Texaco case, where the Third Circuit was guarding against a presumption of irreparable injury based simply on the fact that the CWA had been violated. 906 F.2d at 937. Therefore, the demonstration for irreparable harm does not rise to the requirement of expert testimony on the state of the water.

In analyzing whether an environmental injury is sufficiently likely to lead to irreparable harm Courts have looked at several factors. For example, the United States Supreme Court in Amoco stated that:

> "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."

480 U.S. at 545  Similarly, the court in Stone v. Naperville Park Dist., 38 F. Supp. 2d 651, 656 (N.D. Ill. 1999), reasoned that "the denial of an injunction against future violations could result in irreparable harm," even though Stone had "not established definitively that the defendants' activities have caused measurable, concrete harm to humans or wildlife." The court noted that "the purpose of the Act is not simply to prevent harm. Instead, Congress also aimed to 'maintain the chemical, physical, and biological integrity of the Nation's waters.'" Id. at 656; 33 U.S.C. § 1251(a). The court characterized the defendant's violation of the Act as "an assault on the integrity of the Nation's waters." Id.

By way of another example, a citizens' group brought suit seeking an injunction against the further dumping of raw sewage into the Sakonnet River in Friends of Sakonnet River v. Dutra, 783 F.Supp. 623, 626 (D.R.I. 1990). The court stated that the defendants were "in

violation of the federal and state Clean Water Acts, based on the defendants' release of raw sewage from their septic system into the Sakonnet River without a permit. These laws require the defendants to cease discharging pollutants into the navigable water." Id. at 637. The court determined that "[i]f the pollution is allowed to resume flowing until a permanent solution is found and constructed, irreparable harm will result to the plaintiffs and the public." Id. A showing of continuing violations of the CWA, therefore, proves irreparable damage sufficient for injunctive relief. See Friends of Sakonnet River, 783 F.Supp. at 637; U.S. v. City of Niagara Falls, 706 F. Supp. 1053,1061 (W.D.N.Y. 1988).

Here, Millcreek has been illegally discharging into Walnut Creek since at least 1991, and maybe as early as 1988. App. at 61, 1991 COA; 71, ¶ F, 2003 COA. These discharges have been uncontrolled and have resulted in millions of gallons of sewage being dumped into the Creek. App. at 1-39. The Environmental Protection Agency ("EPA") accepts as a given that millions of gallons of uncontrolled sewage being dumped into a waterbody causes irreparable harm to water quality and aquatic life. See Pl. Resp. Br. at 25-26. Similarly, the Pennsylvania Fish and Boat Commission ("Fish and Boat") have characterized Millcreek's specific discharges as "deleterious, destructive, or poisonous to fish." App. at 77, 81. Fish and Boat has also described the discharge at the Kearsarge pump station as a "chronic event." Id. Millcreek admits it cannot stop this pollution until 2007, when its permanent solution will supposedly be constructed. Def. Resp. Facts Nos. 11 & 14. Thus, like Friends of Sakonnet River, irreparable injury sufficient for injunctive relief exists.

The notion that expert scientific testimony is necessary to establish a measurable concrete harm to the water is belied by the law and facts. Under Stone, Amoco, and Friends of Sakonnet River a scientific demonstration of harm is not necessary. For irreparable harm, it is sufficient to

show that the violations are continuing, the violations are an assault on the integrity of the

waters, or injury is a sufficiently likely. In these situations, the balance of harms favours

protection of the environment.  Plaintiffs have no specific information regarding the contents and

amount of pollutants in Millcreek's sewage discharge because Millcreek has not sampled its own

effluent. Additionally, the expert report of August Maas is neither decisive nor persuasive. *See*

Pl. Resp. Br. at 26-7. Here, Millcreek is placing at risk Walnut Creek's chemical, physical and

biological integrity and is direct violation of the CWA.

 If Millcreek is not enjoined from discharging, there is nothing prohibiting the continued

violations to the CWA. The fact that Millcreek is currently on schedule to meet the 2003 Consent

Order and Agreement ("2003 COA") deadline is not sufficient. Millcreek has already failed to

complete the requirements under the 1991 Consent Order and Agreement ("1991 COA"), which

is why the 2003 COA had to be agreed to in the first place. App. at 72, ¶L. Plaintiffs are not a

party to the 2003 COA. Additionally, the penalties thus far assessed against Millcreek have not

forced Millcreek into compliance with the Act. Here, injunctive relief is the only adequate

remedy.

 Based on the facts and circumstances here and the continuation of violations, the Court

should irreparable harm sufficient to grant injunctive relief.

B.  Balancing the Factors for Civil Penalties Weighs in Favour of Assessing Penalties
    Against Millcreek

 In the determination of civil penalties, §1319(d) states that courts *shall* consider the

following factors in the determination of civil penalties: the seriousness of the violation(s); the

economic benefit resulting from such violation; any history of such violation; any good-faith

efforts to comply with applicable requirements; the economic impact of the penalty on the

violator; and other matters as justice may require. 33 U.S.C. §1319(d); <u>Student Pub. Interest</u> <u>Research Group, Inc., v. Hercules Inc.</u>, C.A., No. 83-32-62, 1989 U.S. Dist. LEXIS 16901, at *4 (D.N.J. April 6, 1989). Therefore, economic benefit is not only consideration, rather just one of many. In <u>Student Pub. Interest Research Group, Inc., v. Monsato Co.</u>, C.A., No. 83-2040, 1988 U.S. Dist. LEXIS 16702, at *2 (D.N.J. March 29, 1988), for example, the Court found the evidence of alleged economic benefit to be "very little, if any" assistance in accessing an appropriate penalty and stated that "a penalty should include, beyond consideration of economic benefit to the violator, many other factors." <u>Id.</u> at *41.  Such factors include history of past violations, seriousness of violations, and harm caused by the discharge.  <u>Id.</u> at *43. In this case, over 15 years of "chronic" violations, millions of gallons of raw sewage dumped creating "deleterious, destructive, or poisonous" conditions for fish all support significant civil penalties. App. at 77, 81.

Even if economic benefit was a major consideration in determining whether civil penalties assessed, Defendants have failed to perform a full economic benefit calculation. Violators typically enjoy an economic benefit when they avoid or delay construction of antipollution equipment "that would have placed it in compliance with its permit."  <u>United States</u> <u>v. Municipal Auth.</u>, 150 F.3d 259, 267 (3rd Cir. 1998).  "The statute does not define the term 'economic benefit' used in this section" and "few published cases discuss the 'economic benefit' factor of the Clean Water Act in any detail."  <u>Id.</u> at 263.  Courts have noted that economic benefits gained by violators of the CWA may not be capable of determination and does not require an elaborate or burdensome showing.  <u>Id.</u> at 264.  Here, Millcreek has avoided the expenditures needed for compliance since at least 1991. Those delayed costs certainly exceed the paltry penalties paid under the 2003 COA.

Here, Defendants constructed the Kearsarge bypass without authorization from the state agency. App. at 68, 1991 COA; 71 ¶¶ E & F, 2003 COA. Since that time Millcreek has been discharging without a permit even after 15 years of Pennsylvania agencies attempting to force Millcreek to comply. Therefore, any economic burdens Millcreek has had in its failed attempts to comply with the CWA are self-inflicted and should not be calculated in offsetting any benefits Millcreek has had in not timely complying with the Act. Millcreek's calculations fail to take into account several necessary costs including the costs that would have been required in order to comply with the NPDES permitting program over the last 15 years, including sampling, testing, monitoring and inspections. It is clearly in the public interest to enjoin Millcreek from further discharge. To allow further discharge without penalty or injunction gives the impression that Millcreek is above the law and is not required to be in compliance with the Act.

Therefore, based on Defendants' history and failure to comply with the CWA and the seriousness of the violations, Defendants should be assessed civil penalties.

C.     A Supplemental Environmental Project Will be Beneficial to Walnut Creek.

Injunctive relief can also be based on enforcement principles. A court's discretion in crafting injunctive relief is broad. So long as an order is not "wholly unrelated to a violation of an existing standard, limitation, or order," the court may require a wide range of compliance measures. Natural Res. Def. Council v. Southwest Marine, Inc., 236 F.3d 985, 1000 (9th Cir. 2000). The court is not limited to "declar[ing] that the [regulatory] requirement exists and repeat[ing] that it must be followed." Id.

Supplemental Environmental Projects ("SEP"), beneficial mitigation projects intended to enhance public health or the environment, are within this Court's discretion to order injunctive relief. In Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.

(*PIRG*), 913 F.2d 64 (3d Cir. 1990), the Third Circuit Court of Appeals addressed the issue of awarding a SEP in a citizen suit CWA case that went to trial, noting that "a court may fashion injunctive relief requiring a defendant to pay monies into a remedial fund, if there is a nexus between the harm and the remedy." Id. at 82.  In determining whether to approve a SEP, the district court Oregon specifically noted:

> "[t]he purpose of the Clean Water Act is to improve water quality, not endow the Treasury. What better use of the penalty type payments in an action like this than to facilitate water quality improvements to the affected watershed in ways which could not be required under law? These additional enhancements to water quality, the payment for which also serves as a hefty sanction to defendant, fully meet congressional intent."

 Northwest Environmental Defense Center (NEDC) v. United Sewerage Agency of Washington County, 1990 U.S. Dist. LEXIS 13349 at *3 (D. Ore. 1990). The fact that EPA's SEP Policy contemplates SEPs for settlement is not persuasive. EPA's policy does not control the broad discretion to craft injunctive relief afforded to the courts.

   Here, Plaintiffs are requesting $100,000[7] in SEP monies for a remedial fund to set up a water quality monitoring program on Walnut Creek to determine the current quality of the Creek and to monitor the physical, chemical, and biological integrity over time as well as for water quality education in the Walnut Creek/ Lake Erie watershed. This project request is directly related to violations alleged herein and will assess any harms done to Walnut Creek. The amount of the SEP should be commensurate with the penalties awarded.

   This injunctive relief in the form of a project or monies for a project is to be distinguished from administrative penalties in that the Court has the discretion to award both. The United States Supreme Court on two separate occasions has held that civil penalties imposed in citizen suits under the Clean Water Act must be paid to the United States Treasury. Gwaltney of

---

[7] This amount is based upon the average grants the Pennsylvania Department of Environmental Protection awards for the these types of project. $5,000 for education and $95,000 for watershed management. *See* App. at 82-84.

Smithfield v. Chesapeake Bay Found., 484 U.S. 49, 53 (1987) ("If the citizen prevails in such an action, the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury"); Middlesex County Sewerage Auth. V. National Sea Clammers Ass'n., 453 U.S. 1, 14 n. 25 (1981) ("Under the [Federal Water Pollution Control Act], civil penalties, payable to the Government, also may be ordered by the court. § 505(a), 33 U.S.C. § 1365(a)"). Not only do the monies go into separate accounts but several courts have approved the institution of both civil penalties and monies for SEPs. *See* Conservation Law Foundation, Inc. v. Fall River, 1992 U.S. District LEXIS 3165 (D. Mass. 1992) (The court imposed a $100,000 civil penalty, and a SEP costing no less than $1,132,750 stating "the purpose of which is pollution prevention through water conservation in Fall River."); United Anglers v. City of S. San Francisco, 1997 U.S. Dist. LEXIS 9331 (N.D. Ca. 1997) (The court imposed a $10,000 civil penalty, payable to the U.S. Treasury, plus it had to pay $90,000 to the State Water Pollution Cleanup and Abatement Account for the purposes of water quality monitoring).

SEPs are therefore a viable alternative to civil penalties and can also be imposed in conjunction with such penalties as part of a "trilogy" of relief: injunction, SEPs, and civil penalties. They fulfill the purpose of the Clean Water Act by providing deterrence against future violations of the Act while restoring, enhancing, and maintaining the quality of the nation's water resources.

## Conclusion

The undisputed evidence demonstrates that Millcreek acted contrary to the CWA in discharging raw and untreated sewage into Walnut Creek without a permit. Because there are no genuine issues of material fact and Plaintiffs have adequately demonstrated standing to sue under the CWA, Plaintiffs are entitled to summary judgment. The appropriate remedy is for the Court

to grant both declaratory and injunctive relief, as well as impose civil penalties as outlined

herein.

Respectfully submitted,

<u>s/ Jennifer A. Murphy</u>
Jennifer A. Murphy, Esquire
PA90851
Mid-Atlantic Environmental Law Center
4601 Concord Pike, P.O. Box 7474
Wilmington, DE 19803-0474
(302) 477-2182
(302) 477-2032 (fax)
jennifer.a.murphy@law.widener.edu
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing document by electronic means utilizing the

Court's CM/ECF system that will serve notice of electronic filing to Mark J. Shaw, Esq.,

McDonald, Illig, Jones & Britton, LLP, Attorney for Defendants on this 5th day of May, 2006.


               /s/ Jennifer A. Murphy
               Jennifer A. Murphy
               PA90851
               Mid-Atlantic Environmental Law Center
               c/o Widener University School of Law
               4601 Concord Pike
               P.O. Box 7474
               Wilmington, DE  19803