IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIE COUNTY ENVIRONMENTAL COALITION, et al.,     Plaintiffs, | ) ) ) ) |
| v. | ) CIVIL ACTION NO. 05-59 ERIE ) ELECTRONICALLY FILED |
| MILLCREEK TOWNSHIP SEWER AUTHORITY, et al.,     Defendants. | ) ) ) |

**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO BRIEF IN SUPPORT OF DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT, SECOND SUPPLEMENT TO BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Erie County Environmental Coalition, PennEnvironment, and Gaia Defense League, by and through counsel, submit the following Brief in Support of its response to the Defendants' filings identified in the title above:

I.  Introduction:

The briefing for summary judgment in this matter began more than two years ago. Plaintiffs have filed additional responses and briefs each time that Defendants Millcreek Township Sewer authority ("MTSA") and Millcreek Township have filed their Supplemental briefs, replies, and surreplies. Despite the voluminous and episodic updating by Defendants, one point remains clear. Defendants have violated the Clean Water Act since at least 1991 and have only made efforts with the *potential* for resolving

their non-compliance within the last year or two. Plaintiffs' arguments in support of its motion and in opposition to the Defendants' cross motions are found in the following documents on the electronic case management docket for this case: Nos. 28, 43, 52, and 66. Plaintiffs also argue in this document that their claims for civil penalties remain in issue despite the efforts made by the Defendant to meet terms in the 2003 Consent Order and Agreement with the Department.

II.     Response to Defendants' Supplemental Facts

Plaintiffs note that the supplemental facts provided by Defendants in their most recent brief contain a significant amount of irrelevant material. For example, the purchase of land by the Township with frontage along Walnut Creek for purposes of parkland has no bearing on whether the Township is liable for violations of the Clean Water Act. Likewise, the Township's small contribution to a grant to monitor stream flow in Walnut Creek to benefit anglers is mere self-promotion with no relevance to the issues confronting the Court.

Moreover, it is doubtful whether the 116 additional connections to the sewer system by homeowners with failing septic systems support the Defendants' position at all. According to an internal memorandum to George Riedesel of the MTSA, average domestic flow from each home is 400 gallons per day. (Exhibit #1: Rodemoyer Memo, January 2, 2008) Such flow on an annual basis from 116 homes is nearly 17 million gallons. That additional flow in the system, to the extent the new connections are upstream of the Kearsarge pump station, logically may only serve to increase the likelihood that a storm event would result in overflows to Walnut Creek.

III.    <u>Response to Defendants' Supplemental Argument to Brief in Support</u>

    A.  PLAINTIFFS' CIVIL PENALTY ACTION IS NOT BARRED BY 33 U.S.C. 1319(g)(6)(A) BECAUSE THE PENNSYLVANIA CLEAN STREAMS LAW IS NOT A STATE LAW COMPARABLE TO 1319(g)

The defense of diligent prosecution as presented in the Clean Water Act at 309(g)(6) and as raised by the Defendants does not obtain to bar the civil penalty action by the Plaintiffs. As Plaintiffs have argued in previous filings in this matter, the Clean Streams Law under which the 2003 Consent Order and Agreement was brought is not a comparable state law for the purposes of subsection 309(g) Administrative Penalties actions in the Clean Water Act. 33 U.S.C. 1319(g). Specifically, the public notice / public participation elements are incongruous, with the state provisions providing no notice and comment opportunities. The opportunity for members of the public to file before an independent administrative tribunal (the PA Environmental Hearing Board) an adversarial legal challenge to the penalty assessment *after* it was issued by the DEP does not constitute a public notice and comment process, but rather an appeal right. The many reasons why such an appeal right is not comparable to actual public participation are discussed at length in Plaintiffs' previous filing of April 4, 2007 (Supplemental Reply Brief, pp5-7 (Dkt. #66), and the lack of comparability issue in general is briefed at length in Plaintiffs' April 20, 2006 filing (Response in Opposition to Defendants' Motion for Summary Judgment, pp. 4-12).

Therefore, given that the Clean Streams Law is not comparable state law, Plaintiffs' claims for civil penalties are *not* extinguished by the pre-existence of the 2003 administrative consent order between DEP and the Defendants.

Furthermore, even if comparability were not the dispositive issue, the question of "diligence" under 309(g)(6)(A) would resolve in Plaintiffs' favor. The question of whether diligent prosecution can bar a citizen suit is determined at the time of filing. An objective analysis shows that in early 2005 very little progress had transpired toward termination of the violations. Illegal discharges to Walnut Creek without a NPDES Permit were continuing. Well along into the 2003 consent order, there was little that would differentiate the "diligence" of that prosecution from the 1992 Consent Order, which had also called for removal of the Kearsarge Overflow, yet permitted violations to persist for 11 years.

B.  [None]

C.  DEFENDANTS HAVE NOT SATISFIED MOOTNESS STANDARD AT THE MANHOLE SITES

Defendants have asserted mootness as to Plaintiffs' claims of violations at three manhole sites. In order to show that it is absolutely clear that violations could not reasonably be expected to recur at these locations, which is the standard for mooting the civil penalty claims, Defendants' carry a "heavy burden." (*See* discussion of Laidlaw, *infra*, at IV.H) and in prior briefs) Although they proffer claims that certain amounts of flow reduction have been achieved as a result of repairs and removal of illegal

4

stormwater connections in areas that will affect the manhole sites, they do not support those numbers through an explanation of how these "estimates" have been derived. Without such analysis, the reductions in flow are unsubstantiated and should provide little confidence to the Court that the mootness burden has been met. Likewise, Defendants' claims that more than three years have passed without an overflow from the manhole locations is not persuasive absent accompanying meteorological data which would demonstrate that Defendants' temporary compliance was not merely happenstance of this period being only average or below average for precipitation. Defendants' have presented no such data, and thus the absolute clarity needed to moot Plaintiffs' claims under Laidlaw has not been attained.

IV.    Response to Defendants' Argument in Support of Amended Motion for Summary Judgment

>    H.    PLAINTIFFS' CLAIMS FOR CIVIL PENALTIES RELATED TO ILLEGAL DISCHARGES FROM KEARSARGE PUMP STATION AREA ARE NOT MOOT

Defendants, more than two years after the initial filing of the Motion for Summary Judgment, now claim that their recent repairs and modifications at the Kearsarge Pump Station will serve to moot Plaintiffs' injunctive relief and civil penalty claims because they contend such changes "ensure" that discharges to Walnut Creek cannot reasonably be expected to recur at those locations in the future.

Mootness is a rare and difficult standard to achieve. It must be shown to be "absolutely clear" that violations cannot "reasonably be expected to recur in the future." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 120 S.Ct.

693 (2000). In <u>Laidlaw</u>, the Supreme Court held that standard was not achieved, even though the Defendant had closed its plant down and had dismantled some of its equipment. Here, Millcreek and MTSA's efforts do not come close to matching even the failing efforts of the <u>Laidlaw</u> defendant. Far from ceasing operation, the Defendants here continue to operate the sanitary sewer system in Millcreek, and continue to operate the Kearsarge Pump Station and the other manhole/pump station locations that were responsible for the violations alleged in Plaintiffs' complaint. Further, Courts following the <u>Laidlaw</u> standard have rejected mootness claims in circumstances very similar to the instant case. In <u>Puerto Rico Campers Association v. PRASA</u>, 219 F.Supp.2d 201 (Dt. of P.R. 2002), the Court found that the Defendant's action of sealing the discharge outfall with concrete did not moot the Plaintiff's claims. The Court reasoned that the Defendant facility was still in the business of processing wastewater and could in the future remove the concrete seal and resume effluent violations of the Clean Water Act. *Id*, at 220. In this case, the Defendants could, as was the concern in <u>PRASA</u>, remove the concrete seal and reestablish the overflow at Kearsarge or another convenient location in the future, following the impending termination of the 2003 Consent Order and Agreement.

      Although the removal of the Kearsarge manual overflow connection to Walnut Creek is a step in the right direction toward reducing intentional illegal discharges, the potential for the Kearsarge Pump Station to be overwhelmed and raw sewage-containing stormwater to escape the facility and flow directly into the adjacent Walnut Creek remains. It is an observable fact that the capacity of the overflow retention facility tanks recently completed at Kearsarge are wholly inadequate to provide <u>Laidlaw</u> assurance that future violations will not occur. According to the Defendants, the tanks hold 2.3 million

gallons. (Affidavit of G. Riedesel, ¶35) The supposed adequacy of the tanks is belied by the fact that on September 9, 2004, Defendants illegally discharged 5.2 million gallons of sewage and stormwater from the Kearsarge overflow. (Plaintiffs' Appendix p. 3-4) This amount is significantly more than *double* the retention capacity that Defendants irresponsibly claim will prevent future violations. It's also noteworthy that merely a week later, on September 17, 2004, an illegal discharge of 1.9 million gallons from the Kearsarge overflow was reported (Plaintiffs' Appendix p. 5-6), an amount uncomfortably close to the retention tank capacity. One year's time from installation of the tanks is a completely insufficient period to assess the effectiveness of the solution, and Defendants cannot claim this brief passage makes it "absolutely clear" their violations will not recur.

  Furthermore, Defendants claim that certain of their actions have reduced the flow to the Kearsarge, which they imply are significant reductions. In supplemental affidavits by George Riedesel and Brian McGrath, Defendants estimate they have reduced flow by 112 million gallons per year, and that the actual flow data supports their estimate because it was allegedly 143 million gallons lower in 2007 than "historical averages." There are two major problems with these claims. First, the affiants have provided no methodology for their flow reduction estimates from removals of improper residential stormwater connections or lateral sewer lines, claimed to represent 33.1 million gallons per year in flow reduction. Have they measured the square footage of each roof from which stormwater connection was removed and made complicated calculations to derive such a number? If, rather, they have used some other generic equation for estimating the numbers, its reliability is not known and cannot be assessed because it has not been provided. Neither affiant has been offered as an expert and thus any basis upon which

7

they would make such estimates would be improper expert testimony. Second, the Defendants' claim that their repair and removal work is responsible for significant reductions in flow to the troubled Kearsarge is nothing more than a false assumption. Although Defendants' would like to take credit for this reduction, they cannot do so unless they eliminate the other obvious explanation, that there was a reduction of stormwater flow in the system in 2007. While it is true that flow through the Kearsarge pump station was lower in 2007 than a number of recent years, that same pattern is true for the Erie Wastewater Treatment Plant (WWTP) as a whole.[1] (Exhibit #2: Affidavit of Howard Buzzell, ¶5 and 6)  Thus, similar flow reductions observed across the region would seem to point to a weather-related explanation. Another way to attempt to understand whether the reductions claimed by the Defendants are real is to figure the percentage of the total WWTP flow numbers that are accounted for by the Kearsarge flow. If the Kearsarge percentage of the total is lower in 2007 than in most recent years, that might lend credence to Defendants' estimates. Performing this simple calculation, taken from flow data provided by the City of Erie (Aff. Buzzell, ¶5 and 6), will show that in 2007 Kearsarge represented a larger percentage of the total flow than in any of the previous years back to 2002, except for 2006 which was slightly higher. On the whole, the correlation one would expect to see if the Defendants' estimates of flow reduction were accurate is not only absent, but the contrary result is found. The fact that the percentage of total WWTP flow represented by Kearsarge is generally tracking upward over the last six years also erodes confidence in a belief that the steps taken thus far by

---

[1] Erie WWTP receives and treats wastewater from the City of Erie and numerous surrounding municipalities including Millcreek Township and Summit Township.

8

the Defendants will be sufficient to provide the level of assurance of future compliance expected by Laidlaw.

Another matter for concern is that any reduction in flow that have actually been achieved by the Defendants will be wiped out by Defendants' effort to immediately eliminate the caps on new connections to the sewer system (which limits development) present in the 2003 Consent Order and Agreement, rather than wait the additional 10 months for complete termination of the COA.

According to the timeline of the 2003 Consent Order and Agreement, the termination of that agreement may occur within 10 months.[2] Thereafter, it cannot be argued that any MTSA or Millcreek actions will be subject to ongoing enforcement action by the state, and there will be no limitation on the increases to the flow to the Kearsarge.

Even the sale of a facility at which Clean Water Act violations occurred have not sufficed to moot claims for civil penalties. In Re Southdown, Inc., 144 F.Supp.2d 935 (S.D. Ohio, 2001), involved a citizen suit allegation of Clean Water Act violations by Southdown arising from its unpermitted discharges into a stream near its landfill. Subsequent to the filing of the complaint, Southdown sold the landfill and then sought to have the case dismissed as moot. The Court rejected the polluter's argument:

> "[T]here is no indication that Southdown has ceased to exist as a corporate entity; therefore, it could once again operate a landfill from which pollutants are discharged without a permit."

Southdown, at 943. The Court perceived the deterrent value of civil penalties as still viable even where a Defendant might seek to conduct the same type of business from a

---

[2] See Defendants' Brief in Support of Amended Motion (4/22/08), p. 5 (COA terminates 24 months from time of Kearsarge overflow removal)

different location. That same logic should apply against Millcreek. The recent changes made to its sanitary sewer and stormwater systems may have bought a little time until the next wave of severe weather events strike and until the township growth and illegal connections again overtake system integrity. The current brief respite from violations does not erase more than a decade and a half of non-compliance, nor does it meet the Laidlaw standard. For the purposes of civil penalties, the Court should construe the Laidlaw standard broadly as was done in Southdown. That is, if the Defendant is capable of violating the Act in a similar manner from *any* location, and it is not absolutely clear that there is no reasonable likelihood that such violations would recur, then civil penalty claims are not moot. Here, given that the Defendants were willing to violate the law for more than 15 years despite ineffectual, mild state enforcement, and were unable to successfully make repairs at times, there is no basis to presume that they will not violate the law again at the specific sites targeted by Plaintiffs in this action or at other nearby portions of their system which would also discharge to Walnut Creek.

The Defendants fail to grasp the purpose of civil penalties. Under the Clean Water Act, civil penalties serve to have a deterrent effect on those who would discharge in violation of the Act. Civil penalties are appropriate where there are continuing violations. The continuing nature of Defendants' violation of the Clean Water Act is demonstrated by the illegal discharges of April 5, 2005 (Exhibit #3: MTSA and CTE/Allender Correspondence, Defendants' Bates Stamped pp. MSA-MT 2948-2951)) and November 29, 2005 (Exhibit #4: Metcalf & Eddy/Allender Correspondence, Defendants' Bates Stamped pp. MSA-MT 5287-5288). Both events occurred subsequent

to the commencement of Plaintiffs' action, and thus the Court's jurisdiction to hear the Plaintiffs' remaining claims for civil penalties is not in doubt. *See Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170, 171-72 (4th Cir.1988) (" *Gwaltney II*"); *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1062 (5th Cir.1991); *Sierra Club v. Union Oil Co. of California,* 853 F.2d 667, 671 (9th Cir.1988).

The need for a message of deterrence to be sent to the Defendants is no less urgent now that they claim to have repaired problems in their sewer and stormwater systems. Furthermore, it must be remembered that liability for civil penalties attaches at the time of the offense. The court has stated that "liability for civil penalties under the Clean Water Act attaches at the time the violations occur, not at the time of the judgment." Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141 (9th Cir. 2000). Citing Laidlaw, the court added that, in Pacific Lumber, civil penalties would still serve as a deterrent to future violations. *Id*, at 1153.

Defendants also claim that because some stipulated penalty payments which "ensure deterrence" have been made on violations alleged in this action, a civil penalty assessment would "achieve no purpose." Defendants' argument is meritless. First, the prospect of stipulated penalties did not appear to deter violations since there were some 18 separate illegal discharges in the 18 months spanning the 2003 Consent Order and Agreement and the filing of Plaintiffs' action. Second, the stipulated penalties were plainly inadequate considering the severity of the violations, and the other factors to be considered under 1319(d) of the Clean Water Act. Third, courts have found that civil penalty assessments for post consent order violations can be appropriate based on the adequacy of the administrative assessments. Public Interest Research Group of New

11

Jersey v. Hercules, 2003 WL 23519620 (D.N.J., 2003). Plaintiffs were not barred from seeking additional penalties under 505(b) and 309(g) of the Clean Water Act. *PIRG v. Hercules,* 830 F.Supp. 1525, 1538 (D.N.J.1993). In the present matter, deterrence of future violations has certainly not been achieved by the minor assessments to date, which have not been commensurate with the seriousness of the Defendants' non-compliance.

V.    Response to Defendants' Supplemental Argument to Brief in Response

        E.  PLAINTIFFS HAVE SUPPORTED THEIR CLAIMS FOR CIVIL PENALTIES WHICH REMAIN APPROPRIATE DESPITE DEFENDANTS' EXPENDITURES

Contrary to Defendants' baseless assertion, Plaintiffs have submitted in previous filings ample evidence of Defendants' numerous violations of the Clean Water Act which transpired over an extremely long period of time despite their commitments to halt those violations in consent order and agreements with the State in 1992 and 2003. It is clear that the few tens of thousands of dollars in assessed and stipulated penalties Defendants' paid over nearly a generation was little more than a "cost of doing business." If the $34 million Defendants' state they have spent to address the violations is an indication, although Plaintiffs do not accept that this investment has definitively resolved the problem, then the avoided costs of not having made investments on this scale in the early and mid-1990s must truly be substantial indeed. This clear economic benefit of non-compliance during these many years must be factored in any determination of a civil penalty assessment pursuant to 1319(d).

Defendants have discussed at great length all the efforts they have made over the years to address the overflow problem, and the expenditures that have been required

12

along the way. Nevertheless, discharging without a NPDES permit under the Clean Water Act is a strict liability offense. The reasonableness of the efforts to comply is not relevant to the determination of whether the violator has liability. *See* Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 890 F.Supp. 470 (D.S.C.1995).

Lastly, the Defendants call attention to purchase of Creek-front parkland, hook-up of former septic system lots, and the removal of a number of illegal stormwater hookups, but these are only distractions from the liability that remains attached. To the extent these actions hold relevance, it could only be conceivably as considerations under the "other matters as justice may require" factor in the determination of civil penalties in 1319(d). These actions do not, however, go to the core issue—the fact that Defendants remain liable for civil penalties on the violations claimed by Plaintiffs.

CONCLUSION:

Despite the additional facts and arguments presented by the Defendants in this latest round of filings, the extensive history of egregious violation of the Clean Water Act is not washed clean. The Plaintiffs' claims for civil penalties to redress these violations remain valid. The Defendants' effort to bar the claims under 309(g)(6) fail for the reasons stated herein and in previous filings. The Defendants' have not met the standard required to demonstrate mootness for the reasons stated herein and in previous filings. The assessments of civil penalties in this matter continues to be appropriate due to the need to deter future violations for the reasons stated herein and in previous filings. For

all the foregoing reasons, the Defendants' Motions should be denied and the Plaintiffs' Motion granted.

WHEREFORE, Plaintiffs respectfully request the Court Deny Defendants' Amended, Supplemental and original Motion for Summary Judgment and Grant Plaintiffs' Motion for Summary Judgment.

                                      Respectfully submitted,

                                      */s/ Michael D Fiorentino*
                                      Michael D. Fiorentino
                                      PA Atty. ID #73576
                                      Mid-Atlantic Environmental Law Center
                                      4601 Concord Pike
                                      Wilmington, DE 19803
                                      (302) 477-2072
                                      (302) 477-2032 (fax)
                                      mdfiorentino@widener.edu
                                      Attorney for Plaintiffs

<u>Dated:</u>  May 22, 2008

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Brief in Support of Plaintiffs' Response to Brief in Support of Defendants' Amended Motion for Summary Judgment, Second Supplement to Brief in Support of Defendants' Motion for Summary Judgment and Brief in Opposition to Plaintiffs' Motion for Summary Judgment was filed by electronic means utilizing the Court's CM/ECF system that will serve notice of the electronic filing to Mark J. Shaw, Esq. and Robert Ernest Gandley, Esq., McDonald, Illig, Jones & Britton, LLP, Attorneys for Defendants, on this 22nd day of May, 2008.

    */s/ Michael D. Fiorentino*
Michael D. Fiorentino
Mid-Atlantic Environmental Law Center
4601 Concord Pike
Wilmington, DE  19803